IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| SPENCER NORMAN, KIEFER NORMAN, COURTNEY NORMAN, and HELEN S. NORMAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No.: 2:12-CV-04210-NKL |
| v. | ) ) | |
| CAMDEN COUNTY, BRIAN D. FIENE, DWIGHT D. FRANKLIN, RICHARD B. DZIADOSZ, LARRY L. RUTHERFORD, and JAMEE L. WATSON, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## AFFIDAVIT OF SHERIFF DWIGHT FRANKLIN

State of Missouri )
                  )
County of Camden )

Sheriff Dwight Franklin, being duly sworn upon his oath, states that he has personal

knowledge of the following facts:

1.  I am the elected Sheriff of Camden County, Missouri.

2.  I was licensed by the Missouri Department of Public Safety as a police officer in the

    State of Missouri on December 7, 1979 and was granted a Class A license.

3.  I am responsible for creating policies for the Camden County Sheriff's Department

    and implementing the policies for the Camden County Sheriff's Department.

4.  I am the final policymaker for the Camden County Sheriff's Department.



Exhibit
C

5. I hired Sgt. Brian Fiene, Deputy Richard Dziadosz, and Deputy Larry Rutherford as deputy sheriffs for Camden County, Missouri when I was elected sheriff on January 1, 2009.

6. I hired Deputy Jamee Watson as a deputy sheriff for Camden County, Missouri on January 21, 2011.

7. Sgt. Fiene, Deputy Dziadosz, Deputy Watson, and Deputy Rutherford, as Deputy Sheriffs of Camden County, had no authority to create or implement policy on behalf of Camden County.

8. I was not present at the arrest of Decedent Glenn David Norman or when Glenn David Norman died at or near the scene of the arrest.

9. I did not participate in the arrest of Decedent Glenn David Norman in any manner.

10. All deputy sheriffs of the Camden County Sheriff's Department are required to have a license issued by the Missouri Department of Public Safety to serve as a deputy sheriff of Camden County.

11. All deputy sheriffs of the Camden County Sheriff's Department are required to maintain their license with the Missouri Department of Public Safety by attending 48 hours of continuing law enforcement education as required by the Missouri Department of Public Safety Peace Officer Standards and Training (POST) for each three-year reporting period.

12. Deputy sheriffs at the Camden County Sheriff's Department are required by POST to complete a minimum of four hours in legal studies, four hours in interpersonal prospectives, four hours of technical studies, and four hours in skill development with four hours of some type of firearm skill development training in each three-year reporting period. Officers must complete the additional 32 hours of training in each

2

three-year reporting period from the areas of legal studies, interpersonal prospectives, technical studies, and skill development. Officers are required by POST to have three hours of racial profiling training in each three-year reporting period.

13. Sergeant Brian Fiene, Deputy Richard Dziadosz, Deputy Jamee Watson, and Deputy Larry Rutherford were all licensed by the Missouri Department of Public Safety as police officers in the State of Missouri on October 4, 2011.

14. Sergeant Brian Fiene, Deputy Richard Dziadosz, Deputy Jamee Watson, and Deputy Larry Rutherford attended training required by POST to maintain their license with the Missouri Department of Public Safety before October 4, 2011.

15. I had no knowledge before October 4, 2011 that Sgt. Brian Fiene had not taken the eight hours of training required to use a taser as required by the Use of Force and Weapons policy of the Camden County Sheriff's Department.

16. I had no knowledge before October 4, 2011 that Sgt. Brian Fiene had not taken the recertification training to use a taser every two years as required by the Use of Force and Weapons policy of the Camden County Sheriff's Department.

17. A true and correct copy of the Camden County Sheriff's Office Incident Report (Dispatch Log) for October 4, 2011 is attached hereto marked Exhibit D.

18. Sgt. Fiene had no complaints lodged against him during his employment with the Camden County Sheriff's Department for his use of force in making an arrest, improper or false arrest, his use of a taser in making an arrest, his failure to monitor an individual in custody, for causing injury to an individual during an arrest, for procedures utilized to handcuff an individual, for failing to render first aid to an arrestee, or for procedures utilized to arrest an emotionally disturbed person prior to October 4, 2011.

19. Deputy Dziadosz had no complaints lodged against him during his employment with the Camden County Sheriff's Department for his use of force in making an arrest, improper or false arrest, the use of a taser in making an arrest, failure to monitor an individual in custody, for procedures utilized for handcuffing an individual, for causing injury to an individual during an arrest, for failing to render first aid to an arrestee, or for procedures to arrest an emotionally disturbed person prior to October 4, 2011.

20. Deputy Watson had no complaints lodged against her during her employment with the Camden County Sheriff's Department for her use of force in making an arrest, improper or false arrest, the use of a taser in making an arrest, failure to monitor an individual in custody, for procedures utilized in handcuffing an individual, for causing injury to an individual during an arrest, for failing to render first aid to an arrestee, or for procedures utilized to arrest an emotionally disturbed person prior to October 4, 2011.

21. Deputy Rutherford had no complaints lodged against him during his employment with the Camden County Sheriff's Department for his use of force in making arrests, improper or false arrest, the use of a taser in making an arrest, failure to monitor an individual in custody, for procedures utilized to handcuff an individual, for causing injury to an individual during an arrest, for failing to render first aid to an arrestee, or for procedures utilized to arrest an emotionally disturbed person prior to October 4, 2011.

22. The Camden County Sheriff's Office Policy Manual contained a policy regulating the "Use of Force and Weapons" in Chapter 8 on October 4, 2011 which is attached as Exhibit J.

23.     The purpose of the "Use of Force and Weapons" policy was to provide deputies guidelines for the use of force upon individuals deputies would encounter.

24.     Specifically, the use of force policy provided:

"It is the policy of the Camden County Sheriff's Office that a deputy uses only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the deputy and the public. It must be stressed that the use of force is not left to the unfettered discretion of the involved deputy. This is not a subjective determination. The use of force must be objectively reasonable. The deputy must only use that force which a reasonably prudent law enforcement officer would use under the same or similar conditions, considering the totality of the circumstances. At no time is force to be used as punishment."

25.     Further, the use of force policy defines non-deadly force and objectively reasonable as follows:

Non-deadly force: Any use of force other than that which is considered deadly force. This includes any physical effort to control or restrain another, or to overcome the resistance of another.

Objectively reasonable: This term means that, in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to the seriousness of the crime, the level of threat or resistance presented by the subject, and the level of threat to the community.

26.     Specifically, the use of force policy provides that deputies may use non-deadly force in the following circumstances:

1.     Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control.

2.     Deputies are authorized to use department-approved, non-deadly force techniques and issued equipment in order to:

   a.     Protect the deputy or others from physical harm;

   b.     Restrain or subdue a resistant individual; and/or

   c.     Bring an unlawful situation safely and effectively under control.

27.     The use of force policy lists various "force options" for deputy sheriffs including:

For control of a subject, there are several options available. The options listed here are not all inclusive. Police canine (bite), handheld impact weapons (baton or blunt instrument), electronic weapons (handheld shock devices, taser, etc.), physical control holds, chemical weapons (O/C pepper spray, C/S spray, C/N spray). These options are calculated to control and/or overcome the subject where there is no expectation of great bodily injury or death.

28. The use of force policy requires all use of physical force, impact weapons, and electronic devices to be reported in a written report to be reviewed by a department head and the chief deputy.

29. The use of force and weapons policy also contains a section relating to "taser handling and deployment."

30. The taser handling and deployment policy sets forth the Camden County Sheriff's Department's policy regarding the training required to use a taser and the handling and deployment of the taser.

31. The taser policy provides that a taser is an additional police tool and is not intended to replace verbal problem-solving skills, ASP, O/C spray or firearms, that the taser can be deployed where it is deemed reasonably necessary to control a non-compliant, dangerous or violent subject when deadly force does not appear to be justified and/or necessary, and that the taser will be placed at the same level as O/C spray on the force continuum.

32. The policy defines a taser as the M-26 Advanced Taser, the X-26 Taser, and any department authorized and issued non-lethal device which is designed to produce and emit an electrical charge.

33. The taser policy requires that each deputy utilizing a taser must take an eight-hour course on the use of an M-26/X-26 Taser from the department's taser training instructor or a taser training program from TASER International.

34. The taser policy also requires where possible that warnings be used announcing "taser" to alert other officers, as well as to provide the subject an additional opportunity to cease the conduct that has given rise to the deployment of the taser.

35. The taser policy also provides that when an officer approaches a subject with the intent to deploy a taser that an additional officer should also approach whenever possible to provide lethal cover should it become necessary for the protection of life and that verbal commands should be used constantly before (whenever practical), during, and after deployment of the taser to warn the subject to cease his/her aggressive demeanor or action.

36. The taser policy also requires that the department's taser control manager ensure that basic certification in the use of a taser by a deputy and biennial (every two years) recertification training on the taser as needed.

37. The Camden County Sheriff's Department also had an "unwritten policy" that allowed deputies to place a knee in the back of an individual handcuffed in a prone position on the ground to restrain the individual on the ground if the individual was continuing to resist arrest by struggling or attempting to stand to flee to protect the deputy and the individual.

38. Deputies of Camden County frequently respond to calls involving emotionally disturbed persons which are individuals acting abnormally due to mental illness, intoxication, and/or the use of drugs.

39. The death of Glenn David Norman was investigated by the Missouri Highway Patrol and the Camden County Prosecuting Attorney.

40. No criminal charges were filed against Sgt. Fiene, Deputy Dziadosz, or Deputy Watson concerning the death of Glenn David Norman.

41. I reviewed the reports of Sgt. Fiene, Deputy Dziadosz, Deputy Watson, and Deputy Rutherford and the investigation of the Missouri State Highway Patrol.

42. I also interviewed all of the deputies about their interaction with Glenn David Norman.

43. I imposed no discipline upon Sgt. Fiene, Deputy Dziadosz, Deputy Watson, or Deputy Rutherford for any of their actions relating to Glenn David Norman.

44. Camden County had no written policy in the Camden County Sheriff's Manual regarding arrest procedures, treatment of subjects after arrest, handling emotionally disturbed persons, first-aid, monitoring subjects in custody, preventing in-custody deaths, and asphyxia prior to October 4, 2011.

45. I did not adopt written policies regarding arrest procedures, treatment of subjects after arrest, handling emotionally disturbed persons, first-aid, monitoring subjects in custody, preventing in-custody deaths, and asphyxia because no problems or incidents had occurred involving deputy sheriffs in these areas that created a need for these specific policies prior to October 4, 2011.

