IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SPENCER NORMAN, KIEFER NORMAN, COURTNEY NORMAN, and HELEN S. NORMAN,<br><br>Plaintiffs,<br><br>v.<br><br>CAMDEN COUNTY, BRIAN D. FIENE, DWIGHT D. FRANKLIN, RICHARD B. DZIADOSZ, LARRY L. RUTHERFORD, and JAMEE L. WATSON,<br><br>Defendants. | Case No.: 2:12-CV-04210-NKL |

## **AFFIDAVIT OF BRIAN FIENE**

State of Missouri )
)
County of Camden )

Brian Fiene, being duly sworn upon his oath, states that he has personal knowledge of the following facts:

1. I was hired as a deputy sheriff by Camden County on September 23, 1997.

2. I attended the police academy at the St. Charles County Law Enforcement Training Center graduating on January 31, 1997 with 490 hours of police training.

3. I was licensed by the Missouri Department of Public Safety as a police officer in the State of Missouri on January 31, 1997 and was granted a Class A license.

4. During my training at the academy, I had training in arrest procedures, use of force, constitutional law, defensive tactics, handcuffing techniques, monitoring individuals in custody, and the law concerning the detention and arrest of individuals.



Exhibit E

5. I had training at the police academy in defensive tactics, including pressure point control tactics, which included instruction on the use of force in making an arrest and how to properly apply handcuffs when making an arrest.

6. I began my career with the Camden County Sheriff's Department as a road patrol deputy sheriff, whose duties included responding to calls for service, investigating crimes, traffic patrol, and enforcing the law in Camden County, Missouri.

7. I received six hours of training to use an M-26 Taser in 2003 when the Camden County Sheriff's Department began utilizing tasers.

8. I was carrying an X-26 Taser on October 4, 2011, which was a Taser that operated and deployed in the same manner as an M-26 Taser.

9. I was trained that a taser could be deployed upon an individual when it was deemed reasonably and objectively necessary to control a non-compliant, dangerous or violent subject and/or an individual resisting arrest when deadly force did not appear to be justified and/or necessary.

10. I received in excess of 300 hours of additional police training from 1997 until October 4, 2011.

11. I have maintained my license with the Missouri Department of Public Safety by taking 48 hours of continuing law enforcement training every three years since I was hired as a deputy sheriff by the Camden County Sheriff's Department.

12. I was promoted to the rank of sergeant at the Camden County Sheriff's Department in 2005.

13. As a sergeant, I was assigned to supervise other road patrol deputy sheriffs on my shift.

14. Generally, I was assigned three to four road patrol deputy sheriffs on a given shift to supervise.

15. I also continued to engage in road patrol activities, responding to calls for services, investigating crimes, traffic patrol, and enforcing the law during my shifts while I was supervising other deputy sheriffs from 2005 until October 4, 2011.

16. I have received training as a supervisor while I have been employed at the Camden County Sheriff's Department, including the Missouri Uniform Crime Reporting for Supervisors course in 2003, the NIMSIS-100 Introduction to the Incident Command System in 2006, and the NIMSIS-700 National Incident Management System in 2006.

17. I attended various constitutional law classes from 1997 until October 4, 2011 which included, among other issues training about the use of force to arrest individuals, arrest procedures, the use of a taser in arresting an individual, and the use of handcuffs in arresting an individual.

18. I received training in the academy, and after I graduated from the academy on January 13, 1997, in pressure point control defensive tactics which included training about the use of handcuffs in arresting an individual.

19. I received training from January 13, 1997 until October 4, 2011 about the use of force in making an arrest and arrest procedures which has included pressure point control defensive tactics, use of force, and high risk warrant service.

20. I received training about monitoring individuals in custody for medical needs which included 14 hours of training in First Responder Training in Emergency Medical Care in the academy in 1997, a Cardiopulmonary Resuscitation and Automated External Defibrillator training in 2002, Adult/Child/Infant Cardiopulmonary

Resuscitation training in 2005, and Cardiopulmonary Resuscitation for the Health Care Provider in 2009.

21. I was trained in the First Responders and Cardiopulmonary Resuscitation (CPR) classes about the procedures for providing cardiopulmonary resuscitation to an individual who had stopped breathing.

22. I attended training in the police academy, and from the date I graduated from the police academy in 1997 until October 4, 2011 through practical classes and constitutional law classes, that taught me I could only use force to arrest individuals that was objectively reasonable and only the force which a reasonably prudent law enforcement officer would use under same or similar conditions considering the totality of the circumstances.

23. During my employment at Camden County I have arrested at least 1,000 individuals.

24. I had read and reviewed the Camden County Sheriff's Office Policy Manual, including the policy on "Use of Force and Weapons" prior to October 4, 2011.

25. I was trained by the Camden County Sheriff's Department that any use of force to arrest an individual had to comply with the "Use of Force and Weapons" policy of the Camden County Sheriff's Department.

26. I had no complaints lodged against me during my employment with the Camden County Sheriff's Department for my use of force in making an arrest, improper or false arrest, my use of a taser in making an arrest, my failure to monitor an individual in custody, for causing injury to an individual during an arrest, for procedures utilized to handcuff an individual, for failing to render first aid to an arrestee, or for procedures utilized to arrest emotionally disturbed persons prior to October 4, 2011.

