IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SPENCER NORMAN, KIEFER NORMAN, COURTNEY NORMAN, and HELEN S. NORMAN, <br><br> Plaintiffs, <br><br> v. <br><br> CAMDEN COUNTY, BRIAN D. FIENE, DWIGHT D. FRANKLIN, RICHARD B. DZIADOSZ, LARRY L. RUTHERFORD, and JAMEE L. WATSON, <br><br> Defendants. | Case No.: 2:12-CV-04210-NKL |

## AFFIDAVIT OF RICHARD DZIADOSZ

State of Missouri )
) 
County of Camden )

Richard Dziadosz, being duly sworn upon his oath, states that he has personal knowledge of the following facts:

1. I was hired as a deputy sheriff by Camden County on June 4, 2007.

2. I attended the police academy at the Missouri Sheriffs' Association graduating on June 7, 2007 with 640 hours of police training.

3. I was licensed by the Missouri Department of Public Safety as a police officer in the State of Missouri on June 7, 2007 and was granted a Class A license.

4. Prior to becoming a deputy sheriff, I worked as a correctional officer in the Camden County jail from 2004 until my commission as a deputy sheriff on June 7, 2007.



5. During the time I was a correctional officer, I received training at the Camden County Sheriff's Department to use a taser in 2004.

6. I was trained that a taser could be deployed on an individual when it was deemed reasonably and objectively necessary to control a non-compliant, dangerous or violent subject and/or an individual resisting arrest when deadly force did not appear to be justified and/or necessary.

7. I was hired by the Camden County Sheriff's Department as a road patrol deputy sheriff, whose duties included responding to calls for services, investigating crimes, traffic patrol, and enforcing the law in Camden County.

8. During my training at the academy, I had training in arrest procedures, use of force, constitutional law, defensive tactics, handcuffing techniques, monitoring individuals in custody, and the law concerning the detention and arrest of individuals.

9. I had training at the police academy in defensive tactics, including pressure point control tactics, which included instruction on the use of force in making an arrest and how to properly apply handcuffs when making an arrest.

10. I have maintained my license with the Missouri Department of Public Safety by taking 48 hours of continuing law enforcement training every three years since I was hired as a deputy sheriff by the Camden County Sheriff's Department.

11. I took constitutional law classes in 2009 and 2010 which included, among other issues, training about the use of force to arrest individuals, arrest procedures, the use of a taser in arresting an individual, and the use of handcuffs in arresting an individual.

12. I received training about monitoring individuals in custody for medical needs which included 40 hours of First Responder Training in Emergency Medical Care in the

police academy in 2007, a Cardiopulmonary Resuscitation (CPR) for the Health Care Provider in 2009, and a Cardiopulmonary Resuscitation (CPR) for the Health Care Provider in 2011.

13. I was trained in the First Responder and Cardiopulmonary Resuscitation (CPR) classes about the procedures for providing cardiopulmonary resuscitation to an individual who had stopped breathing.

14. I took a course in October, 2007 about "The Mentally Ill Person" which trained me to recognize individuals who were mentally ill and/or emotionally disturbed and that individuals who were mentally ill and/or emotionally disturbed should be immediately taken into custody to protect the safety of the individual, the police officer, and the public.

15. Prior to October 4, 2011, I had received additional training in Cardiopulmonary Resuscitation for Health Care Providers in 2009 and 2011.

16. Prior to October 4, 2011, I received additional training in Pressure Point Control Tactics Tactical Handcuffing on July 19, 2011 which included training about the use of handcuffs in arresting an individual.

17. I attended training in the police academy, and from the date I graduated from the police academy in 2007 through practical classes and constitutional law classes, that taught me I could only use force to arrest individuals that was objectively reasonable and only the force which a reasonably prudent law enforcement officer would use under same or similar conditions considering the totality of the circumstances.

18. I received in excess of 100 hours of additional police training from my date of graduation from the police academy until October 4, 2011.

19. During my employment at Camden County, I have arrested at least 300 individuals.

20. I had read and reviewed the Camden County Sheriff's Office Policy Manual, including the policy on "Use of Force and Weapons" prior to October 4, 2011.

21. I was trained by the Camden County Sheriff's Department that any use of force to arrest an individual had to comply with the "Use of Force and Weapons" policy of the Camden County Sheriff's Department.

22. I had no complaints lodged against me during my employment with the Camden County Sheriff's Department for my use of force in making an arrest, improper or false arrest, the use of a taser in making an arrest, failure to monitor an individual in custody, for procedures utilized for handcuffing an individual, for causing injury to an individual during an arrest, for failing to render first aid to an arrestee, or for procedures to arrest an emotionally disturbed person prior to October 4, 2011.

