

COURT REPORTING
& VIDEO

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

**SPENCER NORMAN, KIEFER NORMAN, COURTNEY NORMAN
AND HELEN S. NORMAN**

**VS.**

**CAMDEN COUNTY, BRIAN D. FIENE, DWIGHT D. FRANKLIN,
RICHARD B. DZIADOSZ, LARRY L. RUTHERFORD, AND JAMEE L.
WATSON**

**Case No. 2:12-CV-04210-NKL**

### DEPOSITION OF JASON CRAMER

### JULY 1, 2013



Exhibit

K

NATIONWIDE SCHEDULING

**OFFICES**

MISSOURI Springfield  Jefferson City  Kansas City  Columbia  Rolla  Cape Girardeau
KANSAS  Overland Park  ILLINOIS  Springfield  Champaign

HEADQUARTERS: 711 North Eleventh Street, ST. Louis, Missouri 63101
**800.280.3376**
www.midwestlitigation.com

```
 1            (WHEREUPON, the deposition began at

 2    3:04 p.m.)

 3    JASON CRAMER, being sworn, testified as follows:

 4    DIRECT EXAMINATION BY MR. HENSON:

 5         Q.    Sir, would you please state your full

 6    name and address for the record.

 7         A.    Jason Cramer, and my address is

 8    856 Wind Road, Osage Beach, Missouri.

 9         Q.    Mr. Cramer, my name is Keith Henson.

10    I previously introduced myself to you, and I've

11    explained to you today that we are here to take

12    your deposition in a lawsuit that is styled

13    Norman, et al versus Camden County, et al, and that

14    I represent the Defendants in this lawsuit, which

15    are Camden County Sheriff Dwight Franklin, Sergeant

16    Brian Fiene, Deputy Richard Dziadosz, Deputy Jamee

17    Watson and Deputy Larry Rutherford, and you

18    understand that, do you not?

19         A.    Yes.

20         Q.    All right.  And are you appearing

21    here today pursuant to a subpoena that I had served

22    upon you requesting you to come here and give your

23    deposition in this lawsuit today?

24         A.    Yes.

25              MR. HENSON:  Let's ark this.
```

1    resides in your household?

2        A.    Correct.  Christopher Smith.

3        Q.    How old is Christopher?

4        A.    And he's ten.

5        Q.    Is that all of your children and

6    Ms. Smith's children?

7        A.    That's it.

8        Q.    Can you tell me what your age is?

9        A.    32.

10        Q.    And can you tell me what your Social

11    Security number is?

12        A.    Xxx-xx-8128.  (REPORTER'S NOTE:

13    Redacted pursuant to discussion on page 105.)

14        Q.    Where were you living on October 4th

15    of 2011?

16        A.    That would be 258 Teer Drive,

17    Linn Creek, Missouri.

18        Q.    And what type of residence did you

19    live in on October 4th of 2011 at 258 Teer Drive?

20        A.    It was a mobile home with an

21    addition.

22        Q.    Did you own that residence?

23        A.    No.  We rented.

24        Q.    And who did own that residence?

25        A.    Roger Murray.

1      A.     Yes.

2      Q.     -- address?

3      A.     Yes, we did.

4      Q.     Is that a residence you're renting

5  again?

6      A.     Yes, it is.

7      Q.     And who owns that residence?

8      A.     Actually, Amber's parents own it.

9      Q.     What are their names?

10     A.     Randy and Diane Smith.

11     Q.     And do they live down here in

12  Camdenton or in the Ozarks?

13     A.     Osage Beach.  They live in the same

14  place.  We rent the downstairs.  It's a big house.

15     Q.     So you all live in one residence?

16     A.     Yeah.

17     Q.     All right.  Back on October 4th of

18  2011 when you lived at 258 Teer Drive, who was

19  residing with you at that address?

20     A.     Me, Amber and the four kids.

21     Q.     So it was you, your significant other

22  Amber Smith, and your four children that you've

23  given to us.  Give me their names again.

24     A.     Christopher, Breanna, Landon and

25  Cayden.

1          A.    That sounds about right.

2          Q.    Okay.  Where were you working on

3    October 4th, 2011?

4          A.    I was working for Bolivar Insulation,

5    and they're right there in Linn Creek Business

6    Park.

7          Q.    And can you tell us, did an incident

8    occur that evening or that morning, I guess, of

9    October 4th, 2011?

10         A.    Yeah, that morning.

11         Q.    About what time did this incident

12    occur?

13         A.    It was very, very early morning.  I

14    really don't know, remember what time.  I know it

15    was really early, and I was woke up out of bed.

