UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| SPENCER NORMAN, KEIFER NORMAN, COURTNEY NORMAN, HELEN S. NORMAN, | ) ) ) ) ) | COPY |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Cause No. 2:12-CV-04210 |
| CAMDEN COUNTY, BRIAN D. FIENE, DWIGHT FRANKLIN, | ) ) ) | |
| Defendants. | ) ) | September 24, 2013 Camdenton, Missouri |

DEPOSITION OF RICHARD BRANDON DZIADOSZ,

a witness, produced, sworn and examined on the 24th day of September 2013, between the hours of 10:00 a.m. and 1:15 p.m. of that day, at the Law Offices of Phillips, McElyea, Carpenter and Welch, 85 Court Circle NW, City of Camdenton, County of Camden, State of Missouri, before

Allison A. Brown
CAPITAL CITY COURT REPORTING
Jefferson City ** The Lake ** Columbia
573-761-4350 ** 573-365-5226 ** 573-445-4142

within and for the State of Missouri, in the above-entitled cause, on the part of the Plaintiffs, taken pursuant to notice.

Exhibit m

Page 4

```
 1            THE VIDEOGRAPHER:  We're on the record at
 2   10:07 a.m.  Today's date is September 24, 2013.  We're here
 3   today for the deposition of Dr. -- excuse me.  We're here
 4   today for the deposition of Deputy Brandon Dziadosz being
 5   taking in the matter of Spencer Norman, et al v.
 6   Camden County, et al.
 7            At this time, would counsel please give their
 8   representations for the record?
 9            MR. CARNIE:  Kevin Carnie for the plaintiffs.
10            MR. HENSON:  Keith Henson on behalf of the
11   defendants.
12            THE VIDEOGRAPHER:  Very good.
13            Would the reporter please swear in the
14   witness?
15            (Witness sworn.)
16   RICHARD BRANDON DZIADOSZ, having first been duly sworn,
17   testified as follows:
18   DIRECT EXAMINATION BY MR. CARNIE:
19       Q.   Would you please state your full name?
20       A.   Richard Brandon Dziadosz.
21       Q.   What is your address, sir?
22       A.   My home address?  It's 330 Panoramic,
23   Camdenton, Missouri.
24       Q.   And what is your occupation?
25       A.   Deputy sheriff.
```

1         Q.   -- from the heart of Camdenton?

2         A.   -- from -- correct.

3         Q.   Were you the first person from the sheriff's
4 office to arrive at the scene?

5         A.   Yes, I was.

6         Q.   What did you see when you arrived?

7         A.   When I first arrived, nobody was at the
8 residence that I got called to.

9         Q.   And when you say no one was at the residence,
10 no one was outside the residence?

11        A.   Correct.

12        Q.   Did you go to the door of the residence?

13        A.   I started walking in that direction. I
14 noticed a female coming from another residence walking
15 towards me, so I went and talked to her.

16        Q.   Okay. And what did she say, if you talked to
17 her?

18        A.   I asked her if she was the one that called.
19 She said that she was not, but she believed the gentleman I
20 was there looking for -- she pointed towards the west where I
21 was hearing some yelling. She said that he would be over
22 there.

23        Q.   Do you know now who she was?

24        A.   Now I do.

25        Q.   Who was she?

1
2       A.   Lillian Rogers.
3       Q.   And did she explain to you who she was when
4  you first met her?
5       A.   Very briefly.  She stated that the gentleman
6  was staying -- was staying with her for that night.
7       Q.   And did you ask her if she was the person who
8  called 911?
9       A.   Yes, I did.
10      Q.   And what did she say?
11      A.   She stated she was not.
12      Q.   And then what did you do?
13      A.   I went to try to locate the gentleman that
14 was -- I was hearing the yelling from.
15      Q.   So Lillian Rogers told you that there was a
16 gentleman in some direction?
17      A.   Yes.
18      Q.   And you went in that direction?
19      A.   Correct.
20      Q.   You did not go to the home that called?  You
21 didn't go up to the front door, right?
22      A.   Correct.
23      Q.   After you followed her direction, what did you
24 see?
25      A.   I -- I located a male outside another

1 residence in the backyard.

