IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| SPENCER NORMAN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.: 2:12-CV-04210-NKL |
| v. | ) | |
| | ) | |
| CAMDEN COUNTY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**SUGGESTIONS IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' REQUEST
FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE 56(f)**

Based on the admissions found in Camden County's statement of undisputed facts,

Plaintiffs—not Defendants—are entitled to summary judgment. Defendants' use of force was

excessive at several points during the arrest of Glenn David Norman. And the reasonableness of

the majority of the force used should, if necessary, remain a question for the jury. But one

application of force—kneeling on the back of a handcuffed, prone citizen until the citizen stops

struggling and calms down—is expressly unconstitutional. Indeed, long prior to this incident,

numerous courts explicitly held that this behavior is extremely dangerous and patently

unconstitutional. Defendants admit this behavior occurred pursuant to Camden County policy

and training. Nothing more is required to enter judgment in Plaintiffs' favor.[1] Thus, Plaintiffs

request that this Court deny Defendants' Motion and issue judgment independent of the motion

in favor of Plaintiffs and against Camden County, leaving compensatory damages for trial.[2]

---

[1] Once a constitutional violation is established, Plaintiffs are automatically entitled to nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978). Thus, compensatory damages are not an element of Plaintiffs' claims. *See Corpus v. Bennett*, 430 F.3d 912 (8th Cir. 2005). And judgment may be properly entered against Camden County for its liability for expressly unconstitutional actions taken pursuant to its policies.

[2] Plaintiffs asserted claims against only Camden County. No claims were asserted against the deputies or the sheriff in their individual capacities. Thus those claims are not part of the case and judgment on those claims is improper.

# TABLE OF CONTENTS

I.   STATEMENT OF DISPUTED MATERIAL FACTS ..............................................v

II.  STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS.......... vii

III. INTRODUCTION...............................................................................................1

IV.  FACTUAL BACKGROUND .............................................................................1

V.   ARGUMENT ......................................................................................................3

   A. CAMDEN COUNTY VIOLATED DECEDENT'S CONSTITUTIONAL
      RIGHTS BY SUBJECTING HIM TO EXCESSIVE FORCE AND
      FAILING TO PROVIDE MEDICAL CARE.......................................................3

      1. Excessive Use of Force ............................................................................4

      2. Failure to Provide Medical Care .............................................................9

   B. CAMDEN COUNTY'S POLICY FOR RESTRAINING CITIZENS IS
      FACIALLY UNCONSTITUTIONAL AND CAUSED THE VIOLATION
      OF NORMAN'S RIGHTS ...............................................................................10

   C. CAMDEN COUNTY'S FAILURE TO ENACT POLICES AND TRAIN IS
      DELIBERATE INDIFFERENCE TO CITIZENS' RIGHTS. .........................12

VI.  CONCLUSION .................................................................................................15

# TABLE OF AUTHORITIES

**Federal Cases**

*Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999)........................................................5

*Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013)....................12

*Bd. of the County Comm'rs v. Brown*, 520 U.S. 397 (1997) ........................................12

*Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) .................................8, 9

*Carey v. Piphus*, 435 U.S. 247 (1978) ................................................................. i, 8

*Carpenter v. Gage*, 686 F.3d 644 (8th Cir. 2012)......................................................9

*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004).....................4, 5, 6

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)..............................................3, 12

*City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983) ..........................................9

*Corpus v. Bennett*, 430 F.3d 912 (8th Cir. 2005) ................................................... i, 8

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) .............................................4, 5

*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) .......6

*Flores v. U.S.*, 689 F.3d 894 (8th Cir. 2012) ...........................................................9

*Hawkins v. City of Farmington*, 189 F.3d 695 (8th Cir. 1999).....................................5

*Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. Ohio 1999).............................6

*Jones v. Minn. Dep't of Corr.*, 512 F.3d 478 (8th Cir. 2008) ........................................9

*Ludwig v. Anderson*, 54 F.3d 465 (8th Cir. 1995) ...................................................4, 5

*Mann v. Yarnell*, 497 F.3d 822 (8th Cir. 2007)........................................................6

*Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658 (1978) ...............................3, 10, 11

*Ngo v. Storlie*, 495 F.3d 597 (8th Cir. 2007) ..........................................................4

*Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990)......................................................6

*Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385 (8th Cir. 2007) ..........................................11

*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008).......................................................................5, 6

*Williams v. Chambers*, No. 4:07-CV-01409, 2010 WL 481299 (E.D. Mo. Feb. 5, 2010) ..........6, 7

**Federal Statutes**

42 U.S.C. § 1983.............................................................................................................1, 3, 11

FED. R. EVID. 902(5) ...........................................................................................................14

# I.    STATEMENT OF DISPUTED MATERIAL FACTS[3]

The following facts are not necessary for this Court to enter judgment in Plaintiffs' favor and against Camden County for the expressly unconstitutional act of kneeling on Decedent's back while he was handcuffed and prone, until he stopped struggling and calmed down.  All facts establishing that violation are uncontested and included within Defendants' statement of undisputed facts.  But these facts certainly prevent summary judgment on the other uses of force applied and the failure to provide medical care.

1.      Defendant Fiene Tased Mr. Norman 15 times. (Taser Records, Camden County 00084-85, attached hereto as **Exhibit 1**; *contra* DF ¶¶ 209-19, 238-39.)

2.      Three police officers—Defendant Fiene, Defendant Watson, and Defendant Dziadosz—sat or kneeled on top of Decedent at the same time while he was face-down, in a prone position on the ground. (Durant Dep. 43, attached hereto as **Exhibit 2**; *contra* DF ¶¶ 229, 244-50.)

