IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

SPENCER NORMAN, KIEFER     )
NORMAN, COURTNEY NORMAN    )
and HELEN S. NORMAN,       )
                           )
        Plaintiffs,        )
                           ) Case No.
vs.                        ) 2:12-CV-04210-NKL
                           )
CAMDEN COUNTY, BRIAN D.    )
FIENE, DWIGHT D. FRANKLIN, )
RICHARD B. DZIADOSZ,       )
LARRY L. RUTHERFORD, and   )
JAMEE L. WATSON,           )
                           )
        Defendants.        )

DEPOSITION OF WILLIAM E. DURANT
Taken on Behalf of the Defendants
July 2, 2013


EXHIBIT 2

Case 2:12-cv-04210-NKL   Document 116-4   Filed 01/16/14   Page 1 of 12
b0ce7e87-87d6-4b86-bd6a-0f3d511d5274

42

1     A.  I heard specifically Mr. Fiene
2  telling him to give him his arm. He kept saying it
3  over and over, stop resisting, give me your arm.
4     Q.  So you heard Sergeant Fiene telling
5  Mr. Norman over and over give me your arm and stop
6  resisting?
7     A.  Yes.
8     Q.  How many times do you think you heard
9  Sergeant Fiene tell Mr. Norman that?
10    A.  At least three or four. Probably
11 more. I don't know for sure.
12    Q.  And would that be the same for three
13 or four more times that Sergeant Fiene told
14 Mr. Norman give me your arm?
15    A.  Yes. Stop resisting, give me your
16 arm.
17    Q.  So he made those statements at least
18 three or four times and maybe more?
19    A.  Yes.
20    Q.  Did you hear the other male deputy,
21 Deputy Dziadosz, give any commands to Mr. Norman?
22    A.  No, not really. They were working
23 too hard to get him cuffed.
24    Q.  Did you hear Deputy Watson, the
25 female deputy, give any commands to Mr. Norman?

43

1     A.  I believe once I heard her actually
2  say something like stop fighting.
3     Q.  Did you hear her say anything else?
4     A.  No, not that I know of.
5     Q.  And when you arrived in that backyard
6  of your mother's house, were all three of these
7  deputies there when you arrived?
8     A.  They were all three on the man, on
9  top of the man when I arrived.
10    Q.  And I want you to describe that for
11 me. You said Mr. Norman was face down on the
12 ground, correct?
13    A.  Yes.
14    Q.  And was he face down in this tall
15 grass?
16    A.  Yes.
17    Q.  Did it appear to you that he was all
18 the way to the ground?
19    A.  He was flat on his face on the
20 ground.
21    Q.  Could you see whether his face was
22 actually in the ground or his head was turned left
23 or right?
24    A.  No. I couldn't honestly see his face
25 because Officer -- Sue, what was her name again?

44

1     Q.  Watson.
2     A.  Watson, Officer Watson was pretty
3  much sitting on him where I couldn't see exactly.
4  That's another reason you couldn't hear well. I
5  don't -- I don't know if his head was turned or if
6  he was completely down like this, but everything
7  was muffled that he tried to -- noises he made and
8  all.
9     Q.  All right. When you arrived, you
10 said that you saw Sergeant Fiene basically on his
11 butt; is that what you said?
12    A.  Yes. He was straddling him.
13    Q.  And how was Sergeant Fiene straddling
14 Mr. Norman's butt?
15    A.  The man was laying face down
16 straight, and I don't know how else you would
17 straddle someone. He had one knee over his -- he
18 was like sitting on the small of his back and more
19 of his butt with his legs spread.
20    Q.  So Sergeant Fiene, was he actually
21 sitting on Mr. Norman's butt?
22    A.  Yeah. He was -- had the man down.
23    Q.  So it appeared to you that
24 Sergeant Fiene's buttocks were sitting on top of
25 Mr. Norman's buttocks?

45

1     MR. CARNIE: Object to the form.
2  BY MR. HENSON:
3     Q.  Is that correct?
4     A.  Yeah. I mean, they might have even
5  been a little farther back because I could honestly
6  see the Taser from where he was holding him in the
7  small of Mr. Norman's back.
8     Q.  So you believe Sergeant Fiene was
9  sitting on Mr. Norman's buttocks or shortly behind
10 his buttocks; is that correct?
11    A.  Right.
12    Q.  Did it appear to you at all that
13 Sergeant Fiene was sitting on Mr. Norman's back?
14    A.  I don't believe so, no. I think it
15 was -- because this guy was only wearing boxers.
16 That's all he had on, and I mean --
17    Q.  So the individual, Mr. Norman, who
18 was on the ground was wearing boxer shorts?
19    A.  Yes.
20    Q.  And I want to make sure I understand
21 that. Did it appear to you at all that
22 Sergeant Fiene was sitting on Mr. Norman's back or
23 was it on his buttocks area and behind?
24    A.  What I saw, I believe he was mainly
25 on his butt. I mean, there was a -- he might have

**Page 46**

gotten closer to him as time -- as this fight kind of went on, but -- because I mean they was wrestling around, you know, and everything like that, but he was pretty much straddling his butt and maybe some very small of his back, you know, right where your back meets your ass pretty much.

Q. Did it appear to you that most of Sergeant Fiene was on his -- Mr. Norman's butt, though?

MR. CARNIE: Object to the form.

BY MR. HENSON:

Q. His butt was on -- Sergeant Fiene's buttocks were on Mr. Norman's buttocks?

A. I want to say yes, but I mean, as time went on, the more they wrestled and stuff, oh, that's a -- that's a thin line right there because he was right there. I remember distinctively, you know, seeing him on top of him straddled down. The other two were on his shoulders. Yeah, he was like right there on his butt and the small of his back.

