IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SPENCER NORMAN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 2:12-CV-04210 |
| | ) |
| CAMDEN COUNTY, et al., | ) |
| | ) October 2, 2013 |
| Defendants. | ) Camdenton, Missouri |

VIDEOTAPED DEPOSITION OF JAMEE RUGEN,

a witness, produced, sworn, and examined on October 2, 2013 between the hours of 8:00 a.m. and 6:00 p.m. of that day, at the law offices of Phillips, McElyea, Carpenter & Welch, 85 Court Circle, in the City of Camdenton, County of Camden, State of Missouri, before

SHELLY L. STEWART, CCR (No. 619)
CAPITAL CITY COURT REPORTING
Jefferson City ** The Lake ** Columbia
573-761-4350 * 573-365-5226 * 573-445-4142

within and for the State of Missouri, in the above-entitled cause, on the part of the Plaintiffs, taken pursuant to amended notice.

EXHIBIT 3

Page 6

1  Q. And what is your date of birth?
2  A. 2-23 of '87.
3  Q. Okay. And how tall are you?
4  A. 5'3".
5  Q. And what is your current weight?
6  A. 250.
7  Q. What was your weight at the time of this incident
8  in October 4, 2011?
9  A. Between 220 and 230.
10 Q. Did you attend college?
11 A. Yes, I did.
12 Q. Where?
13 A. Missouri Valley.
14 Q. Where is that located?
15 A. In Marshall, Missouri.
16 Q. What was your major?
17 A. Criminal justice.
18 Q. When did you graduate?
19 A. 2005. I'm sorry. 2009. I graduated from high
20 school in 2005.
21 Q. Okay. So 2009?
22 A. Yes.
23 Q. Criminal justice?
24 A. Yes.
25 Q. Missouri Valley College?

Page 7

1  A. Yes.
2  Q. Okay. And what did you do after you graduated
3  from college?
4  A. I looked for a job.
5  Q. Did you find one?
6  A. Four months later.
7  Q. Okay. What kind of job was it?
8  A. I was hired as a police officer.
9  Q. Okay. Did you have any jobs in the interim
10 between the time of graduating and --
11 A. I worked for Panera Bread.
12 Q. Okay. Anything else?
13 A. Like a week at McDonald's.
14 Q. Okay. And so were you applying for police jobs
15 during that four-month period?
16 A. Yes, I was.
17 Q. And you said you found one?
18 A. Yes.
19 Q. And where was that at?
20 A. Camdenton City.
21 Q. Okay. And is that -- I assume that's in Camden
22 County?
23 A. Yes, it is.
24 Q. How large of a police department is that?
25 A. I believe they have eight to ten officers

Page 8

1  including supervisors.
2  Q. And what is the jurisdiction of Camdenton City,
3  just the actual city limits of Camdenton?
4  A. Yes, just the city limits.
5  Q. And did you attend any kind of police academy
6  before you started on that job?
7  A. Yes, I did.
8  Q. When was that?
9  A. That was in 2009. August of 2009.
10 Q. How long was that?
11 A. For four months.
12 Q. And was that before you started working as a
13 police officer?
14 A. Yes, it was.
15 Q. Where was that at?
16 A. Columbia, Missouri.
17 Q. And what was it called?
18 A. Law Enforcement Training Institute.
19 Q. What was your title with the Camdenton Police
20 Department?
21 A. Well, I was a police officer.
22 Q. Okay. And what were your duties as a police
23 officer?
24 A. General law enforcement, patrol duties, traffic
25 enforcement.

Page 9

1  Q. And how long did you work for Camdenton for the
2  Camdenton Police Department?
3  A. Nine to ten months.
4  Q. And what did you do after that?
5  A. I came to work at Camden County.
6  Q. Okay. And why did you leave Camdenton City?
7  A. For the hours.
8  Q. What do you mean by that?
9  A. It was a better schedule. We worked 12s in
10 Camdenton County, and I worked eight in Camdenton City.
11 Q. So more hours?
12 A. More hours in one shift, yes.
13 Q. Got it. During the time that you were a police
14 officer for the City of Camdenton, did you receive any
15 training?
16 A. Yes.
17 Q. Okay. And was that -- we'll go over training in
18 a second.
19 A. Okay.
20 Q. When you started with Camden -- the Camdenton
21 Sheriff's Office, is that what it's called?
22 A. Camden County Sheriff's Office.
23 Q. Camden County that's right.
24    Okay. When you started with the Camden County
25 Sheriff's office, what was your title?

