# Case: Spencer Norman, et al v. Camden County, et al

Transcript of Sergeant Brian Fiene

**Date:** October 21, 2013

*This transcript is printed on 100% recycled paper*



GorePerry
Reporting & Video

515 Olive Street, Suite 300
St. Louis, MO 63101
Phone: 314-241-6750
1-800-878-6750
Fax: 314-241-5070
Email: schedule@goreperry.com
Internet: www.goreperry.com

EXHIBIT 4

Page 6

```
1    A. Deputy sheriff.
2    Q. Okay. Deputy sheriff --
3    A. Yes, sir.
4    Q. -- is that correct?
5    A. Yes, sir.
6    Q. Is that above or below the rank of sergeant?
7    A. My rank is sergeant.
8    Q. Your rank is sergeant. Okay.
9    A. Yes, sir.
10   Q. And could you please state your age and your date
11   of birth?
12   A. My age is 44. My date of birth is April 2nd,
13   1969.
14   Q. Okay. And what is your current height?
15   A. Six feet three inches.
16   Q. And your weight?
17   A. Two hundred thirty-five pounds.
18   Q. Any changes to your weight since October 4th,
19   2011?
20   A. No, sir.
21   Q. Are you married, sir?
22   A. Yes, sir.
23   Q. Any kids?
24   A. Yes, sir.
25   Q. And how many kids do you have?
```

Page 7

```
1    A. Five.
2    Q. Big family. Would you walk us through your
3    educational background starting with high school?
4    A. I graduated high school in 1987 at Camdenton High
5    School in Missouri. I had two years of vocational
6    technical school. I went to about a year and a half of
7    college through Columbia College and then I went in the
8    military, so that would be about it, I guess.
9    Q. And how long were you in the military?
10   A. Four years.
11   Q. And were you discharged?
12   A. Yes.
13   Q. And what were the terms of your discharge?
14   A. Honorable.
15   Q. And what division of the military?
16   A. Marine Corp.
17   Q. Okay. And what were you studying at Columbia
18   College?
19   A. I was an English major.
20   Q. Any other schooling besides Columbia College?
21   A. No, sir, not until law enforcement academy.
22   Q. Okay. And which law enforcement academy did you
23   attend?
24   A. St. Charles Law Enforcement Academy.
25   Q. How long did that last?
```

Page 8

```
1    A. About four to five months.
2    Q. And you finished the program?
3    A. Yes, sir.
4    Q. Any other education that you've received?
5    A. Just continuing education since I've been a law
6    enforcement officer.
7    Q. Okay. And Camden County, the coverage area for
8    that includes -- how far -- how far is the coverage that
9    Camden County extends to?
10   A. I believe it's about --
11   Q. Is it through the lake?
12   A. Yes, sir.
13   Q. I'm sorry.
14   A. It's about 600 --
15   Q. We should probably start -- Let me -- Let me just
16   state this before you answer the question. Have you ever
17   taken your deposition -- Have you ever had your
18   deposition taken before, have you sat for a deposition?
19   A. Yes, sir.
20   Q. Okay. So I'm going to ask you questions. If you
21   could wait until I'm finished speaking before you start
22   giving your answers, that way we're not talking over each
23   other, especially in a videoconference it can be
24   difficult for the court reporter to record everything
25   accurately if we're both talking at the same time. If
```

Page 9

```
1    you can also give audible answers such as yes and no as
2    opposed to uh-huh and uh-uh. That way the court reporter
3    can record everything accurately. Is that okay with you?
4    A. Yes.
5    Q. Okay. So -- and I know it's more difficult in a
6    videoconference to make sure that we're not cutting each
7    other off, so I will do my best to make sure I don't cut
8    you off and I would ask that you do the same for me. You
9    were answering a question about the coverage area for
10   Camden County.
11   A. Yes. It's about 660 square miles, I believe.
12   Q. And how is the Camden County Police Department
13   set up? What is the structure, basic structure?
14   A. We have a administrative division, a patrol
15   division, investigation division, corrections division,
16   court security division, communications division, special
17   operations division. I believe that's everything.
18   Q. And how many officers does Camden County employ?
19   A. Total employees are around hundred ten. I'm not
20   sure of the number of actual commissioned officers
21   because we have some civilian employees as well.
22   Q. Okay. And where did you work before Camden
23   County as per your law enforcement?
24   A. Linn Creek, Missouri Police Department.
25   Q. Okay. Where is that?
```

