### Ronald L. O'Halloran, M.D.
### 347 Nevada Avenue
### Ventura, California 93004
Home phone 805-647-5198
Email vcmedexaminer@yahoo.com

April 12, 2013

Kevin M. Carnie, Jr., Attorney at Law
The Simon Law Firm, PC
800 Market Street, Ste 1700
St. Louis, MO 63101

RE:  Death of Glenn D. Norman          **Expert Opinion Report**

Dear Mr. Carnie:

You first contacted me on March 7 of 2013, requesting that I review materials you later delivered to my home concerning the death of Mr. Norman. Subsequently, you asked me to respond in a written report to you about my opinions about the cause of his death and related issues.

### Forensic Pathology Qualifications

My opinions are based on my knowledge, training, experience, and research, coupled with critical examination of the materials you sent me. I am a physician, certified by the American Board of Pathology in the medical specialty of anatomic pathology and the subspecialty of forensic pathology. I have worked full time as a forensic pathologist and medical examiner for 33 years, retiring as the Chief Medical Examiner of Ventura County in California in July of 2012. I have been interested in the subject of death associated with custody restraint, have researched the topic, conducted autopsies in such cases, consulted, lectured and published scientific papers on the subject. Attached are my curriculum vitae, fee schedule and recent testimony list.

### Materials Reviewed

- Missouri State Highway Patrol investigation files concerning death of Glenn Norman including:
    - Deputy Richard Dziadosz DSN 2428 - interviews and written report
    - Sergeant Brian Fiene DSN 2418 - interviews and written report
    - Deputy Jamee Watson DSN 2447 - interviews and written report
    - Deputy Larry Rutherford DSN 2406 - interview and written report
    - William Durant - interview and written report
    - Patricia Beckwith - interview and written report
    - Amber Smith - interview and written report
    - Lillian Rogers - interview and written report



**EXHIBIT**
**6**
tabbies

𝛑   EXHIBIT ___3___
ATE:___6-14-13___
WITNESS:__Dr. O'Halloran__
___1___ OF ___22___
J. WHITACRE, CSR

- Miscellaneous other included records and reports concerning Glenn Norman and his death
- Highway Patrol scene print photocopies
- Camden County Sheriff dispatch log/report
- Taser log reports
- Camden County Prosecuting Attorney report and related correspondence
- Mercy Ambulance Prehospital Care Report
- CD – digital autopsy photos
- CD – Corporal White interview – Taser operation expert
- CD – Sgt. Fiene, Deputies Dziadosz, Watson, Rutherford and Jason Cramer recorded interviews
- CD(2) – Audio of dispatch recording on 2 discs
- DVD - Deputies Dziadosz's patrol car video of Mr. Norman's lifeless body through CPR

The information, discussion and opinions expressed below depend in part on the information provided to me. If more substantive information or evidence is found, developed and disclosed to me concerning Mr. Norman's death, my opinions may change.

## Summary of Circumstances of Death

Mr. Glenn Norman was 46 years old at the time of his death on October 4, 2011. He was pronounced dead by paramedics in the yard of a residence after being restrained prone, compressed and handcuffed by three Camden County Sheriff officers.

The incident with the officers was initiated by a 911 call at 0423 hours that indicated Mr. Norman was attempting to enter into a residence against the owner's wishes and was acting odd. Three deputies initially responded and restrained him. He was tasered with darts in the chest, drive-stunned and struck with a flashlight used as a baton. He was forced into a prone position on the ground and held in that position by the three officers for several minutes before he was double handcuffed. Officers continued to hold him down, prone on the ground, even after he was handcuffed and his struggle dissipated. One of the officers admitted to kneeling on his back between his shoulder blades for two or three minutes until he appeared to calm and "go to sleep - making snoring sounds". He was arrested.

Glenn never made voluntary movements after that episode and never regained consciousness. Eventually officers realized Glenn had no vital signs and started CPR. When an ambulance arrived medics took over care but he never regained signs of life. He was pronounced dead at the scene less than one hour after the start of the restraint incident.

Mr. Norman had an admitted addiction to narcotic pain medications which he expressed to his girlfriend he wanted help overcoming. Shortly before the police encounter he had disappeared for about forty minutes from where he was staying at the home of his girlfriend, Lillian Rogers. When he came back his demeanor was mentally and behaviorally different. Lillian described him as being paranoid that someone was out to get him and he seemed "freaked out". In all likelihood, while he was gone he had used methamphetamine.

△ 𝑅 EXHIBIT
DATE: 2
WITNESS:
PAGE 2 OF 22
J. WHITACRE, CSR

Glenn abruptly went outdoors in only his boxer shorts, saying he needed water to drink and needed to urinate. He went to a neighbor's home where he pounded on the door. The homeowner, Jason Cramer, opened the door but refused to let him come in to use his bathroom. Jason pushed Glenn out of his house and Mr. Norman fell from the porch onto the ground. When he got up and aggressively tried again to get into the house, the homeowner punched him in the head and knocked him onto the ground again. Mr. Cramer then locked Glenn out and called 911. That call initiated the arrival of the police about 10 minutes later. As deputies began to arrive, Glenn went to the backyard of another neighborhood home where the police confronted him; struggled with him; restrained him, arrested him, and there he died.

## Timeline and Sequential Details of Incident

### Timeline summary rounded to nearest minute:

4:23  911 call (dispatch record)

4:26  SO dispatched (dispatch record)

4:33  Deputy Dziadosz arrived at scene first (found Mr. Norman in a yard) (dispatch record)

4:35  Sgt. Fiene arrived at scene second (Taser use began; Glenn was forced to the ground) (dispatch record)

4:37  Deputy Watson arrived at scene third (Mr. Norman was prone on ground, held down by Dziadosz and Fiene with their body weight when she first saw the arresting incident. She knelt and assisted restraining and handcuffing Glenn) (dispatch record)

4:40  Sgt. Fiene radioed that the suspect was in custody after he was handcuffed. Deputies reported the suspect continued to struggle or move for 2-3 more minutes after cuffing. Deputy Watson kept her knee pressure on his back. (dispatch record)

4:42  Ambulance was requested by Sgt. Fiene for a medical clearance check. (Deputy Watson removed her knee from Norman's back. Mr. Norman appearing "asleep & snoring") (dispatch record)

4:45  Mr. Norman was dragged to lawn, into patrol car headlights and into video camera view (car video)

4:47  Deputy Rutherford arrived fourth at scene and observed that Mr. Norman looked lifeless (dispatch record)

4:49  Deputy Dziadosz comes back in view with Deputy Rutherford who soon starts checking Norman for vital signs (car video)

4:53  Deputy Rutherford and Deputy Dziadosz check Mr. Norman again, rolling him onto his back still handcuffed. They check pulse, breathing and do numerous vigorous "sternal rubs" with no effect. (Deputies finally realize he is "dead") (car video)

4:54  Deputy Dziadosz removed the handcuffs; Mr. Norman was rolled onto his back; Sgt. Fiene requested that the "ambulance expedite" (dispatch record)

4:57  Deputies finally began CPR (car video)

△    Ω    EXHIBIT_____
DATE:_____3_____
WITNESS:_____
PAGE____3____OF___22__
J. WHITACRE, CSR

05:02   A paramedic talked to deputy briefly beside body and left for equipment (car video)

5:05    EMS took over CPR shortly after arriving at Glenn's side; he had no signs of life (car video)

5:33    Rescue efforts stopped and Mr. Norman was pronounced dead, never having regained
        signs of life (EMS report)

## Sequential Details of Incident:

1.  In the backyard of Mr. William Durant's residence Deputy Dzaidosz first confronted Mr.
    Norman.  He didn't follow commands to put up his hands; rather, he walked away.  Though
    Dzaidosz had his Taser gun in his hand, he didn't use it.  When Sergeant Fiene soon arrived
    and approached Mr. Norman from the other direction he also had his Taser drawn.

