```
 1          IN THE UNITED STATES DISTRICT COURT

         FOR THE WESTERN DISTRICT OF MISSOURI

 2                   CENTRAL DIVISION

 3

 4   SPENCER NORMAN, KIEFER NORMAN,)

 5   COURTNEY NORMAN, and          )

 6   HELEN S. NORMAN,              )

 7                                 )

 8            Plaintiffs,          )

 9                                 )

10   vs.                           )Cause No.

11                                 )2:12-CV-04210-NKL

12   CAMDEN COUNTY, BRIAN D. FIENE,)

13   and DWIGHT D. FRANKLIN,       )

14                                 )

15            Defendants.          )

16

17

18

19

20      DEPOSITION OF CARL CHRISTOPHER STACY, M.D.

21                   August 16, 2013

22

23      (Deposition Starting Time:  3:00 p.m.)

24

25
```

EXHIBIT 7

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334
Case 2:12-cv-04210-NKL   Document 116-9   Filed 01/16/14   Page 1 of 6

Page 5

1    It is hereby stipulated and agreed
2 by and between counsel for Plaintiffs and
3 counsel for the Defendants that this deposition
4 may be taken in shorthand by Marjorie McFann,
5 RMR, CCR No. 242, and afterwards transcribed
6 into printing, and signature by the witness
7 expressly reserved.
8                * * * * *
9    Deposition Exhibits A and B were
10 marked for purposes of identification herein.
11               * * * * *
12    CARL CHRISTOPHER STACY, M.D.
13 of lawful age, produced, sworn, and examined on
14 behalf of the Defendants deposes and says:
15          EXAMINATION
16 QUESTIONS BY MR. HENSON:
17    Q.    Doctor, would you please state
18 your full name and business address for the
19 record?
20    A.    Carl Christopher Stacy. And I work
21 at the University of Missouri at the College of
22 Medicine. I believe it's One Hospital Drive,
23 Columbia, Missouri. And I don't have the zip
24 code.
25    Q.    And, Doctor, that's where we're

Page 6

1 taking this deposition today; is that correct?
2    A.    Yes.
3    Q.    All right.
4    A.    It's 65212.
5    Q.    Doctor, my name is Keith Henson. I
6 previously introduced myself to you. You
7 understand that we're here today to take your
8 deposition in a lawsuit that's been filed by the
9 family of Glenn David Norman against Camden
10 County, the Sheriff of Camden County and certain
11 Deputies of Camden County; is that correct?
12    A.    Yes, sir.
13    Q.    And I don't think I've -- I
14 probably told you before Mr. Carnie represents
15 the family of Mr. Norman and he's here today.
16 And I represent Camden County, the Sheriff of
17 Camden County and the Deputies that have been
18 sued. Do you understand that?
19    A.    Yes, sir.
20    Q.    All right. And are you today, let
21 me hand you what I've marked as Exhibit A. Is
22 that a copy of the First Amended Notice of
23 Deposition that I sent to you along with a
24 subpoena requesting you to appear here today for
25 your deposition?

Page 7

1    A.    Yes, sir.
2    Q.    All right.
3    A.    And I gave you another copy of it
4 back.
5    Q.    And are you appearing here today to
6 give this deposition pursuant to the subpoena
7 that was attached to the First Amended Notice of
8 Deposition in Exhibit A?
9    A.    Yes, sir.
10    Q.    All right. And, Doctor, just so
11 the record will be clear, are you the Medical
12 Examiner for Boone, Callaway and Greene County?
13    A.    Yes, sir.
14    Q.    All right. And were you the
15 Medical Examiner back in 2011 for Boone,
16 Callaway and Greene County?
17    A.    Yes, sir.
18    Q.    All right. Did you also perform
19 autopsies for other counties?
20    A.    Yes, sir.
21    Q.    All right. Did you have the
22 occasion to perform an autopsy on Glenn David
23 Norman for Camden County, Missouri?
24    A.    Yes, sir.
25    Q.    All right. And who requested you

