UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SPENCER NORMAN, KEIFER NORMAN, COURTNEY NORMAN, HELEN S. NORMAN,<br><br>Plaintiffs,<br><br>vs.<br><br>CAMDEN COUNTY, BRIAN D. FIENE, DWIGHT FRANKLIN,<br><br>Defendants. | Cause No. 2:12-CV-04210<br><br>September 24, 2013<br>Camdenton, Missouri |

DEPOSITION OF RICHARD BRANDON DZIADOSZ,

a witness, produced, sworn and examined on the 24th day of September 2013, between the hours of 10:00 a.m. and 1:15 p.m. of that day, at the Law Offices of Phillips, McElyea, Carpenter and Welch, 85 Court Circle NW, City of Camdenton, County of Camden, State of Missouri, before

Allison A. Brown
CAPITAL CITY COURT REPORTING
Jefferson City ** The Lake ** Columbia
573-761-4350 ** 573-365-5226 ** 573-445-4142

within and for the State of Missouri, in the above-entitled cause, on the part of the Plaintiffs, taken pursuant to notice.

**EXHIBIT 8**

Page 6

1  Q. Okay. How tall are you?
2
3  A. Approximately, six foot.
4  Q. And how much do you weigh?
5  A. About 165.
6  Q. Has your weight changed at all since
7  October 4, 2011?
8  A. I think I've gained about five pounds since
9  then.
10 Q. Give or take?
11 A. Give or take.
12 Q. Sort of a normal variation of five pounds?
13 A. Correct.
14 Q. Okay. Where were you born?
15 A. Grain Valley, Missouri -- Kansas City.
16 Q. Okay. Where is that at?
17 A. It's a suburb of Kansas City.
18 Q. Oh. Suburb of Kansas City. I'm sorry.
19 A. Yes.
20 Q. I misunderstood.
21 A. Grain -- it's Grain Valley, Missouri.
22 Q. Did you go to high school out there?
23 A. No. I went to high school here in Camdenton.
24 Q. Okay. When did you move into this area of
25 Camdenton?

Page 7

1  A. When I was approximately three years old.
2  Q. Okay. And have you -- have you been in
3
4  Camdenton ever since then?
5  A. Yes.
6  Q. So you went to high school here in Camdenton?
7  A. Yes.
8  Q. What did you do after high school?
9  A. I went to the Navy.
10 Q. I assume you completed high school?
11 A. Yes.
12 Q. Okay. Completed high school, you went into
13 the Navy. What was your position in the Navy?
14 A. Landing signalman, enlisted. I directed
15 helicopters in for landing on the flight deck.
16 Q. Okay. And where were you stationed during
17 that time?
18 A. Newark, New Jersey.
19 Q. Okay. Did you ever go overseas anywhere?
20 A. Yes, I did.
21 Q. Where did you go?
22 A. I've been all over the Mediterranean. I've
23 been to approximately seven different countries,
24 Mediterranean and the Caribbean area.
25 Q. Always on a ship?

Page 8

1  A. Yes.
2  Q. And if I understand your job, you were to
3  direct the helicopters landing on the aircraft carrier?
4
5  A. It was -- it wasn't an aircraft carrier. It
6  was a supply ship, but yes. I directed them into landing.
7  Q. Okay. How long did you stay in the Navy?
8  A. I was two active; six years inactive.
9  Q What does that mean?
10 A. The six years inactive part?
11 Q. Uh-huh.
12 A. I was not formally in the Navy as in, you
13 know, working with the Navy, but I was available for recall
14 at any time.
15 Q. Did the two years come before the six years of
16 inactivity?
17 A. Yes, it did. Yes, it did.
18 Q. And just so -- just so this goes smoother
19 today, have you had your deposition taken before?
20 A. No.
21 Q. Okay. It's going to be hard, but try not to
22 talk over me, and I'll try not to talk over you.
23 A. Sorry.
24 Q. Sometimes -- that's okay. No problem. It's
25 just something we have to remind everybody, and you'll find

