# Case: Spencer Norman, et al v. Camden County, et al

## Transcript of Sheriff Dwight Franklin

**Date:** October 10, 2013

*This transcript is printed on 100% recycled paper*



### GorePerry
#### Reporting & Video

515 Olive Street, Suite 300
St. Louis, MO 63101
Phone: 314-241-6750
1-800-878-6750
Fax: 314-241-5070
Email: schedule@goreperry.com
Internet: www.goreperry.com

**EXHIBIT**
11

**Page 18**

1  you did more than just -- than just traffic and
2  accidents, right?
3      A   Yes, yes. I was in marijuana eradication.
4  We did a lot of things. I was on the SWAT team,
5  sniper on the SWAT team. It's just many areas that
6  you covered over the career.
7      Q   And the area that you would -- you would
8  patrol, that changed throughout the years?
9      A   It was -- it was basically Camden and
10 Miller County for the majority of my career around
11 the Lake. Then I went to Versailles and worked
12 Morgan and Moniteau County there.
13     Q   Sheriff, have you reviewed the actions of
14 the deputies involved in this incident?
15     A   Yes.
16     Q   Okay. Have you reviewed the force used?
17     A   Yes.
18     Q   Did any of the deputies involved in this
19 incident violate any policies of Camden County?
20     A   No.
21     Q   Did any of the deputies involved in this
22 incident violate any rules of Camden County?
23     A   I'm not sure I understand what rules.
24 What -- what do you mean by rules?
25     Q   Does Camden County have any rules?

**Page 19**

1      MR. HENSON: Policies.
2      A   Policy, policies.
3      Q   (By Mr. Carnie) Yeah, sure, sure. Does --
4  well, let's start out a little more basic. Camden
5  County has some policies, right?
6      A   Yes.
7      Q   Are those written policies?
8      A   Yes.
9      Q   And you have a policy manual for the
10 Sheriff's Office, correct?
11     A   Yes.
12     Q   Are there rules included in that policy
13 manual?
14     A   Yes, yes.
15     Q   Okay. Did -- did any of the deputies
16 involved in this incident violate any of those
17 rules?
18     A   No.
19     Q   Are there also any procedures in that
20 policy manual?
21     A   Yes.
22     Q   Did any of the deputies involved in this
23 incident violate any of the procedures that you have
24 for Camden County?
25     A   No.

**Page 20**

1      Q   Okay. Are you critical of anything any of
2  the deputies did?
3      A   No.
4      Q   Were any of the deputies involved in the
5  incident disciplined in any way?
6      A   No.
7      Q   Now, are you -- you're aware that Deputy
8  Watson put her knee in-between Mr. Norman's shoulder
9  blades while Mr. Norman was prone on the ground
10 being handcuffed, correct?
11     A   Yes.
12     Q   Is that consistent with the training
13 Camden County provided -- provides to Deputy --
14 provided to Deputy Watson?
15     A   That was consistent with the training she
16 had at the academy, yes.
17     Q   Okay. And is that also consistent with
18 training that Deputy Watson received while she was a
19 Camden County Deputy?
20     A   Yes.
21     Q   Is that handcuffing technique that she was
22 using consistent with Camden County's policies?
23     A   Yes.
24     Q   Okay. Sheriff, you're aware that she kept
25 the knee in-between the shoulder blades after he was

**Page 21**

1  handcuffed in a prone position until he calmed down
2  and stopped struggling, correct?
3      A   Yes.
4      Q   Now, is that consistent with the training
5  Camden County provided to Deputy Watson?
6      A   Yes.
7      Q   Is that consistent with Camden County's
8  policies?
9      A   Yes.
10     Q   Do you believe that it is an appropriate
11 use of force to kneel on a citizen's back while the
12 citizen is handcuffed in a prone position on the
13 ground?
14     A   For the officer's safety and the
15 individual's safety, yes.
16     Q   Sheriff, do you have any criticism about
17 Sergeant Fiene's use of the taser in this incident?
18     A   No.
19     Q   Was his use of the taser consistent with
20 the training provided by Camden County?
21     A   Yes.
22     Q   Was the use of his taser consistent with
23 Camden County's policies?
24     A   Yes.
25     Q   Sheriff, I want to talk to you a little

