```
 1              UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF MISSOURI
 3                     CENTRAL DIVISION
 4
 5
 6   SPENCER NORMAN, KIEFER            )
     NORMAN, COURTNEY NORMAN, HELEN    )
 7   S. NORMAN,                        )
                                       )
 8        Plaintiffs,                  )
                                       ) Case No.
 9        vs.                          ) 2:12-CV-04210
                                       )
10   CAMDEN COUNTY, ET AL.             )
                                       )
11        Defendants.                  )
                                       )
12   _____
13
14
15
16   VIDEOTAPED DEPOSITION OF JOHN G. PETERS, JR., Ph.D.
17         Taken at All-American Court Reporters
           1160 North Town Center Drive, Suite 300
18                    Las Vegas, Nevada
19         Taken on Thursday, August 29, 2013
                       At 8:59 a.m.
20
21
22
23
24
25   Reported By: Gale Salerno, RMR, CCR No. 542
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

EXHIBIT 14

Page 46

1 might be emotionally disturbed, and then ultimately
2 we have an arrest-related death, right?
3   A.  Yes.  I would agree with that.
4   Q.  And is that the type of scenario that you
5 teach and train about?
6   A.  Yes.
7   Q.  And in some of your articles, I think you
8 refer to this topic as restraint-related sudden
9 deaths.  Is that the same thing?
10   A.  It can be the same thing.  There's a
11 multitude of labels that get put on these things by
12 medical examiners.
13   Q.  Right.  And I'm just trying to find a way
14 to talk about some of these things and make sure I'm
15 not mixing up definitions.  So that's another term
16 you're okay with using?
17   A.  Yeah, that's fine.
18   Q.  We talked about this a little before, but
19 how long have you been teaching and writing about
20 this topic of restraint-related sudden deaths?
21   A.  1996 is when I started really teaching it.
22 Actually first writing about it would have been 1988.
23   Q.  How long have these issues been around?
24   A.  Well, sudden death has been around since
25 1460 BC.  That's the first written record we have of

Page 47

1 sudden death.
2     Arrest-related deaths is a relatively new
3 phenomenon, probably surfacing in the 70s.
4     Restraint-associated death goes back into
5 the old, what was labeled insane asylums up through
6 today's modern hospitals.
7     So most of your restraint-associated type
8 death, the literature is in the hospital arena or the
9 mental institution category.
10   Q.  And I think I saw in one of your articles,
11 it said there's been research on this topic since
12 like 1836 as far as restraint-related sudden deaths.
13 Is that accurate?
14   A.  Restraint-related, to some degree, 1849 is
15 probably the first article that appeared in The
16 American Journal of Insanity Magazine, which isn't
17 politically correct today, but that's what it was
18 called, The Journal of Insanity.
19     And it was about a dozen people who died
20 over a period of years in McLean, Massachusetts.
21 Dr. Luther Bell was the doctor of that institution.
22     So we do have some delirium-associated
23 deaths.  Some of those people were restrained.
24     And we also have Dewhurst wrote a book in
25 1981 called Willis' Case Study.  And Willis was a

Page 48

1 doctor in the United Kingdom, and he reported a woman
2 in, I think it's Eton, England, who died after being
3 bound with chains and ropes in the 1600s.
4     So this phenomenon is certainly not new.
5 So it's been around for a long time.
6   Q.  Do you agree that police officers are
7 likely to encounter emotionally disturbed persons?
8   A.  I think in today's world, that's a
9 reasonable expectation.
10   Q.  It's certainly not unusual, is it?
11   A.  Not today.
12   Q.  Do you agree that it's a usual and
13 recurring situation that police officers have to deal
14 with?
15   A.  I think in the overall global sense, that
16 would be correct.  When we look at it -- well, let me
17 put it this way:  Statistics apply to groups, not
18 necessarily individuals.
19     So we may have some agencies, we may have
20 some officers who haven't experienced much of it
21 because of where they work or the shift they work.
22     But I think in the global sense, that's
23 correct.
24   Q.  Do you agree that supervisory training is a
25 key ingredient to organizational effectiveness?

Page 49

1   A.  I think that's true, yes.
2   Q.  Do you agree that having contemporary
3 policies and procedures is a key ingredient to
4 organizational effectiveness?