46. Camden County had no complaints or claims for injuries relating to arrest procedures, arrests without probable cause, treatment of subjects after arrest, arresting emotionally disturbed persons, rendering first-aid to individuals, monitoring subjects in custody, in-custody deaths, the use of a taser, the use of handcuffs in making an arrest, the placement of a knee in the back of an individual handcuffed prone on the ground to control the individual, or asphyxia causing a death prior to October 4, 2011.

47. Camden County had one complaint and a claim for injury before October 4, 2011 arising out of an excessive force complaint made by an individual who was arrested in the lobby of the Camden County Sheriff's Department by a Camden County

8

deputy sheriff not involved in the arrest of Glenn David Norman. The excessive force complaint arose out of the deputy sheriff using physical force to arrest the individual.

48.     Before the death of Glenn David Norman on October 4, 2011, no individual had died during an arrest by a Camden County deputy or shortly after the arrest of the individual.

49.     Glenn David Norman was the first individual who died shortly after an arrest by a Camden County deputy and while in custody of a Camden County deputy.

FURTHER, AFFIANT SAYETH NOT.

DWIGHT FRANKLIN, SHERIFF OF CAMDEN
COUNTY, MISSOURI

STATE OF MISSOURI      )
                       ) SS.
COUNTY OF CAMDEN       )

Subscribed and sworn to before me this 5th day of December , 2013.

Notary Public  Donna Jean Cross

My Commission Expires: 10-29-2016

DONNA JEAN CROSS
Notary Public - Notary Seal
State of Missouri
Commissioned for Camden County
My Commission Expires: October 29, 2016
Commission Number: 12617036

**Incident No.:**201100474632   **Complaint No.:** 2011-2921   **Status:** Closed   **Category:** PROPERTY CRIMES/TRESPASSING
**Address:** 258 TEER DR, LINN CREEK

| | | | | |
|---|---|---|---|---|
| **Precinct:** 1 | | **Sector:** E | **GEO:**19_9 | **WARD:** |
| | **Date** | **Time** | **Unit/DSN** | **ESZ** MID1 |
| **Open:** | 10/04/2011 | 04:22:45 | 2428 | |
| **Dispatch:** | 10/04/2011 | 04:24:53 | | **Police:** CAMDEN COUNTY SD |
| **Enroute:** | 10/04/2011 | 04:24:53 | | **Fire:** MID COUNTY FPD |
| **Arrival:** | 10/04/2011 | 04:33:18 | | **EMS:** CAMDEN AMB (MONTREAL) |
| **Departure:** | 10/04/2011 | 11:49:42 | | **Responsible Agency:** CAMDEN COUNTY SD |
| **Closed:** | 10/04/2011 | 11:49:44 | 2428 | **Source:** c889 |

**Caller:**   CRAMER, JASON   **Business Name:**
(573) 286-2326

**Disposition:**   RT
**Incident Notes:**
GUY ON THE FRONT PORCH...MADE HIS WAY IN THE HOUSE ONCE...SAYING HE HAS TO PEE...MIDDLE AGED
**10/04/2011 04:24 C811**
Teer Drive   PVT   SE   Across from Chandler Dr. (v-12)
**10/04/2011 04:25 c889**
WAS BEATING ON THE DOOR AND THE RP ANSWERED...PUSHED PAST THE RP...PUSHED HIM BACK OUT AND HE
TRIED TO FIGHT THE RP
**10/04/2011 04:25 c889**
MALE SUBJ SHORTS AND SHIRT OFF...
**10/04/2011 04:26 c889**
SECOND TO THE LAST TRAILER ON RIGHT WITH AN ADDITION ON IT
**10/04/2011 04:26 c889**
IS STILL TRYING TO GET INTO THE HOUSE...
**10/04/2011 04:27 c889**
RP HAS 4 LITTLE KIDS IN THE HOUSE ALSO...
**10/04/2011 04:30 c889**
THINKS THAT THE MALE SUBJ MESSED WITH THE MOTION DETECTOR CAUSE ITS NOT WORKING NOW
**10/04/2011 04:32 c889**
BLK DODGE DAKOTA...BROWNISH FORD P/U
**10/04/2011 04:40 C811**
MULTIPLE TAZERS DEPLOYED
**10/04/2011 04:43 C811**
REQ AMBULANCE ONLY
**10/04/2011 04:56 c889**
REQ AMB EXPEDITE
**10/04/2011 08:12 C897**
NOTIFY J3
**10/04/2011 08:52 C897**
PER 2425 NOTIFY NEXT FUNERAL HOME, WILL BE TRANSPORTING TO MU IN COLUMBIA
**10/04/2011 08:53 C897**
ALLEE-HOLMAN-HOWE FUNERAL HOME WILL BE ENRT
**10/04/2011 09:23 C897**
ALL COUNTY UNITS CLEAR, DDCC REMAINING ON SCENE
Disposition: RT

| **Agency:** | **Complaint Number:** | **Unit:** | **Close DSN:** |
|---|---|---|---|
| CAMDEN COUNTY SD | 2011-2921 | 2428 | 2428 |



Exhibit
D

**Incident Log**

| Date/Time | Unit | DSN | Dispatcher | Status |
|---|---|---|---|---|
| 10/04/2011 04:24:39 | | | c889 | SENDINC |
| Incident Open by sending Work Area | | | | |
| 10/04/2011 04:24:50 | | | C811 | INCCHNG |
| Notes Added: | | | | |
| Teer Drive    PVT      SE  Across from Chandler Dr. (v-12) | | | | |
| 10/04/2011 04:24:53 | 2428 | 2428 | C811 | E |
| Enroute on Incident | | | | |
| 10/04/2011 04:24:53 | 2428 | 2428 | C811 | SETREMCA |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 04:24:56 | 2447 | 2447 | C811 | E |
| Enroute on Incident | | | | |
| 10/04/2011 04:24:56 | 2447 | 2447 | C811 | SETREMCA |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 04:25:14 | | | c889 | INCCHNG |
| Notes Added: | | | | |
| WAS BEATING ON THE DOOR AND THE RP ANSWERED...PUSHED PAST THE RP...PUSHED HIM BACK OUT AND HE TRIED TO FIGHT THE RP | | | | |
| 10/04/2011 04:25:31 | | | c889 | INCCHNG |
| Notes Added: | | | | |
| MALE SUBJ SHORTS AND SHIRT OFF... | | | | |
| 10/04/2011 04:26:36 | | | c889 | INCCHNG |
| Notes Added: | | | | |
| SECOND TO THE LAST TRAILER ON RIGHT WITH AN ADDITION ON IT | | | | |
| 10/04/2011 04:26:57 | | | c889 | INCCHNG |
| Notes Added: | | | | |
| IS STILL TRYING TO GET INTO THE HOUSE... | | | | |
| 10/04/2011 04:27:09 | 2418 | 2418 | C811 | E |
| Enroute on Incident | | | | |
| 10/04/2011 04:27:09 | 2418 | 2418 | C811 | SETREMCA |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 04:27:41 | | | c889 | INCCHNG |
| Notes Added: | | | | |
| RP HAS 4 LITTLE KIDS IN THE HOUSE ALSO... | | | | |
| 10/04/2011 04:30:42 | | | c889 | INCCHNG |
| Notes Added: | | | | |
| THINKS THAT THE MALE SUBJ MESSED WITH THE MOTION DETECTOR CAUSE ITS NOT WORKING NOW | | | | |
| 10/04/2011 04:32:35 | | | c889 | INCCHNG |
| Notes Added: | | | | |
| BLK DODGE DAKOTA...BROWNISH FORD P/U | | | | |
| 10/04/2011 04:33:18 | 2428 | 2428 | C811 | A |
| Arrived on Scene | | | | |
| 10/04/2011 04:33:18 | 2428 | 2428 | C811 | SETREMUN |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 04:35:07 | 2418 | 2418 | C811 | A |
| Arrived on Scene | | | | |
| 10/04/2011 04:35:07 | 2418 | 2418 | C811 | SETREMUN |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 04:36:47 | 2447 | 2447 | C811 | A |
| Arrived on Scene | | | | |
| 10/04/2011 04:36:47 | 2447 | 2447 | C811 | SETREMUN |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 04:38:33 | 2453 | 2453 | C811 | E |
| Enroute on Incident | | | | |
| 10/04/2011 04:38:33 | 2453 | 2453 | C811 | SETREMCA |
| Reminder Set by C811, for 600 seconds | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 10/04/2011 04:40:09 | 2418 | 2418 | C811 | ARR | |
| ARREST MADE/IN CUSTODY | | | | | |
| 10/04/2011 04:40:09 | 2418 | 2418 | C811 | SETREMUN | |
| Reminder Set by C811, for 600 seconds | | | | | |
| 10/04/2011 04:40:42 | | | C811 | INCCHNG | |
| Notes Added: | | | | | |
| MULTIPLE TAZERS DEPLOYED | | | | | |
| 10/04/2011 04:40:53 | 2453 | 2453 | C811 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 04:40:56 | 2406 | 2406 | C811 | E | |
| Enroute on Incident | | | | | |
| 10/04/2011 04:40:56 | 2406 | 2406 | C811 | SETREMCA | |
| Reminder Set by C811, for 600 seconds | | | | | |
| 10/04/2011 04:42:20 | 2418 | 2418 | C811 | ARR | |
| 2ND SUBJ IN CUSTODY | | | | | |
| 10/04/2011 04:42:20 | 2418 | 2418 | C811 | SETREMUN | |
| Reminder Set by C811, for 600 seconds | | | | | |
| 10/04/2011 04:43:17 | | | C811 | INCCHNG | |
| Notes Added: | | | | | |
| REQ AMBULANCE ONLY | | | | | |
| 10/04/2011 04:43:25 | 2453 | 2453 | C811 | BOOKING | |
| BOOKING IN CCSD INTAKE | | | | | |
| 10/04/2011 04:43:25 | 2453 | 2453 | C811 | SETREMCA | |
| Reminder Set by C811, for 600 seconds | | | | | |
| 10/04/2011 04:43:28 | 2453 | 2453 | C811 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 04:43:46 | 2428 | 2428 | C811 | RESETREM | |
| Reminder Reset by C811, for 600 seconds | | | | | |
| 10/04/2011 04:43:56 | STJA | | c889 | R | |
| Extra Unit on Incident | | | | | |
| 10/04/2011 04:43:56 | STJA | | c889 | SETREMCA | |
| Reminder Set by c889, for 600 seconds | | | | | |
| 10/04/2011 04:47:14 | 2406 | 2406 | C811 | A | |
| Arrived on Scene | | | | | |
| 10/04/2011 04:47:14 | 2406 | 2406 | C811 | SETREMUN | |
| Reminder Set by C811, for 600 seconds | | | | | |
| 10/04/2011 04:54:04 | 2418 | 2418 | c889 | CANCELREM | |
| Reminder Canceled by c889 | | | | | |
| 10/04/2011 04:54:06 | 2428 | 2428 | c889 | CANCELREM | |
| Reminder Canceled by c889 | | | | | |
| 10/04/2011 04:54:08 | 2447 | 2447 | c889 | CANCELREM | |
| Reminder Canceled by c889 | | | | | |
| 10/04/2011 04:54:11 | STJA | | c889 | CANCELREM | |
| Reminder Canceled by c889 | | | | | |
| 10/04/2011 04:56:38 | | | c889 | INCCHNG | |
| Notes Added: | | | | | |
| REQ AMB EXPEDITE | | | | | |
| 10/04/2011 04:57:26 | 2406 | 2406 | c889 | CANCELREM | |
| Reminder Canceled by c889 | | | | | |
| 10/04/2011 05:44:35 | MSHP | | c889 | R | |
| Extra Unit on Incident | | | | | |
| 10/04/2011 05:44:35 | MSHP | | c889 | SETREMCA | |
| Reminder Set by c889, for 600 seconds | | | | | |
| 10/04/2011 05:45:59 | 2436 | 2436 | C811 | E | |
| Enroute on Incident | | | | | |
| 10/04/2011 05:45:59 | 2436 | 2436 | C811 | SETREMCA | |
| Reminder Set by C811, for 600 seconds | | | | | |