27. I have never been a Defendant in a lawsuit alleging claims arising out of my duties and responsibilities as a law enforcement officer prior to this case.

28. I was trained that it was an acceptable handcuffing technique to place a knee in the middle of an individual's shoulder blades while in a prone position (facedown) on the ground to assist an officer in handcuffing the individual and to maintain control of the individual if the individual continued to resist and/or attempt to flee after being handcuffed.

29. The temperature on October 4, 2011 was 40 degrees or less.

30. I confirmed to dispatch that I would also respond to the call.

31. As Deputy Dziadosz was walking in the direction of the male who was yelling, I confirmed that I had arrived on Teer Drive at 4:35:07 a.m.

32. Deputy Dziadosz confirmed to me on the radio that the individual had fled on foot westbound from the victim's house with me stopping my vehicle and walking across a field eastbound toward Deputy Dziadosz in an attempt to keep the individual between the two of us.

33. I arrived in the backyard of the residence and observed the individual walking away from Deputy Dziadosz with the individual refusing to comply as Deputy Dziadosz commanded him to stop and show his hands.

34. The individual refused to comply with my commands with him mumbling and growling at myself and Deputy Dziadosz.

35. I had arrested many individuals under the influence of narcotics before October 4, 2011 and knew from my experience in arresting these individuals that their behavior could be unpredictable and that these individuals could become violent and resist arrest.

36. I believed that the individual posed a threat to my safety, the safety of Deputy Dziadosz, the safety of the individual, and the safety of other individuals in the neighborhood because he was under the influence of narcotics and was acting irrationally by talking to God, making his behavior unpredictable, and because he had unlawfully entered one residence and could potentially enter other residences.

37. Based on the information known to me, I believed the individual had committed a burglary under Missouri law.

38. I decided that the individual had to be taken into custody because he had entered a residence unlawfully, he had fought with the homeowner, he refused to follow commands, he walked away, his behavior was unpredictable due to him being under the influence of narcotics, and he could harm a member of the public, himself, or the deputies.

39. I decided to deploy my taser because the individual continued to walk away from me and continued to ignore my commands to stop, put his hands on his head, and to get on the ground.

40. I believed that the use of the taser was the safest method to take the individual into custody without injury to the individual or the officers because it was a non-lethal use of force.

41. I again commanded the individual to put his hands behind his back, but the individual refused and got back up from the ground flailing and swinging his arms and walking away from me.

42. I then ordered the individual repeatedly to stop resisting and get on the ground with the individual refusing to comply.

43. I went to the ground straddling the individual by sitting on his buttocks in an attempt to hold the individual down.

44. I again ordered the individual to place his hands behind his back with the individual failing to comply.

45. The individual placed both of his arms underneath him and would not release his arms to be handcuffed.

46. During this time, I attempted to pull the individual's right arm from underneath his chest so he could be handcuffed.

47. During this time, I again activated my taser on a number of occasions attempting to drive-stun the individual in the back to force him by the use of pain from the taser to release his arms from underneath his chest.

48. I recall that I activated the taser in the drive-stun mode on a number of occasions, but I am unsure how many times I actually drive-stunned the individual with the taser and observed that no taser drive-stun had any effect on the individual.

49. At one point, Deputy Dziadosz was able to retrieve the individual's left wrist from under his chest with myself placing a handcuff on the left wrist of the individual.

50. At about that time, Deputy Watson arrived on the scene with her arriving at 4:36:47 a.m.

51. I noted that the individual was stronger than me and the other two deputies causing me to be unable to move his hands close enough together to use one pair of handcuffs.

52. I radioed dispatch to confirm that the individual was in custody at 4:40:09 a.m.

53. I then directed my attention to a second male individual and a female who had come upon the scene and started arguing.

54. I returned to the location and called for an ambulance to respond to the scene at 4:43:17 a.m.

55. I decided to move the individual from the tall grass in the back yard of the residence to a mowed area on the side of the residence.

56. I went to Deputy Dziadosz's patrol car and drove it to the side of a residence close to the location where the individual had been handcuffed.

57. I then walked to the back of the residence and told Deputy Dziadosz that we should move the individual from the tall grass behind the residence to an area where the grass had been mowed beside the residence close to the patrol car.

58. Deputy Dziadosz and I carried the individual under each shoulder from the back of the residence to the shorter mowed grass area.

59. I also placed a call to dispatch requesting that dispatch have the ambulance expedite to the location at 4:56:38 a.m.

60. I was interviewed by the Missouri Highway Patrol in the investigation.

61. I prepared a report concerning my interaction with Glenn David Norman and a Use of Force Report concerning the arrest of and my interaction with Glenn David Norman as required by the policies of the Camden County Sheriff's Department.

FURTHER, AFFIANT SAYETH NOT.

                          _____
                          BRIAN FIENE

STATE OF MISSOURI    )
                             ) SS.
COUNTY OF CAMDEN  )

       Subscribed and sworn to before me this 6 day of December, 2013.

                          _____
                          Notary Public

My Commission Expires: 5/16/2017

> CONSTANCE E THOMPSON
> Notary Public, Notary Seal
> State of Missouri
> Camden County
> Commission # 13483064
> My Commission Expires May 16, 2017