23. I have never been a Defendant in a lawsuit alleging claims arising out of my duties and responsibilities as a law enforcement officer prior to this case.

24. I was trained that it was an acceptable handcuffing technique to place a knee in the middle of an individual's shoulder blades while in a prone position (facedown) on the ground to assist an officer in handcuffing the individual and to maintain control of the individual if the individual continued to resist and/or attempt to flee after being handcuffed.

25. At 4:22 a.m., Deputy Watson and I were dispatched to the 911 call made by Jason Cramer at 258 Teer Drive, Linn Creek, Missouri.

26. Mr. Cramer's home at 258 Teer Drive was located in the country approximately eight miles from the City of Camdenton, Missouri.

27. I was dispatched by the Camden County Communication Center for a burglary in progress at 258 Teer Drive, Linn Creek, Missouri. While en route to the location, I

read on my in-car computer that a male had gained entry into a house, that the reporting party was able to get him out of the residence, that the male was still on the front porch banging on the door, and that the individual was a male subject in shorts with no shirt.

28. While en route to the location, I also read information about the incident posted by the dispatcher on my in-car computer including:

   a. Guy on the front porch made his way in the house once saying he has to pee - middle aged;

   b. Was beating on the door and RP answered, pushed past the RP, pushed him back out and he tried to fight the RP (Reporting Party);

   c. Male subject shorts and shirt off;

   d. Second to the last trailer on the right with an addition on it;

   e. Is still trying to get into the house;

   f. RP (Reporting Party) has four little kids in the house also;

   g. Thinks that the male subject messed with the motion detector cause it's not working now; and

   h. Blk Dodge Dakota, brownish Ford P/U.

29. Based upon the dispatch and the information I read on my in-car computer, I believed that the individual had committed a burglary under Missouri law.

30. I began walking toward a residence located at 188 Teer Drive in an attempt to locate the male who was yelling and screaming.

31. I continued to walk into the back yard of a residence located at 188 Teer Drive utilizing my flashlight as I walked because it was dark and no street lights were in the area.

32. The individual did not comply with my command to put his hands in the air.

33. I continued to give the individual commands to put his hands in the air with the individual refusing to comply.

34. I believed that the individual was either intoxicated or under the influence of narcotics.

35. I had arrested many intoxicated individuals and individuals under the influence of narcotics before October 4, 2011 and knew from my experience in arresting these individuals that their behavior could be unpredictable and that the individuals could become violent and resist arrest.

36. While the individual was walking away from me, the individual turned and faced me with me again telling the individual to put his hands in the air with the individual refusing to comply.

37. I believed that the individual had to be taken into custody because he had entered a residence unlawfully, he fought with the homeowner, he refused to follow commands, he walked away, his behavior was unpredictable due to his emotional state, and he could harm a member of the public, himself, or me.

38. I believed that the individual posed a threat to my safety, the safety of the individual, and the safety of other individuals in the neighborhood because he had unlawfully entered one residence, potentially could enter another residence, and because his irrational behavior of talking to God indicated that he was intoxicated or under the influence of narcotics.

39. As the individual was facing me, Sgt. Fiene approached the individual from the opposite direction.

40. I attempted to remove the individual's left arm from underneath his chest so the individual could be handcuffed.

41. Deputy Watson and I remained with the male individual who had been handcuffed to observe him.

42. Deputy Watson and I observed that the individual went to sleep and started making sounds like he was snoring.

43. During this time, Deputy Watson and I observed that the individual was breathing and did not appear to be having any problems breathing.

44. Deputy Watson and I continued to observe the individual after he was moved to the short grass area, and that the individual did not appear to have problems breathing.

45. Deputy Watson and I observed that the individual continued to breathe after he was moved to the short grass area and that the individual did not appear to have problems breathing.

46. Thereafter, Deputy Rutherford and I observed that the individual stopped breathing and no pulse could be found for him.

47. Deputy Rutherford and I began CPR on the individual when he stopped breathing and lost a pulse.

48. The individual was identified as Glenn David Norman

49. I was interviewed by the Missouri Highway Patrol in the investigation.

50. I prepared a report concerning my interaction with Glenn David Norman and a Use of Force Report concerning the arrest of and my interaction with Glenn David Norman as required by the policies of the Camden County Sheriff's Department.

FURTHER, AFFIANT SAYETH NOT.

_____
RICHARD DZIADOSZ

STATE OF MISSOURI )
 ) SS.
COUNTY OF CAMDEN )

Subscribed and sworn to before me this 4 day of December, 2013.

_____
Notary Public

My Commission Expires:

JENNIFER M. WILSON
Notary Public - Notary Seal
STATE OF MISSOURI
Camden County
Commission # 13408208
My Commission Expires: 3/10/2017