16         Q.    And if I represented to you and asked

17    you to assume it was about four o'clock a.m. in the

18    morning, would that sound about right?

19         A.    That was pretty close.

20         Q.    Can you tell me, were you asleep

21    before you got woke up?

22         A.    Yes, I was.

23         Q.    And was Amber Smith at home that

24    morning?

25         A.    Yes.

1     Q.    And were your four children in the

2  house that morning?

3     A.    Yes, they were.

4     Q.    Can you tell me just in your own

5  words what happened at four o'clock a.m. that

6  morning at your home?

7     A.    Well, I was -- I was woke up by this

8  guy beating on the door, banging on the door,

9  yelling and screaming, and I woke up.  And Amber

10  was already awake.  It had woke her up, too.  Her

11  and Breanna were sleeping on the couch.

12          And I went to the door and opened the

13  door.  I didn't know what was going on.  I thought

14  maybe somebody was in trouble.  So I opened the

15  door, and the guy just comes barging in.  And, of

16  course, I've got my kids in the house, so I stopped

17  him right there at the door and was trying to get

18  out of him what was going on.

19          And I couldn't get -- I couldn't

20  really get an answer from him.  I couldn't

21  understand him.  All he was doing was waving his

22  arms around, and I took that as a threat to me and

23  my family, and I grabbed ahold of him and was

24  trying to get him out of my house.

25     Q.    Well, let's stop right there and talk

1          A.    No.

2          Q.    So if I understand you correctly,

3    there was someone banging on your front door and

4    yelling; is that right?

5          A.    That's correct.

6          Q.    Could you decipher what this

7    individual was saying?

8          A.    I could not understand what he was

9    saying.

10          Q.    You went to the front door and you

11    thought somebody might be hurt or something like

12    that?

13          A.    I thought somebody might be in

14    trouble or hurt, so I naturally opened the door and

15    was going to offer assistance, but --

16          Q.    And what happened when you opened

17    your front door that morning?

18          A.    He came -- that's when he came

19    barging in my front door.

20          Q.    Did this individual actually come

21    through the door and come into your house?

22          A.    Yes, he did.

23          Q.    And where was Amber Smith and her

24    child?

25          A.    They were still in the front room.

1          Q.      So were they in the same room where

2     this individual entered?

3          A.      Yes, they were.

4          Q.      And did the individual say anything

5     to you?

6          A.      Like I said, whatever he was saying I

7     could not understand.  Now, I don't know if -- if

8     he was -- I still believe that he was messed up on

9     something, because there was a lot of stuff coming

10    out of his mouth but I could not understand it.

11         Q.      So this individual was speaking and

12    talking, but whatever he was saying you couldn't

13    decipher?

14         A.      Correct.

15         Q.      And it was your impression, I guess,

16    that this individual was high on some type of drug?

17         A.      To my knowledge, I would assume.

18    Nobody -- nobody does that.  That's not logical.

19         Q.      All right.  What was this individual

20    wearing?

21         A.      He was in a pair of shorts, and I

22    don't remember if they were just boxer shorts or if

23    they were just everyday wearing shorts.

24         Q.      Did the individual have any shirt on?

25         A.      No.

1      Q.     Was the individual wearing a hat?

2      A.     No.

3      Q.     Was he carrying any objects or

4  anything of that nature?

5      A.     No.

6      Q.     Did it appear to you he had any type

7  of weapon?

8      A.     It didn't appear to me.

9      Q.     So when this individual came into

10  your house, did you try to talk to him?

11      A.     I did at first, and when I didn't get

12  no response, I -- he just started waving his arms

13  around and barging and pushing his way in further,

14  trying to get in further.  And that's when I took

15  it upon myself to kick him out of my home.

16      Q.     So did this individual lay his hands

17  upon you and push you in your house?

18      A.     He did push me.  He tried to push me

19  back to try to get into my house further, and

20  that's when I grabbed ahold of him.

21      Q.     Where did you grab this individual?

22      A.     I grabbed him by the throat.

23      Q.     And when you grabbed the individual

24  by the throat, what did you do at that point in

25  time?

1      A.      At that point in time, I was

2   squeezing, trying to get him to back off and go

3   back outside, to get away.

4      Q.      And what -- how did this individual

5   react once you grabbed him by the throat and

6   started squeezing his throat?

7      A.      He persisted in fighting me with

8   more -- I don't know what you call it -- force to

9   try to get into my house.

10     Q.      And how did this individual then use

11  force to try to get into your house?