2

3     Q. Okay. And could you describe the male for me?

4     A. **Approximately, 5'9", white male, guessing the**
5 **weight about 190, wearing just boxer shorts.**

6     Q. He didn't have a shirt on?

7     A. **No, he did not.**

8     Q. Did he have shoes on?

9     A. **No, he did not.**

10     Q. Did he have a hat on?

11     A. **No.**

12     Q. He just was wearing boxer shorts?

13     A. **Correct.**

14     Q. And what was he doing?

15     A. **He was yelling at the residence that he was in**
16 **the backyard of.**

17     Q. And what do you mean when you say "he was
18 yelling at the residence"?

19     A. **He was facing one of the windows in the back**
20 **of the trailer. The residence was -- being a trailer and**
21 **yelling inside -- or yelling towards the residence.**

22     Q. How close was he to the trailer?

23     A. **He was within arm's reach so within three**
24 **foot.**

25     Q. Okay. Could you make out any of the words he

1  was saying?

2        A.    No.

3

4        Q.    How close to him were you?

5        A.    When I first noticed him, I was probably 30,

6  40 feet, and I closed the distance to approximately 15 feet.

7        Q.    So you moved closer to him?

8        A.    Correct.

9        Q.    You moved about 15 feet from him?

10       A.    Yes.

11       Q.    And was he still yelling at the trailer at

12  that point?

13       A.    He would go from yelling at the trailer to

14  looking up at the sky and yelling at the sky.

15       Q.    And were you able to make out any of the words

16  that he said?

17       A.    The only word I was able to make out is he

18  would say "God."

19       Q.    Okay.  What did you -- did you say anything to

20  him?

21       A.    I told him to put his hands in the air,

22  identified myself, and had my flashlight shining on him.

23       Q.    Did you say anything else to him?

24       A.    No, just told him to put his hands in the air.

25       Q.    Did he say anything to you?

1  A.   Not at that time, no.

2  Q.   What happened next?

3  A.   I unholstered my taser and turned the laser

5  light on and had it pointing to the ground and continued to

6  give him orders to put his hands in the air. And he started

7  to walk away, looking at the sky.

8  Q.   Which direction was he walking?

9  A.   It would be walking to my left at that point.

10 Q.   Away from --

11 A.   Away from the residence.

12 Q.   Away from the trailer?

13 A.   Yes.

14 Q.   Can you describe the area he was walking to?

15 A.   It was an unkempt backyard, grass pretty close

16 to waist high. It was --

17 Q.   And how long -- how much time elapsed from the

18 time you first got within 30 feet of him and the time he

19 started moving?

20 A.   Probably within a minute or two.

21 Q.   Okay. Then what happened after he started

22 moving?

23 A.   I -- when he turned his back to me, I lifted

24 the taser up and put the laser light at the small of his back

25 and continued to give him orders to put his hands in the air.

1  Q.  So you were saying words to him?

2  A.  Yes.

3  Q.  What were you saying?

4  A.  "Put your hands in the air."

5

6  Q.  You were giving orders?

7  A.  Yes.

8  Q.  You were giving commands?

9  A.  Yes.

10 Q.  Did it seem -- did he obey your commands?

11 A.  No, he did not.

12 Q.  I saw in your interview with the Highway
13 Patrol that, at some point, you identified Mr. Norman as an
14 EDP?

15 A.  Yes.

16 Q.  Can you explain for the jury what an EDP is
17 again?

18 A.  It's a term we use, an emotionally disturbed
19 person.  It's basically anybody that's not in a rational
20 state of mind.

21 Q.  And at what point in your encounter with
22 Mr. Norman did you decide that you were dealing with an EDP?

23 A.  I'd say probably about the time he looked up
24 in the sky and started yelling at God is when I figured he
25 was probably going to be an EDP.