3.      The officers had most of their body weight on Mr. Norman.  (Durant Dep. 208; *contra* DF ¶¶ 229, 244-54.)

4.      The officers were pressing Mr. Norman into the ground. (Durant Dep. 208; *contra* DF ¶¶ 229, 244-54.)

5.      The officers pinned Mr. Norman to the ground.  (Durant Dep. 209; *contra* DF ¶¶ 229, 244-54.)

6.      The officers were putting pressure on Mr. Norman's back, neck, and shoulders. (Durant Dep. 208-09; *contra* DF ¶¶ 229, 244-54.)

---

[3] Due to the volume of Defendants' Statement of Facts, Plaintiffs will submit a separate addendum responding to those facts. Defendant's Facts will be referred to as "DF"; Plaintiff's Disputed Facts will be referred to as "PDF"; Plaintiff's Undisputed Facts will be referred to as "PUF."

7.	Two of the officers, Deputies Dziadosz and Watson, were kneeling on Mr. Norman.  (Durant Dep. 211; *contra* DF ¶¶ 229, 244-54.)

8.	Sergeant Fiene was sitting on Mr. Norman. (Durant Dep. 211; *contra* DF ¶¶ 229, 244-54.)

9.	Most of Mr. Norman's body was covered by the three officers.  (Durant Dep. 211-12; *contra* DF ¶¶ 229, 244-54.)

10.	While Mr. Norman was face-down, in a prone position on the ground, he was not resisting, struggling, or attempting to stand up. (Durant Dep. 46; *contra* DF ¶¶ 228-54.)

11.	When Defendant Fiene used the Taser on Norman while he lay on the ground, Norman made "squalling, gurgling" noises. (Durant Dep. 56; *contra* DF ¶¶ 238-39.)

12.	Mr. Norman "went limp" while the officers were on top of him.  (Durant Dep. 213-14; *contra* DF ¶¶ 244-54.)

13.	After going limp, Mr. Norman made gurgling sounds.  (Durant Dep. 214; *contra* DF ¶¶ 254-74.)

14.	The gurgling noises "sounded like fluid in the lungs, trying to breathe but can't take a full breath and makes a gurgle noise."  (Durant Dep. 214-15; *contra* DF ¶¶ 254-74.)

15.	It sounded like Mr. Norman was having difficulty breathing.  (Durant Dep. 215; *contra* DF ¶¶ 254-74.)

16.	William Durant, an eyewitness to the scene, "thought the man was having problems breathing, [and] was going to die because he couldn't fuckin' breathe." (Durant Dep. 105-06; *contra* DF ¶¶ 254-74.)

17.	The deputies "joked" about how Norman was making gurgling sounds.  (Durant Dep. 78-79, 216-217; *contra* DF ¶¶ 254-74.)

18.     The deputies did not check Decedent for vital signs until, at least, nine minutes after he lost consciousness and began struggling to breathe. (Rugen Dep. 68-69, attached hereto as **Exhibit 3**; Fiene Aff. ¶ 52, Defendant's Ex. E; Dispatch log, Defendant's Ex. D; Durant Dep. 74; *contra* DF ¶¶ 254-74.)

19.     The deputies did not begin CPR until fifteen minutes after Decedent lost consciousness and began struggling to breathe. (Dispatch Log; Fiene Aff. ¶ 52; Fiene Dep. 76-77, attached hereto as **Exhibit 4**; and Durant Dep. 74; *contra* DF ¶¶ 254-74.)

20.     Mr. Norman died from asphyxiation caused by compression of his chest and abdomen. (O'Halloran Dep. 30, attached hereto as **Exhibit 5**; O'Halloran Expert Report 8, attached hereto as **Exhibit 6**; Stacy Dep. 104, attached hereto as **Exhibit 7**; *contra* DF ¶¶ 281, 298.)

21.     Shocks from the Taser contributed to cause Mr. Norman's death. (Stacy Dep. 114-15; *contra* DF ¶¶ 288-89.)

## II.     STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

Like the disputed facts above, these facts are not necessary to establish Camden County's liability for the expressly unconstitutional act of kneeling on Decedent's back while he was handcuffed and prone, until he stopped struggling and calmed down.  All facts establishing that violation are uncontested and included within Defendants' statement of undisputed facts.  But these facts further substantiate that claim and also prevent summary judgment on the other uses of force applied and the failure to provide medical care.

1.     Mr. Norman was 5' 4" inches tall and weighed 170 lbs. (Stacy Dep. 35-36.)

2.     Sergeant Fiene is 6' 3" and weighs 230 lbs.  (Fiene Dep. 6.)

3.      Deputy Dziadosz is 6' 0" and weighs 165 lbs. (Dziadosz Dep. 6, attached hereto as **Exhibit 8**.)

4.      Deputy Watson weighed between 220 and 230 pounds at the time of Mr. Norman's death. (Rugen Dep. 6.)

5.      Norman was unarmed, wearing only his underwear, standing in a field of waist high grass, and yelling the word God at the sky.  (Dziadosz Dep. 58-60.)

6.      Sergeant Fiene recognized Mr. Norman was an emotionally disturbed person "within seconds of seeing him." (Fiene Dep. 83.)

7.      Deputy Dziadosz "immediately realized he was dealing with an emotionally disturbed person, and not so much a burglary suspect." (Missouri State Highway Patrol Interview of Deputy Dziadosz, attached hereto as **Exhibit 9**.)

8.      Deputy Watson (Rugen) observed that Norman was an emotionally disturbed person when she arrived on scene.  (Rugen Dep. 37.)

9.      Norman was wandering "slowly" in the field.  (Dziadosz Dep. 67.)

10.     Dziadosz and Fiene had Norman surrounded.  (Fiene Dep. 35; Dziadosz Dep. 64.)

11.     Fiene shot Norman with his Taser seconds after seeing Norman.  (Dispatch log; Rugen Dep. 30-31.) (Fiene, DSN 2418, arrives on scene at 4:35:07; Watson, DSN 2447, arrives at 4:36:47.  By the time Watson arrived, Norman had already been Tased multiple times and Fiene and Dziadosz were on top of him on the ground)

12.     Sergeant Fiene attempted to "break" Norman's arm with his Maglite.  (Fiene Dep. 52.)

13.     Norman never attempted to strike, hit, kick, or make contact with anyone, including the deputies.  (*See, e.g.*, Dziadosz Dep. 107.)