Q. And when you saw Sergeant Fiene in that area on his buttocks, was Mr. Norman resisting and struggling?

A. I don't believe so. Now's where we get to the twist.

**Page 47**

Q. Okay. What twist are we talking about?

A. Mr. Norman was handcuffed with a handcuff on his left arm behind his back. The male officer was sitting on his shoulder and arm pulled back behind him.

Officer Watson, is that right? Officer Watson, she was sitting -- like I said, she was a large lady. She was on his shoulder, his right shoulder, but I swear to God she had her left knee was trapping his arm to where she was almost straddling his arm between her legs. Okay. You see what I'm getting at?

She was up on the shoulder, but her leg was pinning his right arm. And Officer Fiene kept yelling at the man to stop resisting and give him his arm, and the guy honestly, in my opinion, could not -- he could not give him his arm because this lady was sitting on it with her knee pinned in this part of it to where it couldn't go back.

Q. Let's talk about that a little bit so I understand what you're telling us. Deputy Dziadosz, the other male deputy --

A. -- yes.

Q. -- now, where was he located in

**Page 48**

relationship to Mr. Norman?

A. He was on Mr. Norman's left shoulder and arm.

Q. And when you say that Deputy Dziadosz was on Mr. Norman's left shoulder and arm, what do you mean on?

A. He was straddling -- if I was laying down, he would be straddling with my arm behind my back, his crotch would be right here (indicating) and his, I guess his left leg would have been -- oh, no, because he was facing me. His right leg would have been over -- the arm was already pulled back where it needed to be. He had the arm pinned down like that to where it was pointed right at Mr. Fiene and straddling that shoulder. That's where that gentleman was.

Q. So Deputy Dziadosz was straddling Mr. Norman's left shoulder?

A. Yes.

Q. And he was facing you?

A. Yes.

Q. And did you see Deputy Dziadosz get Mr. Norman's left arm out from underneath him?

A. No. He -- his left arm was already handcuffed and pulled back. Now all he had was had

**Page 49**

the man pinned by his arm and shoulder.

Q. So when you saw this with Deputy Dziadosz, the left -- Mr. Norman's left arm had been pulled back and a handcuff had been applied to it?

A. Yes, I believe so.

Q. Was Mr. Norman's right arm still under his body?

A. No. It was under Ms. Watson's body.

Q. Okay. And let's finish talking about Dziadosz before we talk about Deputy Watson. And when you say Dziadosz, Deputy Dziadosz was straddling Mr. Norman's left shoulder, was he actually sitting on his left shoulder or did he have his knee in his left shoulder?

A. I believe he had more of his -- everybody was on their hands and knees pretty much. I mean, there was nobody standing, squatting or anything like that. He had wrestled the man down, got the arm back behind him and then just kind of pinned him down. So he had like his leg pretty much on it and everything holding the man down.

Q. And when you first got there, did you see anybody get Mr. Norman's left arm behind him and handcuff him? Did you actually see the

### Page 54

    A.  Right.

    Q.  And what you did -- and if I don't describe this correctly, you correct me. You saw Deputy Dziadosz take both his hands and place them on Mr. Norman's back and specifically his left shoulder area and hold him down; is that correct?

    A.  There wasn't a lot of room for him to put his hands down because the other officer was on top, Watson. So there honestly wasn't a lot of room for him. He might have had a hand on her even because she pretty much covered up the rest of the back, shoulder area.

    Q.  You believe Deputy Dziadosz held Mr. Norman down with his hands on his back?

    A.  Yes, I believe so, he did. I'm not sure with both of them, but I know at least one of them.

    Q.  All right. So you believe at least one of Deputy Dziadosz's hands was holding Mr. Norman down on his back; is that correct?

    A.  He was holding him down by his back, yes.

    Q.  All right. And then you also indicated that you believe Deputy Dziadosz was holding Mr. Norman down on the ground with one of

### Page 55

his knees in his back; is that right?

    A.  Yes. Back and shoulder, or more shoulder than back, but --

    Q.  And how long did you see Deputy Dziadosz hold Mr. Norman down with his hand in his back and his knee in his back? Do you have an estimate of how long he held him down?

    A.  I don't know if I can give an estimate as far as an exact time because this -- to me, it seemed to happen really fast. I mean, this wasn't a 20-minute, drawn-out procedure. But yeah, it was --

    Q.  Well, do you have any estimate of --

    A.  I'm going to say a good minute or two, at least.

    Q.  So you believe that Deputy Dziadosz had his hands on Mr. Norman's back and his knee on his back holding him down for a minute or two?

    A.  At least, yeah, I believe.

    Q.  Now, during that time when Deputy Dziadosz was holding Mr. Norman down as you've described, did you see Sergeant Fiene or anyone else use a Taser on Mr. Norman?

    A.  I heard it. I definitely heard it. And I'm wanting to say that when I come up on the

### Page 56

scene, he was being tasered because -- I cannot remember exactly. I remember the lights on the Taser. I believe the Taser was yellow and black, and he would -- he would tell him to quit resisting, give me your arm. If it didn't happen, the Taser would go off. And it seemed like -- God, it seemed like it crackled for -- or made noise for like ten seconds and then quit. And that was when Norman would be making these squalling, gurgling almost noises and -- yeah.