Page 18

1  go?
2  A. I don't know. Well, our training officer, I
3  know, has all the documentation and in the categories, so
4  they would know, with the sheriff's office, and he actually
5  is the one that keeps track of all of our training.
6  Q. Now, who decides what training classes you go to?
7  A. Our training -- the person in charge of training
8  for our department.
9  Q. And that's someone with the Camden County
10 Sheriff's Department?
11 A. Yes.
12 Q. And do they tell you exactly which training
13 classes to go to?
14 A. Yes. They tell us, you need to go to this
15 training and this is the day it's scheduled.
16 Q. So it's not a decision you make?
17 A. Not necessarily, no. We can request training,
18 but it has to be approved.
19 Q. Is it every year that Camden -- somebody at
20 Camden County Sheriff's Department is telling you you have
21 to go to this training or that training?
22 A. Yeah. It's -- I mean, we get e-mails on it on a
23 yearly basis, yes.
24 Q. And that's kind of what I was asking about, do
25 you just get an e-mail that says this is when the training

Page 19

1  is; you need to go to this?
2  A. A lot of times, yes.
3  (PLAINTIFFS' DEPOSITION EXHIBIT NO. 1 WAS MARKED
4  FOR IDENTIFICATION.)
5  BY MR. CARNIE:
6  Q. I'm going to hand you what we've marked as
7  Exhibit 1, and I would like you to take a look at that and
8  let me know if you recognize that?
9  MR. CARNIE: Do you have that, Keith?
10 MR. HENSON: Yeah, I do.
11 MR. CARNIE: Okay. It's just her --
12 MR. HENSON: Yeah, I know.
13 MR. CARNIE: Okay.
14 MR. HENSON: And let me give you -- and I
15 believe -- my paralegal has now returned from the death of
16 the flu, and I have determined, I think these are
17 already -- you already have these that we've produced in
18 her training file, but I've copied them again.
19 So I'm going to give them to you again and -- but
20 she tells me those were in the training file and she tells
21 me the ones last week were in the training file too that
22 Mr. Lawyer, that can't survive without his paralegal, did
23 not know, but I wanted to give those just to make sure you
24 did have them.
25 MR. CARNIE: And we have these. Thank you,

Page 20

1  Keith.
2  MR. HENSON: Yeah.
3  THE WITNESS: I would say they're training
4  records, most likely mine.
5  BY MR. CARNIE:
6  Q. And let me just -- let me just clear that up. I
7  have handed you a document marked Exhibit 1.
8  A. Okay.
9  Q. And do you recognize that document?
10 MR. HENSON: They are your training records.
11 THE WITNESS: Okay. Yes. They look like all the
12 training I've been to, so . . .
13 BY MR. CARNIE:
14 Q. So this is a list of your training records?
15 A. Yes.
16 Q. And do you know of any training that you've
17 received that isn't on that list?
18 A. No.
19 MR. HENSON: That would be before.
20 THE WITNESS: Well, that was --
21 MR. CARNIE: Before.
22 THE WITNESS: -- beforehand?
23 BY MR. CARNIE:
24 Q. Before October 4th, 2011?
25 A. Okay. Yeah, that looks like all the training.

Page 21

1  Q. Just let me know when you finished.
2  Okay. Have you ever had any training about
3  dealing with emotionally disturbed persons?
4  A. No.
5  Q. Have you ever had any training about dealing with
6  mentally ill persons?
7  A. No.
8  Q. Have you ever had any training about prevention
9  of in-custody death?
10 A. No.
11 Q. Have you ever had any training about asphyxia?
12 A. No.
13 Q. Have you ever had any training about positional
14 asphyxia?
15 A. No.
16 Q. Have you ever had any training about restraint
17 asphyxia?
18 A. No.
19 Q. Have you ever had any training that talked about
20 whether it's safe to put pressure on a suspect's back?
21 A. No.
22 Q. Have you ever had any handcuffing training?
23 A. Yes.
24 Q. What class is that?
25 A. PPCT.

Page 22

1  Q. And is that on this training list here?
2  A. Tactical handcuffing is and -- yes.
3  MR. HENSON: And it's in the --
4  THE WITNESS: In the academy, the defensive
5  tactics basic certification.
6  BY MR. CARNIE:
7  Q. Okay. So on two occasions you would have had
8  some handcuffing training, correct?
9  A. Yes.
10  Q. And once would have been in the academy in
11  August 2009, correct?
12  A. Yes.
13  Q. And then the second time was when?
14  A. 7-21 of 2011.
15  Q. And what is that class called?
16  A. PPCT tactical handcuffing.
17  Q. And tell me about that class, is that -- did you
18  go and physically attend it?
19  A. Yes, I did.
20  Q. Where was it?
21  A. At the Camden County Sheriff's Office.
22  Q. And who was the instructor, do you recall?
23  A. I believe it was Justin Young.
24  Q. Who is Justin Young?
25  A. He is a detective for our department.

Page 23

1  Q. So he is actually a Camden County detective?
2  A. Yes.
3  Q. And he taught the PPCT class?
4  A. Yes.
5  Q. And you attended that class in --
6  MR. HENSON: July.
7  BY MR. CARNIE:
8  Q. -- July --
9  MR. HENSON: 2011.
10  BY MR. CARNIE:
11  Q. -- 2011?
12  MR. CARNIE: Thank you.
13  THE WITNESS: Yes.
14  BY MR. CARNIE:
15  Q. Can you tell me what you learned in that class?
16  A. The basic to handcuffing, the way that PPCT
17  teaches it.
18  Q. And what does PPCT stand for?
19  A. I do not know.
20  Q. Okay. And can you tell me any more specifics
21  about what the handcuffing technique that's taught in that
22  class is?
23  A. It teaches you different techniques from
24  different -- I guess from standing, kneeling, prone, how to
25  do different takedowns with handcuffs and so on.