## Page 34

1 Norman when he came into view?
2 **A.** Yes, sir.
3 **Q.** And what -- Can you walk me through what you saw
4 at that point and what happened?
5 **A.** As I approached, Mr. Norman and Deputy Dziadosz
6 where they were coming into sight, it was dark, it was
7 4:30 in the morning, so the light was flashlights only.
8 As I saw them, I could see Mr. Norman walking away from
9 Deputy Dziadosz. Deputy Dziadosz was behind him probably
10 close to 15 feet away. Deputy Dziadosz had his TASER
11 pointed at Mr. Norman and the laser light, the red laser
12 light from Deputy Dziadosz TASER was on and Deputy
13 Dziadosz was continuing to order Mr. Norman to put his
14 hands up, to get on the ground, to stop running away, to
15 comply, and Mr. Norman was continuing away from Deputy
16 Dziadosz.
17 **Q.** Was he walking or was he running or jogging, Mr.
18 Norman?
19 **A.** He was hurriedly walking. He was walking fast.
20 **Q.** Okay. Away from Officer Dziadosz?
21 **A.** That's correct.
22 **Q.** And can you describe what Mr. Norman looked like
23 when you first saw him?
24 **A.** He was clothed only in boxer shorts, no shirt, no
25 pants, no shoes.

## Page 35

1 **Q.** Okay. What about his -- Could you see his face
2 and his eyes?
3 **A.** I could see his face. I couldn't really see his
4 eyes.
5 **Q.** So Officer Dziadosz had his TASER drawn and you
6 said the laser was being -- beam from the TASER was on
7 Mr. Norman's body, the target laser?
8 **A.** I assume it was. I don't know that it was on Mr.
9 Norman's body. I could just see that the laser was on on
10 Deputy Dziadosz TASER. I could see that the red light
11 was on, so I knew he had the laser on, but where it was
12 pointed, I don't know for sure.
13 **Q.** Okay. So you at that point -- What happened
14 after Officer Dziadosz had the TASER drawn and was
15 continuing to talk to Mr. Norman, what did you do?
16 **A.** Well, since Mr. Norman was not complying with
17 Deputy Dziadosz's request and orders, as I closed the
18 distance, I drew my TASER from probably about 15 feet
19 away and I continued to close the distance towards Mr.
20 Norman because I began walking right directly towards him
21 and he was walking away from Deputy Dziadosz because he
22 was in the middle of Dziadosz and I. So he was walking
23 towards me at that point and then I began issuing
24 commands for him to stop and for him to put his hands on
25 his head and for him to quit moving away and quit

## Page 36

1 resisting, that sort of thing, and --
2 **Q.** Okay. Was Officer -- or strike that.
3 Was Mr. Norman speaking at all at that point?
4 Was he responding in any way verbally to either you or
5 Officer Dziadosz?
6 **A.** I didn't heard -- I heard nothing intelligible
7 come from Mr. Norman addressed to Deputy Dziadosz or I.
8 **Q.** What was he saying? Before he was tasered, was
9 he speaking at all?
10 **A.** He -- He was mumbling, doing some mumbling. He
11 was doing a lot of what I described as growling. At one
12 point the only word that he said that I understood, but
13 they weren't addressed to myself or Deputy Dziadosz, but
14 at one point he stopped walking for a second and looked
15 up at the sky and said something about God or Jesus and
16 the Holy Ghost or something to that effect, but then he
17 put his hands down and kept walking away again.
18 **Q.** And is that the only thing that you heard that
19 was intelligible from him, was God, Jesus, Holy Ghost?
20 **A.** Yes.
21 **Q.** Did that mean anything to you at that particular
22 moment?
23 **A.** I suspected he was probably under the influence
24 of narcotics.
25 **Q.** Could you smell any alcohol or drugs when you