2.  Mr. Norman did not follow the two officer's commands to raise his hands or put his hands
    behind his back for handcuffing.  When Sgt. Fiene put the Taser's laser sight beam on Mr.
    Norman's chest he indicated he was not intimidated by it.  Fiene fired the Taser barbs from
    an estimated eight feet away.  He was shocked through the Taser barbs that stuck in his left
    front chest two times for five seconds each, collapsing to the ground incapacitated during the
    five second discharge each time, but immediately getting up.  He broke the Taser wires after
    getting up the second time. Sgt. Fiene pulled the taser trigger once more but it apparently
    was ineffective.  Mr. Norman then walked away again.  When Mr. Norman didn't follow officer
    orders stop and comply, the officers struggled with him while he was still upright.

3.  Sgt. Fiene said he used his Taser in drive-stun mode twice "in his back area" while Mr.
    Norman was still upright.  Though officers said this had no apparent effect, the autopsy
    photographs show two distinct pairs of small electrical burns located in Mr. Norman's left
    anterior abdomen, in the flank area, that look typical for wounds produced by the fixed Taser
    gun electrodes.  Sgt. Fiene said he then struck the back of Norman's right calf with his
    "Maglite" flashlight once or twice and Mr. Norman soon fell to the ground.

4.  Officers went hands-on and wrestled Mr. Norman onto the ground into a prone position. They
    struggled with him and said he still would not comply with commands.  Fiene said he drive-
    stunned Mr. Norman at least one more time in his back, without apparent effect.  Deputy
    Dziadosz, Deputy Watson and the neighbor William Durant said they all saw the Taser
    pressed in the middle of Norman's upper back while he was held prone on the ground.  This
    was confirmed by later analysis of the Taser memory chip to last about 1.5 minutes.  Fiene
    said Mr. Norman was intermittently trying to get up, nearly lifting both Deputy Dziadosz and
    Sgt. Fiene in the process.  Fiene then struck him in the right elbow with his flashlight.  That
    allowed Deputy Dziadosz to start getting a cuff on the left wrist.  (The duration of the five
    initial Taser trigger pulls and pauses between them while Norman was upright was ~30
    seconds per Taser memory chip analysis.  The final 12 trigger pulls were all, or almost all
    during the early part of the prone restraint period, in the Taser's drive-stun mode.  From the
    start of the first trigger pull to the start of the last recorded pull was 2 minutes and 16
    seconds).

5.  Deputy Watson arrived, saw Fiene drive-stunning the Taser in Mr. Norman's back and knelt
    down to help.  Watson repositioned and put her knee on Mr. Norman's back between his
    shoulder blades while trying to get the right arm handcuffed.  She said Mr. Norman was
    pushing up with his right arm.  Fiene said eventually they "manhandled" him and got him
    handcuffed with two sets of handcuffs linked together.  Mr. Norman struggled a little more
    after being handcuffed but that was pretty much the end of it according to the sergeant.
    (Note that in the video Deputy Dziadosz appeared to be approximately the same weight as
    Mr. Norman ~ 170 pounds.  Sgt. Fiene looked heavier – well in excess of 200 pounds.
    Deputy Watson appeared to be frankly obese – in excess of 250 pounds.)

△   Jt   EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE____4____ OF __22__

6. Mr. Norman continued struggling but less after handcuffing while Watson kept kneeling on him for 2 or 3 minutes until he calmed according to both deputies.

7. Watson removed her knee from his back and Mr. Norman made snoring sounds according to his girlfriend (Lillian Rogers), Deputy Watson and Deputy Dziadosz.

8. Sgt. Fiene went to move Dziadosz' car closer to the scene. He said he retrieved it intending to bring Mr. Norman to jail in it.

9. Mr. Norman continued to struggle a little against the handcuffs for estimated 2 minutes after Fiene left for the car (per Dziadosz), but Lillian said he made no sounds and never moved after the snoring sounds stopped.

10. When Sgt. Fiene returned from the car he said both deputies told him Mr. Norman was asleep and breathing.

11. Dziadosz and Fiene dragged the unconscious body of Mr. Norman ~20 feet to the shorter lawn closer to the moved patrol car near the front of the house. They dragged him by gripping under his arms while in a face down posture.

12. Dziadosz and Sgt. Fiene could see blood on Mr. Norman's arm. Sgt. Fiene called an ambulance. He said this was just a routine check on him for medical clearance because he was in a fight and was going to be transported to jail.

13. Deputy Dziadosz moved Mr. Norman partly onto his side so he could better breathe. Dziadosz went to his car to get antibacterial skin cleanser because of the blood. Deputy Watson kept Mr. Norman on his side while Dziadosz was gone.

14. When Dziadosz returned with cleanser he relieved Watson so she could clean herself of blood. Watson went to interview the girlfriend.

15. Deputy Rutherford arrived on scene as Watson left. Since Deputy Rutherford could see the suspect's face and it didn't look like he was breathing or moving he asked Dziadosz if Mr. Norman was okay. Dziadosz realized Mr. Norman hadn't moved for awhile, checked his pulse and thought it felt weak. Following several more checks and "sternal rubs" by each, Dziadosz and Rutherford determined Mr. Norman had no pulse, no breathing and was unresponsive.

16. Deputy Rutherford found the sergeant and told him about Mr. Norman's condition. Rutherford went to his car and to get a CPR mask. Sgt. Fiene told Dziadosz to remove the handcuffs and then he called dispatch to have the ambulance expedite. It was later determined that the ambulance never got that message according to Sgt. Fiene's first interview.

17. When Rutherford got back to Mr. Norman, he and Dziadosz first checked for breathing and pulse again and did several sternal rubs. After that they started CPR. Watson came back from talking to Lillian and assisted with chest compressions, trading with Rutherford. Dziadosz, Rutherford and Watson continued CPR until the ambulance arrived and paramedics took over.

18. When a paramedic first arrived at the patient (Norman) he came without CPR gear. After briefly talking with deputies he went back to ambulance, got gear and another medic, came back, set up and took over life saving efforts. Medics noted no vital signs at any time from start to finish.