Page 8

1 to perform that autopsy?
2    A.    Dr. Jungels.
3    Q.    And was it normal for you to
4 perform autopsies on deceased individuals such
5 as Glenn David Norman when those deaths occurred
6 in Callaway or in Camden County?
7    A.    We typically do not. But in this
8 case Dr. Jungels asked me to do it or asked the
9 University to do it.
10    Q.    All right. And did you know Dr.
11 Jungels?
12    A.    I don't know him real well. I've
13 met him. Just an acquaintance.
14    Q.    All right. Was Dr. Jungels in
15 2011, October, 2011, the Coroner of Camden
16 County?
17    A.    Yes, I believe he was.
18    Q.    All right. Do you recall when did
19 Dr. Jungels ask you to do the examination or the
20 autopsy on Glenn David Norman?
21    A.    Well, typically we'll get a call to
22 our Chief Death Investigator. That would be
23 Dori Burke. And she wrote down the time and the
24 date on, on our note sheet which is the first
25 page of the notes I gave you. And it's listed

bottom of Dori's notes on the first page. Did you take those samples and give them to the Highway Patrol?

A. Those samples would have been taken under my direct supervision by our techs. And then they were placed into, each one of them was placed into a bag and the bags were sealed and signed by me. And then this is just a receipt of what was there. The chain of custody is actually where we sign the samples themselves.

Q. All right. But did you give it to the Highway Patrol?

A. Yes.

Q. And what was the purpose of giving those things to the Highway Patrol?

A. For evidence.

Q. Do you know if anyone ever tested those samples?

A. No, I do not. It can indicate a struggle if you find DNA from another person under a fingernail.

Q. And then there's, I guess, a couple of pages on Exhibit B about where you sent things off to folks; is that correct?

A. Yeah. These are the --

Q. FedEx?

A. -- FedEx airbill for the tox. That provides a chain of custody for toxicology.

Q. And then you did a request to Dr. Long at St. Louis University Toxicology to do the panels and the testing --

A. Yes.

Q. -- of blood and urine; correct?

A. We asked for some -- in addition to the routine testing we asked for some synthetic drugs to be tested for too.

Q. Okay. Bath salts and those type of things; is that correct?

A. Yes, sir.

Q. All right. And I don't believe Dr. Long found any bath salts or any of those things, did he?

A. Not listed in his report.

Q. All right. The only other thing that you did I guess that you don't have here today is you made slides; is that right?

A. Yes.

Q. And how many slides did you make during the autopsy of Mr. Norman?

A. I have ten listed here on page 6.

Dr. Miller did more.

Q. And those particular slides you've maintained; is that correct?

A. Yes, sir.

Q. And in fact you have been kind enough to provide Mr. Carnie and myself with copies of those slides; is that right?

A. Yes, sir.

Q. All right. Let's talk a little bit about Mr. Norman. When you started the autopsy of him how did you find that he was dressed?

A. Gray green striped shorts.

Q. Okay. Did he have any other type of clothes on other than gray green striped shorts?

A. Not that I've listed here, no.

Q. And you would have listed if he would have been --

A. Yes, sir.

Q. -- dressed in anything else; correct?

A. Yes. There's another sheet, a clothing sheet. I think it's in here. Where we would have listed everything else.

Q. Can you tell us what Mr. Norman's, you determined his height and weight to be?

A. Height is five foot four inches, weight 170 pounds. Now this is a height and weight with the body laying on the table. And there may be some -- it may not be an accurate standing height. It's a length of the body from the bottoms of the feet to the top of the head. And if there's any rigor mortis it may seem shorter or it's -- it may not be exactly accurate.