Page 9

1  it's hard to do. I'll try to wait for you to finish the
2  answers; you wait for me to finish the questions, even though
3  you know exactly where I'm going. Okay?
4  A. All right.
5
6  Q. Another thing -- you're doing fine giving
7  verbal answers, okay, yeses and nos, rather than shaking your
8  head and uh-uhs and uh-huhs. Okay?
9  A. All right.
10 Q. Now, we were talking about your -- your
11 service in the Navy. You spent two years in active duty?
12 A. Yes.
13 Q. And in that, you traveled the world a little
14 bit. You were in the Mediterranean; is that fair?
15 A. Yes.
16 Q. Then you had six years where you were
17 inactive?
18 A. Correct.
19 Q. And during that time, you could have been
20 recalled, but you were not?
21 A. Correct.
22 Q. What did you do during those six years?
23 A. I worked at a T-shirt factory,
24 screen-printing.
25 Q. Okay. Where is that located?

Page 26

1   A. We've taken burglaries; citizen assist, which
2   would be your keep the peace or lock outs, stuff like that;
3   assaults; EDPs, which is emotionally disturbed persons; and
4   then there's a category for stealing. And then there's --
5   even though it's assault, we actually distinguish a
6   difference between assaults and domestic assaults. Off the
7   top of my head, that's all I can remember right now.
8   Q. And are these categories -- I believe you're
9   listing now to me categories, right?
10  A. Correct.
11  Q. And are these categories that Camden County
12  assigns to every call that comes in?
13  A. Correct.
14  Q. How does that work?
15  A. Dispatchers, by the nature of the call that
16  comes in, assigns it into a category.
17  Q. And so do you have, like, a code for it, or do
18  you just call it a burglary?
19  A. They just call it a burglary.
20  Q. And so somebody would call it an EDP?
21  A. Correct.
22
23  Q. And somebody would call it domestic assault?
24  A. Correct.
25  Q. And this would be the dispatcher telling you,

Page 27

1   as the patrol officer, what category it is?
2   A. Yes.
3   Q. Do you keep any kind of statistics on how many
4   of each call you respond to in a given month?
5   A. I do not. I believe the sheriff's department
6   does keep track of that, though.
7   Q. Okay. And you've give me six categories. Do
8   you know if there's any more or is that just --
9   A. There might be. That's what I can remember
10  off the top of my head right now.
11  Q. Okay. Are any of those categories more
12  frequent -- or do you respond to calls in any of those
13  categories more frequently than any of the others?
14  A. It really depends on what shift you work.
15  Q. Okay.
16  A. Night shift, you're working more the assaults,
17  EDPs, and stuff like that. Day shift, you respond more to
18  the citizen assist.
19  Q. What is citizen assist?
20  A. It would be responding for lock-outs, helping
21  people out like that, keep the peace, which is -- a person
22  calls, they need to go get property, but they're afraid that
23
24  the people that have -- they might have a problem, so we go
25  there to make sure nothing occurs.

Page 28

1   Q. And so you said at night, it's going to be
2   more assaults and EDPs?
3   A. Correct.
4   Q. If you had to pick one of these categories as
5   the most frequent call that you respond to, what would it be?
6   A. Probably EDPs.
7   Q. Okay. How many EDPs do you respond to in a
8   given week?
9   A. I couldn't give you a good answer on that.
10  Q. Is it -- could you estimate for me? Is it
11  more than 20, less than 20?
12  A. As in the sheriff's department or as in me?
13  Q. Let's start with you.
14  A. When I worked -- I don't work nights anymore,
15  but when I worked nights, I would probably -- I would only
16  think I would respond to two to maybe three a week.
17  Q. A week.
18     What about the sheriff's department as whole?
19  Can you estimate that for me in a given week?
20  A. An estimate, I would say closer to 12 to 15.
21  Q. Okay. So when you were working nights, you
22  would say that per week, you would respond to two or three
23  EDP calls?
24
25  A. Yes.