## Page 26

Q  Got it.
A  He'll write the report as whatever, whatever it actually is. And that's what's --
Q  So -- gotcha. So the report might be different, but this -- you called it the cad, right?
A  Yeah, the gathering information when the initial call comes in. It's the system that's used, used by a lot of sheriff's departments and police departments.
Q  In page 1 of -- I'm sorry. So page 1 of Exhibit 5 is simply what the dispatcher categorized the call as?
A  Basically, yes. That's my understanding.
Q  It would -- it would not reflect any changes to what the call might -- actually might have been based on what the officers saw when they got there?
A  Yes, that's correct.
Q  Okay. And in any event, it appears -- you see the EDP column on Exhibit 5, page 1?
A  Yes.
Q  Can you tell me how many EDP calls Camden County dispatched to from October 9th, 2008 through October 9th, 2013?
A  It would be 1,173.

## Page 27

Q  And then the second number there, what does that number represent?
A  It designates the calls that the Camden County Sheriff's Office actually worked.
Q  Okay. And so if the Camden County Sheriff's Department actually worked 821 of them, like it says here, who worked the other ones?
A  It -- they -- it could be broke down. The fire departments may have arrived on the scene and called the ambulance. It could be the City of Camden County -- or City of Camdenton. And that's how it's broke down.
Q  Okay.
A  We've got two fire departments we dispatch for, the City of Camdenton, and then us.
Q  Okay. So sometimes when it's an EDP call, the Camden County Sheriff's Office doesn't go to that call?
A  Sometimes we don't, no.
Q  Sometimes it's an ambulance?
A  Yes, or fire department.
Q  Sometimes it's the fire department?
A  Yes.
Q  And sometimes it might be the City of Camdenton Police Department?

## Page 28

A  Within the city, yes.
Q  And I -- does the dispatcher determine who the dispatcher wants to send to the scene?
A  Well, I think you're asking -- when the call comes in and they ask for the fire department, they we'll send the fire department. If it's within the City of Camdenton they'll send the city officers. If it's out in the county, one of our officers will respond. They may also -- they may also send the fire department to respond on occasion, so --
Q  Okay. So it's based on what the caller is saying?
A  Is requesting, yes.
Q  Is requesting. It's based on what the caller is requesting and where the incident is located?
A  Yes.
Q  Now, from October 9th, 2010 through October 9th, 2011, how many EDP calls were there in Camden County?
A  It indicates 234.
Q  And how many of those did Camden County deputies respond to?
A  180.

## Page 29

Q  Sheriff, what is an EDP?
A  Someone that's not acting normal due to whatever reason he may be experiencing.
Q  Okay. And what does EDP stand for?
A  Emotionally disturbed person.
Q  And does that include mentally ill people?
A  It could, yes.
Q  Could include people on drugs?
A  Yes.
Q  Could include people who are extremely intoxicated?
A  Yes.
Q  Do you agree that Camden County deputies frequently respond to calls involving emotionally disturbed persons?
A  Yes.
Q  And that's not a new thing, is it?
A  No. No.
Q  You guys have -- at least in the past five years, it looks like you've consistently and frequently responded to calls involving emotionally disturbed persons. Is that fair?
A  Yes.
Q  Sheriff, I'd like to talk to you a little bit about training, okay?