5   A.  Yes.
6   Q.  Do you agree that training is one of the
7 most important responsibilities and duties of a law
8 enforcement agency?
9   A.  Yes.
10   Q.  Do you agree that well-trained officers are
11 generally better prepared to act decisively and
12 correctly in a broad spectrum of situations?
13   A.  As a general rule, that's correct.
14   Q.  Why is training important for police
15 officers?
16   A.  Well, I think it's important for anybody to
17 be trained in what they're going to most likely
18 encounter on the job.
19     I think the state establishes what officers
20 need to be trained in.  And when they go to the
21 academy, they get trained in the areas that the state
22 decides should focus on training.
23     And then I think if there's individual
24 issues at the community level, then that would be
25 something the department would do.

Page 82

1 certainly a medical emergency. That's what we're
2 talking about here.
3   Q. So if you see some of these behavioral
4 cues, though, struggling and resistance can indicate
5 a medical emergency, right?
6   A. It can. Struggling and resistance can also
7 indicate the development of a medical situation, but
8 not always.
9   Q. Okay -- were you finished, I'm sorry?
10   A. I'm finished, yeah. I'm fine.
11   Q. Then if you go down, not the next
12 paragraph, but the one after it, it says: "Another
13 medical issue can quickly develop if too many
14 officers are on the person's back attempting to hold
15 him on the ground."
16   A. Correct.
17   Q. Did I read that properly?
18   A. Yes.
19   Q. And do you agree with that statement?
20   A. Yeah. If you have too much -- too many
21 officers with too much full body weight on them, that
22 can be potentially an issue, depending on the size of
23 the person and the size of the officers.
24   Q. And then the next sentence says: "Here,
25 too, the person may be struggling not to escape the

Page 83

1 situation, but simply to raise the chest to increase
2 his ability to breathe."
3   Did I read that accurately?
4   A. Yes.
5   Q. And do you agree with that statement?
6   A. Yes. In some situations, that's correct.
7   Q. Do you agree that this is information that
8 police officers should be trained about?
9   A. I think police officers should be trained
10 about it, yes. But there's no requirement to train
11 them about it.
12   Q. And next you -- it looks like you're
13 comparing having too many officers on a person's back
14 to being held under water while swimming.
15   A. Right.
16   Q. Did I rephrase that accurately?
17   A. Yes.
18   Q. Can you explain that comparison for us.
19   A. Well, the comparison is when you're under
20 water, and you say come up to surprise your friend,
21 and they see you coming and just hold you under
22 there, you may be almost out of breath anyway. So
23 you panic a little bit because you can't get out from
24 under their grasp.
25   Here, the issue may be that the person is

Page 84

1 trying -- if there's a lot of weight on the person
2 and the person is not very big, the person may have
3 that same sense.
4   We now know since 2006, that it may be a
5 respiratory gas exchange issue that may create that
6 same type of panic, and not something that's just too
7 much weight on the back. But that's the panic that
8 was being compared.
9   Q. And the last sentence of that paragraph
10 says, "This is not unlike a person who is being
11 compressed onto the ground or floor by having too
12 much weight on his or her back and then struggles for
13 air."
14   Did I read that correctly?
15   A. Right.
16   Q. And you agree with that statement?
17   A. Yeah. Again, if it's too much weight, you
18 know, full body weight on a person, and a lot of it,
19 and you've got four officers standing on the guy's
20 back, as they did in Canton, Ohio, a couple of years
21 ago, that's an issue, or can be an issue.
22   Q. I would like to move now to Part III of
23 that series. I think this is one of the articles you
24 sent us.
25   A. Yes.

Page 85

1   Q. If you have that with you.
2   MR. HENSON: Hold on just a second, Kevin.
3 That's one that I sent to you?
4   MR. CARNIE: That's correct.
5   MR. HENSON: Hold on just a second. I'll
6 grab that. My paralegal has tabbed all these, and
7 been very efficient.
8   THE VIDEOGRAPHER: Would it all right if I
9 change the tape quickly now, because we have seven
10 minutes left?
11   MR. CARNIE: Yeah. Let's change the tape.
12   THE VIDEOGRAPHER: This is the end of tape
13 number two of the video deposition of Dr. John G.