| | | | | |
|---|---|---|---|---|
| 10/04/2011 05:54:43 | MSHP | | c889 | CANCELREM |
| Reminder Canceled by c889 | | | | |
| 10/04/2011 05:56:07 | 2436 | 2436 | c889 | CANCELREM |
| Reminder Canceled by c889 | | | | |
| 10/04/2011 05:59:40 | 2436 | 2436 | C811 | A |
| Arrived on Scene | | | | |
| 10/04/2011 05:59:40 | 2436 | 2436 | C811 | SETREMUN |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 06:09:02 | 2463 | 2463 | C811 | A |
| Arrived on Scene | | | | |
| 10/04/2011 06:09:02 | 2463 | 2463 | C811 | SETREMCA |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 06:09:23 | 245 | 245 | C811 | E |
| Enroute on Incident | | | | |
| 10/04/2011 06:09:23 | 245 | 245 | C811 | SETREMCA |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 06:09:53 | 2436 | 2436 | C811 | CANCELREM |
| Reminder Canceled by C811 | | | | |
| 10/04/2011 06:09:59 | 2463 | 2463 | C811 | CANCELREM |
| Reminder Canceled by C811 | | | | |
| 10/04/2011 06:10:17 | 245 | 245 | C811 | CANCELREM |
| Reminder Canceled by C811 | | | | |
| 10/04/2011 06:24:54 | K9-1 | 2416 | C811 | A |
| Arrived on Scene | | | | |
| 10/04/2011 06:24:54 | K9-1 | 2416 | C811 | SETREMCA |
| Reminder Set by C811, for 600 seconds | | | | |
| 10/04/2011 06:35:05 | K9-1 | 2416 | C811 | CANCELREM |
| Reminder Canceled by C811 | | | | |
| 10/04/2011 06:44:00 | 2406 | 2406 | c813 | CLEAR |
| Clear From Incident | | | | |
| 10/04/2011 06:44:14 | 2418 | 2418 | c813 | CLEAR |
| Clear From Incident | | | | |
| 10/04/2011 06:45:15 | 2428 | 2428 | c813 | CLEAR |
| Clear From Incident | | | | |
| 10/04/2011 06:45:18 | 2447 | 2447 | c813 | CLEAR |
| Clear From Incident | | | | |
| 10/04/2011 06:55:55 | STJA | | C897 | A |
| Arrived on Scene | | | | |
| 10/04/2011 06:55:55 | STJA | | C897 | SETREMUN |
| Reminder Set by C897, for 600 seconds | | | | |
| 10/04/2011 07:07:19 | 2425 | 2425 | C897 | E |
| Enroute on Incident | | | | |
| 10/04/2011 07:07:19 | 2425 | 2425 | C897 | SETREMCA |
| Reminder Set by C897, for 600 seconds | | | | |
| 10/04/2011 07:07:24 | 245 | 245 | C897 | A |
| Arrived on Scene | | | | |
| 10/04/2011 07:07:24 | 245 | 245 | C897 | SETREMUN |
| Reminder Set by C897, for 600 seconds | | | | |
| 10/04/2011 07:12:37 | 2428 | 2428 | c813 | COMPLNUM |
| Complaint Number 2011-2921 Assigned Closing DSN: 2428 | | | | |
| 10/04/2011 07:12:39 | 2428 | 2428 | c813 | RECORDS |
| Records Management Report Open. | | | | |
| 10/04/2011 07:43:04 | 2425 | 2425 | C897 | A |
| Arrived on Scene | | | | |
| 10/04/2011 07:43:04 | 2425 | 2425 | C897 | SETREMUN |
| Reminder Set by C897, for 600 seconds | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 10/04/2011 07:43:51 | 245 | 245 | C897 | CANCELREM | |
| Reminder Canceled by C897 | | | | | |
| 10/04/2011 07:43:53 | STJA | | C897 | CANCELREM | |
| Reminder Canceled by C897 | | | | | |
| 10/04/2011 07:49:24 | K9-1 | 2416 | c813 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 08:12:45 | 2425 | 2425 | C897 | CANCELREM | |
| Reminder Canceled by C897 | | | | | |
| 10/04/2011 08:12:48 | | | C897 | INCCHNG | |
| Notes Added: | | | | | |
| NOTIFY J3 | | | | | |
| 10/04/2011 08:15:35 | J3 | | C897 | R | |
| Extra Unit on Incident | | | | | |
| 10/04/2011 08:15:35 | J3 | | C897 | SETREMCA | |
| Reminder Set by C897, for 600 seconds | | | | | |
| 10/04/2011 08:16:05 | J3 | | C897 | E | |
| Enroute on Incident | | | | | |
| 10/04/2011 08:52:20 | | | C897 | INCCHNG | |
| Notes Added: | | | | | |
| PER 2425 NOTIFY NEXT FUNERAL HOME, WILL BE TRANSPORTING TO MU IN COLUMBIA | | | | | |
| 10/04/2011 08:53:54 | | | C897 | INCCHNG | |
| Notes Added: | | | | | |
| ALLEE-HOLMAN-HOWE FUNERAL HOME WILL BE ENRT | | | | | |
| 10/04/2011 09:21:10 | 245 | 245 | C897 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 09:21:33 | 2425 | 2425 | C897 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 09:22:30 | 2463 | 2463 | C897 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 09:22:58 | 2436 | 2436 | C897 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 09:23:07 | | | C897 | INCCHNG | |
| Notes Added: | | | | | |
| ALL COUNTY UNITS CLEAR, DDCC REMAINING ON SCENE | | | | | |
| 10/04/2011 09:23:09 | MSHP | | C897 | A | |
| Arrived on Scene | | | | | |
| 10/04/2011 09:23:09 | MSHP | | C897 | SETREMUN | |
| Reminder Set by C897, for 600 seconds | | | | | |
| 10/04/2011 09:23:13 | J3 | | C897 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 09:23:13 | STJA | | C897 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 11:49:43 | MSHP | | C897 | CLEAR | |
| Clear From Incident | | | | | |
| 10/04/2011 11:49:44 | | | C897 | INCDCLOSE | |
| Incident Closed | | | | | |

Disposition: RT

**Total Incidents = 1**

# Camden County Sheriff's Office Policy Manual
## Camden County Sheriff's Office

### Chapter 8 – USE OF FORCE AND WEAPONS
#### Section 01 – Use of Force

NOTE: This rule or regulation is for internal use only, and does not enlarge an officer's civil or criminal liability in any way. It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third-party claims. Violations of this directive, if proven, can only form the basis of a complaint by this Department, and then only in a non-judicial administrative setting.

1) PURPOSE:

    a) The purpose of this policy is to provide deputies of this agency with guidelines for the use of force, as well as establish protocol for reporting use of force incidents.

2) POLICY

    a) It is the policy of the Camden County Sheriff's Office that a deputy uses only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the deputy and the public. It must be stressed that the use of force is not left to the unfettered discretion of the involved deputy. This is not a subjective determination. The use of force must be objectively reasonable. The deputy must only use that force which a reasonably prudent law enforcement officer would use under the same or similar conditions, considering the totality of the circumstances. At no time is force to be used as punishment.

3) DEFINITIONS

    a) Deadly Force: Any use of force that is reasonably likely to cause death.

    b) Non-Deadly Force: Any use of force other than that which is considered deadly force. This includes any physical effort used to control or restrain another, or to overcome the resistance of another.

    c) Objectively Reasonable: This term means that, in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in the light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the level of threat to the community.

4) PROCEDURES

    a) Use of Deadly Force

        i) Deputies are authorized to use deadly force in order to:

            (1) Protect the deputy or others from what is reasonably believed to be a threat of death or serious bodily harm; and /or


Exhibit
J

Printed 09/10/2012 1523

© 1994 - 2012, Information Technologies, Inc. http://www.ihsusa.com

Camden County 00344

(2) To prevent the escape of a fleeing violent felon who the deputy has probable cause to believe possesses a significant threat of death or serious physical injury to the deputy or others. Where practicable prior to discharge of the firearm, officers shall identify themselves as law enforcement officers and state their intent to shoot.

ii) Deadly Force Restrictions

(1) Officers may use deadly force to destroy an animal that represents a threat to the public safety or as a humanitarian measure where the animal is seriously injured, when the deputy reasonably believes that deadly force can be used without harm to the deputy or others.

(2) Decisions to discharge a firearm at or from a moving vehicle shall be governed by the use-of-force policy and are prohibited if they present an unreasonable risk to the deputy or others.

iii) Use of Non-Deadly Force

(1) Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control.

(2) Deputies are authorized to use department-approved, non-deadly force techniques and issued equipment in order to:

    (a) Protect the deputy or others from physical harm
    (b) Restrain or subdue a resistant individual; and/or
    (c) Bring an unlawful situation safely and effectively under control.

b) Force Options

i) Below are listed some of the force options and their basic definitions available to deputies:

(1) For the *incapacitation* of a subject, there are deadly force applications (firearms, knives, etc.) and less lethal projectile weapons (rubber or plastic bullets, 37mm or 40mm blunt instrument rounds, etc.). These devices are calculated to incapacitate or stop the subject and are likely to produce great bodily injury or death.

(2) For *control* of a subject, there are several options available. The options listed here are not all inclusive. Police canine (bite), hand held impact weapons (baton or blunt instrument), electronic weapons (handheld shock devices, Taser®, etc), physical control holds, chemical weapons (O/C pepper spray, C/S spray, C/N spray). These options are calculated to control and/or overcome the subject where there is no expectation of great bodily injury or death.