12     A.      He -- he pushed -- he was just trying

13  to push on me and try to get me away from him so he

14  could get in further.

15     Q.      Did the individual ever attempt to

16  strike you?

17     A.      No, not that I'm aware of.

18     Q.      When the individual used force and

19  tried to push on into your house, what did you do?

20     A.      Well, I grabbed -- I just -- I

21  grabbed tighter, and I got the front door open

22  enough that I got him back out on the porch.

23     Q.      Did you push the individual out on

24  the porch from your front room?

25     A.      We walked.  I had -- and I had ahold

1    of him still, but we walked out on the front porch,

2    and then I let go of him.  Then he persisted to try

3    to come back into my house.

4         Q.    Was Amber and the one child still in

5    this front room when you were having this

6    interaction?

7         A.    At that point, I think they had moved

8    into the kitchen, the dining room area.

9         Q.    And when this individual was trying

10   to push into your house and get into your house,

11   what was your general feeling?  Were you afraid?

12        A.    I was afraid for my family.

13        Q.    Did you believe that this individual

14   was a threat to your family?

15        A.    I did.  At four o'clock in the

16   morning and -- yeah, I did.

17        Q.    Why did you believe that the

18   individual was a threat to you and your family?

19        A.    With the waving of his arms the way

20   he was doing, I didn't know.  It's something I

21   won't take a chance on.

22        Q.    Had you ever seen this individual

23   before?

24        A.    No, I hadn't.  I'd never seen him

25   around there before.

1      Q.    So this was the first time that you'd

2  ever seen this individual?

3      A.    Correct.

4      Q.    I think we got to the point that you

5  had pushed him out the front door and you were on

6  your front porch; is that correct?

7      A.    That's correct.

8      Q.    And you said the individual persisted

9  in trying to come back into your house?

10     A.    He did, and I grabbed ahold of him

11  and in pretty much -- I tried -- before I grabbed

12  ahold of him, I did try to -- I tried to talk to

13  him.  I tried to get him to calm down, explain to

14  me what was wrong, what he needed, but he -- the

15  words, what he was saying, I still could not

16  understand at that point.  And then the waving of

17  his arms again started going and then he started

18  walking towards me, and yes, I took that as a

19  threat.  I grabbed ahold of him in a bear hug and

20  we went off the porch and he went on his back.

21     Q.    Did you ever smell alcohol on this

22  individual?

23     A.    I didn't.

24     Q.    Were you able to see the individual's

25  eyes to see what his eyes looked like?

1        A.     I didn't really.

2        Q.     But you continued when you were on

3    your front porch to try to talk to this individual

4    and you couldn't understand what he said?

5        A.     I could not understand what he was

6    saying.

7        Q.     And what did you say to him?

8        A.     I asked him to calm down, to tell me

9    what he was in need of, what he -- if there was

10   something I could do to help him.

11       Q.     Did the individual attempt to push

12   you to get back into the house again?

13       A.     Yes, he did, and that's when I

14   grabbed ahold of him in the bear hug and off the

15   porch.  I jumped off the porch.  At that point I

16   took it as he was a threat, he was trying to come

17   in and trying to do some harm.  So yes, I was

18   taking measures to protect my family and to get him

19   away from me so I could get back in my house.

20            Because at that point, after I got up

21   off the ground with him, I turned -- I got turned

22   around and went up on the porch, and no more than I

23   got on the porch, he was already on the steps

24   again.

25       Q.     Well, let's talk about the bear hug.

1    When you put him in a bear hug, when you say those

2    words, it means to me that you took your arms

3    and --

4         A.    Put it around him.

5         Q.    -- and put it around him?

6         A.    Yes.

7         Q.    And maybe grasped them in the back?

8         A.    Yes.  I latched and I held on as

9    tight as I could and I jumped off the porch with

10   him.  I meant to get him away from me, whatever it

11   took.

12        Q.    And this was the front porch of your

13   residence?

14        A.    Correct.

15        Q.    How tall was that front porch?

16        A.    Three foot.

17        Q.    So you grabbed this individual in a

18   bear hug and, in essence, just pushed him and both

19   of you went off the porch onto the ground?

20        A.    Correct.

21        Q.    And did he land on his back or where

22   did he land?

23        A.    He landed on his back.

24        Q.    And were you on top of this

25   individual?

1          A.    I was.

2          Q.    And did you stay on the ground with

3   him for a period of time?

4          A.    No.  As soon as we hit the ground, I

5   got up, and I assumed at that point maybe I'd made

6   my point for him to go away.  Apparently it did not

7   work.  I mean, I immediately got up and got up on

8   the porch, and then no more than I got up on the

9   porch off the steps, he was right there on the

10  steps right there behind me.