1     Q.    And that is when you first approached him, and
2  he was standing by the trailer still?
3     A.    Yeah.
4     Q.    Did you call an ambulance at that point?
5     A.    **No, I did not.**
6
7     Q     Did you tell anyone that you thought
8  Mr. Norman was an EDP?
9     A.    **No, I did not.**
10    Q.    You drew your taser at some point, correct?
11    A.    **Correct.**
12    Q.    And you drew your taser while he was still
13 over by the trailer, right?
14    A.    **Correct.**
15    Q.    And I assume you kept it drawn out while he
16 moved into the tall grass?
17    A.    **The whole backyard is tall grass.**
18    Q.    Oh. So everything is tall grass back there?
19    A.    **Yes. Yes.**
20    Q.    Okay. What happened after he had moved away
21 from the trailer?
22    A.    **Sergeant Fiene, basically, arrived, coming**
23 **from the opposite direction that I came from. And prior to**
24 **his arrival, Mr. Norman turned and faced me. And again, I**
25 **was telling him to put his hands in the air. I had the laser**

1  light on him, and he kind of, like, brushed -- tried to brush
2  the laser light off and stated, "Leave me alone."
3      Q.  Okay.  How long were you on the scene until
4  Sergeant Fiene arrived?
5      A.  Guesstimate, two to three minutes.  Probably
6  closer to two minutes.
7
8      Q.  Did you put the laser light of the taser on
9  Mr. Norman before or after Sergeant Fiene arrived?
10     A.  Before.
11     Q.  And you continued to give him commands?
12     A.  Yes.
13     Q.  Other than giving him commands to put his
14 hands in the air -- is that what you were doing?
15     A.  Yes.
16     Q.  Did you say any other words to him?
17     A.  No.
18     Q.  What did Sergeant Fiene do when he arrived?
19     A.  He put his -- or pulled his -- or drew his
20 taser and pointed it at him and started giving him commands,
21 put his hands on his head.
22     Q.  And Sergeant Fiene's taser would have been
23 facing Mr. Norman's back, correct?
24     A.  When he first arrived, yes.  But very shortly,
25 like, within seconds of his arrival, Mr. Norman turned and

1     A.   Once Sergeant Fiene deployed, I put my taser
2 in the holster.
3     Q.   At that point, there was no need for another
4 taser?
5     A.   In my belief, yes.
6     Q.   I believe you just got us to the point where
7 Mr. Norman falls to the ground; is that right?
8     A.   Yes.
9     Q.   Okay.  Describe that for me.
10    A.   Mr. Norman goes all the way down into prone
11 position and puts his -- both of his arms underneath his
12 chest.
13    Q.   And this was after one of the strikes with the
14 Maglite?
15    A.   Correct.
16    Q.   Why was this strike effective?
17    A.   I'm guessing it was a combination of the
18 several strikes that had occurred, not just that one
19 individual strike.
20    Q.   Did it look as if Mr. Norman lost his balance
21 or what?
22    A.   Yeah.  I would say so.
23    Q.   Was there any contact between Sergeant Fiene
24 and Mr. Norman aside from the Maglite at that point?
25    A.   No.

1  A. He finally stops fighting the cuffs, and she
2 removes her knee.
3  Q. At that point in time when he stops fighting
4 the cuffs, is he making any noise?
5  A. At that time, no.
6  Q. What is he doing?
7  A. He's laying there.
8  Q. Where was his face?
9  A. It was still facing away from me.
10  Q. And what are you doing?
11  A. At that point, I started to roll -- once she
12 got off, I rolled him over onto his side.
13
14  Q. And that's consistent with your training as
15 well?
16  A. Correct.
17  Q. And what is Deputy Watson doing at that point?
18  A. I believe she was catching her breath at that
19 point, just standing right there, you know.
20  Q. Is she touching Mr. Norman?
21  A. No.
22  Q. So does Deputy Watson get her knee in between
23 Mr. Norman's shoulders before or after he is handcuffed?
24  A. It was right during the handcuffing. Once she
25 got the arm out from underneath him and as she was