14.     After Norman was handcuffed, Deputy Watson "kept [her] knee between [Norman's] shoulder blades to hold him down until he finished fighting and struggling." (Deputy Jamee Watson, Use of Force Supplement, October 4, 2011, attached hereto as **Exhibit 10**.)

15.     After Norman was handcuffed, Deputy Watson kept her knee between Norman's shoulder blades for 2-3 minutes. (Rugen Dep. 55.)

16.     "Shortly after [Norman] stopped struggling he began to snore."  (Deputy Jamee Watson, Use of Force Supplement, October 4, 2011.)

17.     The last time the deputies saw Mr. Norman move, Deputy Watson's knee was still in Norman's back.  (Dziadosz Dep. 106.)

18.     After he ceased "snoring" Norman never made another sound.  (Dziadosz Dep. 107-108.)

19.     Camden County trained its officers to keep a knee in between a prone, handcuffed suspect's shoulder blades until the suspect stops struggling. (Franklin Dep. 20-21, attached hereto as **Exhibit 11**.)

20.     By keeping her knee in Norman's back after he was handcuffed, Deputy Watson acted pursuant to Camden County policy and training.  (Franklin Dep. 20-21.)

21.     Asphyxia during prone restraint is a well known danger in the law enforcement community. (Franklin Dep. Ex. 2, p. 59, attached hereto as **Exhibit 12**; Franklin Dep. Ex. 4, attached hereto as **Exhibit 13**; Franklin Dep. 72.; Peters Dep. 46-48, 82, attached hereto as **Exhibit 14**; NAT'L LAW ENFORCEMENT TECH. CTR., U.S. DEP'T OF JUSTICE, POSITIONAL ASPHYXIA—SUDDEN DEATH 1 (1995) (hereinafter DOJ), attached hereto as **Exhibit 15**.

22.    In 1995, the U.S. Department of Justice published a bulletin titled "Positional Asphyxia—Sudden Death." (USDOJ, p.1.)

23.    The bulletin "identifies factors found to precipitate positional asphyxia, and provides recommendations for ensuring a subject's safety and advisory guidelines for care of subject." (USDOJ, p. 1.)

24.    The bulletin describes the basic physiology of a struggle that leads to asphyxia as follows: "A suspect is restrained in a face-down position and breathing may become labored; weight is applied to the person's back—the more weight, the more severe the degree of compression; the individual experiences increased difficulty breathing; the natural reaction to oxygen deficiency occurs—the person struggles more violently; the officer applies more compression to subdue the individual." (USDOJ, p. 1-2.)

25.    The bulletin concludes that "to help minimize the risk of positional asphyxia . . . the use of maximal, prone restraint techniques should be avoided." (USDOJ, p. 3.)

26.    The bulletin lists guidelines from the New York City Police Department for "preventing deaths in custody." (USDOJ, p. 3.)

27.    The NYPD guidelines state that "As soon as the subject is handcuffed, *get him off his stomach*. Turn him on his side or place him in a seated position." (USDOJ, p. 3.)

28.    The NYPD guidelines also state that "[i]f he continues to struggle, *do not sit on his back*. Hold his legs down or wrap his legs with a strap." (USDOJ, p. 3.)

29.    Defendant Camden County knew about the dangers of compression/positional asphyxia during prone restraint. (Franklin Dep. Ex. 2, p. 59; Franklin Dep. Ex. 4; Franklin Dep. 72.)

30.     Defendant Camden County knew that placing pressure on a prone, handcuffed suspects' back could cause asphyxiation.  (Franklin Dep. Ex. 2, p. 59; Franklin Dep. Ex. 4; Franklin Dep. 72.)

31.     Camden County had documents in its possession concerning the dangers of asphyxia during restraint. (Franklin Dep. Ex. 2, p. 59; Franklin Dep. Ex. 4; Franklin Dep. 72.)

32.     Camden County had a document in its possession entitled "A Retrospective Study of Deaths in Police Custody and in the Community." (Franklin Dep. Ex. 4.)

33.     This study was published in 1998.  (Franklin Dep. Ex. 4.)

34.     This study examined 21 cases of unexpected death.  (Franklin Dep. Ex. 4.)

35.     In 18 of the 21 deaths examined, the decedent was restrained in a prone position. (Franklin Dep. Ex. 4.)

36.     In each of these cases, the decedent "suddenly lapsed into tranquility shortly after being restrained." (Franklin Dep. Ex. 4.)

37.     "Eight of the eighteen people who were restrained in the prone position also suffered chest compression from the body weight of the 1 to 5 people restraining them." (Franklin Dep. Ex. 4.)

38.     The study recommends that "law enforcement authorities and others should bear in mind the potential for the unexpected death of people in state of excited delirium who are restrained in the prone position or with a neck hold."  (Franklin Dep. Ex. 4.)

39.     Camden County had a power point in its possession titled "In-Custody Death." (Franklin Dep. Ex. 2.)

40.     The power point was authored by the National Law Enforcement Training Center and it is dated July 2000.  (Franklin Dep. Ex. 2.)

41.     The power point lists "In-Custody Death Prevention Guidelines."  (Franklin Dep. Ex. 2, p. 58).

42.     The prevention guidelines state, among other things, "Be aware of excited delirium and other deadly medical problems. Know when to call EMS and do not hesitate to do it." (Franklin Dep. Ex. 2, p. 58.)

43.     The prevention guidelines state, among other things, "Do not compress the chest." (Franklin Dep. Ex. 2, p. 59.)

44.     Camden County's expert, John Peters, Ph.D., recommends that law enforcement agencies develop a response team and action plan for responding to calls involving emotionally disturbed persons.  (Peters Dep. 104-105.)