    I remember when the Highway Patrol come to talk to me about this, I -- I knew they were coming after I filled out the little bullshit report right there. Highway Patrol were supposed to come out and talk to me. I thought for days, two days on what word to use on this tasering deal, and the best word I could come up with was repeatedly.

    I don't know how many times he was tasered. I read it in the newspaper. I don't believe everything I read, but I read it in the newspaper, and --

    Q.  And did you know what a Taser was before that evening?

    A.  Yes.

### Page 57

    Q.  And what did you understand a Taser to be?

    A.  Taser is basically a form of a gun that shoots wires, barbs out and sends electrical current at the push of a button.

    Q.  And you said that you saw the Taser go off, and your word that you used was repeatedly --

    A.  -- yes.

    Q.  -- is that correct? Did you see -- was Sergeant Fiene using the Taser?

    A.  Yes.

    Q.  Did you see Sergeant Fiene place the Taser or stick the Taser on Mr. Norman's body?

    A.  I don't know -- I don't even know which Taser he had as far as the one with the wires or one that just shoots a current. But I don't know if it was coincidence or what, but when he was wrestling the man, he had one hand kept -- got the left arm back, and he used -- kept using that left hand to try to grab the right arm because he had the Taser in his right hand and that was centered in the small of his back.

    But I didn't know -- I don't know if

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    FAX: 314.644.1334

Case 2:12-cv-04210-NKL   Document 116-4   Filed 01/16/14   Page 4 of 12

b0ce7e87-87d6-4b86-bd6a-0f3d511d5274

Page 74

1  say a word.
2      Q.  And Deputy Watson, you told us you
3  believe you heard her say what?
4      A.  I believe she said stop fighting a
5  time or two.  I don't think she honestly understood
6  either at that point in time.  I think it was such
7  a heat of the moment thing.  I don't believe she
8  honestly understood that she had his arm pinned to
9  where Mr. Fiene couldn't pull it.  But Mr. Fiene
10 kept pulling and it couldn't go nowhere because she
11 was kneeling on it.  And the moment that -- he
12 finally went just completely limp.
13     Q.  So you -- and let me make sure I
14 understand that.  You saw Deputy -- or Sergeant
15 Fiene attempt to grab Mr. Norman's right arm and
16 pull it; is that right?
17     A.  Yes, several times.
18     Q.  Did he actually grab Mr. Norman's
19 right arm?
20     A.  Yes, and he pulled it several times.
21     Q.  And you believe that what prevented
22 Sergeant Fiene from pulling Mr. Norman's right arm
23 behind his back was the fact that Deputy Watson had
24 her left knee in the triangle on the ground holding
25 it?

Page 75

1      A.  Yes.  I don't think it was not in any
2  way intentional, but I mean --
3      Q.  Did you ever see Deputy Watson move
4  her position?
5      A.  Yes, at the very end, after
6  subsequent another tasing, this man just finally
7  went completely limp, I mean, no movement, and
8  that's when I think she realized that she didn't
9  need to be on him that hard and she kind of moved,
10 kind of moved, and that's when Fiene was able to
11 like pull the arm up and handcuff it.
12     Q.  All right.  Now, you said that
13 Mr. Norman went limp.  What was he doing before he
14 went limp?  How were you able to tell he went limp?
15     A.  I could see his feet were still kind
16 of moving, you know.  I mean, he wasn't trying to
17 kick or anything, but when he was being tasered,
18 you could see kind of like the, you know, the
19 muscles tense up in his legs.  That's the only
20 thing I -- and then all of a sudden, I mean, it was
21 just, pfff, no noises, no more nothing.  But that's
22 not when he died.  He wasn't dead at that point.
23     Q.  Okay.  What you saw then, was the
24 only movement you saw of Mr. Norman his legs move,
25 feet move at some point?

Page 76

1      A.  Yeah, pretty much, because like I
2  said, the other three were sitting on top of him
3  and the only thing that was free was his legs.
4      Q.  And what was he doing, Mr. Norman,
5  with his legs?  Was he kicking his legs?  Was he --
6      A.  No.  I just said he wasn't kicking
7  his legs.  I said that he was tensing his legs,
8  tensing -- his muscles would tense up when he was
9  being tasered.
10     Q.  And you saw that movement?
11     A.  Right.
12     Q.  Did you see any other movement from
13 Mr. Norman during this other than the tense up of
14 the legs?
15     A.  No, not really.  I couldn't really
16 see anything.
17     Q.  Then you said Mr. Norman went limp
18 and had no movement; is that right?
19     A.  Right.
20     Q.  And did he quit grunting and yelling
21 at that point?
22     A.  All the grunting and yelling was done
23 except -- we skipped a whole part almost, but --
24     Q.  Okay.  We don't want to skip
25 anything.

Page 77

1      A.  Okay.  I mean, this isn't a very, I
2  don't know, important part.  I'm not proud of it
3  either.  But as I said, this went pretty quick.
4  During the tasering and the trying to get his arm
5  pulled back, I turned to my left and looked and
6  Lillian Rogers was standing from me to you away
7  from me.
8      Q.  So she was standing within four to
9  five feet of you?
10     A.  Yes.
11     Q.  Okay.
12     A.  And I told you that they'd stolen
13 stuff from my vehicles.  I pretty much retired from
14 Ozark Ready Mix when I got hurt at work.  That's
15 where I ended up getting hurt, and I'd worked at
16 Ozark Ready Mix for almost ten years.
17         My best friend, who's pretty much
18 second in command of Ozark Ready Mix, it was the
19 owner and then there's two guys.  One does more
20 public relations and the other guy does work on the
21 trucks, keeps the work done on the trucks, the
22 maintenance and the plants and stuff.  That guy is
23 my best friend.  His name is William Dickle.
24         I'd worked there ten years.  I have
25 coats that are embossed with my name or my