Page 24

1  Q. During that training was there any technique
2  taught that involved putting a knee in a suspect's back?
3  A. Yes, there was.
4  Q. What is that technique called?
5  A. I don't know the name of the technique, but it
6  was used during -- for a prone person or in some of the
7  takedowns to finish handcuffing.
8  Q. And can you tell me what you learned about that
9  technique in the class?
10  A. Like how it was done?
11  Q. Correct.
12  A. It's in prone position for somebody who is not
13  comb-- or non-combative. You instruct them to put their
14  hands out to their sides. You approach. You put a
15  handcuff on their wrist, sweep the arm back to an almost
16  vertical angle so it's angled back toward their -- their
17  hand's angled back toward their feet.
18     You come up and you place your right knee on
19  their shoulder blade or toward the middle of the back --
20  toward the middle -- I'm sorry -- between the shoulder
21  blades. And you can either take your left knee, but it up
22  to the body, put it also on the side of their body or keep
23  it up. And when you do that, you sweep their hand back,
24  instruct them to take the other hand, pull it back and then
25  handcuff.

Page 25

1  Q. And do they teach you why you're putting the knee
2  in between the shoulder blades?
3  A. So you have control over their arm and they
4  can't -- pretty much so they can't get the arm back under
5  their body.
6  Q. And what do they teach you in that class about
7  after the person is handcuffed?
8  A. When the handcuff -- on a prone person?
9  Q. Correct.
10  A. To turn them on their sides and not leave them on
11  their stomachs.
12  Q. Do they teach you in that class to keep your knee
13  in the suspect's back if he continues to struggle after
14  being handcuffed?
15  A. If you don't have control over them, it is a way
16  to just keep control, because if you don't have control
17  over your suspect, then the handcuffing is not going to do
18  much.
19  Q. Okay. And they teach you to keep the knee in the
20  suspect's back after --
21  A. They don't teach you that, no.
22  Q. Okay. Is that a technique that you learned at
23  some point in time?
24  A. Yes, it is.
25  Q. Where did you learn that technique?

Page 30

1  Q. Where were you when you received the call to
2  respond?
3  A. I was on patrol.
4  Q. And where at, do you recall?
5  A. State Road A.
6  Q. Do you remember about the time of that call?
7  A. I believe the call came out at around 4:25 a.m.
8  Q. Do you recall how long it took you to arrive on
9  scene?
10 A. Approximately 11 minutes.
11 Q. The dispatch record says you arrived around
12 4:37 a.m., do you have any reason to dispute that?
13 A. No, I don't.
14 Q. Could you please describe what the call was that
15 you received?
16 A. The call was -- a burglary in progress is what we
17 call it. It was a subject attempting to gain entry into a
18 residence, and we were informed that he did actually gain
19 entry into that residence.
20 Q. And can you describe what you first saw when you
21 arrived?
22 A. I saw my supervisor's patrol car sitting in
23 the -- well, essentially off to the side of the road.
24 Q. And who is your supervisor?
25 A. It was, at the time, Sergeant Brian Fiene.

Page 31

1  Q. And what did you do after you saw his patrol car?
2  A. I parked my patrol car next to it and exited my
3  vehicle.
4  Q. And then what did you do?
5  A. I attempted to locate where my sergeant and the
6  other deputy who had arrived before me were.
7  Q. Were you able to locate them?
8  A. I was.
9  Q. Where did you locate them?
10 A. In tall grass behind the residence.
11 Q. And you mentioned there was another deputy on the
12 scene?
13 A. Yes, there was.
14 Q. Who was that deputy?
15 A. Deputy Brandon Dziadosz.
16 Q. And once you located them, what did you do?
17 A. I went to their location.
18 Q. And what did you see when you first located them?
19 A. That Deputy Dziadosz was on his knees next to a
20 male subject trying to gain control over his left hand and
21 Sergeant Fiene was on his upper thighs and he had his taser
22 drawn.
23 Q. And how far away from Deputy Dziadosz and
24 Sergeant Fiene were you when you first located them?
25 A. When I first saw them, I don't know.