## Page 37

1 were in his vicinity before you tased him?
2 **A.** No, sir. I wasn't close enough to smell
3 anything.
4 **Q.** So he -- Mr. Norman started walking towards you
5 away from Officer Dziadosz. You at that point had your
6 TASER drawn, correct?
7 **A.** Correct.
8 **Q.** And you were giving him verbal commands?
9 **A.** Correct.
10 **Q.** And what were those commands?
11 **A.** I told him several times to stop. I told him at
12 least two or three times to put his hands on his head. I
13 told him at least a couple times after that to get on the
14 ground. I don't know how many commands I gave him.
15 Probably at least six to eight all together.
16 **Q.** And he wasn't -- And there was no response by him
17 to any of these commands?
18 **A.** That's correct.
19 **Q.** You said that you could tell he was under the
20 influence of narcotics of some sort, that's what you
21 suspected?
22 **A.** That's what I suspected, yes.
23 **Q.** And did you -- Is that suspicion you had based on
24 his non-responsiveness, his statement about God and Jesus
25 Christ -- Well, let's narrow it down. What was your

Page 50

1  Q. Is there a reason why you didn't use a PPC
2 technique?
3  A. Yes. Because PPCT teaches you to use their arms
4 and I didn't have his arms; they were underneath him.
5  Q. And so your PPC technique, as part of the
6 training, that allows you to deal with a suspect when you
7 don't have an ability to grab his arms?
8  A. Basically. I mean, not without -- The PPC
9 handcuffing techniques are -- They're designed for when
10 you can get ahold of at least one arm and then spin
11 around and put one knee on the ground and one knee on
12 their back and hold them down that way and then use
13 leverage on their arm to then get it in position to where
14 you can get a handcuff on it.
15  Q. And so you couldn't use that because he -- his
16 arms were underneath his body?
17  A. Correct.
18  Q. And Officer Dziadosz was trying to pull his arms
19 -- trying to pull Norman's arms out from underneath Mr.
20 Norman?
21  A. His left arm, yes.
22  Q. All right. So how did you eventually -- or I
23 didn't mean to cut you off before. You said you were
24 driving -- You were sitting on his butt and driving him
25 down into the ground with your palm sometimes and

Page 51

1 sometimes your arm, correct?
2  A. Correct.
3  Q. Any other techniques that you were using?
4  A. No.
5  Q. So you never used the prone position technique?
6  A. No.
7  Q. You never took your knee and applied it to any
8 part of his back while he was facing down?
9  A. No.
10  Q. Before or after he was handcuffed?
11  A. No, sir.
12  Q. Okay. So you're still sitting on his butt and
13 you don't have his arms yet. What happened then?
14  A. Well, after struggling with him like that for I
15 don't know how long it was, maybe a minute or two or
16 something, we kept telling him to give us his hands so we
17 could handcuff him and to stop resisting. We said those
18 kind of things numerous times. He maintained keeping his
19 arms underneath him and then the next thing of any
20 significance that happened other than that was all of a
21 sudden he did a pushup with me on top of him, and by that
22 I mean he extended both arms completely straight and
23 locked his elbows and did a pushup with me on top of him
24 and he was trying to get up and I was trying to push him
25 back down and Dziadosz was pushing down on his back with

Page 52

1 his hands trying to push him back down and neither one of
2 us could push him back down to the ground.
3  Q. So then what happened?
4  A. That's when I struck him in the right elbow with
5 my flashlight, trying to break his arm.
6  Q. Was that your intent, was to break his arm?
7  A. Yes, sir, it was.
8  Q. And when you say break, you mean like break the
9 bone?
10  A. Yes, sir.
11  Q. Okay. Is that a technique that the department
12 endorses?
13  A. If necessary, yeah. Uh-huh.
14  Q. And why did you feel it was necessary to attempt
15 to try to break his right arm at that point?
16  A. Because I was running out of options on how to
17 get him under control and I didn't want to have to kill
18 him.
19  Q. Okay. Had he struck you before you used your
20 flashlight to hit his right arm?
21  A. No, he had not.
22  Q. Had he struck Officer Dziadosz?
23  A. No, sir.
24  Q. So you used the flashlight and struck his right
25 elbow?