△ 𝜋 EXHIBIT ___ 5
DATE:_____
WITNESS:_____
PAGE____5____ OF __22__

**Mercy Ambulance Prehospital Care Report**

| | |
|---|---|
| 4:43 | 911 call received for ambulance |
| 4:50 | CPR was started by sheriff officers (actual time deputies started CPR was 04:57 according to patrol car video) |
| 5:01 | medics on scene |
| 5:02 | medics at patient |
| 5:33 | CPR stopped and Mr. Norman "S" pronounced dead |

<u>Paramedic Summary</u>: On arrival sheriff staff told Mercy Ambulance staff said S had a cardiac arrest after two Taser shocks followed by a struggle. SO said they started CPR at 4:50 with no effect. S is 46, male. Dressed only in underwear and laying in yard, S is receiving CPR by police. Medics continued CPR without effect. GCS=3 (no evident neurological activity), no pulse, no respiration, no blood pressure. Skin is cool, pale, no capillary refill, no edema. Nasopharyngeal airway placed. IV epinephrine, atropine, and normal saline were given without effect. The emergency department doctor pronounced death by phone, probably with information about an ECG, at 5:33 am.


**Autopsy and Death Certificate**

**<u>Autopsy</u>**

An autopsy was done by **Carl Stacy, MD** (Boone/Callaway County ME Office) the same day at University Hospital in Columbia @ 4:00 PM. It showed external injuries consistent with a struggle and taser dart wounds, a moderate level of methamphetamine in blood, and moderate coronary artery disease of the heart. He was a well developed and well nourished, 46 year old male; 5'4" tall & 170 pounds. Apparently no postmortem temperature was taken.

*External injuries* identified by pathologist:
- <u>Head</u>: right scalp bruise (in temporalis muscle); no ocular petechiae
- <u>Chest & abdomen front</u>: group of puncture wounds in small ½" area in center of chest (unexplained – not paramedics' injections and no AED shocks given per paramedic report, micro said possible burns). 2" group of abrasions in left lower chest (This may be the pathologist's description of the two paired drive-stun Taser wounds seen in the autopsy photos.) A 3x3 mm burn (by microscopic viewing) in left upper chest and 3x3 mm burn in left lower chest, 7" lower. (These appear to be taser dart wounds that straddle the nipple and heart area)
- <u>Back of trunk</u>: 2 linear 4" contusions with abrasions; multiple tiny 2 cm abrasions in lower back
- <u>Right arm</u>: Contusion, laceration of elbow
- <u>Left arm</u>: forearm abrasion
- <u>Right leg</u>: upper thigh abrasion, many abrasions of mid-thigh, knee abrasion, linear abrasions of both feet
- <u>Left leg</u>: linear abrasion of thigh, many abrasions of anterior thigh

*Internal injuries*: rib fractures and intercostal hemorrhages consistent with CPR; brain swelling.


△ π EXHIBIT _____
**6**
DATE:_____
WITNESS:_____
PAGE ___6___ OF ___22___
J. WHITACRE, CSF

*Other internal findings*: heart 400 grams with slight LVH apparently; lungs 850 grams together; liver 2160 grams with slight fatty change; spleen 230 grams; stomach empty; brain 1450 grams.

*Toxicology:*
- Blood *methamphetamine* @ 0.56 mcg/mL (high concentration, but generally below lethal range)
- Blood *cyclobenzaprine* "Flexaril" @ 0.10 mcg/mL (low level)
- Blood *hydrocodone* was below 0.05 mcg/mL (very low level, sub-theraputic)

*Cardiac pathology* consultant (Carl Stacy, MD)
- 355 gram weight; mild LVH with focal subendocardial fibrosis and focal single cell contraction band necrosis
- Moderate coronary atherosclerosis; 70% proximal LAD; 50% LCCA narrowing

*Neuropathology* (brain) consultation (Douglas Miller, MD PhD)
- Fresh brain samples stored at – 70 degress for sending to Miami Miller School of Medicine for dopamine transporter protein expression ("excited delirium test")
- Mild to moderate cerebral edema
- Microscopic acute hypoxic/ischemic damage in a few sensitive neurons of hippocampus Sommer sector and vermian cerebellar pukinje cells

<u>Digital Photographs from Autopsy</u>
- Clearly the puncture slightly above the left nipple and the puncture about 7" below it are from taser darts. The size is right and the skin is blackened from burning.
- Two pairs of burned abrasions from firm contact with fixed taser probes (drive-stun mode), about an inch apart, are in the left upper abdomen near the flank. I did not see these specifically described by the pathologist but they are clearly documented by the photographer. One pair is horizontal with "drag" abrasions from each contact point, directed upward. The other is nearly vertical with similar abrasions from each contact point directed upward and medially. All four have contusions around them.
- The "group of puncture wounds in a small 1x1.5 cm area in center of chest" looks like abrasions that have bruising under them and are in the area over the breast bone where chest compression abrasions from CPR commonly occur.
- A 2mm abrasion is in the left temporal forehead was not described.
- The scratches on the top of the feet are numerous and consistent with dry grass and weed stubble from the prone struggle in the un-mowed area. The same goes for many of the abrasions/scratches on the front and sides of the thighs, the knees, the left chest, the backs of the hands and arms.
- The "2 linear 4 inch contusions with abrasions" on the back are actually over the right shoulder blade, appear to be nearly parallel, nearly horizontal, and 4" to 6" long with central clearing or sparing from bruising. They are consistent with strikes with or against a narrow, rod-like object (or baton) approximate ½ inch wide. Some expandable, telescoping baton types on the market have optional LED flashlights on end of handle.
- Scattered bruises are on the left upper back over scapula.
- Approximately 8 bruises, abrasions and one scratch are on the lower back.
- A vertical linear abrasion is on right hip and many other parallel linear abrasions are on the right lateral thigh. Unfortunately, the photos don't have a scale or ruler in them. Some have a case number tag in them as a potential size reference.

△   π   EXHIBIT _____
DATE:_____ 7
WITNESS:_____
PAGE_____ 7 ____ OF __22
J. WHITACRE, CSR

## Cause of Death

The cause of death was indicated by the forensic pathologist Dr. Stacey as:
*Cause:* A. **Cardiac arrhythmia** due to
      B. **Methamphetamine use, epinephrine surge and respiratory compromise**
*Contributing:* **Moderate coronary artery atherosclerosis**

**Official death certificate** signed 1/19/12 by Camden County ME, James Jungels, DO:
*Cause:* **Cardiac arrhythmia** secondary to **Methamphetamine intoxication** and **epinephrine surge**
**Contributing: Coronary artery atherosclerosis**
*How injury occurred:* Cardiac arrhythmia while being taken into custody by police — Taser used
*Manner:* **Accident**

## Background Discussion of Restraint Asphyxia

In my opinion, the probable cause of Mr. Norman's death is asphyxia by compression of his trunk (chest/abdomen) while being held prone by the weight of three police officers for many minutes. This type of death has been referred to as *mechanical asphyxia*, *positional asphyxia* and *restraint asphyxia*.