Q. But you at least measured Mr. Norman's body and found that according to your measurements --

A. Body length, yes.

Q. -- he was about five foot four inches --

A. Yes.

Q. -- in height and body length; right?

A. Yes.

Q. All right. And he weighed 170 pounds?

A. Yes. That's what we measured. Yes.

Q. How old was Mr. Norman?

A. He was listed at 46 years and he

Page 109

00182. And I believe the doctor is reading the document in its entirety. And then I'm going to draw his attention to a particular portion of it?
A. Okay.
Q. So, Doctor, in this statement that you just read Deputy Watson writes: "After awhile of struggling with Norman I placed my right knee between his two shoulder blades to prevent him from attempting to stand as well as gain control over his resistance. Myself and Deputy Dziadosz were able to place his hands behind his back and apply two sets of handcuffs linked together on in attempts to stop has level of resistance and gain control of him.
After handcuffs were applied Norman again attempted to stand and I kept my knee between his shoulder blades to hold him down until he finished fighting and struggling. After a few minute he calmed down and quit fighting against myself after Deputy Dziadosz. Shortly after he stopped struggling he began to snore. In your opinion is that evidence of respiratory compromise?
MR. HENSON: Object to the form to

Page 110

the extent it calls for speculation and conjecture and an improper opinion on the part of the doctor. And it also lacks foundation for him to give that kind of opinion.
A. Yes. It can result in respiratory compromise.
Q. And what is that based on?
A. Compression of the chest.
Q. And in this particular example she's describing compressing the chest with the knee in between his shoulder blades; correct?
A. Yes, sir.
Q. And is that an example of restraint asphyxia.
MR. HENSON: Object to the form.
A. I don't -- I'm sorry.
MR. HENSON: Object to the form of the question to the extent it calls for speculation and conjecture and improper opinion. Lacks foundation and also an improper expert.
A. I don't typically use the term restraint asphyxia.
Q. Sure. Sure. Well, since you don't want to use that term you said it is evidence of respiratory compromise?

Page 111

MR. HENSON: Same objection. And it's repetitive too.
Q. Okay. You can have it. I was trying to get back on track. Is that evidence of respiratory compromise?
A. Compression of the chest is evidence of respiratory compromise, yes.
Q. And if compression of the chest goes on long enough someone can go unconscious?
MR. HENSON: Object to the form of the question to the extent it calls for speculation and conjecture and improper opinion, lacks foundation.
A. For various reasons possibly.
Q. And I believe you told Mr. Henson that five minutes of respiratory compromise without any other factors can cause death?
A. Can cause somebody not being able to be resuscitated, yes.
Q. And I'm going to read one section from a deposition of a witness to the incident.
MR. CARNIE: And, Keith, this is William Durant's deposition on page 43.
MR. HENSON: I don't think I have Mr. Durant in here.

Page 112

MR. CARNIE: You can share with me if you want.
Q. (By Mr. Carnie) And so the question is by Mr. Henson. And it's: "And when you arrived in that backyard of your mother's house were all three of these Deputies there when you arrived?" And the answer is: "They were all three on the man, on top of the man when I arrived."
And my question to you, is that evidence of respiratory compromise?
MR. HENSON: Object to the form to the extent that it calls for speculation and conjecture and improper opinion. And it also lacks foundation to give that opinion.
A. If the chest is compressed --
Q. Right. It's --
A. -- in my opinion it can cause respiratory compromise.
Q. Right. And so being on top of someone could possibly compress their chest?
MR. HENSON: Object to the form.
A. I don't know how much weight each person had on top of him.
Q. And that's, that's, that's a fair

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:12-cv-04210-NKL   Document 116-9   Filed 01/16/14   Page 4 of 6

Page 113

statement. But if they had enough weight on them, that could cause chest compression?
A. Possible.
MR. HENSON: Object to the form of the question to the extent it calls for speculation and conjecture and improper opinion and lacks foundation.
A. Possible, yes.
Q. Okay. Now the statement that I shared with you and perhaps this deposition, is that the kind of information that you think would be helpful when putting together your opinions in this case?
A. I'm not sure it would change my opinion, no.
Q. But you put that respiratory compromise contributed to cause the death. So it probably wouldn't, would it?
MR. HENSON: Object to the form of the question to the extent it calls for speculation and conjecture. It's argumentative.
A. I forgot the question. I'm sorry.
MR. CARNIE: Can you just read it back for me. I'm sorry.
Q. And you put respiratory compromise

Page 114

as a contributing cause in your autopsy report; correct?
A. Yes. That's my opinion.
Q. That's your opinion. So it would not have changed your opinion because you've already put that in there?
A. No. It wouldn't change my opinion, no.
Q. Because respiratory compromise is already in your opinion?
A. Yes, sir.
Q. And I just want to clarify this. It's your opinion that the shocks from the charge conducted control device contributed to cause the death as well?
MR. HENSON: Object to the form of the question to the extent --
A. No.
MR. HENSON: -- I believe that --
A. No. It's not my opinion.
Q. Okay. So it's your opinion that the shocks from the charge conducted control device contributed to cause respiratory compromise?
A. It may have.