Page 29

1   Q. And the sheriff's department as a whole, you
2   would probably -- you think they might respond to 12 to 15 in
3   a given week?
4   A. Estimate, yes.
5   Q. What about burglaries? How many per week?
6   A. I'd say I probably on -- on nights, I'd
7   probably do about the same, two to three. And depending upon
8   the time of year -- springtime, we always get more burglaries
9   because we've got so many Lake homes around here that are
10  basically summer homes. People are gone throughout the
11  winter, and they don't get reported until springtime, so it's
12  hard to say exactly. If it's springtime, we're going to get
13  probably 15 to 20 burglaries a week. If it's wintertime,
14  we're probably only going to get two to three a week.
15  Q. Function of the weather, I guess?
16  A. Function of having so many summer homes.
17  Q. Got it.
18     Do you have a separate category for -- for
19  drug calls?
20  A. They have one for drug investigation, but we
21  got a drug unit that takes care of that.
22  Q. Okay. And correct me if I'm wrong, but you
23  said EDPs is probably the category you respond to the most?
24  A. When I worked nights, yes.
25

Page 58

1   residence in the backyard.
2
3   Q. Okay. And could you describe the male for me?
4   A. Approximately, 5'9", white male, guessing the
5   weight about 190, wearing just boxer shorts.
6   Q. He didn't have a shirt on?
7   A. No, he did not.
8   Q. Did he have shoes on?
9   A. No, he did not.
10  Q. Did he have a hat on?
11  A. No.
12  Q. He just was wearing boxer shorts?
13  A. Correct.
14  Q. And what was he doing?
15  A. He was yelling at the residence that he was in
16  the backyard of.
17  Q. And what do you mean when you say "he was
18  yelling at the residence"?
19  A. He was facing one of the windows in the back
20  of the trailer. The residence was -- being a trailer and
21  yelling inside -- or yelling towards the residence.
22  Q. How close was he to the trailer?
23  A. He was within arm's reach so within three
24  foot.
25  Q. Okay. Could you make out any of the words he

Page 59

1   was saying?
2   A. No.
3
4   Q. How close to him were you?
5   A. When I first noticed him, I was probably 30,
6   40 feet, and I closed the distance to approximately 15 feet.
7   Q. So you moved closer to him?
8   A. Correct.
9   Q. You moved about 15 feet from him?
10  A. Yes.
11  Q. And was he still yelling at the trailer at
12  that point?
13  A. He would go from yelling at the trailer to
14  looking up at the sky and yelling at the sky.
15  Q. And were you able to make out any of the words
16  that he said?
17  A. The only word I was able to make out is he
18  would say "God."
19  Q. Okay. What did you -- did you say anything to
20  him?
21  A. I told him to put his hands in the air,
22  identified myself, and had my flashlight shining on him.
23  Q. Did you say anything else to him?
24  A. No, just told him to put his hands in the air.
25  Q. Did he say anything to you?

Page 60

1   A. Not at that time, no.
2   Q. What happened next?
3   A. I unholstered my taser and turned the laser
4
5   light on and had it pointing to the ground and continued to
6   give him orders to put his hands in the air. And he started
7   to walk away, looking at the sky.
8   Q. Which direction was he walking?
9   A. It would be walking to my left at that point.
10  Q. Away from --
11  A. Away from the residence.
12  Q. Away from the trailer?
13  A. Yes.
14  Q. Can you describe the area he was walking to?
15  A. It was an unkempt backyard, grass pretty close
16  to waist high. It was --
17  Q. And how long -- how much time elapsed from the
18  time you first got within 30 feet of him and the time he
19  started moving?
20  A. Probably within a minute or two.
21  Q. Okay. Then what happened after he started
22  moving?
23  A. I -- when he turned his back to me, I lifted
24  the taser up and put the laser light at the small of his back
25  and continued to give him orders to put his hands in the air.