**Page 42**

1 that they are trained to handle those situations and
2 do and have.
3    Q   And, Sheriff, do you think that's a good
4 thing that they're trained to prevent in-custody
5 deaths?
6    A   I think they are trained to handle
7 in-custody death. Or any -- any -- any arrest,
8 they're trained in a manner consistent, whether
9 you're a -- whatever.
10   Q   Okay. And do you think that it is
11 important for them to receive training to prevent
12 in-custody deaths?
13   A   They are trained, so I guess it is
14 important.
15   Q   And that's all I'm asking you. They are
16 trained, so -- you believe they are trained to
17 prevent in-custody deaths, correct?
18   A   They are trained to handle individuals,
19 whether -- whatever category you want to put them
20 in, in a certain manner to ensure that their civil
21 rights are not violated and they're protected and
22 the officers are protected, yes.
23   Q   And so you agree that they should be
24 trained in that manner to prevent in-custody deaths?
25   A   I'm saying that they are trained in that

**Page 43**

1 manner to --
2    Q   I -- I get what you're saying, and I'm not
3 arguing with you whatsoever. Sheriff, you make
4 decisions about what kind of training officers
5 receive, right?
6    A   Yes.
7    Q   Okay. You make decisions whether or not
8 they receive training?
9    A   Yes.
10   Q   Do you think -- is that right?
11   A   Yes.
12   Q   Do you think that they should receive that
13 kind of training to prevent in-custody deaths?
14   A   And I'm saying they are.
15       MR. HENSON: And so the answer is yes?
16   A   Yes, the answer is yes.
17   Q   (By Mr. Carnie) Okay. And I'm not -- I'm
18 not trying to be difficult, but I just have to make
19 a record and get the answer to my question. I
20 understand what you're saying. So let's clear it
21 up. Should Camden County deputies be trained to
22 prevent in-custody deaths?
23       MR. HENSON: And I'll object again to the
24 extent that's vague and ambiguous as to what you
25 mean, but go ahead.

**Page 44**

1    A   And I'm saying that they are trained. And
2 yes, I do feel like they should be continued to be
3 trained.
4    Q   (By Mr. Carnie) Thank you. Now, should
5 Camden County deputies receive training about how to
6 identify emotionally disturbed persons?
7    A   Yes.
8    Q   Should Camden County deputies receive
9 training about how to deal with emotionally
10 disturbed persons?
11   A   They deal with them currently.
12       MR. HENSON: He said should they receive
13 training?
14   A   Training?
15   Q   (By Mr. Carnie) Yes.
16   A   Yes.
17   Q   Yeah, yeah, I understand. So should --
18 should Camden County deputies receive training about
19 how to deal with emotionally disturbed persons?
20   A   Yes.
21   Q   Should Camden County deputies receive
22 training about how to safely apprehend an
23 emotionally disturbed person?
24   A   Yes.
25   Q   Should Camden County deputies receive

**Page 45**

1 training about positional asphyxia?
2    A   Yes.
3    Q   Should Camden County deputies receive
4 training about compression asphyxia?
5    A   Yes.
6    Q   And now I think we're going to get to the
7 question that you wanted to answer. Does Camden
8 County provide any training to deputies about
9 preventing in-custody deaths?
10   A   In their training they are taught how to
11 handcuff and take people into custody for their
12 safety and the officer's safety. They don't leave
13 them prone. They lay them down or stand them up.
14 Yes, there is training. They are trained. You hand
15 handle each one basically the same way. You've
16 got -- you've got to get them in custody first and
17 then deal with whatever else is going on after that.
18   Q   Okay. And what classes are those -- are
19 those techniques taught?
20   A   I believe in the academy. I don't know
21 for a fact. But in the academy they do attend, I
22 think they have handcuffing and those procedures.
23   Q   Are these techniques that would be taught
24 in the PPCT class?
25   A   Yes.

**Page 46**

Q Now, in that PPCT class, do they teach anything about putting pressure on a suspect's back?
A I've never attended the PPCT class. I don't know. I assume they do. I assume that they do.
Q So, Sheriff, what is your basis for telling me today that the deputies receive training about preventing in-custody deaths?
A That they're trained to handle individuals in a manner that will, not only for their protection, the deputies, but the individual's protection. When they handcuff, the first priority is to get the situation under control. Once that is done, they look for the safety of the one they've arrested and make sure that everything's fine with them.
Q Okay. And are you familiar with the content of any of the training programs that the deputies involved in this incident went to?
A No. Most of it -- most of it's prior to my tenure.
Q And so that's why I'm kind of asking you what your basis is for saying that they got training on preventing in-custody deaths if you don't know the content of the training they received.