14 Peters, Jr.
15   The time is approximately 11:04 a.m. We're
16 going off the record.
17   (A recess was taken from 11:04 a.m.
18   to 11:19 a.m.)
19   THE VIDEOGRAPHER: This is the beginning of
20 tape number three of the video deposition of Dr. John
21 G. Peters, Jr. The time is approximately
22 11:19 p.m. -- excuse me -- 11:19 a.m. We're going
23 back on the record.
24 BY MR. CARNIE:
25   Q. So before we took a break, we were looking

All-American Court Reporters (702) 240-4393
www.aacrlv.com
Case 2:12-cv-04210-NKL   Document 116-16   Filed 01/16/14   Page 3 of 10

Page 86

1  for another one of your articles, right?
2     A. Yes.
3     Q. And do you have that article in front of
4  you now?
5     A. I do.
6     Q. And could you tell me what that is?
7     A. Again, it's a resized Police and Security
8  News Article that appeared in July/August of 2006
9  entitled Sudden Death, Excited Delirium, and Issues
10 of Force, colon, Part III, Behavioral Cues and
11 Response, Plans for Sudden and In-Custody Deaths.
12    Q. And I think in this article you make use of
13 a hypothetical scenario; is that right?
14    A. Correct.
15    Q. And could you describe that hypothetical
16 scenario for us that this article is based on?
17    A. Yeah, the hypothetical starts out that a
18 woman on a Saturday evening in July sees a person, a
19 male adult, about 30, dressed in his underwear
20 smashing car windows with a stick in front of her
21 home. The evening is hot and humid. The person
22 appears to be drenched in sweat.
23       The woman calls 911. Says he's acting
24 crazy. After he smashes car windows, he runs around
25 the car, and then runs across the street. Smashes

Page 87

1  another car window. He doesn't try to get into the
2  cars. Doesn't even look inside them. He just breaks
3  them.
4        And the woman, in the hypothetical, says,
5  "I think he's a karate student, because every time he
6  breaks a car window he grunts and groans loud enough
7  I can hear him from the house."
8        And then dispatch sends one patrol car in
9  response to the description this woman gives and the
10 address.
11    Q. And then what happens?
12    A. The officer gets there. Stops the car.
13 Sees the man. He's sweating heavily, grunting
14 loudly. He's talking to invisible people.
15       The officer starts out, Can I help you?
16 The officer is ignored.
17       When the officer gets closer, he gives her
18 the long stare, smashes other car window. She says
19 he's under arrest. He ignores her. She pepper
20 sprays the person. The spray has no effect on him.
21 In fact, he gets angry, and then lifts the rear end
22 of a small car.
23       She calls for backup, and hears the sirens
24 coming. And the wild male continues to bash car
25 windows.

Page 88

1        Backup officers arrive. Strike the man
2  with an ASP baton. ASP stands for armament systems
3  and procedures.
4        Baton strikes have no effect. The officers
5  jump the person. He tosses them off like dolls.
6        They finally get the person to the ground.
7  He struggles violently during handcuffing. Suddenly
8  he gets calm and goes nonresponsive.
9        EMS is called, and the person dies. That's
10 basically the hypothetical.
11    Q. And what's the purpose of putting that
12 hypothetical in this article?
13    A. Basically, to describe the behavioral cues
14 of this hypothetical individual, the officers'
15 response. And then basically it sets up a situation
16 that leads us into the describing of the behavioral
17 cues often associated with this. And then a
18 suggested response protocol that agencies could adopt
19 or not adopt.
20    Q. So you mentioned this, but the article then
21 goes on, and you list some behavioral cues that you
22 indicate are indicative that a person is a high risk
23 candidate for in-custody death; is that right?
24    A. Right. What we call -- there's some
25 predisposing factors, and then there's behavior cues

Page 89

1  broken into physical communication and psychological.
2     Q. And what are those behavioral cues that
3  you've listed in this article? And I think page 3 is
4  where they're at.