© 1994 - 2012, Information Technologies, Inc. http://www.ltiusa.com

Camden County  00345

(3) For the *compliance* of a subject, a firm grip or gesture, verbal commands and/or the employee's uniform presence may be all that is required. These options are calculated to gain compliant behavior from the subject, and there is no expectation of injury to the subject.

c) Training

   i) In addition to training required for firearms qualification, deputies shall receive agency-authorized training designed to simulate actual shooting situations and conditions and, as otherwise necessary, to enhance deputies discretion and judgment in using deadly and non-deadly force in accordance with this policy.

d) Reporting

   i) Use of force involving any control hold, other than handcuffing, or involving the use of fists or feet that could result in physical injury or death, electronic devices, K-9, impact weapons or other physical objects, or a firearm, is a reportable use of force.

   ii) When one or more of the above conditions exist, all employees involved shall make an oral report to their supervisor immediately or as soon as practicable after the event. Reference to this oral report shall also be contained in the employee's crime report or memo, which shall contain a detailed description of the facts involved in the decision to use a particular level of force and the application of the force used. The deputy shall complete the Physical Force/Weapons Use Report. The deputy or his immediate supervisor shall interview each assisting or witnessing employee involved.

   iii) The deputy's department head shall review the Physical Force/ Weapons Use Report within three (3) business days of the incident to determine if further action or investigation is warranted. The department head shall forward the report to the Chief Deputy within five (5) business days. After review, the Chief Deputy shall forward the report to the Operations Lieutenant and the training coordinator for processing and filing.

   iv) The department head will ensure that the involved deputies are informed of the disposition relating to a reported use of force incident after review by the Chief Deputy.

© 1994 - 2012, Information Technologies, Inc. http://www.itiuss.com

Camden County  00346

NOTE: This rule or regulation is for internal use only, and does not enlarge an officer's civil or criminal liability in any way. It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third-party claims. Violations of this directive, if proven, can only form the basis of a complaint by this Department, and then only in a non-judicial administrative setting.

5) CLASSIFICATION OF PEPPER SPRAY: The Courts have classified tear gas devices similar in nature to Pepper Spray as weapons, which fall into the same general category as the law enforcement officer's gun, baton and asp. Therefore, Pepper Spray must be used with the same discretion and limitations as any other weapon.

6)   USE OF PEPPER SPRAY:

   a) Pepper Spray was designed to enable officers to perform their duties in a more efficient and human manner when dealing with persons who intend to do bodily harm to themselves, other persons or to the police officer. If used properly, Pepper Spray will reduce the risk of injury to the officer and/or other persons.

   b) Pepper Spray should be used in any situation where it becomes necessary for an officer to physically subdue a person, regardless of whether or not the officer is making an arrest.

   c) Once a person has been subdued and brought under control, there is no further justification to use Pepper Spray.

   d) Authority for an officer to use Pepper Spray while making an arrest is implied in Section RSMo 544.190, which states that an officer may use all necessary to affect an arrest.

7)   PROHIBITED USES OF PEPPER SPRAY:

   a) Pepper Spray shall not be used as a threat to make a person comply with an officer's verbal order.

   b) Pepper Spray shall not be used against any person in retaliation for their verbal abuse of an officer.

   c) The threat or use of Pepper Spray shall not be used to elicit information from any person.

8)   INSTRUCTION FOR USE:

   a) Range

      i) The effective range of Pepper Spray is eight to ten feet (8-10') with a maximum range of twelve feet (12'). It will fire approximately forty (40) one second bursts, or a sixty (60)

second sustained burst. Pepper Spray is most effective from three (3) or more feet. This distance allows the spray to develop a shotgun pattern.

b) How to Use

    i) The most effective use of Pepper Spray is a well-aimed, one (1) second burst, fired into the face of the aggressor from three (3) or more feet. It is not necessary to fire directly into the aggressor's eyes.

c) Medical Attention

    i) A person should have cool water made available as soon as practical after being sprayed. The person's shirt or sweater should be removed.

    ii) The person should also be informed that medical attention is available to him. If the person desires medical attention, it is the responsibility of the inflicting officer to ensure that the person is transported to a medical center for treatment.

    iii) This procedure is necessary as a safeguard to ensure that persons sprayed with Pepper Spray do not receive permanent injury from use of the spray.

d) Refills

    i) An officer can replenish his Pepper Spray once it has been depleted or kept beyond the expiration date, which is displayed on the container, by advising a Supervisor, who will ensure a replacement is issued as soon as possible.

9)    REPORT REQUIRED:

a) Whenever an "Obstructing and Resisting an Officer" report is made and Pepper Spray was used, the circumstances outlining its use will be incorporated into the "USE OF FORCE REPORT".

b) Whenever Pepper Spray is used and there are no arrests, i.e., mental etc., the details outlining the use of Pepper Spray will be included in the appropriate incident report.

c) Whenever Pepper Spray is used, an incident report concerning physical force will be made, in addition to any other reports that are required, as well as a Physical Force/Weapons Use Report.

© 1994 - 2012, Information Technologies, Inc. http://www.iiiusa.com

Camden County   00348

1) **PURPOSE**

   a) This order sets forth the Camden County Sheriff's Department policy regarding the training, handling, and deployment of the Taser.

   b) Specific objectives of this General Order are:

   i) To inform and direct those officers who are authorized operators of the Taser, in a uniform and professional manner, the proper tactics and procedures in deploying the Taser.

   ii) To provide written guidelines for officers to follow when deploying the Taser, as well as the documentation required for a Taser deployment.

2) **INFORMATION**

   a) The Taser is an additional police tool and is not intended to replace verbal problem solving skills, ASP, OC Spray or firearms. The Taser can be deployed where it is deemed reasonably necessary to control a non compliant, dangerous or violent subject when deadly force does not appear to be justified and/or necessary. The Taser will be placed at the same level as OC spray on the force continuum.

3) **DEFINITIONS**

   a) Taser: A Taser includes but is not limited to the M-26 Advanced Taser, the X-26 Taser, and any Department authorized and issued non-lethal device which is designed to produce and emit an electrical charge. Personally owned Tasers are not authorized.

   b) Deployment: The activation of a Taser resulting in the arcing of the unit, a contact maneuver on a subject or animal, and/or the discharge of an air cartridge whether or not the probes strike their intended target. The mere display of a Taser is not a deployment.

   c) "Tased": The accepted word indicating that a person or animal has received an electrical charge from a Taser.

   d) Taser Control Manager: A Taser instructor who has been appointed by the Sheriff to manage the Departments Taser Program.

   e) Taser Instructors: All approved Taser instructors of the Camden County Sheriff's Department.

   f) Department: Camden County Sheriff's Department

   g) Medical Personnel: Includes, but is not limited to, Doctors, Physician's Assistants, Nurses,

© 1994 - 2012, Information Technologies, Inc. http://www.tdusa.com
Camden County  00349

Paramedics, and Emergency Medical Technicians.

h) Supervisor: A Camden County Deputy above the rank of Officer to include Corrections Supervisor, Corporal, Sergeant, Lieutenant, Captain, Under Sheriff and the Sheriff.

4) TRAINING:

a) Purpose of the following training is to ensure the Taser user is knowledgeable of the workings of the M-26/X-26 Taser, its effects and ability to subdue non-compliant suspects. The Taser user will be more confident with the use of the Taser and will have firsthand knowledge and expertise for court room testimony.

b) All personnel, who will be using the Taser as part of their regular duty equipment, must take an 8 hour course on the use of an M-26/X-26 Taser. This course will be conducted by the department Taser Instructor. All Taser users will be required to take a two second exposure demonstration of the Taser, using alligator clips attached to their clothing. The alligator clips will not be placed in a sensitive/private area of the body, which might be construed as inappropriate conduct. Before the Taser user is given the two second exposure demonstration, he/she will be placed in a kneeling or sitting position and held by under each arm pit by two spotters and will have minimum 8 to 10 inch thick padded mat placed underneath them to ensure the person does not fall and injure themselves. If the person begins to fall, the two spotters will assist them slowly to the mat. Volunteer exposure only will be required for the drive stun technique. If the trainee has a condition or pre-existing injury that would be aggravated by muscle contractions and physical exertion the trainee must notify the instructor prior to participating in the Taser exposure and will not be required to take the Taser exposure.

5) PROCEDURE:

a) Tasers shall be issued to and handled or deployed only by officers who have completed the Department's Taser Training Program, or a Taser Training Program from TASER INTERNATIONAL. The Taser shall be handled in the same manner and treated with the same degree of care and discretion as a firearm.

b) Tasers shall only be used as instructed in the training course, and only in accordance with Department policy and State Law. The deployment of a Taser is considered on the same use of force level as pepper spray (Oleoresin Capsicum).

c) Only properly functioning and charged Tasers shall be issued for field use. The battery charge shall be checked prior to removing the Taser from storage. The battery charge shall only be checked when there is no air cartridge loaded in the Taser. The Taser should be pointed in a safe direction with no air cartridge loaded in the unit for the "test spark", performed when checking the Taser out to test the battery charge. The Taser checkout log will be completely filled out each time the authorized officer checks out a Taser. A supervisor shall issue the Tasers out, and the duty shift supervisors shall ensure the checkout log is complete.

© 1994 - 2012, Information Technologies, Inc. http://www.libssa.com
Camden County  00350

d) Any Taser or component thereof found to be defective or damaged shall be returned to the Taser Control Manager for repair or replacement, with a detailed explanation of the malfunction or cause of damage.

e) All Tasers and associated equipment shall be properly secured when not in use. When carried in the field, the Taser shall be carried in the Department-approved holster. The holster shall be carried opposite of the officer's department issued sidearm.

f) Each deployment of a Taser shall be documented utilizing the Use of Force Detail Page in the Department's Report System. This includes a contact deployment, as well as the firing of an air cartridge or other deployment resulting in a subject or animal receiving an electrical charge from the Taser, or when the Taser is activated ("sparked") and the subject is subdued/controlled without actually receiving an electrical charge from the Taser. The Taser International use of force report will also be completed and given to the Taser Control Manager for his records.

g) Any accidental discharge of a Taser air cartridge shall be documented in a written report, a copy given to the supervisor of that division and a copy to the Taser Control Manager, the employee will be subject to disciplinary action depending on the accidental deployment.