11         Q.    So the individual, once you got off

12  this individual on the ground and you got back up

13  on your front porch, this individual got up and got

14  on the steps, too?

15         A.    Up on the steps.

16         Q.    And were you standing on the front

17  porch at that time?

18         A.    I was.  I was standing right at the

19  front of the steps at that point.  I was not going

20  to let him back up on the porch.

21         Q.    And what -- did the individual say

22  anything at that point in time that you could

23  understand?

24         A.    No.  At that point there was no -- no

25  verbal anything coming out of his mouth.  At that

1    point the arms started going again, and I did see

2    his fists double up like he was going to hit me and

3    I did punch him.

4         Q.    Did you say anything to this

5    individual before you punched him?

6         A.    I told him to leave before he got

7    hurt, and that was it.

8         Q.    And when you told this individual to

9    leave before he got hurt, did he ignore that

10   instruction or --

11        A.    Yes, he did.  That's when he -- he

12   started waving the arms around and the fists

13   doubled up, and that's when I -- that's when I hit

14   him, and I hit him right square in the jaw and he

15   fell off the porch.

16        Q.    Did he get back up on the porch

17   before you hit him?

18        A.    He was on the steps.  He didn't get

19   back up onto the porch, but he was trying.

20        Q.    So you hit him square on the jaw?

21        A.    Right on the jaw.

22        Q.    And did you knock him down?

23        A.    I knocked him down.

24        Q.    And did he fall to the ground at that

25   point?

1          A.     Yes, he did.

2          Q.     And which jaw did you hit him in,

3     left or right?

4          A.     Facing me, so it would have been left

5     side.

6          Q.     And the individual went down to the

7     ground?

8          A.     Yes, he did.

9          Q.     And what did you do when this

10    individual went down to the ground?

11         A.     Turned around and went in the house

12    and got the door locked.  That's when I made the

13    911 call.

14         Q.     Did you say anything else to the

15    individual before you went into the house and

16    locked the door?

17         A.     No.

18         Q.     Did he say anything to you that you

19    recognized?

20         A.     No.

21         Q.     During this entire encounter, did the

22    individual ever say anything that you could

23    decipher as far as what he was saying?

24         A.     No.

25         Q.     So you went back into the house,

1   locked the door; is that correct?

2       A.    Correct.

3       Q.    Did you deadbolt the door or just

4   lock it?

5       A.    Well, it was a deadbolt lock.

6       Q.    Was Amber Smith and the child in the

7   front room when you went back in?

8       A.    Yes.   They were standing in the

9   dining room.

10      Q.    Did you and Amber Smith have any

11  conversation at that time about what was happening?

12      A.    She had asked me if he had said

13  anything about what was -- what he was needing or

14  what was wrong, and at that point I just told her

15  that I was calling the police, I was making the

16  call.

17      Q.    And why did you believe it was

18  necessary to call the police?

19      A.    Because I just -- I felt at that

20  point that he was definitely -- there was something

21  wrong, but he was not physically able to verify

22  what it was, so he needed help, I mean.   And he

23  wouldn't get away from my house, so I didn't know

24  if he would try it somewhere else, which he did.

25      Q.    All right.   Did you feel at that

1       point in time that this individual was a threat to

2       you and your family?

3               A.      At the time he was there, yes.

4               Q.      Did you believe that this individual

5       was a threat to your and your family's safety at

6       that point in time?

7               A.      Yes, I did.

8               Q.      And you called 911?

9               A.      Yes, I did.

10              Q.      And 911 is the service -- the

11      emergency service that serves Camden County?

12              A.      Yes.

13              Q.      And did you get through to 911?

14              A.      Yes, I did.

15              Q.      During the time you were dialing 911,

16      did you hear this individual outside?

17              A.      He had -- was -- he started -- he

18      come up on the porch again and he had beat on the

19      door for just a brief second.  And then he had --

20      then he had left, and I didn't know where he'd

21      went.

22                      I was on the phone with the 911 at

23      that point, and I told them that he was -- he was

24      trying to get back in again, and that's when they

25      told me they would be dispatching somebody out

1    there, to stay in the house with the door locked

2    until somebody arrived.

3         Q.    So did this individual attempt to get

4    into your house again?

5         A.    Yes, he did.

6         Q.    How was this individual attempting to

7    get into your house?

8         A.    He was turning the knob on the front

9    door.