1  A.  Each of us grabbed one of his arms and moved
2  him over.
3  Q.  Was he moving at all during that time?
4  A.  No, he was not.
5  Q.  Was he limp?
6  A.  Yes.
7  Q.  And are you dragging him by his arms?
8  A.  We was lifting him up by the arms, and yeah,
9  his feet were dragging.
10  Q.  So his feet are dragging on the ground?
11  A.  Correct.
12  Q.  Is his face facing down or --
13  A.  Yes.
14  Q.  Yes. His face is facing down. You and
15  Sergeant Fiene each have one of his arm -- under his armpit?
16  A.  Yes.
17  Q.  And you're walking forward to the mowed grass?
18  A.  Correct.
19  Q.  My mind is trying to figure that out.
20      What do you do with him when you get him to
21  the mowed grass?
22
23  A.  Lay him back down on the ground and move him
24  to his side. At that point, I was informed by Sergeant Fiene
25  that the ambulance has already been contacted, so we was

1  waiting for the ambulance to arrive.

2      Q.   Did he tell you when he contacted an
3  ambulance?

4      A.   No, he did not.

5      Q.   Did he tell you why he contacted an ambulance?

6      A.   He didn't tell me, but it was just protocol,
7  that we always do whenever a taser and any kind of striking
8  is done.

9      Q.   Okay.  So anytime you strike someone, you call
10 an ambulance?

11     A.   Correct.

12     Q.   Anytime you tase someone, you call an
13 ambulance?

14     A.   Correct.

15     Q.   Do you call an ambulance every time there's an
16 EDP?

17     A.   No.

18     Q.   What is Deputy Watson doing while you are
19 moving Mr. Norman from the long grass to the short grass?

20     A.   She was actually just walking in front of us.

21     Q.   Then you get him to the short grass, and you
22 place him on his side again, correct?

23

24     A.   Correct.

25     Q.   Are you the one sitting there with him?

1  an electrical crackling noise.
2      Q.  Okay.
3      A.  If you push it in really hard, you might be
4  able to hear it, very muffled, but usually, you don't hear
5  it.
6      Q.  So you heard that crackling noise?
7
8      A.  Correct.
9      Q.  And that meant to you that he was at least
10 pressing the trigger on the taser, right?
11     A.  Correct.
12     Q.  And do you have an estimate as to the number
13 of times you heard that noise?
14     A.  No, I do not.
15     MR. CARNIE:  That's all the questions I have
16 for you.  Thank you for your time.
17     THE WITNESS:  Thank you.
18     MR. HENSON:  We have no questions, but we will
19 read and sign, so just send it to me, and I'll send it to the
20 deputy and ask him to sign it.
21     THE VIDEOGRAPHER:  Very good.  This dose
22 conclude the deposition of Dr. -- Deputy Brandon Dziadosz.
23 We're off the record at 1:08 p.m.
24     (SIGNATURE REQUESTED.)
25

1  (THIS IS THE SIGNATURE PAGE TO THE DEPOSITION OF RICHARD
2  BRANDON DZIADOSZ TAKEN ON THE 24TH DAY OF SEPTEMBER 2013.)
3
4
5                                    ORIGINAL
6
7
8  _____
9         RICHARD BRANDON DZIADOSZ
10
11  Subscribed and sworn before me on this    19    day
12  of   October                    2013.
13  My Commission expires   03/10/2017            .

JENNIFER M. WILSON
Notary Public - Notary Seal
STATE OF MISSOURI
Camden County
Commission # 13408208
My Commission Expires: 3/10/2017

16  _____
    NOTARY PUBLIC - STATE OF MISSOURI
17  Commissioned in   Camden   County