45.     In 1988, Peters started writing about restraint-related deaths; in 1996 he started teaching about it. (Peters Dep. 46.)

46.     Peters testified that the concept of restraint related deaths "is certainly not new" and has "been around for a long time."  (Peters Dep. 48.)

47.     Peters testified that the first research article on restraint related death was published in 1849.  (Peters Dep. 47.)

48.     In 2006, Peters published a five step action plan for dealing with emotionally disturbed persons and preventing in custody deaths.  (Peters Dep. 86-108.)

49.     Law enforcement agencies across the country have adopted an action plan for dealing with emotionally disturbed persons and preventing in custody death.  (Peters Dep. 105.)

50.      Peters testified that "bizarre behavior, struggling and resistance can indicate a medical emergency and not a criminal act."  (Peters Dep. 91.)

51.     Peters testified that bizarre behavior can indicate that a person needs emergency help, not a fight with officers over an arrest.  (Peters Dep. 91.)

52.     In his published action plan, Peters wrote "Another medical issue can quickly develop if too many officers are on the person's back attempting to hold him on the ground. Here, too the person may be struggling not to escape the situation, but simply to raise the chest to increase his ability to breathe."  (Peters Dep. 82.)

53.     Peters testified that when officers realize they are dealing with an emotionally disturbed person that an ambulance should be called immediately.  (Peters Dep. 92; 95.)

54.     Peters testified that an ambulance should arrive on the scene at the same time as responding officers.  (Peters Dep. 93.)

55.     Peters agrees that police officers should be trained about the dangers of restraint asphyxia.  (Peters Dep. 83.)

56.     Camden County deputies frequently respond to calls involving emotionally disturbed persons.  (Franklin Dep. 29.)

57.     Camden County responds to approximately 12 to 15 calls involving emotionally disturbed each week. (Dziadosz 28-29.)

58.     Sheriff Franklin agrees that Camden County should train deputies how to deal with emotionally disturbed persons.  (Franklin Dep. 44.)

59.     Sheriff Franklin agrees that Camden County should train about positional asphyxia.  (Franklin Dep. 44.)

60.     Sheriff Franklin agrees that Camden County should train about compression asphyxia. (Franklin Dep. 44.)

61.     Sheriff Franklin agrees that Camden County should train deputies how to safely apprehend emotionally disturbed persons.  (Franklin Dep. 44.)

62.     Camden County did not train its deputies about dealing with emotionally disturbed persons. (Franklin Dep. 47-48.)

63.     Camden County did not train its deputies about preventing in-custody deaths from compression or positional asphyxia. (Franklin Dep. 49.)

64.     Camden County did not train about dealing with mentally ill persons.  (*See, e.g.*, Rugen Dep. 21.)

65.      Camden County did not train about preventing in custody death. (*See, e.g.*, Rugen Dep. 21.)

66.     Camden County did not train about asphyxia. (*See, e.g.*, Rugen Dep. 21.)

67.     Other than CPR, Defendant Camden County provides no training to its officers concerning medical treatment to citizens. (Franklin Dep. 51.)

68.     Defendant Camden County provides no training about when to call an ambulance to the scene. (Franklin Dep. 51-52.)

69.     Defendant Camden County leaves the decision regarding when to call an ambulance up to the "discretion of the officer." (Franklin Dep. 52.)

70.     The Coroner of Camden County, Dr. Jungels, requested that Dr. Carl Stacy, from the University of Missouri, perform an autopsy on Mr. Norman (Stacy Dep. 7-8.)

71.     Dr. Stacy concluded, among other things, that "respiratory compromise" contributed to cause Mr. Norman's death. (Stacy Dep. 104.)

72.     Dr. Stacy testified that "compression of the chest is evidence of respiratory compromise."  (Stacy Dep. 111.)

73.     To this day, Sheriff Franklin still allows deputies to put a knee in the back of a prone, handcuffed citizen until the citizen stops struggling and calms down.  (Franklin Dep. 76.)

74.     To this day, Sheriff Franklin still allows deputies to treat emotionally disturbed persons the same as any other citizen.  (Franklin Dep. 77.)

75.     Deputy Watson has never had any training about dealing with emotionally disturbed persons, dealing with mentally ill persons, prevention of in-custody death, asphyxia, positional asphyxia, restraint asphyxia, or whether or not it is safe to put pressure on a person's back.  (Rugen Dep. 22.)

76.     Deputy Watson believed it was safe to keep her knee in Norman's back based on her training.  (Rugen Dep. 105-06.)

## III.    INTRODUCTION

As Defendants correctly noted, Plaintiffs have not asserted claims against the deputies or the sheriff in their individual capacities.  Thus, even though the deputies and sheriff were nominally included, those claims are effectively made against Camden County.  Because claims against the deputies and sheriff are not part of this case, no response to Defendants' request for summary judgment on those claims is required.[4]

Thus, the only claims at issue are those against Camden County.  Plaintiffs concede that Camden County is immune from liability for state law claims.  So the only issue remaining is Camden County's liability under § 1983.  Camden County's policy for restraining citizens is facially unconstitutional.  And Camden County admits all facts required to establish its liability for constitutional violations flowing from that policy.  Moreover, based on documents in its possession, the general knowledge of the law enforcement community, and well established constitutional guideposts, Camden County's failure to train about the dangers of asphyxia reflects a deliberate indifference to the rights of citizens.  Defendants' Motion should, therefore, be denied and partial summary judgment should be granted in favor of Plaintiffs.

## IV.    FACTUAL BACKGROUND

Mr. Norman was an unarmed, emotionally disturbed person[5], wearing nothing but his underwear, who was banging on a neighbor's door at 4 am in 40 degree weather, yelling that he needed to pee and needed a glass of water.  Camden County deputies found him standing in the middle of a field in Linn Creek, Missouri, yelling at the sky, saying the word God. Deputy

---

[4] Defendants cannot obtain summary judgment on claims that were never asserted; nor can they obtain summary judgment on behalf of parties never sued.  Defendants appear to be asserting that the deputies were sued in their individual capacity in Count I, but in official capacity in County II. Given that there is no distinction in pleading or naming between the counts, this makes little sense.  The capacity must be the same for all counts.