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:12-cv-04210-NKL  Document 116-4  Filed 01/16/14  Page 5 of 12
b0ce7e87-87d6-4b86-bd6a-0f3d511d5274

78

1  nickname. They call me Taz. I have coats,
2  Carhartts that I've gotten for Christmas, hoodies
3  that I've gotten from Willie. And now a hoodie is
4  something that is just not given away freely.
5  I mean, they give T-shirts out constantly, hats.
6  Christ, I've got sunglasses that say Ozark Ready
7  Mix. A hoodie is just something that you've got to
8  know somebody to get one. There, I said it.
9      When I turned and I saw Lillian
10  Rogers standing there, she was wearing my wife's
11  fuckin' hoodie. Okay. She is wearing my wife's
12  stolen clothes. And I -- I looked at her, and
13  first words out of my mouth is, what kind of shit
14  have you started now? And she started -- she
15  looked at me and was almost mouthing and told me,
16  this don't have anything to do with me, yadda,
17  yadda, yadda, yadda. And they had just completed
18  cuffing this man.
19      **Q.** Okay. Well, let me get the sequence
20  of when you looked back to Ms. Rogers. You've
21  described for us what you observed the police
22  officers doing. Had you looked at Ms. Rogers
23  before you turned and looked at her as you've just
24  described?
25      **A.** No.

79

1      **Q.** Okay. So when you turned and looked
2  at Ms. Rogers, had Mr. Norman, in your words, gone
3  limp and had no movement?
4      **A.** Yes.
5      **Q.** Okay. Well, let's talk about that
6  first before you turn and talk with Ms. Rogers.
7  When you say that Mr. Norman went limp and had no
8  movement, are you talking about you didn't see his
9  legs move anymore or what are you saying? Describe
10  that for me.
11     **A.** He went limp. Legs quit moving.
12  They finished cuffing him, which only took a matter
13  of a second once the lady got off his arm.
14  Everybody stood up, and that man just laid there.
15  He never moved.
16     **Q.** All right.
17     **A.** But he would lay there and gurgle,
18  and at one point Watson and -- why am I so bad with
19  names?
20     **Q.** Deputy Dziadosz.
21     **A.** -- Dziadosz made a joke basically
22  of -- this dude was gurgling, face down still.
23  They hadn't moved him or nothing. He was still in
24  the tall grass, face down. And to me, I heard
25  gurgling noises, and they go, look, he's already

80

1  snoring. He's out cold and snoring now.
2      And I knew that was wrong. I mean,
3  I've never seen anybody snore face down for one,
4  and this wasn't a snore. It was a gurgle noise.
5  But then that was pretty much the point, well, I
6  had just gotten handcuffed at that point.
7      **Q.** Well, let's talk about that before we
8  turn to you and Lillian and you being handcuffed.
9  You said at some point Mr. Norman went limp and
10  wasn't moving any longer, correct?
11     **A.** Yes.
12     **Q.** And at some point then did
13  Deputy Watson the female deputy, move?
14     **A.** Yes.
15     **Q.** Okay. Did she move off of
16  Mr. Norman, I mean take her right knee off of his
17  upper back?
18     **A.** I don't know if she -- I don't
19  believe she took her right knee off his back, but
20  she tried to pull her left leg up to kind of get to
21  a squatting, you know, to where her knee's bent
22  instead of on the ground, and that's when the arm
23  come out and click and situation was finished.
24     **Q.** All right. So what you observed
25  Deputy Watson do was move her left knee that was on

81

1  the ground from the triangle pinning Mr. Norman's
2  right arm; is that correct?
3      **A.** Exactly, yes. Correct.
4      **Q.** And when Deputy Watson moved her left
5  knee that was pinning Mr. Norman's right arm, was
6  someone able to get that arm behind his back?
7      **A.** Yes.
8      **Q.** And who was that?
9      **A.** Brian Fiene.
10     **Q.** All right. So Sergeant Fiene then
11  pulled the right arm behind Mr. Norman's back?
12     **A.** Right.
13     **Q.** Was Mr. Norman then handcuffed?
14     **A.** Yes.
15     **Q.** Did you see who handcuffed
16  Mr. Norman?
17     **A.** Fiene.
18     **Q.** Did Sergeant Fiene handcuff
19  Mr. Norman with one set of handcuffs, two sets of
20  handcuffs? Do you know?
21     **A.** Honestly, I want to say two sets of
22  handcuffs because I thought he had a set on the
23  man's left arm already, already had a set on there,
24  and I think he ended up putting another cuff on
25  this arm and then pulling them and locking them

**Page 102**

1  Did the gurgling sound that you've described
2  continue from Mr. Norman?
3     A.  Right after that started, that's when
4  they picked him up and moved him out of my earshot.
5  I see him plain as day.
6     Q.  How long was it that you heard this
7  gurgling sound coming from Mr. Norman? Do you have
8  an estimate of that time?
9     A.  Maybe three times in 30 seconds to a
10 minute before they moved him.
11    Q.  So you heard the gurgling sound on
12 three different occasions?
13    A.  Gurgle noise, nothing, gurgle noise,
14 nothing. Sounded like every time he was trying to
15 take a breath, but I couldn't see him breathing
16 because now, A, my flashlight's gone. He broke it
17 when he threw it on the ground. His light,
18 whatever they had was gone because he had left, and
19 now all there is is these two cops looking around
20 like this, and the only time you really have light
21 on him is when they're looking right down at him
22 with their light.
23    Q.  So you didn't have your flashlight
24 any longer?
25    A.  No. No. No.