Page 32

1  Q. And I assume you walked toward them, correct?
2  A. I rushed toward them.
3  Q. Okay. So you were moving quickly toward them?
4  A. Yes.
5  Q. And what did you see when you got close to them?
6  A. That they were struggling with the male subject
7  to gain control over him. I could see that beforehand too.
8  And that his right arm had some blood on it and that he was
9  actively resisting the deputies.
10 Q. And what was Deputy Dziadosz doing when you
11 arrived?
12 A. He was trying to gain control over the suspect or
13 the subject's left hand and left arm.
14 Q. Was he touching Mr. Norman?
15 A. Yes.
16 Q. What parts of his body were touching Mr. Norman?
17 A. His hands.
18 Q. Where were his knees?
19 A. On the ground.
20 Q. Can you describe what Deputy Dziadosz was doing?
21 A. He was trying to gain control over his hands or
22 his arm.
23 Q. And physically what does that involve doing?
24 A. Holding onto his arm, trying to get it behind his
25 back.

Page 33

1  Q. And where was Mr. Norman's arm?
2  A. Next to his body.
3  Q. And where was Sergeant Fiene?
4  A. He was behind Mr. Norman on his upper thighs, his
5  legs.
6  Q. What part of Sergeant Fiene's body was touching
7  Mr. Norman?
8  A. It would have been his -- he had him straddled,
9  so his legs were between Sergeant Fiene's legs, and I
10 believe his butt was on top of Mr. Norman's legs.
11 Q. What was Sergeant Fiene doing with his hands?
12 A. He had a taser out.
13 Q. Which hand did he have the taser in?
14 A. I believe the right hand.
15 Q. What was he doing with the left hand?
16 A. I don't know.
17 Q. What was he doing with the right hand?
18 A. He had it on the taser.
19 Q. And what was he doing with the taser?
20 A. He had it in his hand. At that time he was not
21 doing anything with it.
22 Q. So at the time you arrived, he is straddling
23 Mr. Norman?
24 A. Yes.
25 Q. Deputy Dziadosz is kneeling beside Mr. Norman?

Page 34

1   A. Yes.
2   Q. And Sergeant Fiene is not touching him other than
3   straddling him?
4   A. Yes.
5   Q. Okay. Then what happened next?
6   A. I rushed to his side and got down on my knees and
7   grabbed hold of Mr. Norman's right hand -- or right arm.
8   Q. Okay. And what did you do with his right arm?
9   A. I attempted to get it out from under his body.
10  Q. Describe to me how you did that.
11  A. I started to grab toward his arm, grabbed his
12  upper for-- or his lower forearm and then worked my way
13  down to his wrist and attempted to pull it out from under
14  his body.
15  Q. And were you able to do that?
16  A. Not right away.
17  Q. At the time you started to make contact with
18  Mr. Norman's arm, what was Sergeant Fiene doing?
19  A. He was directing Mr. Norman to put his hands
20  behind his back.
21  Q. Did you say anything to Mr. Norman?
22  A. I don't recall.
23  Q. Were you able to hear any noises from Mr. Norman?
24  A. Yes.
25  Q. What noises was he making?

Page 35

1   A. He was yelling and grunting.
2   Q. Could you make out any of the words he was
3   saying?
4   A. No.
5   Q. What was Mr. Norman doing when you arrived?
6   A. Resisting deputies.
7   Q. What does that mean?
8   A. He was fighting against deputies. I'm sorry. He
9   was struggling against deputies' hold on him to try to put
10  his arms behind his back, wasn't following commands that
11  the deputies were giving him and attempting to push himself
12  off the ground.
13  Q. Can you describe Mr. Norman's appearance when you
14  arrived?
15  A. He was wearing only shorts, which were later
16  identified as boxer shorts.
17  Q. So he had no shirt on?
18  A. No.
19  Q. Did he have shoes on?
20  A. No.
21  Q. Did he have socks on?
22  A. No.
23  Q. Did he have pants on?
24  A. No.
25  Q. So he was only wearing boxer shorts?

Page 36

1   A. Yes.
2   Q. And what position was Mr. Norman in?
3   A. He was on his stomach.
4   Q. And is that called the prone position?
5   A. Yes, it is.
6   Q. Before you arrived to the scene, did you have any
7   communication with Deputy Dziadosz?
8   A. We had radio communication.
9   Q. What was that radio communication?
10  A. Oh, did I actually talk to him prior to arriving
11  on the scene?
12  Q. Yes, ma'am.
13  A. No, I did not.
14  Q. Okay. Did you hear him say anything over the
15  radio prior to arriving on scene?
16  A. I don't recall what was said over the radio.
17  Q. Did you have any conversation with Sergeant Fiene
18  prior to arriving?
19  A. No.
20  Q. Did you hear Sergeant Fiene say anything over the
21  radio prior to arriving?
22  A. Not that I can remember.
23  Q. Did anybody tell you that Mr. Norman was an
24  emotionally disturbed person before you arrived?
25  A. No.