Page 53

1  A. Yes.
2  Q. And what happened?
3  A. Nothing.
4  Q. He didn't -- His arm was still locked?
5  A. Yes, sir.
6  Q. Still in the pushup position?
7  A. That's correct. It had no effect.
8  Q. And then what happened?
9  A. Basically, we just continued struggling with him
10 for another few seconds and kind of eventually got him
11 facedown on the ground again. I worked pulling his arm
12 trying to pull it out from under him and make him lose
13 his balance on his arms to where he could fall face first
14 back into the ground and that's eventually what we got
15 accomplished and then --
16  Q. While you were struggling though to put handcuffs
17 on him, were there any other officers on the scene at
18 that point besides you and Officer Dziadosz?
19  A. About that time is when Deputy Watson arrived.
20  Q. And what did Officer Watson do?
21  A. She came over and assisted trying to get that
22 right arm around to me so I could cuff it while Deputy
23 Dziadosz was continuing to try and get the left one. And
24 she placed her right knee on his back in order to help
25 keep him down on the ground and we struggled with him

**Page 74**

1 called them on the radio.
2 **Q.** Okay.
3 **A.** Then I went to look for my TASER cartridge in the
4 tall grass.
5 **Q.** Okay. And did you find it?
6 **A.** Yes.
7 **Q.** And then what happened?
8 **A.** Well, it was while I was looking for it still
9 that Deputy Rutherford arrived. He showed up on the
10 scene. I saw him arrive and he stopped and talked to
11 Deputy Dziadosz and Watson briefly and then he came over
12 and talked to me and I don't know what he said to them,
13 but he came over and talked to me and kind of asked me
14 basically what happened. I told him about, you know, we
15 had to fight this guy for a while and I had to TASER him
16 and this and that and he was a handful and now he's in
17 custody and we're waiting for the ambulance to get here
18 and check him out and I think he then turned and made --
19 walked back over to the van then I guess?
20 **Q.** When you were having that conversation with Mr.
21 Rutherford, how far away from Mr. Norman were you?
22 **A.** Ten -- Ten steps or so.
23 **MR. HENSON:** Ten feet, 20 feet?
24 **A.** Well, I say a step. A step is about a foot and a
25 half or two to feet, I guess, so maybe 15 feet or

**Page 75**

1 something.
2 **Q.** (By Mr. Keane) So you -- When you physically
3 helped drag or pull Mr. Norman into the short grass, was
4 he saying anything at that point?
5 **A.** No.
6 **Q.** Was he mumbling?
7 **A.** No.
8 **Q.** Okay. Could you hear him say anything, any kind
9 of -- any words come out of his mouth whatsoever?
10 **A.** I heard no words at all, no.
11 **Q.** Okay. Could you hear him breathing?
12 **A.** I couldn't necessarily hear him breathing, no.
13 **Q.** Okay. When -- How long was your conversation
14 with officer Rutherford?
15 **A.** Not very long. Probably 60 seconds or something.
16 Not very long at all.
17 **Q.** Okay. And while you were having this
18 conversation with Officer Rutherford, what was Officer
19 Watson doing?
20 **A.** Monitoring Mr. Norman with Deputy Dziadosz. They
21 were both still standing there with him.
22 **Q.** So they were standing over him?
23 **A.** Yeah. Well --
24 **Q.** Standing?
25 **A.** At different times I think they were either

**Page 76**

1 standing, kneeling, besides him, you know, that sort of
2 thing, but they were both at his side monitoring him the
3 whole time.
4 **Q.** Okay. But you -- Could you observe how they were
5 monitoring him?
6 **A.** No, not necessarily. They were just keeping an
7 eye on him, basically. What all they did, I don't know.
8 **Q.** So when you finish your conversation with Officer
9 Rutherford, what happened then?
10 **A.** He went back over to where Deputy Dziadosz and
11 Deputy Watson were with the -- with Mr. Norman and in a
12 short time after that he -- Deputy Rutherford again
13 called out to me and said, "Brian, I don't think he's
14 breathing." And I said, "Shit," and I started walking
15 towards him.
16 **Q.** Walking towards Mr. Norman?
17 **A.** Right.
18 **Q.** Okay. And then what happened?
19 **A.** As I approached them, they were checking him,
20 Deputy Dziadosz and Watson were checking pulses and
21 trying to hear and listen for respirations and that sort
22 of thing to see if, indeed, he was not breathing and they
23 again told me, no, I don't think he's breathing and so I
24 immediately grabbed my walkie-talkie and I told dispatch
25 to tell the ambulance to expedite to the scene. And then