In the 1970's and early 1980's it became clear that attempts to use neck holds, derived from grappling sports and the martial arts, in the law enforcement arena as a "less lethal" means of subduing suspects was resulting too often in unexpected deaths. Physician medical examiner researchers published articles in scientific and medical research journals, and discussed the mechanisms of death from the two main types of neck holds taken from martial arts disciplines like judo. The choke hold and the carotid "sleeper" hold, also referred to as the lateral vascular neck restraint (LVNR), were effective and relatively safe in subduing trained athletic opponents in sports settings with rules and referees. However, relatively unskilled police officers attempting to use the same holds on resisting subjects in uncontrolled real world settings while trying to attach handcuffs was causing unnecessary, preventable deaths.

In the late 1980's, subduing uncooperative suspects using prone restraining techniques gained in popularity as a non-lethal means of gaining physical control by law enforcement agents. After being forced to the ground in a prone (chest down) position, subjects would be held down in whatever way worked until mechanical restraints could be applied. The usual mechanical restraints were handcuffs, leg restraints of various sorts, and sometimes cords, straps or clips to connect the handcuffs to the leg restraints. The process of essentially binding the hands to the feet has many terms to describe it, such as "hobbling" or "total appendage restraint procedure" (TARP). In some cases the terms have different meanings to different agencies. The shortened term "hogtying" is widely used for this restraining technique. Hogtying can be loose, with the hands and feet far apart, or tight, with the hands and feet cinched close together, generally behind the buttocks. Tight hogtying can cause the knees to be held off the ground and the back to bow when the subject is prone.

△ . *Π* EXHIBIT _____
DATE:_____ 8
WITNESS:_____
PAGE _____8_____ OF _22_
J. WHITACRE, CSR

Deaths were noticed associated with custody hogtying in the late 1980's and early 1990's, and again were reported in the forensic medical literature, prompting discussions and publications in the law enforcement arena. The first forensic pathology reports of such deaths postulated "positional asphyxia" as the probable cause of death. Positional asphyxia was a term already in use by forensic death investigators prior to general recognition of the custody hogtying death phenomenon. Positional asphyxia as originally used referred to deaths caused by passive entrapment of people in positions that prevented adequate breathing. Dr. Reay in Seattle initially assumed that the death of suspects first noticed to be unresponsive while in prone hogtied positions in the back of police cars meant that that they must have been conscious and breathing when they were left unattended in the cars. Thus, he chose the "positional asphyxia" term to classify and describe deaths in custody while hogtied when there was no other apparent cause. His opinion changed on the validity of that assumption in later years, but the term persisted.

"Restraint asphyxia" is a term introduced to replace the term "positional asphyxia" for asphyxial entrapment deaths caused by active restraint by other people. The "positional asphyxia" term often lead to confusion and misunderstandings about whether the cause of the deaths discussed was related to being in a restrictive, passive, prone hogtie (or otherwise subdued and bound) position, or whether the cause of death was due to the methods used to immobilize the subject during subdual while being mechanically bound. Currently in sudden custody death situations "positional asphyxia" and "restraint asphyxia" are still often used as if interchangeable. Though asphyxia during restraint can be caused by compressing the mouth and nose, or by compressing the neck, most of the deaths are related to compression of the torso, especially the chest.

Understanding the causal mechanism of death in restraint asphyxial situations is important in that the deaths are most likely preventable by using safer techniques for subduing and restraining. In situations of restraint asphyxia by chest compression, anything done to reduce the compressive, restrictive force on the chest, or anything done to decrease the time a subject is forcefully restrained in a restrictive position, can prove life saving. Using as little weight on the back as possible for as short a time as possible will decrease the chance of death. Pinning the arms and legs to the ground to hold a subject down is better than using the compressive force of the restrainers' hands, knees, feet or torso on the back of the prone subject to hold him/her down while attempting to apply handcuffs and other mechanical restraints. Rolling the subject onto his/her side as soon as possible can also prevent death by allowing the subject easier breathing and by allowing blood to flow unimpeded to and through the heart. Finally, frequently monitoring the subject to see if he/she is maintaining consciousness is critically important to quickly discover and hopefully prevent an emerging life threatening catastrophe caused by inadequate delivery of oxygen to the brain and heart. Having an officer or other person specifically assigned to closely monitor the subject's mental status and other vital signs during the restraint process can prevent death. Too often it seems each officer involved is focused on his or her own particular part of trying to get the subject mechanically restrained, while being unaware that the detainee's life is slipping away in the officers' collective hands. Techniques to help prevent asphyxia during subdual and the application of handcuffs and other mechanical restraints are generally not hard to do and have been discussed in police literature for years.

△    𝔛   EXHIBIT _____
DATE:____ _____ ___
WITNESS:_____
PAGE____9____OF__22__
J. WHITACRE, CSR

## Excited Delirium v Restraint Asphyxia Mechanisms of Death

Selected portions of Mr. Norman's brain were saved at autopsy and frozen for sending to Miami to Dr. Mash's laboratory for certain tests that may be correlated with the so called *excited delirium syndrome* (EDS). I do not know at this time whether the tissue was sent, whether it was tested and whether there was a report indicating the result. This does, however, raise the issue that someone was at least considering EDS in Mr. Norman's death.

"Excited Delirium" is a poorly and variably defined condition, not widely used or accepted in general medicine or specifically in the specialty of psychiatry. Recently a panel of doctors in the specialty of emergency medicine wrote a white paper recognizing excited delirium syndrome as a condition. In it they proposed changing the abbreviation from "ED" or EDS" to "ExDS". Prior to the emergency medicine white paper, Dr. Vincent DiMaio, a forensic pathologist and former medical examiner in San Antonio, and his wife in their 2005 book proposed that deaths caused by excited delirium should be referred to as "Excited Delirium Syndrome" (the title of his book) and should be abbreviated as "EDS" to distinguish it from the mental/physiological state of ED. Essentially, they proposed that when a person in the psychological state of excited delirium suddenly dies from it, it should be called the excited delirium syndrome.

Whatever term or abbreviation is used, there is a disturbing lack of understanding of a mechanism by which excited delirium can suddenly kill people and a disturbingly tight association with in-custody sudden deaths involving manual restraint. In fact, deaths that occur in tight temporal association with custody restraint involving close physical contact between the restrainers and the subject, who is almost invariably being restrained prone on the ground when signs of loss of consciousness first appear, make up most of the reported cases of excited delirium deaths. Some writers consider using illicit stimulant drugs, like cocaine and methamphetamine, along with being actively restrained to be part of the excited delirium syndrome.

Delirium is a state of confusion caused by brain dysfunction with many causes. When associated with hyperactivity as part of the confusional state it is sometimes called "agitated" or, "excited" delirium. Delirium, whether agitated or not, is not a disease itself. Rather, it is a symptomatic manifestation of some underlying disease or toxic state affecting brain function. For example, delirium is reported to be seen in about 50% of patients in hospital intensive care units during their stay, where it is often associated with infections or other causes of decreased oxygen delivery to the brain. Diabetics with very low glucose levels often are delirious because the brain needs a steady supply of enough glucose, in addition to enough oxygen, to function normally. Correcting the underlying problem usually restores the brain to normal function and the delirium goes away. Delirium can be caused by many drugs or poisons. People who are delirious do have a several fold increased chance of dying compared to those who are not delirious. But the vast majority of people who are delirious don't die. Those who do die rarely die from being delirious; instead, they die from the underlying disease process that caused the delirium in the first place.