Page 115

Q. It may have?
A. My opinion is that it contributed to the epinephrine surge as part of the struggle.
Q. Okay. So in that sense it contributed to cause his death?
A. Yes, sir.
Q. I want to draw your attention to the large, or you described it, I think, as a large contusion on the back of Mr. Norman. And I can share mine with you if you don't have it ready.
MR. HENSON: It's page 2 of your report, Doctor. Subject one on the upper back
Q. And, Doctor, I apologize. I won't be much longer but I hope you understand --
A. Don't apologize.
Q. -- I have to ask my questions too.
A. Can we go off the record?
Q. Yeah.
(Off the record.)
Q. And so, Doctor, I'm pointing you to page 2 of your report where you wrote that there is a 10 by 3 and 10 by 2 centimeter linear contusion on Mr. Norman's back. Is that where

Page 116

it was located?
A. Yes. I think it was the left.
Q. Yeah. Could you be more specific?
A. Right upper back. Yes, it's upper back.
Q. Which, which side of the upper back?
A. Right upper back.
Q. Right upper back. And is that near the shoulder blade?
A. Yes.
Q. Okay. And how, how can a mark like that be created?
A. A blow.
Q. A blow. Okay.
A. Perhaps. It's a blunt force.
Q. Can you create blunt force with a body part like a knee?
A. Perhaps. More likely baseball bat.
Q. You, you testified earlier that you did look at slides of the heart; right?
A. One slide.
Q. One slide. Okay. And you didn't see any evidence of myocarditis, did you?
A. No, sir, I did not.

29 (Pages 113 to 116)

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:12-cv-04210-NKL   Document 116-9   Filed 01/16/14   Page 5 of 6

Page 133

```
 1         WITNESS ERRATA SHEET

 2   Witness Name: CARL CHRISTOPHER STACY, M.D.

 3   SPENCER NORMAN, KIEFER NORMAN, COURTNEY NORMAN,
     and HELEN S. NORMAN v. CAMDEN COUNTY, BRIAN D.
 4   FIENE, and DWIGHT D. FRANKLIN

 5   Date Taken: August 16, 2013

 6   Page #_____   Line #_____
     Should read: _____
 7   Reason for change: _____
 8   Page #_____   Line #_____
 9   Should read: _____
10   Reason for change: _____
11   Page #_____   Line #_____
12   Should read: _____
13   Reason for change: _____
14   Page #_____   Line #_____
15   Should read: _____
16   Reason for change: _____
17   Page #_____   Line #_____
18   Should read: _____
19   Reason for change: _____
20   Page #_____   Line #_____
21   Should read: _____
22   Reason for change: _____
23
24
25   Witness Signature: _____
```

Page 134

```
 1   STATE OF _____ )
 2   COUNTY OF _____ )
 3
 4       I, CARL CHRISTOPHER STACY, M.D., do hereby
     certify:
 5       That I have read the foregoing deposition;
         That I have made such changes in form
 6   and/or substance to the within deposition as
     might be necessary to render the same true and
 7   correct;
 8       That having made such changes thereon, I
     hereby subscribe my name to the deposition.
 9       I declare under penalty of perjury that the
10   foregoing is true and correct.

11       Executed this _____ day of _____,

12   2013, at _____.
13
14
15
16   _____
17         Notary Public
18
19   My commission expires: _____
20
21
22
23
24       _____
25       CARL CHRISTOPHER STACY, M.D.
```

34 (Pages 133 to 134)

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 2:12-cv-04210-NKL   Document 116-9   Filed 01/16/14   Page 6 of 6