Page 61

1   Q. So you were saying words to him?
2   A. Yes.
3   Q. What were you saying?
4   A. "Put your hands in the air."
5
6   Q. You were giving orders?
7   A. Yes.
8   Q. You were giving commands?
9   A. Yes.
10  Q. Did it seem -- did he obey your commands?
11  A. No, he did not.
12  Q. I saw in your interview with the Highway
13  Patrol that, at some point, you identified Mr. Norman as an
14  EDP?
15  A. Yes.
16  Q. Can you explain for the jury what an EDP is
17  again?
18  A. It's a term we use, an emotionally disturbed
19  person. It's basically anybody that's not in a rational
20  state of mind.
21  Q. And at what point in your encounter with
22  Mr. Norman did you decide that you were dealing with an EDP?
23  A. I'd say probably about the time he looked up
24  in the sky and started yelling at God is when I figured he
25  was probably going to be an EDP.

Page 62

1  Q. And that is when you first approached him, and
2  he was standing by the trailer still?
3  A. Yeah.
4  Q. Did you call an ambulance at that point?
5  A. No, I did not.
6
7  Q Did you tell anyone that you thought
8  Mr. Norman was an EDP?
9  A. No, I did not.
10 Q. You drew your taser at some point, correct?
11 A. Correct.
12 Q. And you drew your taser while he was still
13 over by the trailer, right?
14 A. Correct.
15 Q. And I assume you kept it drawn out while he
16 moved into the tall grass?
17 A. The whole backyard is tall grass.
18 Q. Oh. So everything is tall grass back there?
19 A. Yes. Yes.
20 Q. Okay. What happened after he had moved away
21 from the trailer?
22 A. Sergeant Fiene, basically, arrived, coming
23 from the opposite direction that I came from. And prior to
24 his arrival, Mr. Norman turned and faced me. And again, I
25 was telling him to put his hands in the air. I had the laser

Page 63

1  light on him, and he kind of, like, brushed -- tried to brush
2  the laser light off and stated, "Leave me alone."
3  Q. Okay. How long were you on the scene until
4  Sergeant Fiene arrived?
5  A. Guesstimate, two to three minutes. Probably
6  closer to two minutes.
7
8  Q. Did you put the laser light of the taser on
9  Mr. Norman before or after Sergeant Fiene arrived?
10 A. Before.
11 Q. And you continued to give him commands?
12 A. Yes.
13 Q. Other than giving him commands to put his
14 hands in the air -- is that what you were doing?
15 A. Yes.
16 Q. Did you say any other words to him?
17 A. No.
18 Q. What did Sergeant Fiene do when he arrived?
19 A. He put his -- or pulled his -- or drew his
20 taser and pointed it at him and started giving him commands,
21 put his hands on his head.
22 Q. And Sergeant Fiene's taser would have been
23 facing Mr. Norman's back, correct?
24 A. When he first arrived, yes. But very shortly,
25 like, within seconds of his arrival, Mr. Norman turned and

Page 64

1  faced Sergeant Fiene, so it would be facing his chest the
2  majority.
3  Q. Okay. So initially, you had your -- the laser
4  from the taser on his chest?
5  A. At that point, when Fiene arrived, yes.
6  Q. And then Mr. Norman turned at some point
7  there?
8
9  A. Yes.
10 Q. And he was facing --
11 A. Fiene -- Sergeant Fiene.
12 Q. And did Sergeant Fiene have his taser drawn at
13 that point when Mr. Norman turned?
14 A. Yes.
15 Q. And were you able to see the laser from
16 Sergeant Fiene's taser?
17 A. No, I was not. Mr. Norman was in between us.
18 Q. Okay. Then what happened next?
19 A. Sergeant Fiene continued to give him orders to
20 put his hands in the air, and Mr. Norman started walking
21 away, initially, toward -- to my right back towards the
22 trailer.
23 Q. I want to take you back for one second.
24 A. Yeah
25 Q. You said Mr. Norman swatted at the laser?