**Page 47**

A It's basic training.
Q So these are basic concepts that you believe they would have learned about?
A Yes.
Q But you can't point to any specific class or training materials to support that?
A No, I can't.
Q Does Camden County provide any training to deputies about identifying emotionally disturbed persons?
A I'm not aware of any, no.
Q Does Camden County provide any training about dealing with emotionally disturbed persons?
A No.
Q Does Camden County provide any training about safely restraining emotionally disturbed persons?
A Not aware of any, no.
Q Does Camden County provide any training on taking an emotionally disturbed person into custody?
A That would be no different than anyone into custody. It's the same -- it's the same procedure when we -- when we take someone into custody, whether they are emotionally disturbed or intoxicated or drugged or whatever the case may be.

**Page 48**

Q Okay. So the same training to deal with an ordinary citizen is used to deal with an emotionally disturbed person?
A Basically, yes. Most of the time a citizen will follow your commands and do what they are told. That's the difference. Generally you don't have to go hands-on with someone. They follow your directions.
Q Okay. But in any event, the same -- the same procedures are used by Camden County to deal with an emotionally disturbed person or a regular citizen?
A Yes.
Q Does Camden County have any training provided to it -- does Camden County provide any training to its deputies about monitoring emotionally disturbed persons?
A That's in the basic training where they -- once they handcuff somebody, if they -- if they go hands-on and have to lay them down, keep them -- stand them up or lay them down and monitor their --
Q So the same type of training for ordinary calls, ordinary citizens, applies to handling emotionally disturbed persons?
A Yes.

**Page 49**

Q So no specific class about how to monitor an emotionally disturbed person differently?
A No. Monitoring is monitoring.
Q Does Camden County have any training specific to emotionally disturbed persons about what to do with them once they're in custody?
A Other than their normal training, no.
Q Does Camden County provide any training to its deputies about compression asphyxia?
A No.
Q Does Camden County provide any training to its deputies about positional asphyxia?
A No.
Q Does Camden County provide any training to its deputies about putting weight on a suspect's back?
A I think that's part of the handcuffing technique.
Q Okay. And what do they teach in that technique?
A To restrain the -- while you're handcuffing, to restrain the individual for your protection and his protection until you get the situation under control, it's allowed to put your knee in their back or on their shoulder or on the

**Page 50**

1  back of their neck while you're handcuffing.
2  Q  Okay. So the training technique taught by
3  Camden County is that you're allowed to put your
4  knee in the suspect's back while you're handcuffing
5  him, correct?
6  A  That's the training that I'm familiar
7  with, yes.
8  Q  Okay. And that's the -- that's the
9  training the deputies receive in Camden County,
10 right?
11 A  I believe, yes.
12 Q  And also in that -- I'm sorry, did
13 somebody say something?
14 A  No.
15     MR. HENSON: No.
16 Q  (By Mr. Carnie) Okay. And also in that
17 training, Sheriff, is it taught that you're allowed
18 to keep your knee between the citizen's back or on
19 the citizen's back after they are handcuffed?
20 A  If -- if they're still fighting and
21 showing signs that they're not cooperating, to
22 prevent them from hurting themselves or kicking the
23 deputy's feet out from under them, yes.
24 Q  Okay. So they are allowed to keep the
25 knee in the back after the person is handcuffed and

**Page 51**

1  prone on the ground?
2  A  If they're still fighting and -- to ensure
3  that there's no injuries, yes.
4  Q  Does Camden County provide any training
5  about whether or not it's okay to put a suspect in a
6  prone position?
7  A  I think that's part of the general
8  handcuffing. You don't -- you don't leave somebody
9  sitting in a prone position.
10 Q  Okay. So the training is that you don't
11 leave somebody in that position, correct?
12 A  Yes. You either stand them up or lay them
13 down on their side, yes.
14 Q  But it's okay to handcuff them in a prone
15 position, correct?
16 A  If they're a felon and you have to make
17 the -- effect the arrest, yes. You have to effect
18 the arrest by whatever means you have to.
19 Q  Does Camden County provide any training to
20 its deputies about how to provided medical treatment
21 to citizens?
22 A  Other than CPR, I don't think there's any
23 basic first aid, no.
24 Q  Okay. And does Camden County provide any
25 training about when to call an ambulance to the