5     A. Yes. Under the title Behavioral Cues.
6     Q. And what are those behavioral cues?
7     A. The ones that are listed in the article,
8  the person demonstrates intense paranoia. The person
9  demonstrates extreme agitation. The person
10 demonstrates violent and/or bizarre behavior. The
11 person is violent towards glass, shiny objects and
12 materials, and other inanimate objects.
13       The person is running around wildly. The
14 person is screaming. The person is using pressured
15 loud incoherent speech. The person is naked or is
16 taking off clothes. The person is psychotic in
17 appearance. The person has rapid changes in
18 emotions. The person is disoriented about place,
19 time, purpose, or even him or herself.
20       The person has great seemingly super-human
21 strength. The person has seemingly unlimited
22 endurance. The person has muscle rigidity.
23 Diminished sense of pain or is insensitive to pain.
24       The person is having hallucinations. The
25 person shows aggression towards objects. The person

Page 90

1  violently resists during control and restraint, or
2  after being restrained.
3       The person says I can't breathe during or
4  after being subdued. The person is easily distracted
5  and has a lack of focus.
6       The person has delusions of grandeur.
7  Scattered ideas about things. Makes you feel
8  uncomfortable. Or the person is described as having
9  just snapped or flipped out.
10      Q. And this list of behavioral cues, you're
11 not expecting all these to be present at every
12 situation, are you?
13      A. No.
14      Q. This is just kind of a long list of things
15 to look for?
16      A. Correct.
17      Q. And so any number of these could be present
18 sometimes?
19      A. Correct.
20      Q. Do you agree that someone that is
21 exhibiting a number of these behavioral cues needs
22 emergency medical help?
23      A. They could need it, absolutely.
24      Q. And I think the way you put it in your
25 article is that, you know, it indicates the person

Page 91

1  needs emergency medical help, not a fight with the
2  officers over an arrest. Is that accurate?
3       A. I think --
4       Q. Let me take you to --
5       A. Yeah, take me to the page.
6       Q. Page 2, I'm sorry.
7       A. Right. Based -- to put it again into
8  context, based upon what the 911 caller told the
9  dispatcher, with what the officer saw, indicates a
10 medical emergency.
11      Q. Right. And then it goes on to say,
12 "clearly indicates this man needed emergency help,
13 not a fight with the officers over an arrest," right?
14      A. Correct.
15      Q. And based on this hypothetical, you agree
16 with that statement, right?
17      A. Yes.
18      Q. And then again, it says in that same
19 paragraph, "bizarre behavior, struggling and
20 resistance can indicate a medical emergency and not a
21 criminal act."
22      Did I read that correctly?
23      A. Correct.
24      Q. And you agree with that statement, right?
25      A. Yes.

Page 92

1       Q. Do you agree that if someone is exhibiting
2  these behavioral cues, that EMS should be immediately
3  called to the scene?
4       A. In the ideal world, that would be
5  recommended. Unfortunately, the police department
6  doesn't control EMS.
7       So EMS may decide we're not going to roll
8  on anything. Because it's really up to the EMS
9  medical director to coordinate that, or the fire
10 department. It's not up to the chief of police.
11 It's not up to anybody, but really the EMS director
12 to determine that.
13      Q. Can the dispatcher call for EMS?
14      A. Dispatchers can call for EMS, if there's a
15 protocol for the dispatchers to do that.
16      But again, that would be whoever the call
17 taker -- you have two elements in any dispatch. You
18 have the call taker, who is going to take down the
19 basic information. Then -- and this hasn't happened.
20 EMS has not -- or I'm sorry, 911 has not put together
21 a call response for excited delirium. That's pretty
22 much a decision made by the 911 folks who know
23 something about it. But it's very rare, very few,
24 very far between. They will just generally have a
25 response to, you know, send a police officer.

Page 93

1       Q. Okay. And I'm not really intending to get
2  into whether the police can force the EMS to come,
3  which I think is kind of what you're talking about,
4  isn't it?
5       A. Right. They can't force them to do
6  anything.
7       Q. Right. And aside from that, I mean, you
8  believe that they should be called, though, to the
9  scene immediately, right?
10      A. The protocol we recommend is they be
11 notified and staged somewhere away from the scene
12 because EMS is not going to come and help the
13 officers.
14      Q. Right. And I think you even put, "Better
15 yet, EMS should have rolled with the responding
16 officers."