6) DEPLOYMENT

a) Whenever a Taser is to be deployed it is the responsibility of the deploying officer and on scene supervisor to make certain officers on scene understand that the Taser is being deployed and not lethal force, prior to the deployment of the Taser if at all possible. This shall be accomplished through the warning announcement "TASER!" to alert other officers, as well as to provide the subject an additional opportunity to cease the conduct that has given rise to the deployment of the Taser.

b) When an officer approaches a subject with the intent to deploy the Taser, an additional officer should also approach whenever possible to provide lethal cover should it become necessary for the protection of life. Verbal commands should be used constantly before (whenever practical), during, and after the deployment of the Taser to warn the subject to cease his/her aggressive demeanor or action.

c) Subjects who have received an electrical charge from the Taser unit or probes, shall be treated as follows:

i) Once the subject is safely secured and in custody, the arresting officer shall notify a supervisors that the subject has received an electrical charge from the Taser and relate the approximate time the action occurred. If the probes penetrate the skin, the puncture sites shall be brought to the attention of the on duty supervisor or medical personnel.

© 1994 - 2012, Information Technologies, Inc. http://www.ltiusa.com
Camden County  00351

ii) Only medical personnel may remove or direct to be removed any Taser probes that are embedded in soft tissue areas such as the neck, face and groin. Removal from other areas will be at the discretion of the on-scene supervisor or medical personnel.

iii) The on-scene supervisor shall determine if the subject should be transported to the hospital.

iv) If the probes are no longer affixed to the subject and the supervisor determine the subject does not need to be transported to the emergency room/hospital, the subject may be transported to jail.

v) If the subject is transported to the emergency room/hospital, the transporting officer will obtain the probes from the medical personnel and placed into evidence.

vi) Officers must be aware that one aspect of possible injury to a subject receiving an electrical charge from a Taser is that of falling from a standing position.

d) The spent air cartridge and probes shall be collected and preserved as evidence. Caution should be exercised in handling probes that have penetrated a subject's skin. Such probes shall be packaged and handled with the same care as a hypodermic needle, and shall be packaged in a suitable container to prevent accidental infection. The probes shall be labeled as a biohazard when submitted as evidence.

7) DOCUMENTATION

a) The deploying officer is responsible for documenting the deployment of the Taser by completing the Use of Force Detail Page, indicating the Taser use in the Study section of the event page, as well as submitting a detailed account of the probable cause for deploying the Taser each time it is deployed. If the deploying officer is not the primary reporting officer, the deploying officer shall index a detailed supplement to the case documenting his/her role in the deployment of the Taser.

b) The officer deploying the Taser shall ensure photographs are taken of the subject receiving an electrical charge from the Taser (contact or probes), with special attention to any area injured and where the charge was received. The officer shall also include detailed documentation in the incident report of how the injuries occurred.

c) The deploying officer shall notify his/her Chain of Command and the Taser Instructors by email of the use of the Taser to ensure a detailed review of the deployment.

d) The Taser that was deployed will have the deployment report downloaded from the Taser's data port. A Taser instructor trained to recover the deployment data shall perform this function. Once a printed report is obtained, the Taser may return to service.

© 1994 - 2012, Information Technologies, Inc. http://www.ittusa.com
Camden County  00352

e) A copy of the printed deployment report shall include the date prior to the deployment, the date of deployment on a subject, and the day after if available, and then forwarded to records division for inclusion in the case file.

8) TASER CONTROL MANAGER'S RESPONSIBILITIES

a) The Taser Control Manager shall:

i) Receive, inspect, and ensure the maintenance and replacement of the Department's Taser devices and related equipment.

ii) Establish and maintain systems to record issuance of equipment.

iii) Return defective or damaged Tasers and air cartridges to the suppliers

iv) Obtain service and/or replacement for defective or damaged Taser components from the supplier.

v) Review reported uses of a Taser by Department personnel and establish a system for maintaining statistics on the performance of the Taser. A trained Taser Instructor, so authorized by the Taser Control Manager, may also perform this function.

vi) Ensure Basic certification and biennially (every two years) re-certification training on the Taser is provided as needed, as well as maintaining a record of the training.

vii) All other duties as may become necessary for the employment, maintenance, and enhancement of the Department's Taser program.

© 1994 - 2012, Information Technologies, Inc. http://www.idum.com

Camden County  00353

1) GUIDELINES FOR THE USE OF POLICE SERVICE DOGS, PURPOSE:

   a) The purpose of this policy is to provide the Camden County Sheriff's Department with an internal set of guidelines for the use of police service dogs. This policy is not intended to provide the standard care for any civil or external proceeding and the determination of compliance with this policy is expressly reserved to internal proceedings within the Camden County Sheriff's Department. The decision to use a police service dog in accordance with this policy shall be deemed an act of discretion and shall be reviewed in light of information reasonably available to the deputy at the time the decision is made. The ultimate disposition of any related criminal proceeding shall have no bearing on determining the reasonableness of any such decision.

2) POLICE SERVICE DOG PROGRAM

   a) The police service dog program mission is to provide a reliable patrol dog capability through the employment of trained deputy-dog teams to aid in law enforcement. The primary task of the K-9 team is search and apprehension of criminals. A police service dog may be used to apprehend an individual if the K-9 handler reasonably believes that the individual has either committed or is about to commit any offense and if any of the following conditions exist:

      i) There is a reasonable belief that the subject poses an immediate threat of violence or serious harm to the public, any officer, or himself.

      ii) The subject is physically resisting arrest and the use of a police service dog appears necessary to overcome such resistance.

      iii) The subject is believed to be concealed in an area where entry by other than the K-9 would pose a threat to the safety of officers or the public.

      iv) It is recognized that situations may arise which will not fall within the provisions set forth in this policy. In any such case, a standard of reasonableness shall be used to review the decision to use a police service dog in view of the totality of the circumstances.

      NOTE: Absent the presence of one or more of the above conditions, mere flight from pursuing officers shall not serve as good cause for a K-9 apprehension.

   b) Prior to the use of a police service dog to search for or apprehend any individual, the K-9 handler or supervisor at the scene shall carefully consider all pertinent information reasonably available at the time. This information shall include, but is not limited to:

      i)     The individual's age,

      ii)    The nature of the crime committed,

© 1994 - 2012, Information Technologies, Inc. http://www.ilua3.com
Camden County  00354

iii) Any potential danger to any law enforcement officers who may attempt to intervene or assist with the apprehension,

iv) Any potential danger to the public which may result from the release of a police service dog.

c) Unless it would otherwise increase the risk of injury or escape, a verbal warning followed by a reasonable period of compliance shall precede the release of any police service dog.

d) The on-duty supervisor, the K-9 supervisor and the Sheriff shall be notified as soon as practicable following any police service dog apprehension.

e) Prior to going off duty, the K-9 handler shall complete all necessary reports associated with the use of a police service dog in an apprehension. A copy of the reports including the use of force report shall be placed in the K-9 supervisor's box.

f) The decision to use the police service dog rests solely with the dog's handler. The handler is responsible for the deployment of the dog as a method of investigation.

g) There are 2 - 5' x 10' dog kennels in the secure lot of the sheriff's department. They will be utilized by K9 handlers for any lengthy stay at the office. Non dog handlers will refrain from feeding, tantalizing or handling the dogs in the kennels. There shall not be any non-department K9's put in to the kennels.

3) NARCOTICS DETECTOR DOG PROGRAM

a) The K-9 narcotic program mission is to provide a practical and credible statewide drug detection capability through the employment of trained deputy-dog teams to aid in the investigation, apprehension, and prosecution of persons engaged in illegal drug activities. The primary task of the K-9 team is to locate controlled substances.

b) The drug detector dog may be used to:

i) Search vehicles, buildings, parcels, areas or other items deemed necessary;

ii) Obtain a search warrant by using the dog in support of probable cause;

iii) Assist in the search for narcotics during a search warrant service;

iv) Assist in drug education programs.

c) The drug detector dog will not be used to search a person for drugs. If a drug dog alert causes the deputy to believe that a person may be in possession of drugs, the deputy in charge of the

© 1994 - 2012, Information Technologies, Inc. http://www.lliusa.com
Camden County  00355

Investigation will determine how to proceed. Personal possessions may be searched by the dog only if removed from the person.

d) The decision to use the dog rests solely with the dog's handler. The handler is responsible for the deployment of the dog as a method of investigation.

e) The drug detector dog team may be available for use by other law enforcement agencies as long as the K-9 is not needed at that time by deputies from the Camden County Sheriff's Department.

4) TRACKING / TRAILING DOG PROGRAM

a) The purpose of a tracking dog is to assist the Camden County Sheriff's Department with the apprehension of fleeing criminals and locating lost persons.

b) Prior to requesting a tracking dog, the on scene deputy shall determine the following:

i) The age of the person,

ii) The nature of the crime (if subject is fleeing arrest),

iii) Any potential danger to any other deputies who may attempt to intervene or assist with the capture,

iv) Any potential danger to the public which may result from the release of the K-9,

v) A containment perimeter shall be utilized,

vi) The pursuing deputy shall mark the location he last observed the fleeing subject,

vii) The pursuing deputy shall assist the K-9 team as a cover officer during the track. Regardless of rank, the K-9 handler is in charge during the duration of the track.

viii) The decision to use the dog rests solely with the dog's handler.

5) TRAINING OF THE K-9 TEAMS

a) A K-9 team can become ineffective due to limited use and training. Because of this, all K-9 teams shall have a minimum of 16 hours training within one calendar month.

i) All training shall be documented using the Camden County Sheriff's Department training/call for service log. The handler shall keep a copy for his record and the original shall be signed and given to the Department's K-9 supervisor to be placed in the team's training/call for service file.

b) The Camden County Sheriff's Department training/call for service log shall be used each time the K-9 team is used in a call for service, training and public relations.

c) The K-9 supervisor is responsible for guidance, training and certification of all K-9 teams within the Camden County Sheriff's Department.

6) INJURY TO K-9

a) In the event a Camden County K-9 is injured on or off duty, the handler will immediately contact the K-9 supervisor and the Department's veterinarian, and transport the injured K-9 to his/her clinic. If the Department's veterinarian is not available, the handler will contact the nearest clinic for treatment. In the event the handler is injured during a deployment with the K-9, or during a traffic accident with the K-9 inside the vehicle, another handler shall be contacted to take control of the K-9. If the handler is not able to control his K-9 due to personal injuries, and the K-9 is protecting his injured handler by not allowing others to approach, the K-9 SHALL NOT be destroyed. Another handler will be contacted to take control of the K-9, or if time does not allow, the on scene deputies will use every available method to gain control of the K-9 (bite sleeves, leashes, coats wrapped around arms, etc.). It is the handler's responsibility to train all non-K-9 personnel on his shift on methods to control a police K-9.

b) If a Camden County K-9 is injured or killed by a criminal suspect, the suspect will be charged with assault, and medical expenses or the replacement of the K-9 will be added to his/her fines and costs.

c) If a K-9 is killed or injured in such a way it is no longer able to function in the position of a police K-9, it shall be replaced as soon as possible.

d) At the time a K-9 is retired, it shall be given to the handler for the cost of one dollar. If the retiring K-9's handler is not able to keep the K-9, the handler, K-9 supervisor and the Sheriff shall determine who within the department will be able to purchase the K-9 for one dollar. At no time will the retired K-9 be given or sold to the public.