10        Q.    Did he beat on the door again?

11        A.    For just a couple times, and I think

12   once he realized that the door was locked, that he

13   was probably not going to be able to do it again,

14   and it was just -- I don't know how long it was.

15   But it didn't seem like it was very long and the

16   officers were there.  But he had already made it to

17   the neighbor's house and the neighbor's mom's

18   house.

19        Q.    Did the individual yell anything or

20   say anything when he was beating on your door and

21   when you were calling 911 or attempting to turn the

22   doorknob?

23        A.    No.

24               (CRAMER EXHIBIT NO. 2 WAS MARKED FOR

25   IDENTIFICATION.)

1          A.     I think it was later on -- later on

2     that day.

3          Q.     And did you learn that this

4     individual's name was Glen David Norman?

5          A.     Yes.

6          Q.     So that was the individual that was

7     at least identified to you as the individual that

8     came into your house that morning?

9          A.     Correct.

10         Q.     You heard on the beginning of the 911

11    tape, all of those are timed, and it says 4:22 a.m.

12    Did you hear that?

13         A.     Correct.  Yes.

14         Q.     And does that sound about like the

15    approximate time on October 4, 2011 you made the

16    call to 911 about 4:22 a.m.?

17         A.     Yeah.

18         Q.     All right.  It also appeared that you

19    told the 911 operator that this individual had made

20    it into your house one time; is that correct?

21         A.     Correct.

22         Q.     Is that the only time the individual

23    got into your house was on that one occasion?

24         A.     That was it.

25         Q.     And it also seemed to me that you had

1    tape.  Did you tell the 911 operators that he was

2    still beating on your door and trying to come in

3    your house?

4         A.    Yes, I did.

5         Q.    And was that your voice on the second

6    part of that call?

7         A.    Yes, it was.

8              MR. HENSON:  And I think Mr. Carnie's

9    correct.  What we can do is put on the record that

10   it appears to me that this 911 call goes on for

11   one, two, three, four, five, six -- six additional

12   segments that is on this CD that we have, and Mr.

13   Carnie has the same CD.

14              And I assume, Mr. Carnie, you and I

15   can agree that those six additional segments of the

16   911 call were conversations between Mr. Cramer and

17   the 911 operator?

18              MR. CARNIE:  That's correct, we can.

19              MR. HENSON:  And so, therefore, we

20   don't have to listen to all of them, which is a

21   good thing.

22              THE WITNESS:  Yeah.

23              MR. CARNIE:  Just trying to get you

24   out of here.

25              MR. HENSON:  Well, I can tell you

1          Q.     Mr. Cramer, you have now listened to

2     that interview that Corporal Stacks did of you on

3     October 6 of 2011.  Is that your voice on the

4     interview?

5          A.     Yes, it is.

6          Q.     Is that the interview that you gave

7     to Corporal Stacks of the Missouri Highway Patrol

8     on October 6, 2011 that we marked as Exhibit 3?

9          A.     Yes, it is.

10          Q.     One good thing about listening to

11     interviews sometimes is it refreshes your

12     recollection a little bit about what happened

13     because you gave that interview two days after this

14     incident; is that correct?

15          A.     Yes.

16          Q.     Did you hear some things in there

17     today that has refreshed your recollection about

18     what happened that morning?

19          A.     The guy said he needed to go pee.  I

20     did forget about that.

21          Q.     Well, I heard that.  I heard that

22     also, so that was one of the things I'd written

23     down.  Do you remember this individual when he was

24     coming into your house or on your front porch

25     saying that he needed to go pee?

1   can.  If you want to waive that right and just tell

2   us on the record that you're waiving your right to

3   read and sign, you can do that.  It's up to you.

4           THE WITNESS:  I'll waive my right to

5   read and sign.  I trust her judgment.

6           MR. HENSON:  Then we'll show on the

7   record that you've waived your right to read and

8   sign it and we won't send you a copy of it.  The

9   one thing I will tell you -- off the record I'll

10   get your cell phone number.  We've got this case

11   set for trial I think in April of next year; is

12   that right?

13           MR. CARNIE:  I believe so.

14           MR. HENSON:  And if this case has to

15   be tried, we will probably subpoena you again to

16   ask you to come to the trial, which will be in

17   Jefferson City actually.  That's a little bit

18   further.

19           THE WITNESS:  Yeah.

20           MR. HENSON: But that's not until

21   April of 2014.  I'm just telling you that so you'd

22   be aware.

23           THE WITNESS:  Okay.

24           MR. HENSON:  And I guess technically

25   the subpoena may be valid to get you there that's