[5] The term "emotionally disturbed person" is a term used by law enforcement officers to describe a person who does not appear to be acting in a rational state of mind, due to any number of underlying conditions, such as mental illness, intoxication, etc.

Dziadosz pointed his Taser at Norman and Norman attempted to swat the red light away. Within seconds of arriving on scene, Sergeant Fiene shot Norman in the chest with his Taser. Fiene activated the Taser 15 times, beat Norman with a Maglite, and tackled Norman to the ground. Fiene tried to break Norman's arm with the Maglite. The deputies wrestled Norman into a prone position (face down) and placed their bodies on top of Norman, pressing him into the ground. Deputy Watson arrived on scene and placed her knee between Norman's shoulder blades, compressing his chest further into the ground. Norman was 5' 4" and 170 lbs; the deputies weighed a combined 625 lbs. Norman never attempted to strike or hit anyone. The deputies eventually handcuffed Norman behind his back. But Deputy Watson remained with her knee in Norman's back for two to three minutes, until Norman stopped struggling. Norman began struggling to breathe—the deputies described it as "snoring"; the only independent eye-witness described it as gurgling noises that "sounded like fluid in the lungs, trying to breathe but can't take a full breath." Nine minutes later, the deputies first checked his vital signs. Fifteen minutes later, they started CPR. It was far too late.

The dangers of prone restraint, particularly when it involves the application of pressure to a citizen's back, are well documented in scientific literature and well known in the law enforcement community. Moreover, prone restraint is particularly deadly when used on emotionally disturbed persons. Documents in Camden County's possession spell out these dangers and provide detailed recommendations for implementing policy and providing training to prevent in custody deaths due to asphyxiation. Ironically, so does Camden County's expert.

Camden County deputies frequently encounter emotionally disturbed persons, like Mr. Norman. Indeed, Deputy Dziadosz estimated that deputies encounter 12-15 emotionally disturbed persons per week. Yet Camden County provides no training about dealing with

emotionally disturbed persons, preventing in custody deaths, or preventing asphyxia during restraint. Nor does Camden County have any policies covering those topics.

Instead, Camden County has a policy and training that directs its officers to place a knee in the back of a prone, handcuffed citizen, until the citizen stops struggling. Camden County's policy and training is facially unconstitutional and directly contradicts well-known guidelines for safely arresting and restraining citizens. In other words, Camden County has chosen to implement policy and training that deliberately disregards citizens' rights by subjecting them to unnecessary risk of death. Mr. Norman is a casualty of that policy.

## V.    ARGUMENT

(A) Establishing a constitutional violation is, obviously, the first element of Plaintiffs' § 1983 claim. Second, Plaintiffs must provide evidence that *either* (B) the constitutional violation flowed from a Camden County policy *or* (C) the constitutional violation was caused by Camden County's deliberate indifference in failing to train its employees or enact adequate policies. *Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658, 690-95 (1978) (violation flows from policy); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-92 (1989) (failure to train). Ample evidence supports each of these elements. Indeed, based on Defendants' statement of facts alone, partial summary judgment can be granted in Plaintiffs' favor.

### A.  CAMDEN COUNTY VIOLATED NORMAN'S CONSTITUTIONAL RIGHTS BY SUBJECTING HIM TO EXCESSIVE FORCE AND FAILING TO PROVIDE MEDICAL CARE.

Camden County deputies used excessive force before and after Mr. Norman was handcuffed. Before, he was Tased fifteen times, beaten with a Maglite, tackled, and crushed by three officers; after, his chest was compressed into the ground until he asphyxiated. Norman went limp and gasped for air. Deputies ignored his obvious medical needs for fifteen minutes.

### 1. Excessive Use of Force.

"The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment . . . ." *Ngo v. Storlie*, 495 F.3d 597, 604 (8th Cir. 2007). Whether force is excessive depends on "whether the amount of force used was objectively reasonable under the particular circumstances." *Id.* at 601. To determine reasonableness, courts look to several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Important here, "[t]he diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004). In other words, "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001); *see also Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995) (whether suspect is emotionally disturbed is *material* to reasonableness). In *Deorle*, for instance, officers encountered a man who "upset at being diagnosed with Hepatitis C and having consumed a half-pint of vodka and some Interferon, his prescribed medication, began behaving erratically." *Deorle*, 272 F.3d at 1275-76. He "had become suicidal," "lost control of himself" and "began screaming and banging on the walls of [his] house." *Id.* An officer eventually shot the man with a "beanbag round." *Id.* In weighing the reasonableness of the officers' conduct, the court eloquently explained the importance of diminished capacity:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.

In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.

*Id.* at 1282-83. Put succinctly, emotionally disturbed persons must be treated differently. *See e.g.*, *Ludwig,* 54 F.3d at 472 ("[S]tandard police procedure regarding emotionally disturbed persons differs greatly from that regarding emotionally stable persons.").

Even so, the reasonableness standard "should frequently remain a question for the jury." *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999); *see also*, *Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999). Courts "rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared." *Abraham*, 183 F.3d at 290. A jury may not be required, however, when the pertinent facts are undisputed and it is clearly established that certain conduct is objectively unreasonable.

Paramount here, "it [is] clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Champion*, 380 F.3d at 903. Indeed, "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes ***objectively unreasonable*** excessive force." *Id.* (emphasis added).