**Page 103**

1     Q.  Was there anything, any light
2  illuminating Mr. Norman's body at that time?
3     A.  Not a lot, no. Just there was some
4  light that actually come out of -- by now my mom's
5  up and she's got every light in her -- she has a
6  modular home. She's got all the lights on in her
7  dining room, which flood out two windows and the
8  back door, and that was illuminating him there.
9     Q.  Okay. So could you actually see
10 Mr. Norman's body?
11    A.  Yes.
12    Q.  Okay. So you heard this gurgling
13 sound on three different occasions?
14    A.  In the course of just what basically
15 sounded like three breaths.
16    Q.  Could you see Mr. Norman to tell
17 whether he was breathing or not?
18    A.  Not at that point because he was on
19 his face.
20    Q.  And you've described this gurgling
21 sound for us. Did it sound to you like Mr. Norman
22 was having problems breathing?
23    A.  Yes. That's exactly what it sounds
24 like.
25    Q.  And which one of the officers said

**Page 104**

1  something about he was asleep and snoring?
2     A.  I believe that was the lady.
3     Q.  So Deputy Watson made that statement?
4     A.  I believe it was Watson that said
5  that, but I can't be absolutely positive. I know
6  that comment was made, and -- but that's when they
7  said, let's move him up here to the short grass.
8     Q.  So when Deputy Watson said that, did
9  you say anything to her?
10    A.  No. I was done. I'm sitting there.
11 I'm -- it was cold, too. I'm serious. It was
12 probably 40 degrees outdoors that morning, and --
13    Q.  I was going to ask you, what was --
14    A.  I was ready to go -- I mean, I think
15 it was probably cooler than 40 because I saw this
16 man take his last breath. I saw him exhale and
17 never saw another one.
18    Q.  You believe it was somewhere
19 40 degrees or less on the morning of October 4,
20 2011?
21    A.  Yeah. It was cold. I mean, cold for
22 me. I mean, I'm in shorts and a T-shirt, you know,
23 and I was cold. I was ready to go get in that car.
24 I was ready to be transported. I'm like, let's go.
25    Q.  And Mr. Norman you've described is

**Page 105**

1  dressed in some kind of boxer shorts?
2     A.  Yeah. I believe he just had a pair
3  of white boxers on, basically.
4     Q.  He didn't have on any shirt or
5  anything?
6     A.  No.
7     Q.  Did he have socks or shoes?
8     A.  I don't think he had socks and shoes
9  on, no, because I remember seeing his legs and
10 everything.
11    Q.  On this morning of October 4th, 2011,
12 could you see your breath when you would breathe
13 out?
14    A.  That's exactly, yes, right.
15    Q.  So it was cold enough that when you
16 would breathe it would look like steam?
17    A.  Right.
18    Q.  So you heard the deputy say it looks
19 like he's asleep and he's snoring?
20    A.  Right.
21    Q.  And you didn't believe that?
22    A.  No. No, not at all.
23    Q.  And what did you believe was
24 happening?
25    A.  I thought the man was having problems

**Page 106**

breathing, was going to die because he couldn't fuckin' breathe. That's exactly what I thought.
    Q. And did you say anything to the deputies?
    A. I almost -- I probably had a verbal chuckle come out, and I know I shook my head like, shh, you've got to be kidding me, you know, when they said that, but that was about it, because I was pretty much done with them. I had nothing to, you know --
    Q. You were still sitting there a little bit on the angry side?
    A. Yeah. I still wasn't very happy.
    Q. And how did the deputies -- after they made the statement about him being asleep and snoring, did they pick him up? Did they put him on his side? Did they -- what did they do?
    A. He was laying face down, arms behind his back. They each one reached down here and grabbed an armpit pretty much on each side and walked him, drug him up here to the cut grass. Like I said, all this is cut right here, and the squad cars were pulled in here to where everything after that should have been on a dash cam, you'd think. But they drug him from the porch to right

**Page 107**

here, laid him down, still face down.
        That's the first time that I saw his face was when they -- I saw the side of his face because they picked him up and they had to drag him -- like I said, he was right over here. They had to drag him across the front of me, and I could see his face was just, you know --
    Q. Which two deputies picked him up under his arms?
    A. Watson and --
    Q. Dziadosz?
    A. -- Dziadosz. Why do I keep thinking it starts with a P?
    Q. And did Sergeant Fiene come back before Mr. Norman was moved?
    A. No. No. Mr. Fiene was still -- he was at the front door. I don't know where he was. He was gone around the house to speak to my mother. I'm taking it for granted he was on the porch.
    Q. Okay. So you didn't know where Sergeant Fiene was?
    A. No.
    Q. So once the deputies noted that he was asleep and snoring, did you see them check him before they moved him?