Page 37

1   Q. Were you at any point able to make that
2   determination?
3   A. Yes.
4   Q. When?
5   A. When I got up to everybody, the group of them,
6   and he wasn't following commands. Everything -- he was --
7   he just wasn't responding the way a normal person would.
8   Q. When you arrived, did Deputy Dziadosz tell you he
9   was an emotionally disturbed person?
10  A. No.
11  Q. Did Sergeant Fiene tell you he was an emotionally
12  disturbed person?
13  A. No.
14  Q. That's just something you observed when you
15  arrived?
16  A. Yes.
17  Q. At any point during your interaction with
18  Mr. Norman did you say anything to him?
19  A. The only thing that I would have said would be
20  put your hands behind your back and stop resisting.
21  Q. During the entire interaction with Mr. Norman,
22  could you make out any words that Mr. Norman said?
23  A. No.
24  Q. Can you tell me all of the words you remember
25  Sergeant Fiene saying to Mr. Norman?

Page 54

1  A. I don't know.
2  Q. When is the next time you recall seeing Deputy
3  Dziadosz?
4  A. When we -- after I removed my knee, we both
5  grabbed hold of Mr. Norman and put him up to his knees.
6  Q. And that's prior to moving him?
7  A. To the short grass?
8  Q. Yeah.
9  A. Yes.
10 Q. When was the next time you recall seeing Sergeant
11 Fiene after he -- after Mr. Norman was handcuffed?
12 A. When he came back from getting his vehicle or
13 getting, I think it was, Deputy Dziadosz' vehicle?
14 Q. So that would have been just shortly after you
15 put Mr. Norman up on his knees?
16 A. Yes.
17 Q. Now, after Mr. Norman was handcuffed, was he
18 making any noises?
19 A. Yes.
20 Q. Were his eyes open?
21 A. Yes.
22 Q. Where was his head facing?
23 A. It was facing towards me, so it was facing to the
24 right.
25 Q. Okay. And you remained in the same position

Page 55

1  relative to Mr. Norman's body, correct?
2  A. Yes.
3  Q. What were you looking at during the time period
4  when -- after Mr. Norman was handcuffed and before you
5  removed the knee from the back?
6  A. At Mr. Norman.
7  Q. What was your plan at that time relative to
8  having the knee in his back?
9  A. What do you mean?
10 Q. In other words, how long did you plan to keep
11 your knee in his back?
12 A. Until we had control over him.
13 Q. And what does control over him mean?
14 A. Until he relaxed and was compliant, or at least
15 until we could -- yeah.
16 Q. And you said it took two to three minutes for him
17 to calm down?
18 A. Yes.
19 Q. And during that entire time you remained with
20 your knee in between his shoulder blades?
21 A. Yes.
22 Q. And during that entire time, until he calmed
23 down, he was pushing up?
24 A. Yes.
25 Q. And he was handcuffed, correct?

Page 56

1  A. Yes.
2  Q. And his hands were behind his back?
3  A. Yes.
4  Q. And he was prone on the ground?
5  A. Yes.
6  Q. Can you describe for me what happened when he
7  calmed down?
8  A. He visibly relaxed. I could feel his body relax,
9  and his breathing -- he wasn't grunting anymore. He
10 visibly calmed down. When that happened, I removed my
11 knee.
12 Q. Okay. How long from the point in time that he
13 calm downed until you removed your knee?
14 A. It was immediately.
15 Q. And then what did you do when you removed your
16 knee?
17 A. We placed him -- myself and Deputy Dziadosz
18 placed him up on his knees so he was no longer on the
19 ground.
20 Q. Okay. So after removing your knee, did you stand
21 up?
22 A. Yes, I did.
23 Q. Okay. And then what happened?
24 A. In reference -- what did I do?
25 Q. Let me ask a better question.

Page 57

1  What was Mr. Norman doing after you removed your
2  knee?
3  A. He was laying on the ground blinking, breathing
4  normally.
5  Q. Okay. His eyes were open?
6  A. They were open.
7  Q. At some point in time did his eyes close?
8  A. Yes.
9  Q. When was that?
10 A. I can't give you an exact time, but it was around
11 the same time he started snoring.
12 Q. And how long from the point in time when you
13 removed your knee from his back until he started snoring?
14 A. About a minute. One minute to two minutes.
15 Q. Okay. And did his head remain facing in the same
16 direction the whole time?
17 A. He would -- before he started snoring, he would
18 straighten it up, put his chin on the ground and then place
19 it back with his left cheek on the ground facing toward me.
20 Q. And so it took one to two minutes before he
21 started making a snoring sound?
22 A. Yes.
23 Q. What were you doing during that time?
24 A. I was standing up and Deputy Dziadosz and I were
25 in the process of putting him on his knees.

Page 66

1  MR. HENSON: Yeah. We did the same thing with
2  the summarization of the highway patrol interview that we
3  did with Deputy Dziadosz, and she found three different
4  things that the patrol wrote up in a different manner than
5  she said them. So I just --
6  MR. CARNIE: Okay. And I will do just like I did
7  Deputy Dziadosz, I'll let her explain.
8  MR. HENSON: I just want you to know that.
9  MR. CARNIE: So we know what those are. Give me
10 one second.
11 MR. HENSON: Okay.
12 BY MR. CARNIE:
13 Q. Now, at the time of this incident, did you
14 believe that it was normal for someone to go from actively
15 fighting to snoring?
16 A. No.
17 Q. Did you think that was kind of strange?
18 A. Yes.
19 Q. Did you mention anything to anyone else about
20 those thoughts at the time?
21 A. That it was unusual he was snoring? I'm sure I
22 did, but I don't remember.
23 Q. So you don't recall one way or another if you
24 said something to Deputy Dziadosz about, is this normal or
25 not?