**Page 77**

1 I told Dziadosz to remove the handcuffs from Mr. Norman
2 and roll him over onto his back and I told them to then
3 start doing CPR on him at least till the ambulance could
4 get there.
5 **Q.** When he was still on his side before he was --
6 you removed the handcuffs from him and his pulse was
7 being checked by Officer Rutherford and Officer Watson
8 and Officer Dziadosz, all three of them?
9 **A.** Yeah, I believe so.
10 **Q.** And was Mr. Norman on his side?
11 **A.** No. He was on his back, I think, at that point.
12 I mean, they were rolling him over to check on his pulse
13 and things and I couldn't tell you who did what exactly.
14 Everybody -- They were all checking him, but I know one
15 person checked his neck and one person I think checked
16 his wrist and one person was listening to his -- for
17 respirations and that sort of thing. He was probably
18 checked more than once, truth be known, by -- I mean, he
19 was probably checked multiple times in multiple ways, but
20 -- Yeah, when they said that, he definitely was not
21 breathing. I said, "Well, roll him over and get the
22 cuffs off and put him on his back and start CPR," and I
23 told the ambulance to expedite.
24 **Q.** And who performed the CPR?
25 **A.** I believe all three of them did. Deputy Dziadosz

**Page 82**

1  correct, before this deposition?
2  A. That's correct.
3  Q. Does the Camden County Police Department have a
4  definition of an emotionally disturbed person?
5  A. Not that I'm aware of.
6  Q. What does that term mean to you?
7  A. A person who is mentally impaired.
8  Q. And that could be a mental impairment for a
9  variety of reasons?
10  A. Yes. It could be a mental illness or drug
11  involvement or -- yes, a number of things like that.
12  Q. Would you agree that Mr. Norman was emotionally
13  disturbed?
14  A. Yes.
15  Q. Was it obvious to you that he was under the
16  influence of drugs or alcohol?
17  A. I believe he was under the influence of drugs,
18  yes.
19  Q. We kind of covered that before as to why you
20  thought that was. Have you thought any more about why he
21  might have been invoking the name of God, Jesus Christ,
22  the Holy Ghost before you tased him?
23  MR. HENSON: Object to the form to the extent
24  that calls for speculation, conjecture.
25  Q. (By Mr. Keane) You can answer.

**Page 83**

1  A. Have I thought any more about why he was saying
2  that?
3  Q. Yes.
4  MR. HENSON: Same objection.
5  A. No.
6  Q. (By Mr. Keane) Did it take long for you to make
7  the determination that Mr. Norman was emotionally
8  disturbed after you first saw him that night?
9  A. Is the question did it take long for me to
10  realized that or to think that?
11  MR. HENSON: Listen to -- Let her repeat the
12  question for him. I don't think he heard it, Ryan.
13  MR. KEANE: Sure. I'll rephrase it.
14  MR. HENSON: Oh, okay.
15  Q. (By Mr. Keane) At what point do you recall
16  determining that Mr. Norman was a emotionally disturbed
17  person?
18  A. As soon as I saw him I kind of figured --
19  Q. Within seconds of seeing him?
20  A. Yeah, within seconds of seeing him.
21  Q. I'm sorry. And what personal observation was the
22  key factor to you that led to that conclusion?
23  A. I don't know that there was a key factor. It was
24  a totality -- totality of the circumstances. Like I said
25  before, kind of when you're asking what led to me

**Page 84**

1  thinking he was on drugs, I mean, it was kind of the same
2  thing. Just everything he had done and everything he was
3  doing and the way he was dressed and the way he was
4  acting and it all put together as soon as I walked up
5  there, that's kind of what I figured, he was probably on
6  drugs.
7  Q. Would you agree that Mr. Norman was not a
8  burglar?
9  A. No, I would not agree.
10  Q. And why is that?
11  A. Because the definition of burglar is to
12  unlawfully enter a dealing with the purpose of committing
13  a crime therein, which he had done.
14  Q. Is it your understanding that he has -- a suspect
15  in order to commit burglary has to have the mental
16  capability to understand what he's doing to actually
17  commit burglary?
18  MR. HENSON: Object to the form to the extent it
19  calls for speculation and a legal opinion and improper
20  opinion.
21  A. I wouldn't -- I wouldn't say that. I don't -- I
22  didn't know for sure what exactly his mental state was at
23  that point, nor have any way of exactly knowing, so, yes,
24  to me he was a burglar.
25  Q. I'm sorry. What was that last part?