Most of the reported cases of excited delirium deaths are of cocaine induced excited delirium and originated in Miami. Debora Mash, PhD, a Miami researcher using brains from purported excited delirium death victims, at one time said she believed the mechanism of death was hyperthermia and that the elevation of body temperature

△  π  EXHIBIT____10____
DATE:_____
WITNESS:_____
PAGE_____10___OF___22

develops over a relatively long time. Dr. DiMaio believes the mechanism of death is probably akin to an adrenaline overdose. Dr. Charles Wetli, who first coined the term "excited delirium" in a 1985 paper reporting a handful of cocaine using men who died suddenly during police arrest and restraint situations in Miami-Dade County, has stated he doesn't know the mechanism of death.

In my opinion, the probable cause of death in most prone restraint cases with loss of consciousness during restraint is asphyxia by chest/abdominal compression during the restraint process. *Asphyxia* in this case is used in the broad application of the term — meaning a process causing decreased oxygen availability to cells. Cells make up all organs of the body, including the very oxygen-deprivation sensitive heart and brain. The heart and brain need a fairly continuous supply of oxygen to continue to function normally and not be damaged. Inhibition of respiration (breathing) and/or inhibition of cardiac functional output (blood flow) caused by too much weight on the back for too long can cause asphyxia and death.

Compression of the chest and abdominal area can cause asphyxia in two ways. Weight on the back of a person who is unable to use his arms or legs to relieve pressure makes breathing more difficult since a person must use the relatively weak muscles of breathing (primarily the diaphragm and intercostal muscles) to expand the chest and lift the weight enough to allow air to flow into the lungs from ambient air pressure during the breathing process. With time and with sustained weight, or too much weight applied over a shorter time, those muscles become exhausted and can no longer lift the weight enough to breathe and deliver oxygen to the blood being pumped through the lungs. Compression of the thorax can also cause the low pressure veins bringing blood to the heart to collapse, or the lower pressure chambers of the heart to collapse as they are compressed against the spine, such that blood cannot get into the heart to be pumped out. Without blood being pumped oxygen will not get to the brain or to the specialized muscles of the heart. Not getting oxygen to the brain causes loss of consciousness and eventually death. Not getting oxygen to the heart causes arrhythmias, cardiac arrest and eventually death, too.

## Discussion and Opinions

In my opinion, the probable (more likely than not) cause of Mr. Glenn Norman's death is restraint asphyxia. He was forced into a prone position on the ground and held in that position with the substantial weight of two male sheriff officers on his back holding him down (Deputy Dziadosz and Sergeant Fiene) before he was handcuffed. He also had the added weight of an obese female officer (Deputy Jamee Watson) partially on his back before he was handcuffed and kneeling in the center of his back for two or three more minutes after being handcuffed. As a reference point, 100 to 125 pounds of hand pressure on an adult's chest is recommended for compressing the heart during cardiopulmonary resuscitation (CPR).

The total time Mr. Norman had the weight of officers on his back was approximately six minutes. It generally takes only three to five minutes of not being able to breathe to cause loss of consciousness that can become permanent and fatal. It takes less time if the circulation of blood to the brain is inhibited or stopped. Officers describe Glenn as gradually decreasing his struggling after being handcuffed while he still had weight on his back. He could no longer relieve any of the compressive force on his back and chest by pushing up with his arms cuffed behind his back.

△　π　EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE____11____OF____22____ 11
J. WHITACRE, CSR

Officers described Glenn as going to sleep and snoring. However, he soon stopped making snoring sounds and never woke up. Belatedly, when he was finally checked carefully several minutes after Deputy Larry Rutherford arrived and noticed his lifeless appearance, he was totally unconscious, unresponsive, had no pulse and was not breathing. This careful check was at least 10 minutes after he lost consciousness. Intermittent gasps and snore-like sounds are common after a person looses consciousness from lack of oxygen supply to the brain. They are part of the so called "death rattle".

CPR was not started for another 4 minutes after Deputy Rutherford and Dziadosz more carefully evaluated Glenn's condition. CPR was started about 15 minutes or more after he lost consciousness. This is much too long to have any reasonable chance of resuscitation. Had deputies not assumed Mr. Norman just fell asleep after an exhaustive struggle involving wrestling with police, electrical shocks, strikes with a flashlight and being handcuffed, there would have been a reasonable chance of successful resuscitation. Successful resuscitation is fairly commonly seen with resuscitation efforts promptly following witnessed near-drowning incidents.

The findings from the autopsy support asphyxia as the cause of death. Asphyxia leaves no specific findings in or on the body generally. Certain modalities of asphyxia, such as manual strangulation, can leave findings that give clues as to how asphyxia took place, such as abrasions and bruises on the neck or a broken larynx or hyoid bone. Chest compression deaths usually leave non-specific findings as seen in this case. The neuropathology examination identified brain swelling and acute microscopic damage to oxygen sensitive neurons in the brain. Those brain findings support a slower, asphyxial death rather than a sudden, spontaneous cardiac arrhythmia death.

The cause of death was indicated by the forensic pathologist Dr. Stacey as: *Cardiac arrhythmia due to Methamphetamine use, epinephrine surge and respiratory compromise.* He listed *Moderate coronary artery atherosclerosis* as a contributing cause of death. This wording suggests that Dr. Stacey was aware that a "respiratory compromise" seemed to be an issue in the death of Mr. Norman.

Dr. James Jungels, Camden County Medical Examiner, certified the official cause of death on the death certificate three months after the death differently, without explanation in the materials provided to me. He listed the cause of death as: *Cardiac arrhythmia secondary to methamphetamine intoxication and epinephrine surge.* He listed *coronary artery atherosclerosis* as a contributing condition. He then listed the manner of death as *accident* and how the injury occurred as: *Cardiac arrhythmia while being taken into custody by police – taser used.* Clearly, he chose to leave off the diagnosis of "respiratory compromise" from the cause of death. He also made mention of a taser being used as part of the explanation of how the fatal injury occurred.

If I were the medical examiner signing the death certificate, given what I know about the details of the findings *and circumstances* of death, I would change it. I would list the primary cause of death as: *Restraint asphyxia by chest compression.* I would list *methamphetamine intoxication* as a contributing condition because his aberrant behavior that prompted the 911 call and police confrontation was most likely caused by recent methamphetamine use and the amount in his blood was significant. I would list the manner of death as *homicide*, since this is clearly a death at the hands of others.