Page 65

1  A. Yeah. He was kind of brushing his chest where
2  the laser light was hitting his chest.
3  Q. Is that something that people typically do
4  when you put the laser on them?
5  A. We've had it on a lot of occasions where
6  people will do that.
7  Q. And are those people EDPs?
8  A. Some. Then we get just some that are just
9
10 people that are drunk and not realizing what's going on. We
11 get some people that just -- joking around, you know, like,
12 you know, "What are you going to try to do to me" type deal,
13 you know. It's -- we -- we get it quite a bit, that people
14 will, you know, kind of, like, brush it off or try to brush
15 it off.
16 Q. And you said sometimes people are drunk. Is
17 that different than an EDP?
18 A. A lot of times, it is. A lot of times, even
19 though you're drunk, you still have your functions. You're
20 still rational in your thinking.
21 Q. And just so the jury understands, just being
22 drunk doesn't make you an EDP, right?
23 A. Correct.
24 Q. It has to be something more than that?
25 A. Correct.

Page 66

1  Q. Was that, in any way, any confirmation to you
2  that you were dealing with an EDP, that he was swiping that
3  laser away?
4  A. No, it was not.
5  Q. You had already made the determination he was
6  an EDP?
7  A. I -- I assumed, at that point, that he was not
8  in his right state of mind.
9  Q. So it certainly didn't change your mind?
10
11 A. Correct.
12 Q. Okay. Take me back to where we were. What
13 does Sergeant Fiene when he arrives on the scene?
14 A. He points his taser at Mr. Norman and gives
15 him commands to put his hands on his head.
16 Q. Other than telling him to put his hands on his
17 head, did he say any other words to Mr. Norman?
18 A. Not that I can recall.
19 Q. Did Mr. Norman obey Sergeant Fiene's command?
20 A. No, he did not.
21 Q. What happened next?
22 A. Like, Mr. Norman started walking, and we
23 continued to give him commands. At one point, I don't
24 know -- I don't know exactly what time-wise into it, but
25 Sergeant Fiene deployed his taser striking Mr. Norman in the

Page 67

1  chest.
2  Q. How long was Sergeant Fiene on the scene
3  before he deployed his taser?
4  A. Guesstimate, one to two minutes.
5  Q. You said Mr. Normal started walking.
6  A. Yes.
7  Q. Where was he walking to?
8  A. Initially, he walked towards the trailer. We
9  kind of moved our -- changed our position to kind of block
10 his, you know, route, and he turned around and started
11
12 walking away from the trailer, which would be towards the
13 woods.
14 Q. Okay. And he -- was he walking slowly?
15 A. Yeah.
16 Q. He wasn't running?
17 A. No.
18 Q. Was he walking in circles or how -- I just
19 don't understand.
20 A. As in?
21 Q. Could you explain to me his path as he's
22 walking?
23 A. His path was originally to my right going
24 toward the trailer. And we adjusted our positions to block
25 him from leaving -- or escaping that direction. He turned

Page 68

1  around and started walking toward -- away from the trailer
2  towards the woods. And again, we just moved our position to
3  parallel him.
4  Q. How far away were the woods?
5  A. And "woods," it's not like thick woods; just a
6  bunch of trees. 15 yards.
7  Q. Okay. And when you say "woods," you kind of
8  explained this a little bit. You just mean a few trees?
9  A. Well, more than a few. It's not, like, one or
10 two trees there, but it wasn't, you know, you go out in deep
11 woods type. It was several trees and even more underbrush
12
13 than just grass -- tall grass.
14 Q. What happened when Sergeant Fiene deployed his
15 taser?
16 A. Mr. Norman went to the ground.
17 Q. Where did he strike Mr. Norman with the taser?
18 A. Both probes hit his chest.
19 Q. In taser -- have you taken taser training?
20 A. Yes, I have.
21 Q. Where do they teach you in taser class that
22 you should strike someone with the probes of the taser?
23 A. Anywhere below the nipple line on a person.
24 Q. Below the nipple line?
25 A. Yes.