**Page 52**

1  scene?
2  A  That's part of the overall discretion of
3  the officer when he's at the scene. If he needs an
4  ambulance it's up to him to contact Dispatch and
5  have an ambulance sent or fire department or wrecker
6  or any numerous things. That's his discretion on
7  the scene.
8  Q  Okay. So there isn't any specific
9  training about when to do that?
10 A  No.
11 Q  And I assume the same would be true about
12 emotionally disturbed persons, there's no specific
13 training about when to call an ambulance to the
14 scene when you're dealing with an emotionally
15 disturbed person, correct?
16 A  Well --
17    MR. HENSON: Training.
18 A  Training, no.
19    MR. HENSON: When you get to a good spot,
20 Tim, we've been going about an hour.
21    MR. CARNIE: Yeah, let's take a break.
22    MR. HENSON: Okay.
23    VIDEOGRAPHER: This will end disk number
24 one in the deposition of Sheriff Dwight Franklin.
25 We're off the record at 11:02 a.m.

**Page 53**

1     (Off the record.)
2     VIDEOGRAPHER: We're back on the record at
3  11:11 a.m. This begins disk number two in the
4  deposition of Sheriff Dwight Franklin. Please
5  continue.
6  Q  (By Mr. Carnie) Sheriff, is the PPCT
7  training class, is that one that Camden County
8  teaches in-house?
9  A  Yes.
10 Q  And that's the handcuffing training class?
11 A  I think that's part of it, yes. It's
12 all-inclusive.
13 Q  Okay. And that's the class that teaches
14 the technique where you put the knee in the back
15 while you're handcuffing?
16 A  I'm -- it could be, yes.
17 Q  Sheriff, who's responsible for creating
18 the policies for the sheriff's department?
19 A  I am.
20 Q  Since you took office, did you revise any
21 of the policies?
22 A  Yes.
23 Q  Which ones?
24 A  I'm not familiar with a lot of them. I
25 know we did the use of force and some of the uniform

14 (Pages 50 to 53)

**Page 70**

1  disturbed persons who suddenly go unconscious?
2     A   No.
3     Q   Could you please turn to Plaintiffs'
4  Exhibit 4? Now, Sheriff, like the other two
5  documents, this is a document we received from you
6  on a CD labeled Camden County 871. And this is
7  Bates stamped Camden 871-081 through Camden 871-088.
8  Is that correct?
9     A   Yes.
10    Q   And have you ever seen this document
11 before?
12    A   No.
13    Q   Do you know what this document is?
14    A   No.
15    Q   Can you tell looking at it right now what
16 it is?
17    A   The bullet point says, unexpected death
18 related to restraint for excited delirium.
19    Q   Does it look like some kind of a journal,
20 scientific article, or something like that to you?
21    A   Possible, yes.
22    Q   Okay. And in the middle, it looks like
23 there's a title to this, to this study. Or
24 actually, up at the top, you see where it says
25 title?

**Page 71**

1        MR. HENSON: Top of the first page.
2     A   I see from, sent, to, subject. Title,
3  yes.
4     Q   (By Mr. Carnie) And what is the title of
5  this study?
6     A   Unexpected Death Related to Restraint for
7  Excited Delirium.
8     Q   And what's the rest of it?
9     A   A Retrospective Study of Deaths in Police
10 Custody and in the Community.
11    Q   And then down at the bottom of the page,
12 it has a section called results. Do you see that?
13    A   Yes.
14    Q   And what -- what does it say the results
15 of this study were?
16    A   In all 21 cases of unexpected death
17 associated with excited delirium the deaths were
18 associated with restraint.
19    Q   And does it go on any further?
20    A   Yeah, I believe it goes on to the next
21 page, agitation and hyperactivity, with the person
22 either in a prone position or subjected to pressure
23 on the neck.
24    Q   And then the next sentence says what?
25    A   All of those who died had suddenly lapsed