17      A. Under ideal conditions where the
18 organization gets the cooperation of EMS or fire, the
19 EMS medical director, when all the parties can get
20 together, including mental health and any other
21 stakeholder that may be involved, when that works
22 harmoniously, the idea would be that when the
23 officers are dispatched, where the dispatcher has the
24 behavioral cues, then you would roll EMS. That would
25 be under the ideal conditions.

Page 94

1  Q. Does it work like this: Somebody
2  identifies the behavioral cues, and then makes sure
3  to call EMS, whether it's the dispatcher or the
4  responding officer?
5  A. Generally, what happens is the dispatchers
6  would go through training; the 911 call taker would
7  go through training. Be told about the behavioral
8  signs.
9     If he or she hears those behavioral cues
10 during the 911 call, it may be enough for the 911
11 call taker to tell the dispatcher, look, I think we
12 have the behavioral signs here to roll EMS with the
13 officer. But that's based on training and the
14 protocols of the 911 and the dispatch center. And
15 that's only if the caller, in describing the event,
16 describes one or more of these behavioral signs.
17 Q. So let's assume if that doesn't happen,
18 then you have the responding officer, right? And
19 then the responding officer could see behavioral
20 cues; is that correct?
21 A. Correct. They could see behavioral cues.
22 Q. And then based on those behavioral cues,
23 they could call EMS?
24 A. They could call EMS. More than likely what
25 they would do first is call for backup.

Page 95

1  Q. And then I'm still on page 2 in the bottom
2  right-hand corner.
3  A. Right.
4  Q. It says, "Unless officers can eliminate a
5  reasonable explanation about the person's condition,
6  consider this a medical emergency and get EMS rolling
7  to the scene, if it has not already been dispatched
8  to their location."
9  A. Correct.
10 Q. Did I read that correctly? And you agree
11 with that statement?
12 A. Yes.
13 Q. Now, next in the article, it looks like
14 you've set out five action steps; is that correct?
15 A. That's correct.
16 Q. And what are these action steps for?
17 A. The action steps are for the capture,
18 control and restraint of the individual. And then if
19 EMS wants to get involved at that point, EMS can get
20 involved.
21 Q. So one of the later steps involves EMS
22 more, right?
23 A. It can. Sometimes EMS isn't available.
24 Sometimes EMS protocol, they won't come out. And in
25 those cases, then the officer has to transport.

Page 96

1  The real issue here is don't transport in a
2  police car, transport in an ambulance.
3  Q. And at the beginning of the five action
4  steps it says, "Many agencies have adopted the
5  following five action steps, which were initially
6  suggested by medical researchers and officials."
7     Have I read that correctly?
8  A. Correct.
9  Q. And is that an accurate statement?
10 A. Yes.
11 Q. And I take it because you were writing
12 about these action steps, you would recommend that
13 law enforcement agencies adopt these action steps,
14 correct?
15 A. Correct.
16 Q. Now, before you get into the steps here, it
17 looks like you're making a few other recommendations.
18 It says, "develop a plan with other officers and EMS
19 personnel; review the following five-step action plan
20 with them."
21 A. Correct.
22 Q. What does that mean?
23 A. These action steps, to really be
24 implemented, are systemic in nature.
25    So prior to an agency adopting these, the

Page 97

1  agency head would have to contact the EMS director,
2  maybe the fire personnel, and talk to them and get
3  them on board with the concept.
4     If EMS and/or fire got on board with the
5  concept, then you would want to bring in mental
6  health, because this may be a mental health issue,
7  and get them on board with it.
8     Some agencies bring in their district
9  attorney and other investigative agencies to get them
10 involved with it. Because even following those steps
11 doesn't guarantee a good outcome.
12    So you develop that plan, and that plan has
13 to coordinate so that police has a guideline, EMS has
14 a guideline, fire has a guideline. Mental health is
15 involved, and then maybe your investigators and
16 medical examiners as well.
17    So it's systemic in nature. It's not where
18 somebody can operate in isolation, and make all these
19 steps work.
20 Q. And these are things that have to happen
21 before you even get the call?