7) CALL OUTS OF THE DEPARTMENT K-9'S

a) Whenever the Camden County Sheriff's Department receives a call for K-9 assistance, the on duty K-9 handler will be contacted and advised the following:

   i) Agency requesting assistance,

   ii) Type of K-9 call, and

   iii) Location.

© 1994 - 2012, Information Technologies, Inc. http://www.ldiusa.com
Camden County  00357

b) The on duty handler and no one else will decide if and which Camden County K-9 team will respond. If there is no Camden County K-9 team on duty, the Camden County K-9 supervisor will be contacted to determine which team will respond.

    i) In the event the K-9 supervisor is going to be unavailable, he shall contact dispatch to advise them of his status and which Camden County K-9 team to be contacted first.

c) Only after failed attempts to contact all Camden County K-9 teams will another agency be contacted.

8)     COMPLAINTS AGAINST K-9'S

a) Whenever the Camden County Sheriff's Department receives a formal complaint from the public concerning the deployment of a K-9 team, the Department shall conduct a review board.

    i)     The review board will consist of the K-9 supervisor and two deputies.

        (1) In the event the complaint is against the K-9 supervisor, the review board will consist of a supervisor of higher rank, a K-9 handler and one deputy.

b) It is the board's responsibility to review the complaint, interview the complainant, the handle and others who may have been on scene to determine if the K-9 team followed the K-9 guidelines and department procedures.

c) Once the board makes a final determination, the board supervisor shall notify the Sheriff in writing of their findings. The Sheriff has final say and authority. Once the Sheriff gives his decision on the investigation, the complainant shall be contacted and the K-9 handler will receive the board's findings in writing.

9)     EXPLOSIVES DETECTOR DOG PROGRAM

a) The K9 explosive detector program mission is to provide a practical and credible statewide explosives detection capability through the employment of trained deputy-dog teams to aid in the investigation, detection, and prosecution of persons engaged in illegal explosive activities.

b) The explosive detector dog may be used to:

    i)     Search vehicles, buildings, parcels, areas or other items deemed necessary;

    ii)    Obtain a search warrant by using the dog in support of probable cause;

    iii)   Assist in the search for explosives during a search warrant service;

© 1994 - 2012, Information Technologies, Inc. http://www.ldaaa.com
Camden County   00358

iv) Assist when explosives are suspected or known;

v) Assist in a search when a credible written or verbal bomb threat has been made;

vi) Assist in explosives education programs;

c) The explosive detector dog will not be used to search a person for explosives. If an explosive dog alert causes the deputy to believe that a person may be in possession of explosives, the deputy in charge of the investigation will determine how to proceed. The dog may search personal possessions, only if removed from the person.

d) The decision to use the dog rests solely with the dog's handler. The handler is responsible for deployment of the dog as a method of investigation.

e) The explosive detector dog team may be available for use by other law enforcement agencies as long as the K9 team is not needed at the time by deputies from the Camden County Sheriff's Department.

f) During a search the explosive K9 team may not show an alert to explosives being present. This only means no alert was made, not that the area or item is guaranteed safe.

10) GUIDELINES FOR THE DISTRIBUTION, STORAGE, USE, SAFEKEEPING AND DESTRUCTION OF TRAINING NARCOTICS TO BE USED DURING THE TRAINING OF POLICE SERVICE DOGS

a) FOUND and/or SEIZED NARCOTICS - All found and/or seized evidence by any sheriff's office personnel is to be placed into the evidence room after the proper reports are completed. If the narcotics will not be used for evidence and/or prosecution purposes that shall be indicated on the evidence report form.

b) DISTRIBUTION OF NARCOTICS TO K-9 SUPERVISOR - Once a destruction order is signed by a judge for narcotics and/or it has been determined that certain found narcotics will not be used for evidence and/or prosecution, the narcotics may be distributed to the K-9 Supervisor by the Evidence Technician as training narcotics.

c) STORAGE OF TRAINING NARCOTICS - Once training narcotics are distributed the training narcotics shall be tested, weighed and labeled by the K-9 Supervisor in the presence of the Evidence Technician. The training narcotics will then be placed into a K-9 training narcotics "safe" which will be kept in the evidence room. All training narcotics placed into the safe will be listed on a sign in/ sign out sheet which will also be secured inside the safe. The K-9 Supervisor, Sheriff and Chief Deputy will be the only persons having access to the safe.

d) USE OF TRAINING NARCOTICS - When training narcotics are required by a K-9 Handler for training purposes the following steps must be taken:

© 1994 - 2012, Information Technologies, Inc. http://www.hlsaa.com
Camden County  00359

i) The K-9 Handler must contact the K-9 Supervisor with a request of the proper training narcotics necessary for training.

ii) Immediately prior to the training, the K-9 Supervisor will assign the K-9 Handler training narcotics and notate same on the sign in/ sign out sheet.

iii) Immediately following the training the training narcotics are to be returned to the K-9 Supervisor by the K-9 Handler.

iv) The training narcotics will then be returned to the safe and the sign in/ sign out sheet will be notated.

v) Training narcotics will be checked out to the K-9 Handler for an amount of time not to exceed 48 hours.

vi) An inventory of training narcotics will be performed each time training narcotics are checked in and/or checked out.

e) SAFEKEEPING OF TRAINING NARCOTICS - The K-9 Handler is responsible for the safekeeping and return of the training narcotics while training narcotics are in his/her possession. If any training narcotics are lost and/or inadvertently destroyed during training the K-9 Handler shall take the following steps:

i) Immediately contact the K-9 Supervisor informing him/her of what training narcotics were lost and/or destroyed.

ii) Write a memorandum concerning the lost and/or destroyed training narcotics which shall be distributed to the K-9 Supervisor.

f) DESTRUCTION OF TRAINING NARCOTICS - Training narcotics shall be destroyed 6 months following the initial distribution date by the Evidence Technician with the exception of marijuana. Marijuana shall be destroyed 1 year following the initial distribution date. When determined that any training narcotics have reached their disposal date, the narcotics shall be destroyed in the following manner:

i) The K-9 Supervisor will give written notice to the Lieutenant by way of memorandum concerning which training narcotics should be destroyed.

ii) After receiving acknowledgment from Lieutenant, the K-9 Supervisor along with one other deputy will properly dispose of the training narcotics.

iii) Training narcotics will be destroyed by way of incineration and/or disposal through the sewage system which will be determined by the type and/or quantity of the training

© 1994 - 2012, Information Technologies, Inc. http://www.ithuss.com
Camden County  00360

narcotic.

iv) The K-9 Supervisor will then notate on the sign in/ sign out sheet which training narcotics were destroyed.

© 1994 - 2012, Information Technologies, Inc. http://www.ltiusa.com
Camden County  00361

NOTE: This rule or regulation is for internal use only, and does not enlarge an officer's civil or criminal liability in any way. It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third-party claims. Violations of this directive, if proven, can only form the basis of a complaint by this Department, and then only in a non-judicial administrative setting.

1) Personnel may only utilize tire deflation devices authorized by the department. As with all operational decisions made during the conduct of a vehicular pursuit, the use of such devices is subject to the assessment of inherent risk balanced against the need to apprehend a fleeing offender

2) To be authorized for deployment and use under this policy, the tire deflation device must:

   a) Be capable of producing a controlled deflation of one or more tires of a pursued vehicle;

   b) Be capable of being placed in the roadway before activation and driven over by other traffic without causing damage to the vehicles;

   c) Be capable of being activated immediately before the pursued vehicle drives over it, and deactivated immediately after the pursued vehicle drives over it;

   d) Allow the officer to remain a safe distance from the roadway at the time of activation; and

   e) Be capable of remaining in the roadway after activation and deactivation without causing damage to any vehicles.

3) Use of an authorized tire deflation device

   a) An authorized tire deflation device may be utilized only after supervisory approval.

   b) An authorized tire deflation device shall not be used to stop motorcycles, mopeds, or similar vehicles.

   c) The authorized tire deflation device should not be used in locations where specific geographic features (e.g., sharp curves, alongside of rivers, steep embankments, etc.) increase the risk of serious injury to the officer, violator or public.

   d) Deployment locations should have reasonably good sight distances to enable the officer to observe the pursuit and other traffic as it approaches.

   e) The officer deploying the authorized tire deflation device should not attempt to overtake and pass a high speed pursuit in order to position the device.

© 1994 - 2012, Information Technologies, Inc. http://www.ltlusa.com
Camden County  00362

4) Deployment

   a) The officer deploying the authorized tire deflation device should do so from a position of safety.

   b) The officer deploying the authorized tire deflation device should be in position to allow sufficient time for deployment.

   c) The supervisor overseeing the pursuit must approve the location of the authorized tire deflation device.

   d) The communications operator shall notify all units of the location of the authorized tire deflation device deployment.

5) Activation of the authorized tire deflation device

   a) The officer operating the authorized tire deflation device should take a position of safety as the pursued vehicle approaches.

   b) After all other traffic has passed the officer, and immediately prior to the pursued vehicle passing over the authorized tire deflation device, the device shall be activated (exposing the spikes).

   c) Immediately after the pursued vehicle goes over the authorized tire deflation device, the officer shall deactivate the device (retract the spikes).

   d) The officer should immediately notify communications if the pursued vehicle impacted the authorized tire deflation device, if the officer observed any signs of deflation, and the direction and operation of the pursued vehicle after the impact.

6) Removal of the authorized tire deflation device

   a) As soon as practical, the authorized tire deflation device shall be re-moved from the roadway.

7) Reporting

   a) After deployment or use of the authorized tire deflation device, the officer shall complete a Use of Force Report, and include the following information in a supplemental to the vehicle pursuit incident report:

      i) Date, time and location of deployment

      ii) Officer who deployed the authorized tire deflation device

© 1994 - 2012, Information Technologies, Inc. http://www.itiusa.com
Camden County  00363

iii)   Supervisor who authorized the deployment of the authorized tire deflation device

iv)   Date and time of activation

v)   Officer who activated the authorized tire deflation device

vi)   Results of the use of authorized tire deflation device on the pursued vehicle

vii) Results of the use of the authorized tire deflation device on any other vehicle, property or person

viii)   Results of the use on the authorized tire deflation device itself.

© 1994 - 2012, Information Technologies, Inc. http://www.itiusa.com

Camden County  00364

NOTE: This rule or regulation is for internal use only, and does not enlarge an officer's civil or criminal liability in any way. It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third-party claims. Violations of this directive, if proven, can only form the basis of a complaint by this Department, and then only in a non-judicial administrative setting.