This concept is not novel. (PUF 21-55.) And it is well known in the law enforcement community. (*Id.*) For more than two decades, courts have consistently held that putting pressure on the back of a handcuffed, prone suspect is dangerous and unreasonable. *See*, *e.g.*

*Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008) ("[T]he law was clearly established that applying pressure to [the suspect's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions . . . . A reasonable officer would know these actions present a substantial and totally unnecessary risk of death to the person."); *Champion,* 380 F.3d at 904 (see quotations above); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061-62 (9th Cir. 2003) (holding that the "law was clearly established" and that "*Any* reasonable officer should have known" that "pressing their weight on [the suspect's] neck and torso . . . despite the fact that his hands were cuffed behind his back and he was offering no resistance" constituted excessive force); *Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013, 1019-20 (S.D. Ohio 1999) (finding information existed in law enforcement community that put officers on notice of dangers of asphyxia); *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990) (finding ample evidence of excessive force where plaintiff "could have died of asphyxiation resulting from the pressure exerted when [defendant] sat on his chest").

Ignoring overwhelming appellate precedent, Defendants rest on *Williams v. Chambers*—an unreported case from a district court. No. 4:07-CV-01409, 2010 WL 481299 (E.D. Mo. Feb. 5, 2010).[6] Defendants, apparently, believe that decades of precedent have been undone by a district court finding that is objectively reasonable for an officer to apply "just enough pressure" to prevent a suspect from rolling into moving traffic on Interstate 44. Needless to say, *Williams* is inapposite. Foremost, the undisputed facts in *Williams* show that while being restrained the suspect was lying "three to four feet from the yellow line on the inside shoulder of Interstate

---

[6] To be fair, Defendants also cite *Mann v. Yarnell*, 497 F.3d 822 (8th Cir. 2007). But that case is not even speciously relevant to Deputy Watson's decision to leave her knee in Norman's back. In *Mann*, no force was applied after the suspect was handcuffed. In fact, there's no mention of a knee or even a hand being placed in the suspect's back **at any time** during the arrest. If anything, *Mann* shows that handcuffed suspects can be easily monitored and controlled without resorting to asphyxiation.

44." 2010 WL 481299 at *6. "[T]raffic was driving by mere inches away." *Id.* at *7. Second, the undisputed facts show that "after the handcuffs were placed on [the suspect] . . . [the officer] did not believe that . . . [the suspect] posed a threat of serious injury to him or the public, **except for the fact that they were beside an interstate highway**." *Id.* at *6 (emphasis added). Indeed, "[the officer] knew that [the suspect] could not get up from his position on his stomach . . . ." *Id.* at 7. And finally, the undisputed facts made clear that the officers used "just enough pressure" and only their hands to prevent the suspect from rolling into traffic. *Id.* at *13. In fact, the Court used the term "just enough pressure" four times in its analysis. And it concluded that "the Defendant Officers were concerned about maintaining control of [the suspect] and keeping him off of the interstate . . . ." *Id* at *16. As detailed below, none of these exigencies are present here. Lying in a field in Linn Creek, Missouri is quite different.

Camden County admits that Deputy Watson kept her knee between Norman's shoulder blades—after he was handcuffed and prone—for two to three minutes, until Norman stopped struggling. (DF 252-54.) This admission alone is sufficient to find that Norman's constitutional rights were violated. Norman was handcuffed, lying on his stomach in the middle of a field and by no stretch of the imagination a threat to anyone. He was not lying on a busy interstate. Nor did he ever attempt to strike, hit, kick or threaten to harm anyone in any way. (PUF 13.) But directly contrary to established constitutional guidance, Deputy Watson continued to apply the force of her bodyweight—220-230 lbs—by compressing Norman's back and chest. (PUF 4, 14-15; DF 252-54.) That force was objectively unreasonable and, in fact, created asphyxiating conditions. Any reasonable officer should have known that the force was unnecessary and extremely dangerous.

The fact that this conduct killed Mr. Norman is, of course, disputed. But this Court need not analyze causation. Nor does this Court even need to find that the conduct harmed Norman. *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978) (upon showing of conduct violating constitutional rights, Plaintiff is entitled, at the very least, to nominal damages); *Corpus v. Bennett*, 430 F.3d 912 (8th Cir. 2005) (compensatory damages not an element of excessive force claim). Thus, there is no reason for this Court to even analyze whether the other conduct violated Norman's constitutional rights.

Even so, there's no doubt that the deputies acted unreasonably throughout the encounter. Norman was unarmed, wearing only underwear, and yelling at God. (PUF 5.) He was in a field in Linn Creek, Missouri, surrounded by deputies. (PUF 10.) Every deputy admits that it was immediately evident he was emotionally disturbed. (DF 189, 243; PUF 6.) In fact, Deputy Dziadosz reported that after hearing Norman yelling at God, he "immediately realized he was dealing with an emotionally disturbed person, and not so much a burglary suspect." (PUF 7.) Yet the deputies treated Norman like an armed, violent, fleeing felon. Sergeant Fiene shot Norman in the chest with a Taser within seconds of arriving on scene. (PUF 11.) Fiene shot him because Norman was wandering slowly in a field and ignoring his commands—hardly threatening conduct. (DF 209; PUF 9.) That shot alone is enough to preclude summary judgment. *See Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (affirming denial of summary judgment because jury could find use of Taser was excessive force where suspect "posed at most minimal safety threat . . . and was not actively resisting arrest or attempting to flee").

But the force did not end there. Fiene activated his Taser fifteen times, he tried to break Norman's arm with his Maglite, and he tackled Norman to the ground into a prone position.

(PDF 1; PUF 12; DF 225) Then three deputies put their bodyweight (625 lbs) on top of Norman (5'4" 170 lb), compressing him into the ground until he went limp. (PUF 1-4; PDF 2-9,12.) Norman was not resisting, struggling or attempting to stand up. (PDF 10.)  Obviously, some of these facts are disputed.  But even relying only on Defendants' facts, a jury can fairly conclude that the force used was excessive: an unarmed, emotionally disturbed man in his underwear was Tased multiple times, hit with a Maglite, tackled to the ground, sat on by one deputy and kneeled on by another. (DF 200, 201, 211-16, 219, 223-25, 229, 236, 249.)  And more important at this stage, "[i]t is the province of the jury to assess the credibility of the evidence . . . ." *Brown*, 574 F.3d at 500.  If the jury believes the only independent eye witness—Mr. William Durant—then there's no doubt that all force used was excessive.