**Page 108**

    A. No. They just reached down and picked him up by his shoulders or armpits and drug him by me. And like I said, now we're halfway in the middle of the house where I'm at. So it was only another -- this house is only 56 feet long, so --
    Q. So how far do you believe they drug Mr. Norman?
    A. Probably 20 feet. At least 20 feet.
    Q. And they drug him 20 feet into what you'd call the mowed grass, short grass?
    A. The short grass, yes.
    Q. And would that have been in your mother's basically side yard, I guess?
    A. Exactly.
    Q. And when they picked Mr. Norman up, did you -- could you see his face or was it too dark to see his face?
    A. It wasn't too dark to see his face, but from where he was hanging down like that, it was kind of shadowed, you know, especially with one officer -- I could see it when they first started bringing him towards me, you know.
        Like I said, that's the very first time I ever saw him. I knew he had tattoos. I

**Page 109**

remember tattoos, I think, but I don't remember exactly where.
    Q. So as the officers were taking him and dragging him past you, were you able to see Mr. Norman's face?
    A. I got a glimpse of it, yes.
    Q. Did it appear to you when the officers took him past you that Mr. Norman was breathing, or could you tell?
    A. I could still -- the minute he went by, that was one of the -- let's see. Gurgle, gurgle, gurgle. They decided they were going to move him. I think I heard some kind of a -- it was more like a cough or something like that. That was right after they said, look, he's asleep and snoring, and they picked him up and started moving, I heard some kind of a -- I don't know what it was. But I know he was -- I saw him breathing after that point, so I know he was breathing at that point.
    Q. So when the Deputies Watson and Dziadosz were moving Mr. Norman past you, you thought he coughed or did something like that?
    A. Yeah. It was a pretty lame cough. It was just like a (indicating) type thing.
    Q. Okay.

**Page 206**

1 asking.
2    A.   Okay. I'm just letting you --
3 getting that out there, I mean.
4    Q.   Have you ever taken methamphetamines?
5    A.   Yeah, but I don't think it was any
6 good, back in -- when I was 18, 19 years old. I
7 think they were Black Beauties they called them
8 back then. I think they were just a capsule.
9 Tried it a couple times. Yeah, it just didn't do
10 anything for me.
11    Q.   Have you since that time ever taken
12 any methamphetamines, cocaine, heroin, anything
13 like that?
14    A.   No.
15    Q.   Were you doing any type of illegal
16 drugs in 2011?
17    A.   Only marijuana if I see it once in a
18 while.
19    Q.   After this conviction --
20    A.   Put it this way. I don't smoke
21 enough to buy any. I'm the smoke with a buddy
22 thing, but I'm not going to go buy pot.
23    Q.   After this conviction in 1996 by the
24 jury on second degree burglary, have you been
25 convicted of any felonies or misdemeanors since

**Page 207**

1 then?
2    A.   No. I haven't been in trouble for
3 nothing.
4    Q.   So from 1996 to the present time
5 today, have you been arrested or convicted of any
6 crimes?
7    A.   Only thing I've done is been in
8 handcuffs over this incident right here. That's
9 it.
10    Q.   That's what I was asking. So since
11 1996, would it be a correct statement that no law
12 enforcement officer has arrested you for anything?
13    A.   Yes.
14    Q.   Okay.
15    A.   Correct.
16    Q.   And, of course, that's other than
17 this incident on the morning of October 4?
18    A.   Right.
19    Q.   Have you been charged with any crimes
20 from 1996 to the present time?
21    A.   No. Like I said, the one in '96, I'm
22 not even good for that one.
23    MR. HENSON: Let's use the bathroom
24 and we'll let him ask you some questions and I
25 think we're done.

**Page 208**

1    (A BREAK WAS TAKEN.)
2    MR. HENSON: Go ahead.
3 CROSS-EXAMINATION BY MR. CARNIE:
4    Q.   Mr. Durant, I do have a couple
5 questions for you. So when you came out of your
6 house, you saw three officers on top of Mr. Norman?
7    A.   Yes, I did.
8    Q.   And they had their entire body weight
9 on top of Mr. Norman?
10    MR. HENSON: Object to the form.
11 Calls for speculation and conjecture on his part
12 and improper opinion. Subject to that, go ahead.
13    THE WITNESS: Individuals were
14 definitely on top of the man. I do not know if it
15 was the full weight of their bodies, but at least
16 most of each, so yes, basically.
17 BY MR. CARNIE:
18    Q.   So they were pressing him into the
19 ground?
20    A.   Exactly, yes. He was detained.
21    Q.   They were putting pressure on his
22 back?
23    MR. HENSON: Object to the form to
24 the extent it calls for speculation and conjecture
25 and improper opinion. Subject to that, go ahead.

**Page 209**

1    THE WITNESS: Back, neck and
2 shoulder, and then as I said, the one guy was
3 sitting more on his buttocks than anything else.
4 BY MR. CARNIE:
5    Q.   They were touching his back?
6    A.   Yes.
7    Q.   They were pushing him on the ground?
8    A.   Yes. He was being pinned to the
9 ground.
10    Q.   Would you agree they were putting
11 pressure on his back?
12    MR. HENSON: Object to the form to
13 the extent it calls for speculation --
14    THE WITNESS: Yes, I do.
15    MR. HENSON: -- conjecture and
16 improper opinion. Go ahead.
17    THE WITNESS: You're saying go on.
18 He's telling me to wait 'til he's done.
19    MR. HENSON: You have to wait until I
20 finish.
21 BY MR. CARNIE:
22    Q.   Here's what's happening. He's making
23 an objection for the judge later. You can just
24 pretend as if you don't hear him. Wait for him to
25 finish, though --

53 (Pages 206 to 209)
MIDWEST LITIGATION SERVICES
www.midwestlitigation.com   Phone: 1.800.280.3376   Fax: 314.644.1334
Case 2:12-cv-04210-NKL   Document 116-4   Filed 01/16/14   Page 9 of 12
b0ce7e87-87d6-4b86-bd6a-0f3d511d5274

**Page 210**

1  A. Okay.
2  Q. -- and then answer my question.
3  A. I'm good to go, then. You need to
4  throw that out there, let me know what's going on.
5  Thank you.
6  Q. No problem. So you agree they were
7  putting pressure on his back?
8      MR. HENSON: Object to the form of
9  the question to the extent it calls for speculation
10 and conjecture and improper opinion on his part.
11     THE WITNESS: Yes, sir.
12 BY MR. CARNIE:
13 Q. They were kneeling on him?
14     MR. HENSON: Object to the form to
15 the extent it calls for speculation and conjecture
16 and improper opinion.
17     THE WITNESS: Yes.
18 BY MR. CARNIE:
19 Q. Well, you saw their knees, right?
20 A. Yes, I did.
21 Q. And you could see where the officers
22 put their knees?
23 A. Yes.
24 Q. And you could see that they put their
25 knees on Mr. Norman?