Page 67

1  A. No, I don't.
2  Q. But in any event, you didn't think it was normal?
3  A. No.
4  Q. I think if you look at Deputy Dziadosz' dash
5  camera, it shows that Mr. Norman was first in the lights of
6  his patrol car around 4:45 a.m.; do you have any reason to
7  dispute that?
8  A. No.
9  Q. Now, while Mr. Norman was being moved from the
10 long grass to the short grass, what were you doing?
11 A. I was walking in front of them.
12 Q. And it was Deputy Dziadosz and Sergeant Fiene
13 that were moving him?
14 A. Yes.
15 Q. Now, during the time he was being moved, did you
16 hear him make any noises?
17 A. Other than the snoring?
18 Q. Well, that's a good start. So did you hear him
19 make the snoring sound as he was being dragged from the
20 long grass to the short grass?
21 A. I'm trying to remember. I believe so. I know
22 when we got to the short grass he was still snoring.
23 Q. Okay. So at the time he is placed in the short
24 grass, how is he placed?
25 A. He's placed on his stomach, then turned to his

Page 68

1  side.
2  Q. And at that time when you arrived to the short
3  grass, he is still making the snoring sound?
4  A. Yes, for a short period of time.
5  Q. For how long?
6  A. I don't know. Maybe 30 seconds to a minute.
7  Q. Now, at the time he first started snoring, did
8  you believe that he was unconscious?
9  A. He was unresponsive, so yes.
10 Q. And did that change from the point in time when
11 he was moved from the short grass to the tall grass?
12 A. From the tall grass to the short grass?
13 Q. Tall grass to the short grass, correct.
14 A. Yes.
15 Q. It did change?
16 A. I'm sorry. No, it did not change.
17 Q. Okay. His condition, as far as being responsive
18 or not, did not change from the time period where he first
19 started snoring until when you had him in the short grass?
20 A. No, it did not.
21 Q. He was still unresponsive?
22 A. Yes.
23 Q. And what do you mean when you say unresponsive?
24 A. He wasn't -- he wasn't opening his eyes making
25 any movements. He was unconscious.

Page 69

1  Q. Okay. And when he got to the short grass, did
2  you check for a pulse?
3  A. I did eventually, yes.
4  Q. Okay. How long after the point in time he got to
5  the short grass was it?
6  A. I believe I checked his pulse at 4:49 a.m.
7  Q. And I take it you've recently looked at the
8  video?
9  A. I have.
10 Q. And there's a point in time where it shows you
11 doing something that looks like you might be checking his
12 pulse, right?
13 A. Yes.
14 Q. And before watching that video, did you recall
15 checking his pulse?
16 A. I did.
17 Q. You did?
18 A. Yes.
19 Q. Did you feel a pulse?
20 A. I did.
21 Q. And where did you check his pulse?
22 A. Underneath -- well, it would have been on his
23 neck.
24 Q. Okay. When Mr. Norman gets into the short grass,
25 you say he's put on his side, right?

Page 102

1   A. Yes.
2   Q. What did she say then?
3   A. She had come back with her son and daughter, and
4   I made contact with her before she got anywhere near it,
5   because we had everything taped off and what-not. And she
6   had informed me that she had notified his son who lives in
7   Osage Beach. And I asked for her kids to take her back to
8   the trailer and, again, told her that a deputy would be out
9   to speak with her.
10  Q. And did she go back to her trailer?
11  A. Yes, she did.
12  Q. Do you agree that Mr. Norman was an emotionally
13  disturbed person?
14  A. Yes.
15  Q. Was it obvious to you when you arrived on the
16  scene that he was high or intoxicated?
17  A. Yes.
18  Q. And you didn't need anybody to tell you that, did
19  you?
20  A. No.
21  Q. Do you believe that as deputy you need to treat
22  emotionally disturbed people any different than another
23  suspect?
24  A. No.
25  Q. Have you ever had any training on that?

Page 103

1   A. No.
2   Q. Are there any Camden County policies on that?
3   A. No.
4   Q. Does Camden County have any policies about when
5   an ambulance needs to be called to the scene?
6   A. No.
7   Q. Have you had any training about that?
8   A. No.
9   Q. Have you had any CPR training?
10  A. Yes.
11  Q. What do they teach you in CPR class?
12  A. What do you mean? Like compressions to breath?
13  Q. If I wanted to take a CPR class, what would they
14  teach me?
15  A. How to assess whether or not somebody is
16  breathing, what to do if they aren't breathing, when to
17  stop CPR.
18  Q. How do they teach you how to assess if someone is
19  breathing or not?
20  A. Airway -- like color, airway and whether or not,
21  you know, there's actually breath coming out of their
22  mouth.
23  Q. Is there a technique that they teach you to use
24  to determine whether breath is coming out of someone's
25  mouth?