**Page 85**

1  A. To me at the time, yes, he was a burglar.
2  Q. He was banging on a door, he was speaking
3  incoherently, correct?
4  A. Correct.
5  Q. Well, when you arrived, you saw him walking down
6  the street, correct?
7  A. No. He was walking in a field away from Deputy
8  Dziadosz.
9  Q. In a field. I'm sorry. Right. You never
10  actually saw him attempt to try to break in to any
11  residence; is that correct?
12  A. That's correct.
13  Q. Do you believe that you need to treat emotionally
14  disturbed people differently than people that are not
15  emotionally disturbed?
16  A. At what point? In talking to them?
17  Q. When you are trying to -- When you're trying to
18  take them into custody?
19  A. No, sir, I would not agree with that.
20  Q. So in your experience as a police officer, you
21  would say that you do not need to treat emotionally
22  disturbed people any differently when taking them into
23  custody; is that correct?
24  A. That is correct.
25  Q. Have you taken any courses or training on mental

94

1  GorePerry Reporting & Video
2  Tuesday, November 05, 2013
3
   Keith Henson
4  Paule Camazine & Blumenthal
   165 North Meramec, Suite 110
5  Clayton, MO, 63105
6  Re: Deposition of Sergeant Brian Fiene
   Date:Monday, October 21, 2013
7  Case:Spencer Norman, et al vs. Camden County, et al
8  Keith Henson
9
10 Your witness did not waive the right to read and sign
   his/her deposition in the above referenced matter.
11 Enclosed is the copy of the deposition you ordered,
   together with errata sheets and additional signature
12 page. Please instruct your witness to read the
   transcript, list any corrections (including page and
13 line number) on the errata sheets, sign and date the
   errata sheets and signature page.
14
   Within 30 days, please return the errata sheets and
15 signature page to our office for further processing.
16 Your prompt cooperation will be appreciated.
17 Sincerely,
18
19
20
21
22
23 Production Department
   GorePerry Reporting & Video
24 515 Olive Street
   St. Louis, MO 63101
25 (314) 241-6750

95

1  Page Line Should Read:
2  Reason for change:
3
4  Page Line Should Read:
5  Reason for change:
6
7  Page Line Should Read:
8  Reason for change:
9
10 Page Line Should Read:
11 Reason for change:
12
13 Page Line Should Read:
14 Reason for change:
15
16 Page Line Should Read:
17 Reason for change:
18
19 Page Line Should Read:
20 Reason for change:
21
22 Page Line Should Read:
23 Reason for change:
24
25

96

1  Page Line Should Read:
2  Reason for change:
3
4  Page Line Should Read:
5  Reason for change:
6
7  Page Line Should Read:
8  Reason for change:
9
10 Page Line Should Read:
11 Reason for change:
12
13 Page Line Should Read:
14 Reason for change:
15
16 Page Line Should Read:
17 Reason for change:
18
19 Page Line Should Read:
20 Reason for change:
21
22 Page Line Should Read:
23 Reason for change:
24
25

97

1  Comes now the witness, Sergeant Brian Fiene,
2  and having read the foregoing transcript
3  of the deposition taken on 10/21/2013,
4  acknowledges by signature hereto that it is a
5  true and accurate transcript of the testimony given
6  on the date hereinabove mentioned.
7
8
9  _____
10 Sergeant Brian Fiene
11
12 Subscribed and sworn to me before this
13 _____ day of _____,20____.
14 My Commission expires
15
16
17 _____
18 Notary Public

25 (Pages 94 to 97)

Gore Perry Reporting and Video
FAX 314-241-5970    314-241-6750    www.goreperry.com
Case 2:12-cv-04210-NKL   Document 116-6   Filed 01/16/14   Page 7 of 7
cb55b2a8-1753-4dc4-8ba0-f45f04caa5dc