△ π EXHIBIT_____
12
DATE:_____
WITNESS:_____
PAGE  12  OF  22
J. WHITACRE, CSR

"Homicide" as generally used by coroners and medical examiners does not necessarily mean the death was caused by a criminal act. Finally, I would list how the injury occurred as: *Asphyxiated while being restrained prone on ground by arresting police officers applying compressive force of their body weight to subject's back.*

I would not list *coronary artery atherosclerosis* as a factor because there was no evidence at autopsy that he had a fresh or old myocardial infarct and there was nothing in the history that I received to indicate that he had prior heart disease symptoms, like arrhythmias or exertional angina. His heart could have been more susceptible to hypoxia than a heart without this coronary artery stenosis, but the death process was more likely a slow asphyxia rather than a sudden arrhythmia.

I would not list *epinephrine surge* as a factor causing death because there is a more likely primary explanation: restraint asphyxia. No doubt Mr. Norman had elevated epinephrine in his blood at the time of death. The stressors of pain from the fight including blows to his body; shocks to his body from the taser; fear; exertion; feelings of shortness of breath while being compressed, and the effects of methamphetamine all could have caused increased catecholamine stress to his body. They could also cause increased oxygen demands generally. But in my opinion he probably would have died anyway if he was restrained the same way as he was, if somehow he did not have elevated quantities of epinephrine in his body induced by drugs, fear, pain, or physical exertion.

Finally, shocks from the Taser gun probably did not cause death. Though the first shocks delivered to his chest through barbs embedded in the skin above and below the general area of his heart were located in an area that has been described as having the potential to induce ventricular fibrillation of the heart, they probably didn't. He collapsed to the ground during the first two Taser discharges, but immediately got up. He went on to struggle with deputies for minutes afterward. If the shocks would have induced a sustained ventricular fibrillation he would be expected to collapse and loose consciousness within seconds, most likely in much less than a minute.

### Summary:

In my opinion the probable cause of Glenn Norman's death, more likely than not, was restraint asphyxia caused by the weight of three sheriff officers compressing him prone on the ground with the weight of their bodies, while he was in the process of being arrested and handcuffed.

Furthermore, had the police officers paid closer attention to Mr. Norman's dire condition after being handcuffed, observing that he was unconscious rather than assuming he was asleep, they could have summoned medical care emergently and started CPR promptly. More likely than not, this would have given him a reasonable chance of survival and recovery.

Respectfully,

*Ron O'Halloran*

Ronald L. O'Halloran, MD

△ ℛ EXHIBIT_____
13
DATE:_____
WITNESS:_____
PAGE____13____OF___22
L. WHITACRE, CSR

# CURRICULUM VITAE
## Ronald L. O'Halloran, M.D.

March, 2013

### ADDRESS AND PHONE:

Home:  347 Nevada Avenue
Ventura, California 93004
Phone (805) 647-5198

Office:  Ventura County Medical Examiner
3291 Loma Vista Road
Ventura, California 93003
Phone (805) 641-4408

### PERSONAL:

Born in Portland, Oregon, 2-15-50
Married in 1974, two children, born 1980, 1982

### COLLEGE EDUCATION:

*Gonzaga University*
Spokane, Washington
Psychology and Premedicine, BA, 1972

Honors:  Honor Society
Graduation – Summa cum Laude

### MEDICAL SCHOOL EDUCATION:

*Oregon Health Sciences University*
Portland, Oregon
*Doctor of Medicine*, 1977

Honors:  Sneeden Award for Excellence in Pathology, 1977

### MEDICAL INTERNSHIP AND RESIDENCY TRAINING:

Anatomic Pathology:  *Oregon Health Sciences University*
Department of Pathology,
Portland, Oregon, 1974 - 1977
Student Fellowship in Pathology

*U.C.L.A. Hospitals and Clinics*
Department of Pathology
Los Angeles, California, 1977 - 1979

EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE ___14___ OF ___22___
J. WITHEM, CSR

Forensic Pathology:     *Office of the Chief State Medical Investigator*
                        *University of New Mexico*
                        *Albuquerque, New Mexico, 1979*

                        *Oregon State Medical Examiner Office*
                        *Portland, Oregon, 1980-1981*

## PROFESSIONAL BOARD CERTIFICATIONS:

American Board of Pathology
Certification in *Anatomic Pathology* - November, 1980

American Board of Pathology
Certification in *Forensic Pathology* - May, 1981

## ASSOCIATIONS:

Former:     Oregon Pathologists Association
            Washington County Medical Society (Oregon)
            Tri-counties Investigators' Association
            American Medical Association

Current:    National Association of Medical Examiners
            American Academy of Forensic Sciences
            California State Coroners Association

## FORMER POSITIONS:

Deputy Chief Medical Examiner,
    State of Oregon, 1979-1985
Washington County Medical Examiner,
    Oregon, 1983-1985
Instructor in Anatomic and Forensic Pathology,
    University of Oregon Medical School, 1979-85
Clinical Assistant Professor, Department of Pathology,
    Division of Forensic Studies,
    University of Oregon Dental School, 1984-85
Assistant Chief Medical Examiner
    Ventura County, California, 1985-92
Chief Medical Examiner - Coroner
    Ventura County, California, 1993-2012 (retired)

△   π   EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE __15__ OF __22__
J. WHITACRE, CSR

## CURRENT POSITIONS:

Emeritus Chief Medical Examiner
Ventura County, California, 2012-present
Forensic Pathologist, Department of Medicine,
Ventura County Medical Center, 1985-present

## OTHER APPOINTMENTS:

Lecturer - Ventura County Criminal Justice
Training Center, 1986-2012
Lecturer - Basic Coroner Academy, California Board of
Police Standards and Training, 1989-2012
Lecturer - Ventura County Traffic Accident
Investigators School, 1990-2012
Ventura County Child Death Review Team, 1988-2008

## MEDICAL LICENSURE:

Oregon, 1979-present (now inactive status)
California, 1978-79, 1985-present (active status)

## OTHER AWARDS:

*1996 Manager of the Year*
California State Coroners' Association

## PUBLICATIONS:

1. Atypical Papillary Hyperplasia of the Pancreatic Duct Mimicking Obstructing Pancreatic Carcinoma. New England Journal of Medicine: 301; 531-532, Sept 6, 1979.

2. Deaths during the May, 1980, Eruption of Mount St. Helens. New England Journal of Medicine. 305: 931-936, Oct. 15, 1981.

3. Three Fatalities in a Flash Fire with Variable Dental Charring. American Journal of Forensic Medicine and Pathology. 6(3): 248-249, Sept., 1985.

4. Age and Ossification of the Hyoid Bone: Forensic Implications. Journal of Forensic Sciences. Vol. 32(6): Nov., 1987.

5. Autoerotic Asphyxial Death Following Television Broadcast. Journal of Forensic Sciences. Vol. 33(6): 1493-94, Nov., 1988.

EXHIBIT_____
ATE:_____
WITNESS:_____
AGE____*16*_ OF __*22*_

6. Death by Embolization of Prosthetic Aortic Valve. American Journal of Forensic Medicine and Pathology. Vol. 12(I): 80-81, March, 1991.