Page 69

1  Q. And where did Sergeant Fiene hit Mr. Norman
2  with the probes?
3  A. Honestly, I didn't see the probes. I'm not --
4  I know that it hit his chest, but I don't know -- I couldn't
5  give you the exact placements.
6  Q. Is the training any different for a firearm --
7  a gun than a taser about where you should shoot the person
8  at?
9  A. You always -- a firearm, you always shoot
10 center mass.
11 Q. Okay.
12 A. And tasers, pretty much, you're aiming for the
13
14 largest area, which would be center mass.
15 Q. So no different than a gun?
16 A. Correct.
17 Q. Your training has been to shoot in the chest?
18 A. Correct.
19 Q. And you've never received any training that
20 told you shouldn't shoot somebody in the chest with a taser?
21 A. Correct.
22 Q. When was your last taser course?
23 A. I don't remember the last. It's --
24 MR. HENSON: I think he's had one since this
25 incident.

Page 106

1  A. Yes. At this point, I was the one holding him
2  on his side.
3  Q. Okay. And what is Deputy Watson doing at that
4  point?
5  A. She's standing -- still standing right there
6  facing me.
7  Q. Okay. And at this point, you had not checked
8  him for a pulse, correct?
9  A. Correct.
10 Q. At this point, you had not done any CPR,
11 correct?
12 A. Correct.
13 Q. And I'm sorry, what was Deputy Watson doing
14 while you were holding him on his side in the short grass?
15 A. She was standing -- just standing in security,
16 I guess -- what we consider security -- facing me.
17 Q. She's actually looking at you and Mr. Norman?
18 A. She was facing me. I don't know what she was
19 actually looking at, but she was facing me.
20 Q. Facing you. Okay. That's a good point.
21    When is the last time you saw Mr. Norman move?
22 A. When he was fighting the cuffs.
23 Q. During the -- during the incident with
24
25 Mr. Norman, did he ever strike you?

Page 107

1  A. No, he did not.
2  Q. Did he ever kick you?
3  A. No, he did not.
4  Q. Did he ever try to bite you?
5  A. No, he did not.
6  Q. Did you see him try to strike anyone else?
7  A. No, I did not.
8  Q. Did you see him try to kick anyone else?
9  A. No, I did not.
10 Q. Did you see him try to bite anyone else?
11 A. No, I did not.
12    MR. HENSON: When you get to a point, I could
13 probably do that bathroom break.
14    MR. CARNIE: Yeah. Yeah. We can take a --
15    MR. HENSON: Whenever you get to it.
16    MR. CARNIE: Let me -- give me a couple more
17 minutes, and then we'll take a break. Okay?
18    MR. HENSON: Yeah. Yeah. I just said when
19 you get to it.
20 BY MR. CARNIE:
21 Q. While you're sitting there with him in the
22 short grass, is he making any noise?
23 A. No, he's not.
24 Q. When is the last time you heard him make any
25

Page 108

1  noise?
2  A. Besides the snoring?
3  Q. The snoring -- including the snoring?
4  A. The snoring would be the last -- when we was
5  back in the tall grass.
6  Q. And then before the snoring, when is the last
7  noise you heard from him?
8  A. While he was still fighting the cuffs, he was
9  yelling and screaming at that point.
10 Q. Up to this point, had you observed anyone else
11 checking Mr. Norman's pulse?
12 A. No, I have not.
13 Q. What happens next as you're sitting there with
14 Mr. Norman holding him on his side?
15 A. At that point, Deputy Watson realized she had
16 blood on her from -- I -- at some point, which I did not see,
17 Mr. Norman sustained a cut on his right elbow which was
18 bleeding, and Deputy Watson noticed blood on her from that
19 cut. I instructed her to hold Mr. Norman while I retrieved
20 some antibacterial cleanser to clean the blood.
21 Q. So then Deputy Watson takes your place,
22 holding Mr. Norman on his side?
23 A. Correct.
24 Q. You go to the car to get some antibacterial
25 cleanser?