**Page 72**

1  into tranquility shortly after being restrained.
2     Q   Now if you'd turn to Camden 871-083. And
3  you see there's another results section here. Would
4  you mind reading that for us?
5     A   Of the 21 people in whom unexpected death
6  was associated with excited delirium, 20,
7  95 percent, were men. The mean age was 33 years.
8  All of the deaths were associated with the restraint
9  either in the prone position or with pressure
10 applied to the neck. Eight of the 18 people who
11 were restrained in the prone position also suffered
12 chest compressions from the body weight of the one
13 to five people who were restraining them. You want
14 me to continue?
15    Q   Just one more sentence. What does the
16 next sentence say?
17    A   All 21 people had suddenly lapsed into
18 tranquility shortly after being restrained.
19    Q   Now, Sheriff, prior to this morning, have
20 you ever seen a study like this?
21    A   No.
22    Q   Have you ever heard of any studies like
23 this?
24    A   No.
25    Q   Sheriff, do you agree that deputies should

**Page 73**

1  avoid doing anything that unnecessarily puts a
2  citizen's life in danger?
3     A   The first and foremost is the safety of
4  the deputy engaged in whatever -- I think that's the
5  first. And he's going to have to do whatever he
6  needs to effect an arrest. So --
7     Q   Okay. But you'd agree that a deputy
8  should not unnecessarily put a citizen's life in
9  danger?
10    A   Unnecessarily, yes.
11    Q   Now, Sheriff, do you agree that
12 emotionally disturbed persons need to be treated
13 differently than a regular citizen?
14    A   No.
15    Q   Sheriff, do you believe it is safe to
16 place a knee between a citizen's shoulder blades
17 after the person is handcuffed in a prone position
18 on the ground?
19    A   If he's moving around and trying to get up
20 and elude an arrest, yes.
21    Q   Is that something that you've directed the
22 deputies of Camden County to do?
23    A   I haven't directed them to do that
24 specific --
25    Q   Is that -- is that something you approve

19 (Pages 70 to 73)

Gore Perry Reporting and Video
FAX 314-241-5070    314-241-6750    www.goreperry.com
Case 2:12-cv-04210-NKL   Document 116-13   Filed 01/16/14   Page 7 of 9

**Page 74**

```
 1   of though?
 2      A   To effect an arrest, a felon, to take a
 3   felon into custody, yes, whatever means necessary to
 4   effect the arrest, reasonable and objectively.
 5      Q   In your time in office, Sheriff, have
 6   there been any other incidents where Camden County
 7   deputies were alleged to have asphyxiated someone?
 8      A   No.
 9      Q   How about any incidents where the deputies
10   were alleged to have used excessive force?
11      A   One incident in the jail.
12      Q   Okay.  And can you tell me a little bit
13   about that?
14      A   We had an individual come in to bond his
15   wife out and became belligerent.  He was
16   intoxicated.  And the deputy took -- came out and
17   placed him under arrest and an altercation ensued.
18   He placed him under arrest, and he filed a formal
19   complaint against him for excessive force.
20      Q   What kind of force was used in that
21   incident?
22      A   Force necessary to effect the arrest.
23   They took him and handcuffed him and placed him
24   under arrest.
25      Q   And as far as contact between the
```

**Page 75**

```
 1   arresting officer and the citizen, what happened?
 2   Was there punches thrown, were there --
 3      A   He resisted and the deputy placed him
 4   under arrest and handcuffed him and processed him.
 5   He was arrested for --
 6      Q   Was he --
 7      A   He was arrested for resisting arrest
 8   and --
 9      Q   Okay.  Was he -- go ahead.
10      A   And that was -- that was it.
11      Q   Go ahead, I'm sorry.
12      A   That was it.
13      Q   Okay.  Was -- was the citizen injured
14   during that --
15      A   No.
16      Q   -- incident?
17      A   No.
18      Q   What was his complaint about the excessive
19   force?
20      A   That he used excessive force.
21      Q   In what manner?
22      A   It wasn't specific that I recall what
23   manner it was.  It was just excessive force.
24      Q   And I'm just asking you if he -- if he
25   alleged that he was tased, if he alleged that he
```