22 A. It should happen before you get the call.
23 Q. Right. And then I think in the plan here,
24 it says, "After reasonably assessing the scene, and
25 if time permits you to do so safely, develop a plan

Page 98

with other officers and EMS personnel."
      Is that something you're talking about doing there at the scene, right?
   A. Generally, if you have all these action steps in place, you've already included everybody in your training. And all you're going to do is just say, okay, we're going to capture, control and restrain EMS, and then you come in and do your intervention.
      So you sort of look at it that way.
      Most of the time in reality, EMS, it's not going to happen at the front end. EMS will roll up after the person is restrained.
      Then you can say to EMS, okay, he's restrained, here's what we saw. They're taking vitals, and then they will decide from there.
      Police are out of the picture at that point for the most part.
   Q. Are you kind of saying when you get to the same kind of just -- if you already have this plan in place, just remind all the other officers, hey, we're going to go with the five-step plan. Is that where you're coming from?
   A. Pretty much. If time permits.
   Q. Then it says, "Attempt to de-escalate the

Page 99

situation through verbal skills," and then in parentheses, "notice I did not say commands."
      Did I read that correctly?
   A. Correct.
   Q. Did I read that correctly?
   A. Correct.
   Q. And you agree with that statement?
   A. Yes. In this scenario, yes.
   Q. Why did you put the part in the parentheses that says, "notice I did not say commands"?
   A. Usually commands are given very loudly. And the hypothetical suspect in this case, that may tend to have not a calming effect on the person. They may not hear it.
      So you try -- usually it's sort of a continuum, if you will, where you start with, you know, requesting, and then you ultimately get to the command phase potentially. But you would start with more conversational-type directions, would be a good term.
   Q. Can you give me an example of how that's done.
   A. Yeah, Appleton, Wisconsin had a great video, captured the whole thing on video actually. The guy's name was Tim. And the officer arrived.

Page 100

And Tim was later found to be having an allergic reaction to mushrooms. You know, hallucinogenic mushrooms.
      And Tim was yelling and screaming, and then he would say, "I'm going to get on the floor."
      And the officer in a very calm voice said, "Tim, why don't you get on the floor." And then Tim got onto the floor.
      And the officer said, "We need to take you to the hospital. You're having a reaction to something."
      But then as Tim's behavior escalated, the officer got a little louder, and commanded him to stop. And then at one point, the officer said, "Get him out of here."
      EMS came, took him out.
      So in a sense, when you're doing this, it's called matching. If the person is yelling real loud, then you try to bring your voice down, and hopefully he'll match, and it won't turn into a screaming match.
      But it's all directed by the suspect or the person who is having the medical problem. That's usually who drives the machine.
   Q. And then step one is, "Quickly and safely

Page 101

capture the person."
   A. Correct.
   Q. Is that correct? And you recommend doing that with a taser; is that right?
   A. Taser is the recommended capture device at a distance. Carotid restraint is the recommended technique if you're in close.
      But again, not every agency carries a taser. Not every agency teaches the carotid restraint. Those are the two recommended. If they don't carry it, they can't use it, so they will have to do something else.
   Q. What is the carotid restraint?
   A. It's just -- we refer to it as a blood choke. It's just applying the forearm along the carotid artery side of the neck and applying pressure, rendering the person unconscious temporarily and then doing what you need to do.
   Q. And then step two is, "Quickly and safely control the person," correct?
   A. Correct.
   Q. And you say that that should be done by one or more officers safely grabbing both arms or all of the appendages; is that correct?
   A. Correct.

Page 102

1  Q. Is that correct?
2  A. Yes.
3  Q. Sorry, I'm not trying to talk over you.
4  A. That's all right.
5  Q. By appendages, did you mean arms and legs?
6  A. Generally arms and legs. And grabbing him
7  sometimes doesn't work. Sometimes you have to lay
8  across them.
9    Basically, trying to control them and gain
10 access to them. You can't handcuff the wrist if you
11 can't get the arm, so you have got to get the wrist.
12 Q. Then step three is, "Quickly and safely
13 restrain the person."
14 A. Correct.
15 Q. And you say that should be done "with
16 plastic or metallic restraints, nylon restraints,
17 leather restraints, restraint combinations, and so
18 forth."
19 A. Right.
20 Q. So it's pretty wide open on how that's
21 done?