1) A Glock .40 caliber automatic approved weapon shall be carried by all deputies while in uniform or on-duty, except while assigned to special duties.

2) Regular full-time deputies (off-duty) "may" carry their approved on-duty weapons or an approved off-duty weapon.

3) Reserve deputies will be permitted to carry a weapon on their person while off-duty, provided they have demonstrated proficiency with the weapon and it meets Departmental standards.

   a) ALL OFFICERS MUST PASS A WEAPONS QUALIFICATIONS COURSE WITH EACH WEAPON CARRIED EITHER ON OR OFF DUTY! THERE WILL BE NO EXCEPTIONS!

4) APPROVED FIREARMS FOR ON-DUTY USE WILL BE:

   a) UNIFORMED FULL TIME DEPUTIES:

      i) Glock .40 caliber automatic, furnished to all full-time deputies by the Sheriff's Department.

      ii) SPECIAL ASSIGNMENT FULL TIME DEPUTIES AND RESERVES:

         (1) American manufactured revolver, solid frame, double action: a 9 mm semi-automatic pistol: or a .40 caliber semi-automatic weapon approved by the Sheriff.
         (2) Barrel length, minimum of two inches (2"), maximum of six inches (6").
         (3) Weapon shall be capable of firing a .38 special, .357 magnum, 9 mm cartridge, or .40 caliber.

5) APPROVED FIREARMS FOR OFF-DUTY USE WILL BE:

   a) Single or double-action revolver or semi-automatic pistol of at least the caliber of .380.

      i) All sworn personnel shall qualify with off-duty weapons at least once per year in accordance with Departmental rules governing weapons qualifications.

         (1) Minimum barrel length of two inches (2")
         (2) All sworn personnel, when off-duty, shall carry their weapons concealed from public view.

© 1994 - 2012, Information Technologies, Inc. http://www.ldiusa.com
Camden County  00365

6) Sheriff's Deputies shall carry approved .40 caliber ammunition, issued by the Department firearms instructor. All deputies using off-duty weapons that are not Glock .40 caliber shall be responsible for purchasing their own ammunition, which has been approved by the Department firearms instructor. Such ammunition shall not be altered or defaced in any manner whatsoever.

7) Each and every commissioned Sheriff's Deputy of the Department shall fire a qualifying score (minimum of 70%), with his on-duty weapon twice yearly. Special Operations Officers are held to a higher degree of proficiency with all weapons carried for duty.

8)    A Sheriff's Deputy may discharge his firearm for only the following purposes:

   a) To defend himself or others from death or serious injury.

   b) To affect an arrest when he reasonably believes the use of deadly force is immediately necessary, and he knows that the person to be arrested has committed, or attempted to commit, a violent crime or might endanger a person's life or physical safety.

      i) Deadly force has been defined as "that which could cause death or serious physical injury."

      ii)    All officers must have the training to affect the use of deadly force safely.

      iii)    No unreasonable threat may be posed to the public.

   c) At a fleeing felon, only if the deputy knows that the fleeing person has committed a crime of violence, and only after all other alternatives have been exhausted.

   d) To kill a dangerous animal, or to kill an animal that is so badly injured that humanity requires its removal from suffering.

   e) To give an alarm or to call for assistance for an important purpose when no other means can be used.

9) The discharge of a firearm to aid in the arrest, or to stop the flight, of a person who has committed only a misdemeanor is prohibited. However, when such a person becomes a dangerous assailant, or when an attempt is made to rescue, by violence, a prisoner of any grade, even though guilty of no more than a misdemeanor, the situation changes instantly. The deputy must meet force with force, and the use of his weapon is a last means of protecting himself from death or serious injury and will be approved by the Department.

10) Firearms shall not be taken into an area of confinement or in an area where prisoners are allowed freedom of movement, except in an emergency.

© 1994 - 2012, Information Technologies, Inc. http://www.itfusa.com
Camden County  00366

11) Gas guns, gas projectiles, machine guns and automatic rifles shall be used only under direction of a Field Sergeant or Superior Officer, and with the knowledge of the Sheriff.

12) Every deputy shall familiarize himself and comply with the State provisions which prohibit the buying, selling, borrowing, loaning, trading or otherwise acquiring or disposing of concealable firearms.

13) Brass knuckles, stun guns and other unauthorized weapons shall not be carried or used by employees at any time.

14) FIREARMS INSTRUCTOR: The Sheriff will designate a deputy to be the Firearms Instructor. An Assistant Firearms Instructor will also be designated.

15) In these positions, the Firearms Instructor and his assistant are responsible only to the Sheriff, or in his absence, his assistant.

16) The Firearms Instructor and his assistant will be in charge of all firearms training, with the exception of any special training involving the Crisis Action Team, which will be directed by the Crisis Action Team leader or a qualified instructor.

17) The Firearms Instructor and his assistant will be in charge of all firearms training, whether classroom or on the range.

18) The Firearms Instructor and his assistant will be responsible for developing procedures for safety, firearms courses, etc., involved in firearms training.

19) The Firearms Instructor and his assistant will be in charge of all Department weapons, with the exception of the special weapons of the Crisis Action Team. These weapons will be the responsibility of the Crisis Action Team leader.

20) The Firearms Instructor and his assistant will implement a monthly inspection of the Department weapons that they are responsible for and forward to the Sheriff or his assistant, a report in reference to the condition of the weapons.

21) The Firearms Instructor and his assistant will be in charge of all Department ammunition and will be accountable for all ammunition.

22) The Firearms Instructor and his assistant will be responsible for ordering all ammunition and will ensure that a more than adequate supply of ammunition is available.

23) The Firearms Instructor and assistant will be responsible for ordering any other materials or supplies that are required for firearms training.

24) The Firearms Instructor and assistant will be responsible for clean-up of any range used by

© 1994 - 2012, Information Technologies, Inc. http://www.ilusa.com
Camden County  00367

this Department.

25) NON-DEADLY FORCE: "Non-deadly force" is the force employed which is neither likely nor intended to cause death or serious physical injury.

26) Non-deadly force is the use of physical restraint, pepper spray, contact controls, nerve center controls, joint restraints, and use of PR-24 or ASP.

27) Non-deadly force is that force used without the officers duty weapon being displayed or discharged.

28) Non-deadly force is used to apprehend misdemeanor suspects, or fleeing felons, with no weapons displayed in the suspect's hands, or when the fleeing felon is not likely to cause harm to a citizen or the deputy.

29) PR-24 PRECERTIFICATION PROCEDURE: The Department allows deputies to carry a PR-24 police baton and or an ASP TACTICAL POLICE BATON. A PR-24/ASP is a defensive instrument that will be used for the purpose of non-deadly force arrests. Deputies will not carry a PR-24 or ASP until they are certified in its use.

30) Recertification of the PR-24 baton or the ASP will consist of a two (2) hour class conducted each year by a qualified instructor.

31) In the event newly hired deputies who do not possess a PR-24 or ASP certification, they will not allowed to carry a PR-24 or ASP until certification has been completed.

32) CLASSIFICATION OF PEPPER SPRAY: The Courts have classified tear gas devices similar in nature to Pepper Mace as weapons, which fall into the same general category as the law enforcement officer's gun, baton and asp. Therefore, Pepper Mace must be used with the same discretion and limitations as any other weapon.

33) CERTIFICATION WITH PEPPER SPRAY: The Department allows deputies to carry Department issued pepper spray. Pepper Spray is a defensive instrument to be used for the purpose of non-deadly force arrest. Deputies will not carry pepper spray until they are certified in its use. Certification will be by a qualified instructor. For proper use of pepper spray see Chapter 8, Section 01 PEPPER SPRAY of this manual.

34) STANDARD OPERATING PROCEDURES FOR OFFICER INVOLVED IN SHOOTING OR SERIOUS INJURY. This Standard Operating Procedure shall be placed in effect when any one of the following incidents occurs involving a deputy of this Department.

a) Deputy fires his weapon at another individual, whether that individual is injured or not.

b) Deputy is fired upon by another person, whether he is struck or not.

c) Deputy is assaulted in such a manner that serious bodily harm, as defined in the "CRIMINAL CODE" would have been a likely result of said action.

d) Deputy's weapon is taken from him by hostile person(s).

e) Any other event occurs that may cause an impairment in said deputy's ability to perform his normal duties.

f) Any other incident deemed necessary by the Sheriff.

g) In the event of the occurrence of any of the above, the Sheriff shall implement the following actions, as he deems necessary.

    i) Affected deputy shall be administratively suspended with pay, or placed in a administrative position as deemed by the Sheriff, until all facts and circumstances surrounding the incident are known

    ii) Will order an investigation, and, depending on the circumstances, may request an uninvolved outside agency to conduct the investigation.

    iii) May require the affected deputy to submit to psychological evaluation and counseling.

    iv) Submit case information to the prosecutor's office for review and criminal charges against the defendant or the deputy, depending on circumstances.

    v) Sheriff or his designate, shall make all information releases with the concurrence of the County Attorney.

    vi) Any additional steps as deemed necessary to effect a thorough investigation.

    vii) The affected Deputy shall submit to any and all tests that may be lawfully requested of him, or her, in order to complete all phases of the investigation.

35) PHYSICAL FORCE/WEAPONS USE REPORT:

a) In all circumstances in which physical force or a weapon is used, displayed or ready for use, the Deputy shall fill out a Physical Force/Weapons Use Report.

    i) The Physical Force/Weapons Use Report is in addition to all other reports.

        (1) The deputies immediate supervisor will complete the Physical Force/Weapons Use Report if the deputy is unable to do so.

© 1994 - 2012, Information Technologies, Inc. http://www.htusa.com
Camden County  00369

---

ii) The Physical Force/Weapons Use Reports are available in the forms cabinet in the report room. The report shall contain the following.

(1) Incident number.
(2) Case number.
(3) Date of Report.
(4) Deputy Name.
(5) Deputy Badge number.
(6) Rank.
(7) Date and time of incident.
(8) Location of incident.
(9) Manner in which deputy became involved (radio assignment, on view, etc. If by radio assignment give wording of assignment.)
(10)     Box checked Weapon Used or Physical Force Used.
(11) Box checked Service Pistol, PR-24, Off Duty Weapon, Chemical Mace, Other (specify).
(12)     Box checked Protect Self, Protect Citizen, Other (specify).
(13)     Describe force used.
(14)     Name of suspect.
(15)     Address of suspect.
(16)     Sex of suspect.
(17)     Race of suspect.
(18)     Height of suspect.
(19)     Weight of suspect.
(20)     State or FBI identification numbers of suspect.
(21)     What weapon did suspect use?
(22)     Was suspect under influence of alcohol/drugs?
(23)     Lighting Conditions Box checked

   (a)     Daylight
   (b)     Dusk
   (c)     Night
   (d)     Good Artificial
   (e)     Poor Artificial

(24)     Weather conditions box checked.