### 2.  Failure to Provide Medical Care.

State officials must provide medical care to individuals "who have been injured while being apprehended by the police." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). A violation of this right is viewed under a deliberate indifference standard. *See Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012). Deliberate indifference "requires proof of a reckless disregard of the known risk." *Flores v. U.S.*, 689 F.3d 894, 903 (8th Cir. 2012). Plaintiffs must show Norman had an "objectively serious medical need" and officers "had actual knowledge of those needs but deliberately disregarded them." *Carpenter*, 686 F.3d at 650. A serious medical need is one that has been diagnosed by a physician or "is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008). Actual knowledge "may be inferred from circumstantial evidence or from the very fact that the risk was obvious." *Id.* at 481-82.

Norman had an "objectively serious medical need," which was obvious to a layperson at the scene, and the Defendants had knowledge of this "obvious" need. Mr. William Durant, a layperson with no medical or police training, observed that:

- Mr. Norman "went limp" while the officers were on top of him
- After going limp, Mr. Norman made gurgling sounds
- The gurgling noises "sounded like fluid in the lungs, trying to breathe but can't take a full breath and makes a gurgle noise"
- It sounded like Mr. Norman was having difficulty breathing
- He "thought the man was having problems breathing, [and] was going to die because he couldn't fuckin' breathe."; and
- The deputies "joked" about how Norman was making gurgling sounds.

(PDF 12-17.) Yet the deputies did not check Norman for vital signs until, at least, nine minutes after he lost consciousness and began struggling to breathe. (PDF 18.) And they did not begin CPR until fifteen minutes after he lost consciousness. (PDF 19.)

Even worse, the deputies knew Norman needed medical help *before* they brutalized him. They immediately realized he was an emotionally disturbed person. (PUF 6-8.) Thus, they knew he needed medical help, not a fight with police. (PUF 50-51.) Yet contrary to guidelines proposed by even their own use of force expert, they waited until after asphyxiating Norman to even call an ambulance. (PUF 53-54; DF 262) Had they been properly trained to deal with emotionally disturbed persons— perhaps even by the expert they have now hired to opine on use of force—the deputies would have immediately requested an ambulance when they learned that Norman was an emotionally disturbed person. This utter failure to provide medical care is a violation of Norman's constitutional rights.

### B. CAMDEN COUNTY'S POLICY FOR RESTRAINING CITIZENS IS FACIALLY UNCONSTITUTIONAL AND CAUSED THE VIOLATION OF NORMAN'S RIGHTS.

A municipality is responsible under § 1983 when "execution of a government's policy or custom . . . inflicts the injury . . . ." *Monell*, 436 U.S. at 694. Meaning, the policy is the

"moving force of the constitutional violation." *Id.* "'Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving [the] issues of fault and causation is straightforward.'" *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389-90 (8th Cir. 2007) "To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise." *Id.* at 389-90.

Camden County admits that its policy directs deputies to place a knee in the back of a prone, handcuffed citizen's back until the citizen stops struggling. (DF 136.) This policy is facially unconstitutional.[7] Yet Camden County specifically trains deputies to restrain citizens in this manner. (DF 137.) Based on her training, Deputy Watson believed her actions were safe. (PUF 76.) And Camden County admits Watson acted pursuant to the policy and her training:

> Q   Okay. Sheriff, you're aware that she kept the knee in-between the shoulder
>      blades after he was handcuffed in a prone position until he calmed down and
>      stopped struggling, correct?
> A   Yes.
> Q   Now, is that consistent with the training Camden County provided to Deputy
>      Watson?
> A   Yes.
> Q   Is that consistent with Camden County's policies?
> A   Yes.

(PUF 20.) Thus, Deputy Watson's unconstitutional restraint of Norman flowed directly from Camden County's policy and training.

Several courts have expressly ruled that this tactic is an unconstitutional use of force based upon the high risk of death by asphyxiation. *See infra* Section V.A.1. Because Camden County's policy instructed its officers to take an unconstitutional action and it is undisputed that the action was taken against Norman, Camden County's Motion should be denied and partial summary judgment should be granted in favor of Plaintiffs.

---

[7] *See infra* Section V.A.1.

### C. CAMDEN COUNTY'S FAILURE TO ENACT POLICIES AND TRAIN IS DELIBERATE INDIFFERENCE TO CITIZENS' RIGHTS.

Even absent an unconstitutional policy, Camden County would still be liable based on its failure to train. *See City of Canton*, 489 U.S. at 388. Liability is established "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* Where the need for more or different training is obvious and the inadequacy is likely to result in the violation of constitutional rights, a municipality is deliberately indifferent to the need for more training. *Id.* at 390.

Notice is given heavy weight in determining deliberate indifference. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). But a plaintiff does not have to show "a pattern of constitutional violations." *See Bd. of County Com'rs v. Brown*, 520 U.S. 397, 409 (1997). A constitutional violation "may be a highly predictable consequence" of a municipality's failure to train. *Id.* "The likelihood that the situation will recur and the predictability" that officers who are not adequately trained will violate citizens' rights can justify a finding of deliberate indifference. *Id.* Moreover, a "high degree of predictability" may support an inference that the municipality's deliberate indifference led to the "very consequence that was so predictable." *Id.* at 410-11.