**Page 211**

1  A. Yes.
2  Q. You agree they were kneeling on him?
3  A. Yes.
4      MR. HENSON: Object to the form to
5  the extent it misstates his prior testimony when
6  you use officers kneeling on Mr. Norman.
7      THE WITNESS: Yes.
8  BY MR. CARNIE:
9  Q. And let me just clarify that. Two of
10 the officers were kneeling on him, perhaps not
11 Sergeant Fiene?
12 A. Yes.
13 Q. So Dziadosz and Watson were kneeling
14 on Mr. Norman?
15 A. Yes.
16 Q. Sergeant Fiene was not kneeling, he
17 was sitting on him?
18 A. He was sitting, straddling him, as
19 you would a horse.
20 Q. Now, the officers were completely
21 covering him up, correct?
22     MR. HENSON: Object to the form to
23 the extent it calls for speculation and conjecture.
24 Misstates his prior testimony. Lacks foundation.
25 Go ahead.

**Page 212**

1      THE WITNESS: Pretty much all but his
2  lower back and his back of his legs and knees area.
3  BY MR. CARNIE:
4  Q. So most of his body was covered up,
5  is that your testimony today?
6  A. Yes.
7  Q. And aside from his lower back, was
8  the rest of his back covered up by officers?
9      MR. HENSON: Object to the form to
10 the extent lacks foundation. Go ahead.
11     THE WITNESS: Yes.
12 BY MR. CARNIE:
13 Q. Maybe I missed something. You
14 testified earlier that you couldn't see a lot of
15 his body because it was covered up by officers, is
16 that correct, or am I misstating something?
17 A. Yes, most of his body was covered up.
18 Q. And that includes most of his back
19 except the lower part of his back?
20 A. Yes. I could only see his lower back
21 and I could see his hand sticking out that was
22 being pinned because the man kept -- Mr. Fiene kept
23 grabbing the wrist and trying to pull it and -- but
24 yes, I could see just most of his upper torso was
25 covered.

**Page 213**

1  Q. And you saw him get tasered
2  repeatedly?
3  A. Yes. I heard it more than seeing it.
4  I would see a light come on on the Taser once in a
5  while, but I mean, you can't miss that crackle
6  noise.
7  Q. And what was going through your mind
8  while you were watching this?
9  A. I couldn't believe it. I was just
10 dumfounded that, first of all, it was actually
11 happening in front of me, you know, because this
12 looked like something that would be on Cops TV
13 show, but -- and I had a little bit of disbelief,
14 you know, when I realized what was going on.
15     I think everybody else, the other
16 three were just -- the three officers were just too
17 close to the scene to actually know that this chick
18 had her knee on him. But I'm standing back far
19 away that I could kind of see that picture. I can
20 see him pulling on the arm, and like I said, he's
21 trying to do two or three other things at the same
22 time. I honestly don't believe that Mr. Fiene saw
23 that the man's arm was pinned down.
24 Q. And you testified earlier, and
25 correct me if I'm wrong, that when the officers

**Page 214**

1  were on top of him, at some point he went limp?
2     A. Yes.
3     Q. And then at some point after that,
4  you heard a gurgling sound?
5     A. Yes.
6     Q. And you testified earlier that it was
7  obvious to you he was having trouble breathing?
8     A. Yes.
9        MR. HENSON: Object to the form to
10 the extent it calls speculation, conjecture,
11 improper opinion. Subject to that -- lacks
12 foundation. Go ahead.
13       THE WITNESS: That's how it appeared
14 to me, yes. That is what I thought.
15 BY MR. CARNIE:
16    Q. And that is based on the noises you
17 heard?
18    A. Yes.
19       MR. HENSON: Same objection.
20       THE WITNESS: Yes.
21 BY MR. CARNIE:
22    Q. And you heard a noise, a gurgling
23 sound; is that what you heard?
24    A. Yes, I did.
25    Q. And how did you describe that again,

**Page 215**

1  one more time?
2     A. Sounded like fluid in the lungs,
3  trying to breathe but can't take a full breath and
4  makes a gurgle noise.
5     Q. So it sounded like he was having
6  difficulty breathing?
7        MR. HENSON: Object to the form to
8  the extent it calls for speculation, conjecture,
9  improper opinion. It lacks foundation. Subject to
10 that, go ahead.
11       THE WITNESS: Yes.
12 BY MR. CARNIE:
13    Q. You mentioned earlier that the
14 officers or at least one of the officers said that
15 they thought he was snoring, correct?
16    A. Yes.
17    Q. And you didn't think he was snoring,
18 did you?
19    A. Me personally, no, I did not.
20    Q. In fact, you were shocked that they
21 thought that that was snoring?
22    A. Yes, I was very shocked.
23    Q. And why were you shocked?
24    A. Because I thought it was kind of a
25 dumb conclusion to come to. I mean, A, the man was