Page 104

1   A. It's called ABC, but I can't remember what they
2   stand for. I know it's airway -- I believe it's airway,
3   breathing and I can't remember -- I don't remember exactly
4   what the --
5   Q. And that's okay. I'm not so interested in
6   terminology. I'm interested in what you actually
7   physically do?
8       MR. HENSON: He's talking about checking breaths
9   and those kinds of things.
10      MR. CARNIE: Yes.
11      MR. HENSON: What do they teach you to do to
12  check breaths?
13      THE WITNESS: To check breaths?
14  BY MR. CARNIE:
15  Q. So earlier you talked to me about how you saw on
16  the video that either Dziadosz or Rutherford checked for
17  breaths.
18  A. Yes.
19  Q. Is that part of the CPR training?
20  A. Yes, it is.
21  Q. And that's putting your ear by the person's
22  mouth?
23  A. Yes. To hear and to feel whether or not there's
24  breath coming out of their mouth.
25  Q. And that's how CPR class trains you to check if

Page 105

1   somebody is breathing or not?
2   A. Yes.
3   Q. Does CPR class teach you when compressions and
4   breaths need to start?
5   A. Yes.
6   Q. What do they teach you about that?
7   A. When there's no pulse and -- or there's no pulse
8   and no breathing you essentially start CPR.
9   Q. Does CPR class teach you anything about what to
10  do if there's a weak pulse?
11  A. I don't remember exactly. I know there is, but I
12  can't explain to you what it is right now.
13  Q. Okay.
14      MR. CARNIE: Let's go ahead and take a break, and
15  this will probably be our final break.
16      THE VIDEOGRAPHER: We are off the record at
17  12:10. This ends Tape 2.
18      (A BREAK WAS TAKEN.)
19      THE VIDEOGRAPHER: We are back on the record at
20  12:23. This begins Tape 3 of the deposition of Deputy
21  Jamee Rugen.
22  BY MR. CARNIE:
23  Q. Deputy, do you believe it's safe to place your
24  knee in a suspect's back after he is handcuffed?
25      MR. HENSON: Object to the form. It calls for an

Page 106

1  improper opinion. It's speculation on her part.
2       THE WITNESS: Yes.
3  BY MR. CARNIE:
4       Q. And what is that based on?
5       A. Based on the location that it was at, I don't
6  think it would be detrimental, and it helps with making
7  sure that the subject wouldn't further cause harm to
8  himself or us, and just to make sure that we have control
9  over them.
10      Q. And is that based on your training?
11      A. Yes.
12      MR. CARNIE: I don't have any further questions
13 for you.
14      MR. HENSON: We don't have any questions and we
15 will read and sign, so send it to me and we'll get it back
16 to you.
17      THE VIDEOGRAPHER: We are off the record at
18 12:24. This concludes this deposition of Deputy Jamee
19 Rugen.
20      (SIGNATURE REQUESTED.)
21
22
23
24
25

Page 107

1  October 16, 2013
2
3
4  D. Keith Henson
5  Attorney at Law
6  Paule, Camazine & Blumenthal
7  165 North Meramec Avenue
   Sixth Floor
8  St. Louis, Missouri 63105-3789
9  In Re: SPENCER NORMAN, et al. vs. CAMDEN COUNTY, et al.
10 Dear Mr. Henson:
11 Please find enclosed your copy of the deposition of Jamee
   Rugen taken on October 2, 2013, in the above-referenced
12 case. Also enclosed is the original signature page and
   errata sheet.
13
   Please have Mrs. Rugen read your copy of the transcript,
14 indicate any changes and/or corrections desired on the
   errata sheet and sign the signature page in front of a
15 notary public.
16 Please return the errata sheet and signed signature page to
   Mr. Carnie so he can file the original deposition in the
17 appropriate manner.
18
   If you have any questions, please feel free to call me.
19
20 Sincerely,
21
22
23 Shelly L. Stewart, CCR
24 CAPITAL CITY COURT REPORTING
25

Page 108

1  (THIS IS THE SIGNATURE PAGE TO THE VIDEOTAPED DEPOSITION OF
2  JAMEE RUGEN TAKEN ON OCTOBER 2, 2013.)
3
4
5
6
7
8
9       _____
        JAMEE RUGEN
10
11 Subscribed and sworn before me on this _____ day
12 of _____ 2013.
13 My Commission expires _____.
14
15
16
17
        _____
18 NOTARY PUBLIC - STATE OF MISSOURI
   Commissioned in _____ County
19
20
21
22
23
24
25