7. Autoerotic Fatalities with Power Hydraulics. Journal of Forensic Sciences, JFSCA. Vol. 38, (2): 359-364, March, 1993.

8. An Accidental Death Related to Cocaine, Cocaethylene and Caffeine. Presented at the 1993 American Academy of Forensic Sciences Annual Meeting, Boston. Journal of Forensic Sciences, JFSCA, Vol. 38(6): 1513-1515, November, 1993.

9. Restraint Asphyxiation in Excited Delirium. American Journal of Forensic Medicine and Pathology. Vol. 14(4): 289-295. Dec., 1993.

10. The Author's Response. (Letter to the Editor re: Restraint Asphyxia Death Certification) American Journal of Forensic Medicine and Pathology. Vol. 15, (4): page 348, Dec. 1994.

11. Child Abuse Reports in Families with Sudden Infant Death Syndrome. American Journal of Forensic Medicine and Pathology. 19(1):57-62, March, 1998.

12. Age and Sex-Related Variation in Hyoid Bone Morphology. Journal of Forensic Sciences. 1998; 43(6):1138-1143.

13. Asphyxial Death During Prone Restraint Revisited: A Report of 21 Cases. American Journal of Forensic Medicine and Pathology. March 2000; 21(1):39-52.

14. The Authors' Reply. (Letter to the Editor re: Restraint Asphyxia Diagnosis) American Journal of Forensic Medicine and Pathology. Dec. 2000 Vol, 21(4): page 420.

15. Reenactment of Circumstances in Deaths Related to Restraint. American Journal of Forensic Medicine and Pathology. Sept. 2004 Vol. 25(3): pp 190-193.

16. Restraint and Seclusion Use in U.S. School Settings: Recommendations From Allied Treatment Disciplines. J LeBel, MA Nunno, WK Mohr, RL O'Halloran American Journal of Orthopsychiatry. January 2012 Vol. 82(1): pp 75–86.

## SELECTED LECTURES GIVEN:

1. *Oregon State Medical Examiner Death Investigation Seminars.* 1980-1985. All aspects of forensic death investigation.

1. *"Sudden Death from Natural Causes."* Oregon Health Sciences University Medical School. 1980-1985.

EXHIBIT _____
DATE:_____
WITNESS:_____
PAGE ____17____ OF __22__

2. *"Sudden Death in Alcoholics."* Oregon Pathologists Association. 1983.

3. *"Postmortem Time of Death Determination; Postmortem Identification; Functions of Medical Examiner/Coroner"*. Ventura County Sheriff's Academy. 1986 to present.

4. *"Postmortem Identification."* International Association of Forensic Identification, California Division. 1989 Annual Conference.

5. *"Investigation of Traffic Fatalities."* Ventura County Sheriff Traffic Investigator School. 1990 to present.

6. *"The Dead Body as Evidence."* Pepperdine University School of Law. 1993–1996.

7. *"Investigating Asphyxial Deaths in Custody."* Los Angeles Correctional Medical Service. 1994.

8. *"Positional/Restraint Asphyxial Deaths."* California Coroners Association Annual Training Conference. 1994.

9. *"Investigating Traffic Fatalities."* International Association of Medical Examiners and Coroners Annual Conference. 1995.

10. *"Sudden Infant Death Syndrome vs. Child Abuse."* California SIDS Program Training Seminar. 1995.

11. *"Restraint Asphyxia in Custody: the Ventura County Experience."* National Association of Medical Examiners Annual Conference. 1995.

12. *"The Dead Body as Evidence."* Ventura County Emergency Medical Services Second Annual Conference. May 24, 1996.

13. *"Death by Asphyxia and Restraint."* Ventura County Emergency Medical Services Third Annual Conference. June 5, 1997.

14. Lecturer, California POST certified "Basic Death Investigation" course. Addressing *Time of Death, Postmortem Changes, Postmortem Identification, Asphyxial Deaths, Blunt and Sharp Force Injuries, Traffic Fatalities and Gunshot Wounds.* 1987-1999.

15. *"Positional Asphyxia and Restraint Asphyxia"*. Ventura County Police and Sheriff Patrol Commander Meeting. April 23, 1998.

16. *"Asphyxia, Sudden Death and In-Custody Restraint"*. California State Coroner Association Advanced Training Program. Riverside, CA. September 22, 1998.

EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE____*18*____OF____*22*

17. "*Restraint Asphyxia: Asphyxia by Chest Compression during Prone Restraint.*" Los Angeles County Medical Examiner CME Death Investigation Conference. May 27, 1999.

18. "*How to Interpret an Autopsy Report.*" California Public Defenders Association. Training meeting in Oxnard. November 20, 1999.

19. "*The Crash of Alaska Flight 261 - Medical Examiner Operations and Identification Issues*" Ventura County Emergency Medical Services Sixth Annual Conference. June 2, 2000.

20. "*How and When a Physician Should Sign a Death Certificate.*"
    - VCMC Medicine Staff Conference, September 11, 1997.
    - St. John's & Los Robles Regional Medical Center's CME Conference, Sept. 26, 2000.
    - VCMC Family Practice Resident Physician Conference, Feb. 21, 2007.

21. "*The Crash of Alaska Flight 261 - Medical Examiner Operations and Identification Issues*". California Emergency Services Association Annual Conference. South Lake Tahoe, CA. October 18, 2000.

22. "*Manner of Death Determination; Restraint Asphyxia; the Crash of Alaska Flight 261 – Medical Examiner Operations and Identification Issues*". California State Coroner Association Advanced Training Program. Ventura, CA. September 18-21, 2001.

23. "*How a Medical Examiner Uses Postmortem Toxicology*". California Association of Toxicologists meeting. Ventura, CA. November 2, 2002.

24. "*Videotaped re-enactment of Deaths during Restraint.*" Presented at the National Association of Medical Examiners Annual Meeting. October, 2003.

25. "*Restraint Asphyxia and the Sudden In-Custody Death Syndrome.*" California State Coroner Association Advanced Symposium. Riverside, CA. Sept. 2008.

26. "*Restraint Asphyxia and the Sudden Custody Death Syndrome.*" Institute for the Prevention of In-Custody Death 4th Annual Meeting. Las Vegas, Nevada. November 2009.

EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE __19__ OF __22__
L. WHITACRE CSF

**Ronald L. O'Halloran, M.D.**
**347 Nevada Avenue**
**Ventura, California 93004**
**Home phone: 805 647-5198**
**Home email: vcmedexaminer@yahoo.com**

### Dr. R. L. O'Halloran CONSULTATION FEE SCHEDULE 2008
Revised January, 2008

- $400 per hour for all time involved including case file review, document preparation, telephone or personal consultation, testimony time, waiting time, travel time.

- $3200 retainer if work on case is estimated to be more than four hours.

- Advance payment at rate of $400/hr for anticipated time involved for requested services for non-government entity.

- $1600 minimum for deposition or court testimony, or hourly rate, whichever is greater.

- Payment for major costs incurred in performance of services, such as laboratory tests, air transportation or lodging expenses.