Page 109

1
2  A. Correct.
3  Q. How long had you been in the short grass at
4  that point?
5  A. I'd say three, four minutes, guesstimate.
6  Q. Do you return with the cleanser at some point?
7  A. Yes, I do.
8  Q. Okay. Then what happens?
9  A. I relieve her and give her the cleanser.
10 Q. And so you're back down with Mr. Norman again?
11 A. Correct.
12 Q. Holding him on his side?
13 A. Correct.
14 Q. Still don't hear him say anything?
15 A. Correct.
16 Q. Still don't see him moving?
17 A. I see his chest rising and falling but moving
18 arms and legs, no.
19 Q. Okay. His eyes open, closed?
20 A. He's facing away from me. I didn't see his
21 eyes.
22 Q. What happens next?
23 A. After that, Deputy Rutherford arrived and
24 basically said -- or when he walked by, he could see
25 Mr. Norman, and he said he doesn't look very good, so that's

Page 142

October 7, 2013

D. Keith Henson
Attorney at Law
Paule, Camazine and Blumenthal
165 North Meramec Avenue, Sixth Floor
St. Louis, Missouri 63105

IN RE: Norman, et al v. Camden County, et al

Dear Mr. Henson:

Please find enclosed your copy of the deposition of Richard Brandon Dziadosz taken September 24, 2013, in the above-referenced case. Also enclosed is the original signature page and errata sheet.

Please have Deputy Dziadosz read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheet and sign the signature page in front of a notary public.

Please return the errata sheet and signed signature page to Mr. Carnie so he can file the original deposition in the appropriate manner.

If you have any questions, please feel free to call me.

Sincerely,


Allison A. Brown, CCR
CAPITAL CITY COURT REPORTING

Enclosures

cc: Mr. Carnie

Page 143

(THIS IS THE SIGNATURE PAGE TO THE DEPOSITION OF RICHARD BRANDON DZIADOSZ TAKEN ON THE 24TH DAY OF SEPTEMBER 2013.)








_____
RICHARD BRANDON DZIADOSZ

Subscribed and sworn before me on this _____ day

of _____ 2013.

My Commission expires _____.




_____
NOTARY PUBLIC – STATE OF MISSOURI
Commissioned in _____ County

Page 144

ERRATA SHEET

Deponent: RICHARD B. DZIADOSZ

Date Taken: September 24, 2013

IN RE: Norman, et al v. Camden County, et al

Page # _____, Line # _____
Should Read: _____
Reason for Change: _____
Page # _____, Line # _____
Should Read: _____
Reason for Change: _____
Page # _____, Line # _____
Should Read: _____
Reason for Change: _____
Page # _____, Line # _____
Should Read: _____
Reason for Change: _____
Page # _____, Line # _____
Should Read: _____
Reason for Change: _____
Page # _____, Line # _____
Should Read: _____
Reason for Change: _____

Page 145

CERTIFICATE

STATE OF MISSOURI )
                  ) ss.
COUNTY OF HOWARD  )

I, Allison A. Brown, Court Reporter with the firm of Capital City Court Reporting, commissioned in Howard County, do hereby certify that pursuant to notice, there came before me on September 24, 2013,

RICHARD BRANDON DZIADOSZ,

at the Law Offices of Phillips, McElyea, Carpenter and Welch, 85 Court Circle NW, in the City of Camdenton, County of Camden, who was first duly sworn by me to testify the whole truth of his knowledge concerning matter in controversy aforesaid; that he was examined, and his examination was then and there recorded in stenomask verbatim recording by me and afterwards transcribed and is fully and correctly set forth in the foregoing pages; and the witness and counsel waived presentment of this deposition to the witness, by me, and that the signature was requested, and the deposition is now herewith returned.

I further certify that I am neither attorney or counsel for, nor related to, nor employed by any of the parties to this action in which this deposition is taken; and furthermore that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

Given at my office in the City of Fayette, County of Howard, State of Missouri, this 7th day of October, 2013.


_____
Allison A. Brown, C.C.R. #1205
CAPITAL CITY COURT REPORTING