**Page 76**

```
 1   was --
 2      A   No.
 3      Q   -- beat with the baton --
 4      A   No.
 5      Q   -- anything like that.
 6      A   No, no.
 7      Q   Okay.  Sheriff, have you changed any of
 8   the training requirements of Camden County since
 9   this incident?
10      A   No.
11      Q   Have you implemented any new policies?
12      A   No.
13      Q   So deputies are still allowed to put a
14   knee in a citizen's back when the deputy is
15   handcuffing the citizen?
16      A   To effect the arrest of a -- yes.
17      Q   And deputies are still allowed to put a
18   knee in the citizen's back after the citizen is
19   handcuffed in a prone position on the ground?
20      A   If he's trying to flee and resist, yes.
21      Q   And are deputies allowed to keep a knee in
22   the citizen's back until the citizen stops
23   struggling and calms down?
24      A   Yes.
25      Q   And deputies are still allowed to treat
```

**Page 77**

```
 1   emotionally disturbed persons the same as any other
 2   citizen, correct?
 3      A   To effect the arrest, yes.
 4          MR. CARNIE:  I don't have any further
 5   questions for you, Sheriff.  Thank you for your
 6   time.
 7          THE WITNESS:  Thank you.
 8          MR. HENSON:  We will -- we have no
 9   questions, and we will read and sign.  So I'll ask
10   the court reporter just to send it to us and send me
11   the signature pages.
12          VIDEOGRAPHER:  Can we go off the video
13   record?
14          MR. HENSON:  Yes, we can go off the video
15   record.
16          VIDEOGRAPHER:  Very good.
17          MR. HENSON:  Kevin --
18          VIDEOGRAPHER:  This will end the video
19   portion of Sheriff Dwight Franklin's deposition.  We
20   are off the record at 11:45 a.m.
21          MR. HENSON:  Kevin, as far as -- Kevin, as
22   far as this Exhibit No. -- I guess 5 that we
23   marked --
24          MR. CARNIE:  Yeah.
25          MR. HENSON:  -- I'm going to see if they
```

## Page 82

1  Page Line Should Read:
2  Reason for change:
3
4  Page Line Should Read:
5  Reason for change:
6
7  Page Line Should Read:
8  Reason for change:
9
10 Page Line Should Read:
11 Reason for change:
12
13 Page Line Should Read:
14 Reason for change:
15
16 Page Line Should Read:
17 Reason for change:
18
19 Page Line Should Read:
20 Reason for change:
21
22 Page Line Should Read:
23 Reason for change:
24
25

## Page 83

1  Page Line Should Read:
2  Reason for change:
3
4  Page Line Should Read:
5  Reason for change:
6
7  Page Line Should Read:
8  Reason for change:
9
10 Page Line Should Read:
11 Reason for change:
12
13 Page Line Should Read:
14 Reason for change:
15
16 Page Line Should Read:
17 Reason for change:
18
19 Page Line Should Read:
20 Reason for change:
21
22 Page Line Should Read:
23 Reason for change:
24
25

## Page 84

Comes now the witness, Sheriff Dwight Franklin, and having read the foregoing transcript of the deposition taken on 10/10/2013, acknowledges by signature hereto that it is a true and accurate transcript of the testimony given on the date hereinabove mentioned.

_____
Sheriff Dwight Franklin

Subscribed and sworn to me before this _____ day of _____,20____.
My Commission expires

_____
Notary Public

## Page 85

COURT MEMO

Spencer Norman, et al vs. Camden County, et al

CERTIFICATE OF OFFICER AND
STATEMENT OF DEPOSITION CHARGES

DEPOSITION OF Sheriff Dwight Franklin

10/10/2013
Name and address of person or firm having custody of the original transcript:

The Simon Law Firm
800 Market St., Suite 1700
St. Louis, MO 63101