22 A. Well, it's fairly wide open because
23 different agencies carry different types of restraint
24 equipment.
25   If you have a standard set of handcuffs,

Page 103

1  and the guy is real big, you might need two or three
2  sets of handcuffs. If you have plastic ties, you
3  might use plastic ties. It just depends. It depends
4  on the size of the person, the strength of the
5  person, where you're located, how many people you've
6  arrested at that point. You may be short on
7  equipment.
8  Q. And then it says it is not recommended that
9  the -- "It is recommended that the person not be left
10 in the prone position for an unreasonable time, but
11 rather rolled onto the side or sitting upright,"
12 correct?
13 A. Correct.
14 Q. And then step four is, "sedate the
15 individual." Correct?
16 A. Correct. That's an EMS decision. That's
17 not a law enforcement decision.
18 Q. Right, and that's what I was going to ask
19 you. So you say that should be done by the
20 paramedics on the scene, right?
21 A. Correct. It cannot be done by EMTs because
22 they're not authorized. It has to be done by only
23 paramedics, and those paramedics will get all their
24 guidance from the EMS director.
25   And even though they may have sedation

Page 104

1  drugs in their rig or in their kit, the EMS director
2  may prohibit it, and say bring him to the hospital.
3    So that step is totally out of law
4  enforcement's control.
5  Q. And then step five is, "Immediately
6  transport the person to the hospital," correct?
7  A. Correct.
8  Q. So then the next section after the
9  five-step plan, you recommend that law enforcement
10 agencies develop a response team which can be
11 immediately dispatched to the scene of an individual
12 who demonstrates one or more behavioral cues,
13 correct?
14 A. Correct.
15 Q. And you agree with that recommendation?
16 A. I agree with it, provided the agency is
17 large enough to have it. I mean, if you have a
18 two-person police department, you're not going to
19 have a response team.
20   But again, this response team would include
21 EMS. It would include all the people we talked about
22 earlier.
23   So again, it's that systemic response,
24 including possibly DA investigators, or highway
25 patrol investigators, state police, whatever.

Page 105

1  Q. And then you say, "This response team
2  should be trained in how to recognize behavioral
3  signs, restraint techniques, report writing, and
4  investigation techniques."
5    Did I read that right?
6  A. That's correct.
7  Q. And you agree with that?
8  A. Yes.
9  Q. Then if you look to the summary, you say
10 that, "There are many agencies throughout the
11 United States which have adopted the five-step action
12 plan as outlined above, or with slight
13 modifications."
14   Did I read that correctly?
15 A. Yes.
16 Q. And is that an accurate statement?
17 A. Yes.
18 Q. Then it looks like you go on to talk about
19 the Jacksonville, Florida Sheriff's Department; is
20 that right?
21 A. Yes.
22 Q. And you state that they, "have several
23 Identification, Prevention, Management and
24 Investigation of Sudden and In-Custody Death
25 qualified instructors."

Page 106

1  A. Correct.
2  Q. Is that correct? And that's an accurate
3  statement?
4  A. Yes.
5  Q. And then you say, "It has developed a
6  systematic approach to these situations."
7      Is that accurate?
8  A. Yes.
9  Q. Then you go on to say how the Jacksonville
10 Sheriff's Department Administration made it a point
11 to first train its dispatchers "so they would know
12 what to look and listen for during a 911 call, and
13 then dispatch the appropriate resources."
14     Did I read that correctly?
15 A. That's correct.
16 Q. And is that an accurate statement?
17 A. Yes.
18 Q. And then if we go to Final Thoughts. You
19 state, "If one or more behavioral cue is identified,
20 dispatch and/or responding officers should
21 immediately request EMS to be sent directly to the
22 scene, along with additional officers and a
23 supervisor."
24     Did I read that right?
25 A. Correct.

Page 107

1  Q. And you agree with that statement?
2  A. Yes.
3  Q. And then you say, "The restrained
4  individual should immediately be taken to the
5  hospital. Taking the person to the police station or
6  to jail will only waste precious, potentially
7  lifesaving time, so go directly to the hospital."