   (a)     Clear
   (b)     Rain
   (c)     Snow
   (d)     Cloudy
   (e)     Fog

(25)     Officer Injuries box checked.

© 1994 - 2012, Information Technologies, Inc. http://www.hitusa.com
Camden County  00370

    (a)    Not Wounded
    (b)    Superficially Wounded
    (c)    Critically Wounded
    (d)    Killed
    (e)    Location of Officers wound(s) and nature of treatment.

(26)    Suspect Injuries box checked.

    (a)    Not Wounded
    (b)    Superficially Wounded
    (c)    Critically Wounded
    (d)    Killed
    (e)    Unknown
    (f)    Location of Suspect wounds(s) and nature of treatment.

(27) Narrative-Detailed account of incident, to include assistance received from other agencies or persons.

© 1994 - 2012, Information Technologies, Inc. http://www.lillusa.com
Camden County  00371

NOTE: This rule or regulation is for internal use only, and does not enlarge an officer's civil or criminal liability in any way. It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third-party claims. Violations of this directive, if proven, can only form the basis of a complaint by this Department, and then only in a non-judicial administrative setting.

## Definitions

Special Weapons and Tactics (SWAT) team-   is a designated law enforcement team, whose members are recruited, selected, trained, equipped and assigned to resolve critical incidents involving a threat to public safety which would otherwise exceed the resources of traditional law enforcement first responders and/or investigative units.

"SWAT"-   is an accepted title for a team with specialized training and expertise as defined above and further defined within these standards.

Hostage Situation - A person held against his or her will by an armed, potentially armed, or otherwise dangerous suspect who has demonstrated by action, word, or deed willingness to do the person harm in order to compel another party to act or refrain from acting in a particular way, or for personal gratification.

Barricade Situation - The stand-off created by an armed or potentially armed suspect in any location, whether fortified or not, who is refusing to comply with Police demands for surrender.

Barricaded Subject - A person who is not suspected of committing a crime but is the focus of a legitimate police intervention effort, most often involving threats of suicide or mental illness, who has taken a position in a physical location, most often a structure or a vehicle that does not allow immediate police access, whether fortified or not, and who is refusing police orders to exit. A barricaded subject may be known to be armed, thought to be armed, have access to weapons, or be in an unknown weapons status.

Barricaded Suspect - A criminal suspect who has taken a position in a physical location, most often a structure or vehicle, that does not allow immediate police access-whether fortified or not-and who is refusing police orders to exit. A barricaded suspect may be known to be armed, thought to be armed, have access to weapons in the location, or be in an unknown weapons status.

Inner Perimeter - A close proximity boundary maintained initially by first responding officers, later transferred to the special weapons and tactics team and designed to contain the situation to the smallest possible area and prevent access to the target location by persons from the outside.

© 1994 - 2012, Information Technologies, Inc. http://www.ldusa.com
Camden County  00372

<u>Outer Perimeter</u> - A boundary outside the inner perimeter maintained by patrol officers and designed to prevent unauthorized persons from entering the area of the critical incident.

<u>Sniper Situation/Active Shooter</u> - The firing upon citizens and/or police by an armed suspect whether stationary or mobile.

<u>High-Risk Apprehension</u> - The arrest or apprehension of an armed or potentially armed suspect where the likelihood of armed resistance is high, and which may require the specific application of various levels of force, up to and including deadly force.

<u>High-Risk Warrant Service</u>- The service of search or arrest warrants executed at a location where there is a well-founded expectation of danger to the members involved; i.e., armed suspects, aggressive animals, explosive devices, etc., or where the warrant service may require the specific application of various levels of force, up to and including, deadly force, or policy recommends, requires, or requests the *SWAT team*.

<u>Weapons of Mass Destruction</u> - Response to chemical, biological, nuclear, radiological and explosive incidents.

<u>Special Assignment</u> - The security of special persons such as witnesses or suspects based on threat or potential threat to the well-being of those persons.

## II    Purpose

The primary purpose of SWAT is to provide a systematic approach to saving lives in accordance with the priorities of life and the specific standards set forth by policy, in concert with the totality of circumstances presented. While life safety is a priority of SWAT, the specific circumstances will dictate the level of force necessary to adequately protect the public and the officers involved. Resolution of some incidents may require the specific application of various levels of force, up to and including, deadly force.

The purpose of this policy is to provide patrol personnel and supervisors clear guidelines for the activation and response of the Camden County Sheriff's Office SWAT team, and establish directives for patrol personnel awaiting the SWAT team arrival to a critical incident.

## III    Basic Configuration

The SWAT team shall be comprised of members with the training and expertise to responsibly engage in the following operations, in accordance with NTOA standards; at a minimum this shall include:

-Tactical Command

-Containment

-Emergency Action

-Deliberate Action

-Precision Long Rifle

The SWAT team shall consist of the following personnel:

1. Team Commander (must be a member of the Command Staff)
2. Team Leader
3. Team Director
4. Assistant Team Leader
5. Entry Team Members
6. Containment Team Members
7. Hasty Reaction Team Members
8. Sniper/Observer Team Members
9. Hostage Negotiators
10. Support Personnel- Drivers, Armorer, Dispatchers, etc.

## IV    Mission

Recognizing that the presence of a highly-trained, highly-skilled SWAT team has been shown to substantially reduce the risk of injury or loss of life to citizens, police officers and suspects during the conduct of police special operations, and recognizing that a well-managed team response to police special operations usually results in successful resolution of such operations, it is the intent of the Camden County Sheriff's Office to provide a highly trained and skilled SWAT team as a resource for the conduct of special operations.

The mission of the SWAT team is to conduct special operations where appropriate and as assigned. Special operations consist of, but are not limited to, hostage situations, barricade situations, sniper situations, high-risk apprehension, high-risk warrant service, personal protection details, supporting special events, special assignments, weapons of mass destruction (WMD), and acts of terrorism.

## V    Notification

The on-duty, field supervisor shall contact the Team Commander, or in his absence the Team Leader, in any circumstances involving a threat to officer or public safety which exceed the capabilities of patrol first responders or investigative units.  Some of those circumstances are listed below, but this is not an all inclusive list, and in no way implies these are the only circumstances to which the SWAT team will respond. Any threat to the safety of the public or officer safety should warrant a call to the Team Commander for consideration. Final consideration for the activation of the SWAT team shall rest with the Team Leader or the Team Commander, and the Sheriff of Camden County. A field supervisor shall contact the Team Commander or the Team Leader when:

1.    A hostage situation

2.    A barricade situation

3.    An armed individual is loose in an urban or rural area

4.    High-risk warrant service

5.    Dignitary protection/Special assignment

6.    Terrorism response

7.    High-risk apprehension

8.    Sniper/Active Shooter

9.    Any incident which exceeds the capability of patrol personnel to protect public safety

## VI    Activation

Based upon the assessment of the Sheriff, along with the Team Commander or the Team Leader, the SWAT team will be activated. Team members will respond to the Sheriff's Office, or any other designated briefing/staging area, at the direction of the Team Commander or Team Leader.

If while waiting for the SWAT team to respond, the situation escalates to the point that immediate law enforcement action is required, deputies are directed to take action, as necessary, to restrain and take into custody the suspect(s) and to protect themselves and innocent parties from danger.

Special operations cause a wide spectrum of situations; maximum latitude must be afforded to first responders, containment members and SWAT team members, to avoid constraining them unnecessarily in the planning and execution of any operation.

The application of the procedures outlined in this order will be made during times of stress, when individual emotions are likely to run high. It is impossible to set forth the exact procedures deputies should follow in every situation they may encounter. Therefore, all deputies should realize they are

© 1994 - 2012, Information Technologies, Inc. http://www.ltusa.com
Camden County  00375

expected to exercise their best judgment when faced with other problems not covered herein.

## VII    Containment/Response by Patrol Personnel

After determining that one of the above situations exists, the first deputy at the scene should take a protected position. Weapons should be used only in accordance with the department's policy concerning the use of deadly force. As soon as possible, the first deputy should make certain that the sergeant on-duty or field supervisor has been made aware of the situation. Subsequent actions by the first deputy will include:

-Attempt to contain the suspect(s).
-Evacuate persons within the immediate danger area, if practical.

Other responding deputies will:

-Establish communication with the first deputy.
-Establish perimeter security.
-Help contain the suspect(s).
-Begin evacuation from the danger area, if practical.
-Identify all potential witnesses in the area for later interviews.
-Assist in gathering intelligence information.
-Maintain positions until released by the Field Sergeant or commander.

Deputies should be aware that it may take some time before other deputies begin to arrive, and efforts should be directed toward maintaining control, containing the suspect(s), evacuating personnel from the danger area, establishing secured perimeter lines around the scene, and directing pedestrian/vehicular traffic away from the area.

Although primary considerations will be given to rescuing a wounded deputy, assisting deputies will not respond directly to him without first assessing the situation, due the extent of his injuries, location of the suspect(s), other deputies present, etc. Attention must be given to the possibility of the suspect(s) ambushing other deputies arriving at the scene.

Additional injured deputies will not benefit a rescue operation. It may be necessary to wait for the arrival of the SWAT team, in order to perform the rescue operation as safely as possible.

Deputies initially dispatched to the call will not attempt to advance on the suspect(s)' position. They will refrain from indiscriminate firing in the general area of a suspect, because of possibility of injury to innocent citizens within the close proximity. They will check suspicious persons leaving the area and prohibit entry to others attempting to enter the area. In addition to providing perimeter security, other deputies and/or reserve deputies may be utilized to fulfill any additional manpower requirements, for various support functions.

All deputies shall complete any reports required because of an offense which occurred before, or

during, the operation. Each deputy will document any action taken by him personally.

## VIII   Response by Field Supervisor

At this time, the Field sergeant, Corporal, or senior deputy may be assigned to take charge of all field operations regarding outer perimeter security, traffic control, evacuation, etc.

At his discretion, the Field Sergeant may instruct the dispatcher to call in any number of off-duty personnel and reserve Sheriff's Department personnel to assist with the incident. He may also notify any additional law enforcement agencies and request additional personnel, if he deems it necessary. All additional personnel should be instructed to report to any area designated by the field supervisor and be prepared for further assignment.

The Field Sergeant or Supervisor shall remain in charge of the scene until the arrival of SWAT team personnel, at which time control of the scene shall be relinquished to the SWAT Team Commander or the Team Leader. The Field Sergeant or Supervisor shall then follow all directives from the Team Commander or Team Leader.

© 1994 - 2012, Information Technologies, Inc. http://www.lduss.com

Camden County  00377