Deputy Watson never received any training about emotionally disturbed persons, preventing in custody death, or asphyxia. (PUF 75.) Camden County provides no training to its deputies about the dangers of asphyxia during restraint. (PUF 62-66.) Likewise, Camden County provides no training on dealing with emotionally disturbed persons—the demographic most likely to suffer asphyxia during restraint. (*Id.*) Nor does it provide training or guidance for when deputies should provide medical care or summon medical providers to assist emotionally disturbed persons. (PUF 67-69.) Needless to say, Camden County doesn't have any policies

dealing with these issue either.  (DF 294.)  Yet Camden County deputies frequently encounter emotionally disturbed persons.  (DF 138.)  With zero guidance, constitutional violations are highly predictable, if not certain.

Camden County certainly had notice about the dangers of asphyxia during restraint. Foremost, the body of case law discussing these dangers—and finding that officers who ignored them committed constitutional violations—is well established.  *See infra* SECTION V.A.1.

Camden County also had documents in its possession detailing the dangers of prone restraint. (PUF 31.)  Specifically, Camden County had a document in its possession titled "A Retrospective Study of Deaths in Police Custody and in the Community." (PUF 32.) This study was published in 1998 and examined 21 cases of unexpected death. (PUF 33-34.)  In 18 of the 21 deaths examined, the decedent was restrained in a prone position and in each, the decedent "suddenly lapsed into tranquility shortly after being restrained." (PUF 35-36.)  And "[e]ight of the eighteen people who were restrained in the prone position also suffered chest compression from the body weight of the 1 to 5 people restraining them." (PUF 37.) The study recommended that "law enforcement authorities . . . should bear in mind the potential for the unexpected death of people in a state of excited delirium who are restrained in the prone position . . . ." (PUF 38.)

Camden County also had a power point in its possession titled "In-Custody Death." (PUF 39.)  The power point, dated July 2000, was authored by the National Law Enforcement Training Center. (PUF 40.) It lists "In-Custody Death Prevention Guidelines."  (PUF 41.) The prevention guidelines state, "Know when to call EMS and do not hesitate to do it." (PUF 42.) And most important, the guidelines explicitly state, "Do not compress the chest." (PUF 43.)

What's more, these dangers have been well known in the law enforcement community for decades prior to Norman's death.  Perhaps most telling, in 1995, the U.S. Department of

Justice published a bulletin titled "Positional Asphyxia—Sudden Death.[8]" (PUF 22.)  It

"identifies factors found to precipitate positional asphyxia, and provides recommendations for

ensuring a subject's safety and advisory guidelines for care of subject." (PUF 23.) It also

describes the basic physiology of a struggle that leads to asphyxia:

- A suspect is restrained in a face-down position and breathing may become labored;
- weight is applied to the person's back—the more weight, the more severe the degree of compression;
- the individual experiences increased difficulty breathing;
- the natural reaction to oxygen deficiency occurs—the person struggles more violently;
- the officer applies more compression to subdue the individual.

(PUF 24.) And it concludes that "to help minimize the risk of positional asphyxia . . . the use of

maximal, prone restraint techniques should be avoided."  (PUF 25.) The bulletin also lists

guidelines from the New York City Police Department for "preventing deaths in custody." (PUF

26.) The guidelines state that "[a]s soon as the subject is handcuffed, *get him off his stomach*.

Turn him on his side or place him in a seated position."  (PUF 27.)  And most pertinent here,

"[i]f he continues to struggle, *do not sit on his back*.  Hold his legs down or wrap his legs with a

strap."  (PUF 28.)

Ironically, Camden County's use of force expert has published several articles about

preventing in custody deaths of emotionally disturbed persons. (PUF  44-55.)  Peters testified

that the concept of restraint related deaths has been around since, at least, 1849. (PUF 47.)  And

in order to prevent exactly what happened here, he advises agencies to implement an action

plan. (PUF 44, 48)  In fact, law enforcement agencies throughout the country have done so.

(PUF 49.) Peters preaches that an ambulance should "roll with responding officers," that

"bizarre behavior, struggling and resistance can indicate a medical emergency and not a

---

[8] This is, of course, a self authenticating document.  FED. R. EVID. 902(5).

criminal act," that a person exhibiting bizarre behavior needs medical help, "not a fight with the officers over an arrest," that a person can suffocate if officers put weight on his back, and that the person "may be struggling not to escape the situation, but simply to raise the chest to increase his ability to breathe." (PUF 50-54.) Peters believes that officers should be trained about these issues. (PUF 55.) Needless to say, Camden County hired Peters far too late.

And finally, even Sheriff Franklin, Camden County's corporate representative, agrees that Camden County should provide more training:

> Q  [S]hould Camden County deputies receive training about how to deal with emotionally disturbed persons?
> A  Yes.
> Q  Should Camden County deputies receive training about how to safely apprehend an emotionally disturbed person?
> A  Yes.
> Q  Should Camden County deputies receive training about positional asphyxia?
> A  Yes.
> Q  Should Camden County deputies receive training about compression asphyxia?
> A  Yes.

(PUF 58-61.) Yet Franklin has neither changed policies nor added training. (PUF 73-74.)

By failing to train and implement policies concerning these dangers—and even worse, implementing a policy that is well-known to cause death—Camden County was deliberately indifferent to citizens' rights. Camden County's deliberate indifference caused the violation of Norman's rights, and ultimately, his death.

## VI.   CONCLUSION

Defendants' Motion should be denied; partial judgment should be granted for Plaintiffs.

Respectfully Submitted,

**THE SIMON LAW FIRM, P.C.**


/s/ Kevin M. Carnie  Jr.

By:    John G. Simon, #35321MO
Kevin M. Carnie Jr., #60979MO
800 Market Street, Suite 1700
St. Louis, MO 63101
Telephone:  314-241-2929
Facsimile:  314-241-2029
jsimon@simonlawpc.com
kcarnie@simonlawpc.com
***Attorneys for Plaintiffs***


<u>**CERTIFICATE OF SERVICE**</u>


I hereby certify that on the 16th day of January 2014, I electronically filed the foregoing with the clerk of the court using the CM/ECF system to be served by operation of the Court's electronic filing system upon all counsel of record.

/s/Kevin M. Carnie, Jr.