**Page 216**

1  face down. I've never heard anybody, including me,
2  snore face down, and I have a CPAP machine, so I
3  know about snoring, and -- no. I just couldn't
4  believe that's what they thought it was.
5     Q. You mentioned earlier the officers
6  were joking, I think the word you said was?
7     A. She said it amusingly, look, he's
8  already snoring. Can you believe that?
9     Q. And how would you describe their
10 tone? Was it disrespectful in any way?
11    A. I don't believe it was disrespectful
12 at the time, but I do believe it was kind of -- I
13 mean, I don't know. I probably would have said
14 something, too, if I was joking around about it,
15 but this was no joke. I mean, to me it seemed like
16 it was more serious to me than them, but they do
17 that stuff for a living every day, so --
18    Q. So it didn't seem to you that they
19 were taking it very seriously?
20       MR. HENSON: Object to the form to
21 extent it calls for speculation, conjecture,
22 improper opinion.
23       THE WITNESS: At that point it
24 probably was in bad taste, I would think, but I
25 think they -- I think the woman honestly believed

**Page 217**

1  that. I think she honestly believed that he was
2  snoring. That's why I just couldn't --
3  BY MR. CARNIE:
4     Q. And you thought that conclusion was
5  ridiculous?
6     A. Pretty much.
7        MR. HENSON: Object to the form to
8  the extent it calls for speculation, conjecture,
9  improper opinion.
10       THE WITNESS: Yes, sir. I'm not on
11 any side here, but if I'm going to have to tell the
12 truth, I want to get this out and over with.
13       MR. HENSON: You're doing fine,
14 Mr. Durant. I just have to do my job, too.
15       THE WITNESS: Oh, I understand.
16       MR. CARNIE: He realizes you don't
17 like his answers.
18       THE WITNESS: Yeah. You guys made me
19 come here. I didn't ask.
20       MR. CARNIE: We're almost done.
21       THE WITNESS: I'm good.
22 BY MR. CARNIE:
23    Q. We talked a little bit before about
24 the second interview that you had gave to the
25 Highway Patrol. Do you remember testifying about

Page 226

1  A. Right.
2  Q. And we'll blank out the first part of
3  the numbers, but what is your Social Security
4  number?
5  A. Xxx-xx-7302.
6  Q. Xxx-xx-7302?
7  A. Yes. I have a phone that I got
8  through being disability -- disabled. They give
9  you a free phone, 250 minutes a month, you know.
10  Q. That's pretty cool. But this phone
11  number of your wife, we can always get ahold of
12  you?
13  A. Yes. You can reach me there
14  99 percent of the time.
15  MR. HENSON: Mr. Durant, I don't have
16  any other questions. Mr. Carnie may.
17  MR. CARNIE: I do not.
18  MR. HENSON: Let me tell you, the
19  Federal Rules of Civil Procedure, this is a federal
20  case, you have a right to, after this lady types
21  this transcript, to read and make sure she's taken
22  down everything you've said here correctly. It's
23  not a right to change your testimony but just to
24  see if she took down what you said correctly and
25  there's no typos, those kinds of things.

Page 227

1  You have an equal right to waive your
2  right to read and sign the deposition, just say
3  this lady's done her job today. She does not work
4  for Mr. Carnie. She does not work for me. She's
5  independent. She does this as a job to make a
6  living, like the rest of us. So I don't want you
7  to think she's associated with either one of us
8  because she's not.
9  But it's up to you. You can either
10  read and sign the deposition before a notary of
11  your choice and make corrections if you think they
12  need to be or you can waive your right to read and
13  sign, and we don't care what you do. It's up to
14  you. It's your right to choose.
15  THE WITNESS: I waive my right to
16  read it, but I want to know if I can have a copy.
17  When it is all transcribed on paper, I'd like a
18  copy of my own. I don't care whether I've got to
19  pay for it. But if we're going to go, if we're
20  going to do this, we're going to do it right. I
21  want to have every piece of paper. I'd like every
22  piece of paper I can get.
23  MR. HENSON: We can make sure that
24  happens.
25  THE WITNESS: I don't want to be

Page 228

1  blind.
2  MR. HENSON: We can certainly do
3  that.
4  (SIGNATURE WAIVED.)
5  (WHEREUPON, the deposition concluded
6  at 1:14 p.m.)

Page 229

1  CERTIFICATE OF REPORTER
2  STATE OF MISSOURI   )
3                      ) ss.
4  COUNTY OF COLE      )
5
6  I, KELLENE K. FEDDERSEN, RPR, CSR,
7  CCR in the State of Missouri, do hereby certify
8  that the witness whose testimony appears in the
9  foregoing deposition was duly sworn by me; that the
10  testimony of said witness was taken by me to the
11  best of my ability and thereafter reduced to
12  typewriting under my direction; that I am neither
13  counsel for, related to, nor employed by any of the
14  parties to the action to which this deposition was
15  taken, and further that I am not a relative or
16  employee of any attorney or counsel employed by the
17  parties thereto, nor financially or otherwise
18  interested in the outcome of the action.
19
20
21
22  _____
    KELLENE K. FEDDERSEN, RPR, CSR, CCR #838

58 (Pages 226 to 229)
MIDWEST LITIGATION SERVICES
www.midwestlitigation.com   Phone: 1-800-280-3376   Fax: 314.644.1334
Case 2:12-cv-04210-NKL   Document 116-4   Filed 01/16/14   Page 12 of 12
b0ce7e87-87d6-4b86-bd6a-0f3d511d5274