Page 109

1       ERRATA SHEET
2            Page 1 of 2
3  Deponent: JAMEE RUGEN
4  In Re: SPENCER NORMAN, et al. vs. CAMDEN COUNTY, et al.
5  Date Taken: OCTOBER 2, 2013
6
7  Page #_____, Line #_____,
8  Should Read: _____
9  Reason for Change: _____
10 Page #_____, Line #_____,
11 Should Read: _____
12 Reason for Change: _____
13 Page #_____, Line #_____,
14 Should Read: _____
15 Reason for Change: _____
16 Page #_____, Line #_____,
17 Should Read: _____
18 Reason for Change: _____
19 Page #_____, Line #_____,
20 Should Read: _____
21 Reason for Change: _____
22 Page #_____, Line #_____,
23 Should Read: _____
24 Reason for Change: _____
25

Page 110

```
 1            E R R A T A  S H E E T
 2                  Page 2 of 2
 3
 4      Page #_____, Line #_____,
 5      Should Read: _____
 6      Reason for Change: _____
 7      Page #_____, Line #_____,
 8      Should Read: _____
 9      Reason for Change: _____
10      Page #_____, Line #_____,
11      Should Read: _____
12      Reason for Change: _____
13      Page #_____, Line #_____,
14      Should Read: _____
15      Reason for Change: _____
16      Page #_____, Line #_____,
17      Should Read: _____
18      Reason for Change: _____
19      Page #_____, Line #_____,
20      Should Read: _____
21      Reason for Change: _____
22      Page #_____, Line #_____,
23      Should Read: _____
24      Reason for Change: _____
25
```

Page 111

```
 1                    CERTIFICATE
 2
 3      I, Shelly L. Stewart, Certified Court Reporter, Capital
 4      City Court Reporting, Post Office Box 446, Jefferson City,
        Missouri 65102, do hereby certify that pursuant to amended
 5      notice, there came before me,
 6              JAMEE RUGEN,
 7
        at the law offices of Phillips, McElyea, Carpenter & Welch,
 8      85 Court Circle, in the City of Camdenton, County of
        Camden, State of Missouri, on October 2, 2013, who was
 9      first duly sworn to testify to the whole truth of her
        knowledge concerning the matter in controversy aforesaid;
10      that she was examined and her examination was then and
        there written in machine shorthand by me and afterwards
11      typed under my supervision, and is fully and correctly set
        forth in the foregoing pages; and the witness and counsel
12      waived presentment of this deposition to the witness, by
        me, and that the signature shall be acknowledged by a
13      notary public, and the deposition is now herewith returned.
14      I further certify that I am neither attorney or counsel
        for, nor related to, nor employed by any of the parties to
15      this action which this deposition is taken; and
        furthermore, that I am not a relative or employee of any
16      attorney or counsel employed by the parties hereto, or
17      financially interested in this action.
18      IN WITNESS WHEREOF, I have hereunto set my hand on this
        16th day of October 2013.
19
20
21
22
23              _____
24                    SHELLY L. STEWART, CCR
25                    CAPITAL CITY COURT REPORTING
```

Page 112

```
 1                    COURT MEMO
 2      IN THE UNITED STATES DISTRICT COURT
 3       WESTERN DISTRICT/CENTRAL DIVISION
 4             STATE OF MISSOURI
 5      SPENCER NORMAN, et al.,    )
                                   )
 6          Plaintiffs,            )
                                   ) Case No. 2:12-CV-04210
 7      vs.                        )
                                   )
 8      CAMDEN COUNTY, et al.,     )
                                   )
 9          Defendants.            )
10      CERTIFICATE OF OFFICER & STATEMENT OF COSTS
11      Transcript of Videotaped Deposition of JAMEE RUGEN
              October 2, 2013
12
13      Name & address of person or firm having custody of the
        original transcript: KEVIN M. CARNIE, JR., 800 Market
14      Street, Suite 1700, St. Louis, Missouri 63101
15
16      TAXED IN FAVOR OF: Plaintiffs, represented by KEVIN M.
17      CARNIE, JR.: Attendance, original with original exhibit &
        copy of transcript and E-transcript,
18
            TOTAL.......$ 660.25
19
20      TAXED IN FAVOR OF: Defendants, represented by D. KEITH
21      HENSON: Regular copy, condensed copy of transcript,
22      exhibits and E-transcript,
23
24          TOTAL.......$ 284.25
25
```

Page 113

```
 1
 2
 3
 4
 5
 6      Upon delivery of transcript, the above charges had not yet
 7      been paid. It is anticipated that all charges will be paid
 8      in the normal course of business.
 9          SHELLY L. STEWART, CCR (No. 619)
            CAPITAL CITY COURT REPORTING
10       Jefferson City ** The Lake ** Columbia
         573-761-4350 * 573-365-5226 * 573-445-4142
11
        IN AFFIRMATION THEREOF, I have hereunto set my hand on this
12      16th day of October 2013.
13
14
15          _____
                SHELLY STEWART, CCR
16              CAPITAL CITY COURT REPORTING
17
18
19
20
21
22
23
24
25
```