𝜋  EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE____20____OF____22
J. WHITACRE, CSR

Ronald L. O'Halloran, M.D.
Deposition or Trial Testimony 2007 to
present (updated 3/9/2013)

**2007**
01-25-07 Grand jury: ME#955-06 shooting
02-07-07 Grand jury: ME#1769-06 shooting
05-11-07 Trial: ME#1365-05 stabbing
06-05-07 Depo: ME#1949-04 on job injury
10-05-07 Trial: ME#2251-07 stabbing
11-12-07 Depo: Civil – Strother v United Summit
Center (see next entry)
12-14-07 Trial: in West Virginia, Strother v United
Summit Center. Restraint in group mental facility.
Plaintiff attorney – Tyler Smith of Pittsburg
12-28-07 Depo: ME#2094-05 Traffic fatal

**2008**
01-24-08 Trial: ME#783-05 homicide shooting
02-20-08 Grand jury: ME#1384-06 hom. shooting
03-10-08 Trial: ME#990-06 homicide stabbing
04-08-08 Trial: ME#955-06 homicide shooting
05-01-08 Depo: civil ME#206-07 fall off gurney
04-09-08 Depo: civil – Eichenlaub v LA County
SO. Restraint/beating with rhabdomyolysis,
attorney Dale Galipo, plaintiff, wrongful death
05-15-08 Depo: civil – Medina v LA PD restraint
death, attorney Dale Galipo of Los Angeles,
plaintiff, wrongful death, restraint asphyxia
10-7-08 Depo: civil ME#1949-04 – on-the-job fatal
fall - wrongful death
10-20-08 Trial: ME#1769-06 homicide shooting
11-14-08 Prelim hearing ME#1249-08 shooting
11-12-08 LA Fed Ct. trial, Medina v LAPD
restraint death. Attny Dale Galipo
11-24-08 Depo Texas Ramos v Cameron Cnty.
Police restraint. Attnys Rodriquez & Tovar
12-10-08 Trial: ME#1098-05 homicide shooting

**2009**
01-15-09 Trial: ME#2372-05 med malpractice,
contrast dye reaction
01-21-09 Grand Jury: ME#576-08 Homicide,
battered child
02-25-09 Prelim hearing: ME#698-09 stabbing
04-03-09 Trial: ME#1493-06 Homicide baseball
bat beating
07-20-09 Prelim hearing: ME#180-06 Larry King
15yo shot by 14 yo classmate
07-30-09 Deposition: ME#802-06 civil Duragesic
accidental overdose. Product liability claim
08-13-09 Trial: ME#2430-03 & ME#138-07 two
shootings, one suspect
09-01-09 Deposition: ME#311-08 civil traffic
accident death
10/15/09 Grand Jury: ME#239-09 Battered Child
10-20-07 Jury Trial: ME#1249-07 Drive by
shooting
11-19-09 Deposition: ME#1209-06 civil
pedestrian hit by car

11-23-09 Grand Jury: ME#1045-09 criminal. 1 of
5 dead, drunk driver
12-9-09 Jury trial: ME# 2094-05 civil v. City,
traffic fatal 18 year old female
12-15-09 Grand Jury: ME#1132-09. Stabbing
12-17-09 Federal Jury Trial in LA. Consult.
Mendoza v LA Restraint Asphyxia Attorney:
Samuel Ogbogu

**2010**
01-04-10 Jury trial: ME #1039 & 1040-08
Shotgun homicides
02-19-10 Jury trial: ME #913, 917, 918-04 GSW's
03-12-09 Jury trial: ME#1206-09. civil, ped v car
04-06-10 Depo: Chasse v Portland PD restraint
death (crushed ribs causing death)
08-10-10 Jury trial: ME#1716-05 GSW
08-25-10 Depo: ME#1212-08 Oxycodone OD
med malpractice wrongful death, civil
09-09-10 Prelim hearing: ME#1420-09 GSW
09-15-10 Jury trial: ME#1384-06 GSW

**2011**
01-06-11 Depo re chain of custody ME 677-09
traffic fatal
02-03-11 Jury trial ME 1249-07 GSW homicide
02-??-11 Jury trial ME 142-08 GSW homicide
03-03-11 Depo Nash, attorney Dale Galipo
restraint LA fed court
03-04-11 Jury trial ME 952-08 GSW homicide
04-08-11 Jury trial Nash, attny Galipo restraint LA
fed court
04-13-11 Depo ME 1193-08 on job injury death,
head crushed in manufacturing metal press
04-14-11 Jury trial ME 1126-03 Rape/stabbing
DNA match
05-04-11 Depo civil ME 1469-11 drug OD vs
prescribing doctor
05-11-11 Depo ME 845-09, bicyclist v pickup
05-14-11 Jury trial ME 239-09 2.5 month old
battered baby, arm, ribs and skull fractures
05-24-11 Jury trial ME 239-09 re-call by defense
in battered child
06-09-11 Prelim. hearing ME 706-08 stabbing
07-07-11 Jury trial 180-06 shooting at school of
15 year old cross dressing boy
07-15-11 Preliminary hearing ME 1059-10, GSW
11-01-11 Jury trial ME 1132-09, stabbing
11-09-11 Jury trial ME 916-09 pedestrian v car
11-30-11 Preliminary hearing 1360-11 GSW
12-29-11 Depo, Appel, Attny Dale Galipo,
restraint asphyxia by Riverside SO

π    EXHIBIT _____
DATE: _____
WITNESS: _____
PAGE _21_ OF _22_
J. WHITACRE, CSR

**2012**

1-6-12 Federal court jury trial, Appel, Attny Dale Galipo, restraint asphyxia by Riverside SO

2-8-12 LA County S. Court jury trial, Attny John Burton, brain damage-non-death, restraint

4-26-12 Prelim., ME 1202-11, strangulation +/- drowning

6-1-12 Jury trial, ME 1420-09, GSW

7-10-12 Jury trial, ME 706-08, Stabbing

7-30-12 Jury trial, ME 1454-08, rifle GSW

7-30-12 Trial, ME 1429-11, homicide

8-8-12 Grand Jury, ME #7, GSW

8-21-12 Judicial hearing, ME 854-10, drug OD Medical malpractice

10-26-12 Prelim hearing, ME 104-12, beating with "The Club"

12-3-12 Prelim. Hearing, ME 1286, stabbing

12-7-12 Trial, ME 104-12, homicide

**2013**

3-4-13 Prelim hearing, ME 006-12, homicide

3-27-13 Grand Jury, ME 643-09, homicide

3-28-13 civil trial, Arcady v Genesis Corp

Note: Cases with "ME" are Ventura County Medical Examiner cases, mostly criminal homicides; testimony is as county employee (not personally professionally retained or paid) until after my 7/1/12 County retirement date. The 2 digits after the dash in the ME case number are the year of death. Testimony is usually about cause of death and related issues.

△   π   EXHIBIT_____3_____

DATE:_____

WITNESS:_____

PAGE __22__ OF __22__

J. WHITACRE, CSR