8      Did I read that correctly?
9  A. Yes.
10 Q. And do you agree with that statement?
11 A. Yes.
12 Q. Then you say, "For those officers who are
13 out in the county by themselves, or the local EMS
14 service is temporarily out of service, sit the person
15 upright in the backseat of the police car, seat belt
16 and shoulder harness him (or her) and then proceed
17 directly to the hospital."
18     Did I read that correctly?
19 A. Correct.
20 Q. And do you agree with that statement?
21 A. Yes.
22 Q. And then finally, you say, "It is strongly
23 recommended that a second officer sit in the backseat
24 with the individual so he can be continuously
25 monitored."

Page 108

1  A. That's correct.
2  Q. Did I read that correctly?
3  A. Yes.
4  Q. And you agree with that statement?
5  A. If there's room, yes.
6  Q. And just to synthesize that, if I
7  understand that, if EMS isn't available right away,
8  the police officer should take the person straight to
9  the hospital, right?
10 A. Correct. Instead of going to jail, you
11 take them to the hospital. The real point here is
12 take them to the hospital, don't take them to jail.
13 Q. You don't want to waste any time, right?
14 A. Well, time is an issue. Because if you
15 take them to the jail, and the jail refuses, then now
16 you've wasted that transport time, now you've got to
17 go to the hospital.
18 Q. Better just to take them straight to the
19 hospital?
20 A. Right.
21 Q. I would now like to turn to another article
22 that it looks like you wrote for Police and Security
23 News. This is one that I provided to you. It's
24 called, Excited Delirium, What Every Chief Needs to
25 Know.

Page 109

1  A. Okay.
2     MR. HENSON: Hold on just a second, Kevin.
3  We got it.
4  BY MR. CARNIE:
5  Q. Can you identify that article for me?
6  A. Again, this is a resized reproduction of
7  the Police and Security News article that appeared in
8  the September/October 2007, Police and Security News
9  magazine.
10 Q. Why did you write that article?
11 A. Basically, we found that a lot of chiefs
12 and administrators around the country just didn't
13 know about excited delirium. So we thought this is
14 something that would go to the chief. And we were
15 hoping that if a chief saw this article, he or she
16 might look at it and is say, you know, this might be
17 something we need to look at.
18    So we were just trying to educate chiefs a
19 little bit, and administrators.
20 Q. And in particular, it seems to deal with
21 how they interact with the media, right?
22 A. Part of it is the media response. Cursory
23 analysis of administrators, not only in the police
24 department, but public information officers and
25 whomever meet the media. They didn't know anything

Page 190

1  THE COURT REPORTER: Thank you.
2  THE VIDEOGRAPHER: This concludes the
3  videotaped deposition of Dr. John G. Peters, Jr.
4  consisting of five tapes, on Thursday, August 29th,
5  2013.
6  The original tapes of this testimony will
7  remain in the custody of Las Vegas Legal Video.
8  The time is approximately 2:32 p.m. We're
9  now off the record.
10       - - -
11  (The videotaped deposition was
12  concluded at 2:32 p.m.)
13       - - -

Page 192

1  CERTIFICATE OF REPORTER
2  I, the undersigned, a Certified Shorthand
3  Reporter of the State of Nevada, do hereby certify:
4  That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand which was thereafter transcribed under my
10  direction; that the foregoing transcript is a true
11  record of the testimony given to the best of my
12  ability.
13  Further, that before completion of the
14  proceedings, review of the transcript [X] was
15  [ ] was not requested pursuant to NRCP 30(e).
16  I further certify I am neither financially
17  interested in the action, nor a relative or employee
18  of any attorney or party to this action.
19  IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21
22  Dated: September 3, 2013
23
24
       _____
       GALE SALERNO, RMR, CCR No. 542
25

Page 191

1  CERTIFICATE OF DEPONENT
2  PAGE  LINE  CHANGE       REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17
18       \* \* \* \* \*
19  I, JOHN G. PETERS, JR., Ph.D., deponent herein,
    do hereby certify and declare under penalty of
20  perjury the within and foregoing transcription to be
    my deposition in said action; that I have read,
21  corrected and do hereby affix my signature to said
    deposition.
22
23       _____
         JOHN G. PETERS, JR., Ph.D.
         Deponent
24
25